

prevent socio-economic equity and opportunities. Policy Notes for Uganda, Mozambique, Rwanda and Kenya, a working paper and a policy brief of key cross-cutting themes are available at: http://www.chronicpoverty.org/publications/details/challenges-and-opportunities-in-african-societies. Data were collected through interviews with representatives of governmental and non-governmental agencies working specifically on issues related to inheritance and property rights, as well as a review of research and policy literature.

Who is included and excluded from inheriting particular assets depends on legal property rights, as well as cultural norms concerning social roles and relationships. This Policy Note addresses how Ghanaian law currently affects property inheritance, the challenges and opportunities in existing law reform, and the issues surrounding how inheritance is governed and practised in people's lives in Ghana.

---

**Box 1: Background on Ghana**

Ghana, which has a population of 23.3 million people, gained independence from Great Britain in 1957 and has been governed democratically since 1993. Economic growth has increased steadily since 2000 with annual GDP increasing from 3.7 percent in 2000 to 7.3 percent in 2008 (Ghana Ministry of Finance and Economic Planning, 2008). Agriculture contributes about 35 percent of the country's GDP, employing approximately 55 percent of the labour force, mainly as small landholders. Other important contributors to GDP are services (37 percent of GDP, 29 percent of labour force) and industry (25 percent of GDP, 15 percent of labour force). The country's major exports include cocoa, gold, and timber. Income poverty has fallen from 52 percent in 1991/92 to 28 percent in 2007 (UNDP, 2008). Nevertheless, Ghana is presently under the Heavily Indebted Poor Country program and the Multilateral Debt Relief Initiative. The government's goal is for Ghana to be classified as a middle-income country by the year 2020. An estimated 80 percent of land in Ghana is held under customary land tenure, with traditional systems of governance (referred to as stools in northern Ghana and skins in southern Ghana) responsible for corporate land ownership and use (Sarpong, 2006).



---

## Opportunities and challenges in policy

Several laws relating to inheritance rights in Ghana do not adequately reflect current realities. These gaps have triggered legal challenges and reforms. Ghana is a common law jurisdiction, and in recent years, judicial decisions have set precedents in what can constitute the establishment of property and inheritance rights, such as criteria for the recognition of customary marriages. These hold important implications for policy reform and implementation.

### Constitution of Ghana

The Constitution of Ghana (1992) importantly states that 'A person shall not be discriminated against on grounds of gender, race, colour, ethnic origin, religion, creed or social or economic status' (Article 17.2) and does not allow for exceptions from customary systems of governance. At the same time, the Constitution acknowledges the customary corporate governance of land. Articles 36-8 state that 'ownership and possession of land carry a social obligation to serve the large community' and prohibits the creation of freehold interest out of stool or skin[1] land in favour of any individuals.

It is significant that a spouse's claim to part of the marital estate is enshrined as a constitutional right in Ghana. Article 22 provides that a spouse shall not be deprived of a reasonable provision out of a spouse's estate, whether or not there is a will; spouses shall have equal access to property jointly acquired during marriage; and assets which are jointly acquired during marriage shall be distributed equitably between the spouses upon dissolution of the marriage. However, there are limitations to this, as the portion to which a spouse is entitled to is subject to considerable judicial discretion. The Constitution also enjoins Parliament

**246**
EOIR-000239



to enact legislation to regulate the property rights of spouses 'as soon as practicable', but this has not yet been achieved. Hence, the pre-constitutional Intestate Succession Law of 1985 stands as the lead legislation for family inheritance rights.

Customary systems of rights and governance remain in Ghana's Constitution, but it stipulates that the National House of Chiefs will:

> 'undertake the progressive study, interpretation and codification of customary law with a view to evolving, in appropriate cases, a unified system of rules of customary law, and compiling the customary laws and lines of succession applicable to each stool or skin' (Article 272b)

> and

> 'undertake an evaluation of traditional customs and usages with a view to eliminating those customs and usages that are outmoded and socially harmful.' (Article 272c).

Such undertakings, however, are highly contentious and have not yielded a unified codification of customary law nor an evaluation of how to eliminate those deemed 'socially harmful'. It is worthwhile to revisit the question of whether and how this initiative might be pursued in relation to the inheritance systems.

## Inheritance law

The Intestate Succession Act (PNDCL[2] 111, 1985) remains the existing law to govern family inheritance when a property owner dies without a will. Since 1985, specific amendments have been made so that it is more consistent with recent legislation, in particular with the passage of the Intestate Succession Amendment Law (PNDCL 264).

The main opportunity provided through PNDCL 111 is the protection of the surviving spouse's property rights in intestate succession. It recognises that a surviving spouse and children face insecurity under customary law, that the nuclear family is of growing importance in the Ghanaian family system, and that a wife's role in a husband's economic activity requires legal recognition.

The major limitation of the existing law is that it only pertains to self-acquired property and not to any lineage property, which is the classification of the majority of land in Ghana. This distinction leaves no protection under the law for a spouse's or children's claims to the deceased's (lineage) land holdings. In cases where land has been inherited from the lineage, even if it was undeveloped land and later developed by the inheritor, it has been ruled that PNDCL 111 cannot apply (Woodman, 2004).

The Intestate Succession Act specifies that spouses and children are absolutely entitled to the household chattels (i.e. jewellery, clothes, furniture and household appliances, simple agricultural equipment, motor vehicles and household livestock). If the deceased's estate includes a house, the spouse and children are entitled to it and will hold it as tenants-in-common. If the deceased left multiple houses, the spouse and children are entitled to only one house. Amendments in 1991 have made it an offence punishable by fine or imprisonment to eject a spouse or child from the matrimonial home prior to the distribution of an estate, whether or not there is a will. Unlawfully depriving a person of the use of any property to which they are entitled under the statute, is also an offence. PNDCL 111 was amended following passage of the Children's Act to ensure that from the estate, 'reasonable provision' is made for any child who is a 'minor undergoing educational training'.

A significant challenge with the existing Intestate Succession Act is that it does not specifically address the reality of polygamy, despite more than one in five women aged between 15 and 49 years in Ghana living in a polygamous union (Statistical Service of Ghana , 2006).[3] In cases where a deceased man has multiple wives, the courts interpret the succession law as granting the household chattels and one house to all of the deceased's wives and children as tenants-in-common. There also remains a significant restriction in the Intestate Succession Act's definition of a spouse, as it does not include cohabiting partners who are not married according to Ghana's marriage laws.

The Intestate Succession Act (Section 5) contains further complicated formulas for the division of the residue of the estate among various relatives. For instance, where the intestate is survived by a spouse and children, 3/16 goes to the surviving spouse, 9/16 to the surviving children, 1/8 to the surviving parent, and 1/8 is pursuant to customary law.

By drafting a will, an individual can provide for a distribution of estate other than that established by the Intestate Succession Act or by customary law. Written wills in Ghana are governed by the Wills Act, 1971 (Act 360). The Wills Act enables the High Court to make reasonable provision out of the estate for a spouse, father, mother, or child under 18 years if the High Court finds that the will does not contain reasonable provision for their maintenance, and that this neglect causes hardship.



## Marriage law

Determining which law should be used in property and inheritance rights for spouses depends on the type of marriage: marriage under the Marriage Ordinance, which must be monogamous; marriage under the Marriage of Mohammedans Ordinance (for Muslims), which may be polygamous; and customary marriage, which may be polygamous. It has been estimated that 80 percent of marriages are customary in Ghana (Fenrich and Higgins, 2002).

The Intestate Succession Act applies to registered marriages, however, customary marriages have rarely been registered in Ghana. The amended Customary Marriage and Divorce (Registration) Law of 1985 (PNDCL 112) provides that only one person in a customary marriage needs to apply to register a marriage and that it can be registered at any time at the Registrar of Marriages office in the district in which the marriage took place. Registering a marriage does not restrict a customary marriage to monogamy although this is widely misunderstood in Ghana and regarded as a deterrent.

The amended PNDCL 112, however, is not straightforward to interpret. It states that the Intestate Succession Act can be applied to customary marriages that have not been registered, but 'where a court or tribunal is satisfied by oral or documentary evidence before it that a customary law marriage had been validly contracted between a deceased and surviving spouse.' This can result in disputes between the parents of a deceased individual and the individual(s) who claim to have been customarily married to the deceased. For instance, the parents of the deceased may claim that a woman claiming to be a wife under customary law is not a valid wife but a girlfriend. A judge must then try to determine whether the relationship constituted a customary marriage, and evidence is often dependent on witnesses' testimonies. For example, in a High Court case in 1992 (*Esselfie v. Quarcoo*) the judge distinguished between two forms of valid customary marriage: in the first, the necessary customary rites and ceremonies are fully performed; in the second, the customary rites have not been performed but the parties have consented to live in public acknowledgment as man and wife, with consent from their families. Moreover, family consent need not be actual or expressed, but could be 'implied from the conduct, e.g., acknowledging the parties as man and wife or accepting drinks from the man or his family' (Fenrich and Higgins, 2002:

310). The case was affirmed by the Court of Appeal and is legally binding in Ghana; however, it has been applied inconsistently by lower courts. There is no legal recognition of cohabiting unions that do not meet the criteria of having earned the partners' families' consent and acknowledgment.

There is currently no provision in Ghana for joint ownership of property by individuals who are not part of the same lineage, including legally married individuals. Husbands and wives retain separately any property they own prior to the marriage and own separately, as individuals, any property acquired during marriage. Since 2002, the Ghanaian government has been developing a law to govern the property rights of spouses during, and upon dissolution of, marriages. The current draft of this law is discussed below under the section concerning a Law Reform Agenda.

## Land laws

While the Constitution recognises that customary law and corporate trust is the basis for land tenure in Ghana, land rights and tenure systems remain subject to legal pluralism. Provisions in the Constitution, customary governance systems as well as several other pieces of statutory legislation may all be applicable. As such, there are many institutional and administrative bodies, each with different mandates for land.

Among some of the most pertinent statutory laws is the Land Title Registration Law 1986 (PNDCL, 152) which provides different types of tenure security to various types of landholders by issuing land titles for freehold, usufruct, lease and tenancy agreements. Under this law, land must be registered before any transfer can occur, and because the law allows for co-registration of land (for example, between a husband and wife), a land transfer requires the consent of all those registered. The Head of Family Accountability Law (1985) protects family property from being sold without other members being informed, giving consent or benefiting from the proceeds. If a family member who has a beneficial right to such property deems that the family head is mismanaging the property, they may file a claim against the family head in Ghana's High Court after first seeking redress at the family level. This law is a potential avenue for family members to safeguard their inheritance rights to family property, although it can be presumed to require significant social fissures.



## Law reform agenda

### Revision of the Intestate Succession Act

In 2008, a draft revision of the Intestate Succession Bill and an accompanying Memorandum was issued by the Attorney-General. The draft seeks to give a larger portion of the estate to the spouse and children, and acknowledges that the fractional distribution of the estate has been difficult to implement, that the lack of provision for polygamous marriages in the 1985 Bill creates a 'problem', and that the law should contain special provisions for spouses' jointly acquired property, as well as for dependent parents and children of the deceased who are still in school.

However, while there are revisions to the current procedure of proportionally dividing an estate, its percentage-based replacement remains complicated: a surviving spouse is entitled to 35 percent of an estate, a child (or children) 40 percent, a surviving parent(s) 15 percent and 10 percent is to be devolved in accordance with customary law. For polygamous marriages, surviving spouses are entitled to equal shares of 50 percent of the estate, the children 40 percent, five percent to the parent(s) and five percent to customary devolution. If a surviving spouse made a contribution to the acquisition of the matrimonial home, it is proposed that she be entitled to more than a 50 percent share of the matrimonial home. There are other rules included when there is no spouse and/ or no children, and/or no surviving parent. There are also instructions that school fees must be provided for any children and dependants of the deceased who are still in school, before the deceased's estate is distributed.

These revisions reflect concerns among women's and children's rights organisations that the portions of spouses' property inheritance should be separate from that of the children in the distribution of the estate (i.e. all spouses and children should not be expected to share a portion of the inheritance, such as a house). But even so, this is still inadequate protection of wives in polygamous marriages. It is recommended that there should be protection for the rights of a wife and/or a child to inherit and continue to reside in the house (with its chattels) where a wife and/or child lived with the deceased. As well, further protection should be added to legislation for rights of individual wives to property they acquired, or contributed to the acquisition of, during the period of marriage. For example, the law could be amended to explicitly exclude a spouse's self-acquired property from the intestate's estate. To further protect the property rights of women in polygamous marriages, women's groups recommend that the distribution of property upon a husband's death should take into consideration the duration of marriage, and provide greater property rights for those wives who have been in the marriage longer. As well, the property of a deceased wife in a polygamous union should be distributed equally among the husband and co-wives, rather than only inherited by the husband.

Nonetheless, there are important innovations in the draft bill, including recognising what constitutes 'contribution' to acquisition of property during marriage. A 'contribution' may include payment of money for acquisition or maintenance of the home, care of household members, and/or performance of household duties.[4] This follows on judicial innovation in previous court cases concerning the distribution of assets upon marriage dissolution or death[5], and provides increased protection for women's rights to marital property. Yet, who counts as a spouse under the Intestate Succession Act remains pinned to definitions of marriage set in other legislation as well as in courts.

Significant debate on the proposed draft may be expected between Ghanaian civil society and politicians, as much of the Act's current and proposed approaches run contrary to customary systems that privilege male and lineage property ownership and governance. There is also resistance to the property distribution laws for Muslims, as it contrasts with the laws set in the Qur'an. Under the Qur'an, a man will inherit 1/2 of the estate of his wife, upon her death, if she does not have children. If she has children, her husband will inherit 1/4 of her estate. In each case, a woman receives only half of what a man would receive under the same circumstances.

### Draft law on property rights in marriage

There is no legislation to regulate the property rights of spouses during and at dissolution of marriage, despite the fact that the Constitution requires the soonest possible enactment of it. As a result, women's property rights in and out of marriage are unclear, and their access to property is restricted.

The draft law on property rights in marriage contains the first legal recognition of cohabiting unions and the property rights of people living in cohabiting unions in Ghana. It states that if a man and woman have been living together publicly for five years, the property rights of married spouses is presumed. Fierce opposition to this, however, is expected. Specifically, religious leaders publicly



oppose cohabitation as equivalent to marriage. The Christian Council of Ghana, for example, is vocal in their objection, and traditional rulers, such as the Queen Mothers of the Ashante, have voiced their opposition as they prefer to maintain customary rites of marriage, over which they preside.

Registration of marriages is importantly linked to property rights upon death of a spouse, or dissolution of marriage. As such, improving accessibility is vital. It has been recommended that the Customary Marriage and Divorce (Registration) Law be amended to allow District Assemblies to delegate marriage registration functions to an appropriate local body or official (e.g. assemblymen, chiefs, queen mothers, local attorneys, pastors, head-teachers of local schools).[6]

## Opportunities and challenges in practice

While statutory laws exist, they do not always, nor in most cases, set the standards for inheritance practices in Ghana. There are two main reasons for this: first, customary systems of governance remain more prevalent in Ghanaian communities, particularly among rural areas and primarily concerning land rights; and second, access to statutory laws, which includes knowledge of the law, remains restricted for many Ghanaians. This section reviews important aspects related to these two issues, starting with access to statutory law and then addressing customary governance, from the perspective of current and potential effects on inheritance practices.

### Access to the law

Lack of awareness, illiteracy, and time and financial costs are most often cited as the key obstacles to people in accessing their rights as laid out in statutory law.

How well Ghanaians understand their laws, and deem them appropriate, is not systematically monitored or evaluated. However, a study conducted in the Volta region of Ghana found that the Intestate Succession Law is the best-known legislation[7] although awareness levels are still low (Duncan and Brants, 2004). Among 300 respondents, a small percentage of men (22 percent) and women (13 percent) had either general or specific knowledge of the law, but a larger number (49 percent female, and 36 percent male) had no knowledge of the law. Almost two-thirds of respondents in the study were also unaware of any cases where the Intestate Succession Law had been applied in the absence of a will; rather, traditional inheritance practices had been used.

Decentralisation of offices and procedures is a deliberate strategy for improving access to administrative and legal services among Ghanaians. Magistrate courts have been established in every district to rule on the distribution of estates (higher value estates are referred to circuit courts that serve clusters of districts). To support these courts, a programme by the Ghana School of Law trains junior magistrates (or lay magistrates, i.e. without law degrees) to serve as rural magistrates. There is also support given to Alternative Dispute Resolution (ADR) to facilitate timely access to the arbitration of disputes and avoid congestion that results in long delays in court hearings and decisions. This includes public endorsement of the ADR by the Ghanaian Chief Justice and other High Court Justices, a National Legal Aid Program which applies ADR, and the Ghana Association of Chartered Mediators and Arbitrators' provision of professionalised oversight of ADR. To support ADR processes, judges work with ADR mediators twice a year to endorse or rule on ADR resolutions to prevent later recourse to the courts. In attempts to realise better consistency among governance bodies, traditional rulers are also sometimes trained and targeted for positions as ADR mediators.

However, despite progress in decentralisation, challenges in access persist.[8] There are time lags in processing legal documents and legal aid practitioners describe that the language used in court is often not well understood by claimants. One of the most common complaints is that resources are inadequate, especially among decentralised government and non-governmental legal aid services, which include ADR options. The existing National Legal Aid Program is reportedly very under-resourced, while other legal aid programmes, for example those run by WILDAF, LAWA, FIDA and the Arc Foundation, are dependent on international donors' financial support. Recent initiatives have plugged holes but have not achieved a comprehensive response. For example, the government introduced a one year paralegal service programme for university students but this has a high turnover, with students returning to their

250
EOIR-000243



studies after just one year of service. NGO-run legal aid programmes currently operate with very large scope in the country, but are not accessible in every region. Moreover, challenges include the reliance on volunteer staff and lack of basic resources.

## Customary governance

The enduring social significance of customary systems of governance in Ghana is another important reason why statutory law has not been paramount. Customary rulers such as kings, chiefs and queen mothers retain their influence, especially in rural areas of Ghana, and particularly over issues related to land and family (i.e. inheritance and marriage). Customary rulers are chosen through succession, and not necessarily based on formal education or skills. In many cases, they govern according to tradition and socio-political interests, rather than statutory law.

Local leaders are often the first to be approached when claims or disputes arise. Yet, this does not mean that access is easy or equitable. For example, there are often fines to both parties involved, and the party who pays in full can be more favourably heard. This works to the disadvantage of women and children in situations where they have less access to money and other liquid assets.

There are important differences between customary groups in Ghana. Patrilineal communities (e.g. including the Ewe, Ga, Dangbe and Krobo in Ghana) derive the right to inherit property (including land use rights since land is not inherited per se) from membership in the family through one's father. In the past, daughters often had no property inheritance rights, and today, male children are still given preference over female children. Widowed women are allowed to stay in the matrimonial home; however, while there is no published systematic evidence of land grabbing practices in Ghana, it is reported that women have been evicted by their in-laws.

In matrilineal communities (e.g. the Fanti, Akyem and Ashanti in Ghana), the right to inherit property is derived from membership in the family of one's mother (e.g. property is inherited by children from their mothers' brothers). By matrilineal customs, wives and children of a deceased man are not considered members of the lineage and are therefore not entitled to inherit any specific portions of the deceased man's estate even though they may have certain limited rights to reside in and maintain the matrimonial home.[9] In matrilineal systems, women may benefit as lineage members of a deceased man (e.g. wives of a man's sister's sons), but not as a man's wives or children. Within customary governance systems, stability of marriages and good relations with male relatives are critical factors in maintaining women's land and inheritance rights (Sarpong, 2006). However, while a married woman may gain access to land through the allocation of her husband, she may lose this access upon divorce or the death of her husband.

Customary practices strongly determine an individual's access to land and control over land, including inheritance of land. In a study in Ghana's Volta region (WILDAF, 2000 cited in Duncan and Brants, 2004), 57 percent of 643 men and women obtained access to land through inheritance or as gifts from parents or grandparents (mainly men inherited from fathers while a smaller number, mainly women, inherited from mothers). Access to land was also obtained through sharecropping agreements, from lineage or stools, from spouses' allocated land (mainly for women), and a very small number (four of 643 people) bought land. Most men in the study and about half of the women considered the customary system governing property rights to be good. Most men and women also agreed that men and women had equal access to land in their communities, although focus group discussions revealed that women's rights to land are secondary; women's rights to land are accessed through men's rights. More females than males in the study indicated that the system could be improved and needed to be improved because it favoured men over women and children (ibid).

Further study in the Volta region (Duncan and Brants, 2004) found that there are differences in access rights to land, not only between men and women, but also between different categories of women, for example, between widows with children, widows without children, daughters, stepdaughters and adopted daughters, women in cohabitating relationships and women with physical disabilities. Out of 296 respondents, five percent of widows with children and 43 percent of widows without children had no access to their late husbands' land. Unmarried biological daughters often maintained full access to their father's land after his death, but step- and adopted daughters did not have the same secure rights.[10] Very few women were allowed to keep their lineage land after marriage, although it was not unusual for divorced women and widows to return to their own lineages where lineage or household heads may or may not decide to provide access to land.

7



In different regions of Ghana, for instance where cocoa production is practised, there are indications of changing land relations among men, women and children (La Ferrara, 2007; Quisumbing *et al.*, 2004). Increasingly, men and women are negotiating exchanges of farming labour in cocoa production for rights in land. Under the process, which is called 'gifting,' there is evidence of married women being given land from their husbands in exchange for their work. However, such gifts can only be made permanent from self-acquired and not from lineage land *(Duncan, 2010)*.

## Land titling and registration

The majority of land registration is done in urban centres, where registration offices are located. There are significant gender disparities in the registration of land. A study of titles registered between 1989 and 2002 through Accra's Land Title Registry showed that nearly two-thirds were by sole males and a quarter by sole females; only one in ten were joint entries (GTZ, 2003). In many cases, women allowed property acquired by them solely or jointly with their husbands to be registered in the names of their husbands (GTZ, 2005). It is assumed that the proportion of land registered to women or jointly, is lower among rural populations than urban populations. A GTZ 2005 report concluded that very few customary interest holders or sharecroppers and tenants in the country have applied for registration of land occupied by them.

The FAO Volta study found that very few (six of 296 respondents) had registered household farm plots (Duncan and Brants, 2004). Most did not because they either did not know how to register, lacked interest in registering land, or were unable to register the land because it did not belong to them. Traditional land demarcation practices, such as the planting of permanent trees or the construction of concrete poles on the borders of one's land, were considered sufficient for securing their property rights. Some people fear that the registration processes could result in re-demarcations.

Secondary rights to land, such as rights to collect fruits, firewood and other forest products, can be 'swallowed' by the broader categories of land rights recognised in Ghana's land titling system.[11] To be more comprehensive and accountable to multiple uses and users of lands, making an inventory of all recognised arrangements and interests is recommended.[12] Improving understanding of, and acess to registration, through employing more participatory methods of land demarcation and simplifying written records, are also recommended. For example, a pilot project by GTZ used oral testimonies to produce written documentation of land transactions under customary law, including grants, customary law freeholds and other contractual arrangements (Delville *et al.*, 2001). Such efforts to increase transparency and participation in processes may demystify the registration process for individuals and set secure foundations for future inheritance claims.

## Agenda for practical change

Land in Ghana is subject to customary systems of governance, which means that the inheritance of land and associated properties (e.g. buildings, fencing, crops) must be considered in the context of customary practices. It is critical to engage with customary leaders to improve equity and consistency in recognition of inheritance rights. This can be done through engaging directly with customary leaders or through supporting broadly based public engagement with the relevant issues.

Providing alternative avenues for dispute resolution is equally important. Ensuring that there is access to locally relevant mediation of inheritance disputes, as well as appropriate legal advice can help protect the rights of the most vulnerable, including widowed women. The recent passage of the Domestic Violence Bill in Ghana has seen some progress in

criminalising economic violations, training police officers to understand and respond to such situations, and setting up Domestic Violence and Abuse Units in local police stations. It is important that local police can provide public guidance on inheritance rights, as this can ensure the rapid and local protection of people's property rights. Additionally, extending paralegal services can further disseminate ideas on standards of equity in inheritance and property disputes. Particularly targeting local and customary leaders for such roles may prove effective in guiding more systemic change. Other opportunities to improve the protection of inheritance rights to land and other properties include increasing birth and marriage registrations, which may strengthen claims to property rights when there are disputes within families. Making the registration of customary marriages easier by

8



improving physical access via decentralisation and delegation to local bodies and improving efficiency in application and waiting procedures are important areas for improvement.

Presently, there is a noticeable lack of engagement of Ghanaian civil society with land rights, and even less focus on women and land rights.[13] While women's rights NGOs in Ghana have proven effective in mobilising advocacy and public engagement, particularly in controversial social issues such as domestic violence, they have yet to systematically engage in women's economic, property and inheritance rights.

To date, inequitable inheritance practices have not been perceived as a systemic problem in Ghana and disinheritance has not been publicly acknowledged as linked with poverty. Thorough research on inheritance practices and outcomes in Ghana could address whether this perception is accurate and whether there is cause for concern at a systemic level regarding inheritance practices.

**This policy note was written by Elizabeth Cooper**

## Notes

1 Traditional systems of governance are referred to as *stools* in northern Ghana and *skins* in southern Ghana.

2 PNDCL stands for Provisional National Defence Council Law. The PNDC was the government of Ghana following a coup d'etat in 1981 until 1993.

3 Nationally, 22 percent of Ghanaian women are in polygamous unions. In the country's three northern regions, approximately 40 percent of women are in polygamous unions (Statistical Service of Ghana *et al.*, 2006).

4 Sarpong (2006) notes that it is often a customary obligation of marriage for wives to help their husbands with their farm labour, which, when combined with women's other domestic work, leaves little time for women to develop their own farms.

5 As with recognition of evidence of customary marriages, judicial determinations concerning what constitutes rights to property acquired during customary or statutory marriages are dependent on individual judges' perspectives.

6 There is a precedent for such localised registration in birth registrations as governed by Ghana's Children's Act.

7 Respondents were asked to share their knowledge of relevant statutory laws affecting land rights, including the Intestate Succession Law, the Constitution of Ghana, the Land Title Registration Law, the Head of Family Accountability Law and the Administration of Estates (Amendment) Law.

8 By way of comparison, while birth registration has been decentralised and promoted throughout Ghana, according to the Ghana Multiple Indicator Cluster Survey of 2006, only 51 percent of the births of children under five years of age have been registered There are no significant variations in birth registration across sex of children; however, there is a significant discrepancy between urban and rural, at 69 and 42 percent registration respectively. Only 41 percent of births to mothers with no education are registered. Asked to identify reasons for not registering births, respondents identify cost of registration, travel distance, and lack of knowledge as main reasons. Cost is particularly dominant in urban areas, whereas cost, travel distance and lack of knowledge play equally significant roles in rural areas.

9 Two studies among the matrilineal Akan society of Ghana find that while the customary inheritance system is organised to see a man's land automatically transfer to his sister's children upon his death, many people are resisting this by making *inter vivos* transfers to their own children and wives, thereby reducing the property left to be inherited by nephews upon the uncle's death (La Ferrara, 2007; Quisumbing, *et al.*, 2004). Such land transfers however can only be made of self-acquired land, and not lineage land.

10 63 percent of the respondents (n=187) were of the impression that biological daughters maintained full access to their father's land after his death, compared to a mere nine percent for adopted daughters and seven percent for stepdaughters.

11 There are significant regional disparities concerning access to land: the percentage of female landholders ranges from two percent in the north and 50 percent in the Ashanti region (CEDAW, 2005).

12 Similar lack or recognition of secondary uses of land has been present in government compensation schemes for land expropriations (for example, for mining interests). In such cases, compensation has been paid to chiefs and/or heads of families, but not directly to the end users of the expropriated lands.

13 In 2001 Land for Life was the only registered land NGO in Ghana but recent initiatives spurred by CARE International have encouraged other NGOs to focus on land issues. In 2009 the Civil Society Coalition on Land (CICOL) was launched, funded by CARE.

## References

Benschop, M. and Sait, M. (2006). 'Progress Report on Removing Discrimination Against Women in Respect of Property and Inheritance Rights'. Nairobi: United Nations Human Settlements Programme Available at: http://www.unhabitat.org/downloads/docs/3983_71713_Inheritance%20Final%20071006.pdf

Bird, K. and Pratt, N. with O'Neil, T. and Bolt, V. (2004). 'Fracture Points in Social Policies for Chronic Poverty Reduction'. Chronic Poverty Research Centre Working Paper 47, Overseas Development Institute Working Paper 242. London: Overseas Development Institute (ODI) and Chronic Poverty Research Centre (CPRC). Available at: http://www.chronicpoverty.org/uploads/publication_files/WP47_ANNEXBird_et_al.pdf

253
EOIR-000246

CEDAW (2005). Considerations of reports submitted by states parties under article 18 of the Convention on the Elimination of All Forms of Discrimination against Women; combined third, fourth and fifth periodic reports of States parties -Ghana. CEDAW/C/GHA/4-5, Committee on the Elimination of Discrimination Against Women.

Cooper, E. (2008). 'Inheritance Practices and the Intergenerational Transmission of Poverty: A Literature Review and Annotated Bibliography'. Chronic Poverty Research Centre Working Paper 116. Manchester, UK: Chronic Poverty Research Centre (CPRC). Available at: http://www.chronicpoverty.org/uploads/publication_files/WP116_Cooper-annotatedbib-litreview.pdf

Cooper, E. (2010). 'Inheritance and the Intergenerational Transmission of Poverty in Africa: Policy Considerations'. Chronic Poverty Research Centre working Paper 159. Manchester, UK: Chronic Poverty Research Centre (CPRC). Available at: http://www.chronicpoverty.org/uploads/publication_files/WP159%20Cooper.pdf

Davies, P. (2005). 'Marriage, Divorce and Inheritance Laws in Sierra Leone and their Discriminatory Effects on Women'. *Human Rights Brief*, 12 (3), 17-20.

Delville, Toulmin, Colin and Chaveau, (2001). *Securing Secondary Rights to Land in West Africa: The Dynamics of Derived Rights to Land and Natural Resources and Implications for Land Tenure Policy.* IIED

Dowuona-Hammond, C. (2006). Property Rights of Women in Ghana. Accra: Attorney-General and Minister for Justice.

Duncan, B. and C. Brants. (2004). 'Access to and Control over Land from a Gender Perspective: A Study conducted in the Volta Region of Ghana'. Accra: FAO. Accessible at: http://www.fao.org/docrep/007/ae501e/ae501e00.HTM

Duncan, B. (2010). 'Cocoa, Marriage, Labour and Land in Ghana: Some Matrilineal and Patrilineal Perspectives'. *Africa*, 80(2): 301-321.

Fafchamps, M. and Quisumbing, A. (2005). 'Assets at Marriage in Rural Ethiopia'. *Journal of Development Economics*, 77, 1– 25.

Fenrich, J. and Higgins, T. (2002). 'Promise Unfulfilled: Law, Culture, and Women's Inheritance Rights in Ghana'. *Fordham International Law Journal*, 25: 259-341.

Ghana Ministry of Finance and Economic Planning (2008). Available at: http://www.mofep.gov.gh/

Government of Ghana. (2006). Ghana Land Administration Project. Available at: http://www.ghanalap.gov.gh/index1.php?linkid=47&sublinkid=97

GTZ (2003). *State Land Management and its Impact on Women and the Poor.* Eschborn: GTZ.

GTZ (2005). *State Land Management and its Impact on Land Rights of Women and the Poor.* Eschborn: GTZ.

Human Rights Watch (2003). *Double Standards: Women's Property Rights Violations in Kenya.* New York: Human Rights Watch. Available at: http://www.hrw.org

La Ferrara, E. (2007). 'Descent Rules and Strategic Transfers. Evidence from Matrilineal Groups in Ghana'. *Journal of Development Economics*, 83, 280–301

Mensa-Bonsu, H.J.A.N. (1994). 'The Intestate Succession Law in Ghana: Practical Problems in Application'. *Jahrbuch für afrikanisches Recht*, 8(105): 118-19.

Minkah-Premo, S. and Dowuona-Hammond, C. (2005). Recommendations for Integrating Gender Issues into the Land Administration Project: Review of Land and Gender Studies and Identification of Resources in Ghana. Accra: Government of Ghana Ministry of Lands and Forestry.

Mutangadura, G. (2004). 'Women and Land Tenure Rights in Southern Africa: A Human Rights-based Approach'. Presentation at Land in Africa: Market Asset or Secure Livelihood Conference, London, UK, November 8-9, 2004. Available at: http://pubs.iied.org/pdfs/G00173.pdf

Quisumbing, A., Payongayong, E. and Otsuka, K. (2004). 'Are Wealth Transfers Biased Against Girls? Gender Differences in Land Inheritance and Schooling Investment in Ghana's Western Region'. Washington, DC: International Food Policy Institute. Available at: www.ifpri.org/divs/fcnd/dp/papers/fcndp186.pdf

Rose, L. (2006). 'Children's Property and Inheritance Rights and their Livelihoods: The Context of HIV and AIDS in Southern and East Africa'. Food and Agricultural Organization of the United Nations'. Available at: www.oxfam.org.uk/resources/learning/landrights/downloads/childrens_property_and_inheritance_rights_and_livelihoods.pdf

Ruenger, M. (Ed) 2004 West African Regional Conference on Legal and Judicial Reform to Promote Improved Women's Rights in Land and Family Law within Plural Legal Systems. Conference Proceedings. Accra: Attorney-General and Minister for Justice.

Sarpong, G. (2006). Improving Tenure Security for the Rural Poor: Ghana Case Study Country. Accra: FAO

Statistical Service of Ghana, *et al.* (2006). Ghana Multiple Indicator Cluster Survey, 2006. Accra: Statistical Service of Ghana.

Strickland, R. (2004). 'To Have and To Hold: Women's Property and Inheritance Rights in the Context of HIV/AIDS in Sub-Saharan Africa'. Washington, DC: International Center for Research on Women. Available at: www.icrw.org/docs/2004_paper_haveandhold.pdf

United Nations Development Programme (UNDP) (2008). Ghana Human Development Report, 2007. Accra: UNDP.

UN Habitat (2005) Land Tenure, Housing Rights and Gender in Mozambique. Nairobi: United Nations Human Settlements Programme.

Wily, L. and Dowuona-Hammond, C. (2001). Land Security and the Poor in Ghana. London: Department for International Development.

Woodman, G. (2004). 'The stream crosses the path, the path crosses the stream: Does the law guide life or life guide law? The issue of good governance in relation to the family and land laws in Ghana'. Presented at West Arican Regional Conference on Legal and Judicial Reform to Promote improved Women's Rights in Land and Family Law within Plural Legal Systems, Accra, 10-12 February 2004.

**Chronic Poverty Research Centre**

The Chronic Poverty Research Centre (CPRC) is an international partnership of universities, research institutes and NGOs, with the central aim of creating knowledge that contributes to both the speed and quality of poverty reduction, and a focus on assisting those who are trapped in poverty, particularly in sub-Saharan Africa and South Asia.

This document is an output from Chronic Poverty Research Centre (CPRC) which is funded by UKaid from the UK Department for International Development (DFID) for the benefit of developing countries. The views expressed are not necessarily those of DFID.

© Chronic Poverty Research Centre 2011

www.chronicpoverty.org

254

EOIR-000247



**IEA Ghana** THE INSTITUTE OF ECONOMIC AFFAIRS
*A Public Policy Institute*

# SURVEY REPORT ON KEY SOCIO-ECONOMIC AND GOVERNANCE ISSUES IN GHANA

EOIR-000248



**The Institute of Economic Affairs**
*A Public Policy Institute*

# SURVEY REPORT ON KEY SOCIO-ECONOMIC AND GOVERNANCE ISSUES IN GHANA

# MAIN REPORT

## MAY, 2016

256
EOIR-000249

## ACKNOWLEDGEMENTS

The IEA Socio-Economic and Governance Survey Report was made possible with funding from the International Development Research Centre/ Think Tank Initiative (IDRC/TTI). The report was prepared by the IEA research team, comprising Prof. Joseph R.A. Ayee (Senior Adjunct Fellow), Dr. Michael Ofori-Mensah (Senior Research Fellow), Mr. Samuel B. Manu (Research Officer) and Mr. Evans Nelson-Dziwornu (Research Officer)

257
EOIR-000250

*Survey Report on Key Socio-Economic and Governance Issues in Ghana.*     *The Institute of Economic Affairs, Accra Ghana*

# TABLE OF CONTENTS

ACKNOWLEDGEMENTS ............................................................................................... ii

LIST OF TABLES AND CHARTS .................................................................................. v

LIST OF ABBREVIATIONS ........................................................................................... vii

ACKNOWLEDGEMENT.................................................................................................. viii

EXECUTIVE SUMMARY ............................................................................................... viii

PART ONE: INTRODUCTION ........................................................................................ 1

1.1 Background ................................................................................................................. 1

1.2 Justification ................................................................................................................ 1

1.3 Objectives of the Survey ........................................................................................... 2

1.4 Methodology .............................................................................................................. 2

    1.4.1 Sample Design.................................................................................................... 2

    1.4.2 Sample Size and Allocation............................................................................... 3

    1.4.3 Implementation of Field Data Collection .......................................................... 5

    1.4.4 Strengths and Weaknesses of the Methodology ................................................ 5

PART TWO: SOCIO-ECONOMIC CHARACTERISTICS.............................................. 7

2.1 Demographic Background of Respondents ................................................................. 7

PART THREE: ECONOMIC/LIVING CONDITIONS .................................................... 8

3.1 People's Living Conditions ........................................................................................ 8

3.2 Food Security.............................................................................................................. 11

3.3 Access to Safe Drinking Water .................................................................................. 12

3.4 Access to Medical Services........................................................................................ 13

3.5 Cooking Fuel .............................................................................................................. 14

3.6 Schooling Expenses.................................................................................................... 15

3.7 Access to General Public Services ............................................................................. 16

PART FOUR: RELATIONS BETWEEN GROUPS ........................................................ 18

4.0 Relations between Groups........................................................................................... 18

4.1 Relationships between Ethnic Groups......................................................................... 18

4.2 Relationships between Religious Groups..................................................................... 19

4.3 Relationships between Ghanaians and Foreigners ...................................................... 20

PART FIVE: PERCEPTION ON DISCRIMINATION..................................................... 22

5.1 Effects of Ethnicity..................................................................................................... 22

    5.1.1 Ethnic Influence on Getting Government Jobs and Contracts............................. 22

    5.1.2 Ethnic Influence on Getting Government Housing ............................................ 23

    5.1.3 Ethnic Influence on Getting Admission into Pre-University Institutions............ 24

    5.1.4 Ethnic Influence on Getting Admission into University Institutions .................. 24

    5.1.5 Ethnic Influence on Getting Loans from Government Banks .............................. 25

5.2 Effect of Gender ......................................................................................................... 26

258
EOIR-000251

5.2.1 Influence of Gender in Getting Government Jobs and Contracts.............................. 26

5.2.2 Influence of Gender in Getting Government Housing .......................................... 27

5.2.3 Influence of Gender in Getting Pre-University Admission ................................... 27

5.2.4 Influence of Gender in Getting University Admission.......................................... 28

5.2.5 Influence of Gender on Getting Loans from Government Banks............................ 29

PART SIX: SAFETY AND SECURITY ....................................................................... 30

6.1 Safety in the Neighbourhood................................................................................. 30

6.2 Theft in the House During Past Year...................................................................... 31

6.3 Physically Attacked in the Past Year...................................................................... 32

6.4 Report of Incident to Police.................................................................................. 33

PART SEVEN: COMMUNICATION & FREEDOM OF PARTICIPATION................... 36

7.1 Source of News................................................................................................... 36

7.2 Media Abuse of Freedoms.................................................................................... 37

7.3 Participation in the Democratic Process.................................................................. 38

7.4 Factors which Influenced Voters in the 2012 Presidential Election............................ 39

PART EIGHT: GOVERNANCE ............................................................................... 40

8.1 Treatment of People ............................................................................................ 40

8.2 Trust in Public Institutions ................................................................................... 41

8.3 Most Important Problems Confronting the Country.................................................. 41

8.4 Performance of Current Government ...................................................................... 43

8.5 Election of Metropolitan/Municipal/District Chief Executives.................................. 44

PART NINE: CONCLUSIONS AND POLICY RECOMMENDATIONS......................... 49

REFERENCES ...................................................................................................... 51

**259**
EOIR-000252

*Survey Report on Key Socio-Economic and Governance Issues in Ghana.*　　　　　*The Institute of Economic Affairs, Accra Ghana*

# LIST OF TABLES AND FIGURES

Page

Table 1.1: The Distribution of Enumeration Areas (EAs) Across the Regions...................................4

Table 2.1: Regional Distribution of Respondents .................................................................. 7

Table 2.2: 2010 PHC Regional Distribution of Respondents................................................... 7

Table 2.3: Percent Distribution of Respondents by Type of Locality and Sex ........................... 7

Table 3.1: Present Living Conditions by Region, Sex and Locality ......................................... 8

Table 3.2: Present Living Conditions Compared to Six Months ago by Region, Locality and Sex........... 10

Table 3.3: Present Living Conditions Compared to Six Months Ahead by Region, Locality and Sex...... 11

Table 3.4: Households without Enough Food to Eat in Last Six Months by Region by Locality.............. 12

Table 3.5: Households without Clean Water in Last Six Months by Region and Locality........................ 13

Table 3.6: Households without Medicine or Medical Treatment in Last Six Months by Region and Locality................................................................................................................................ 14

Table 3.7: Households without Enough Fuel to Cook in Last Six Months by Region by Locality ........... 15

Table 3.8: Households without Money for School Expenses in Last Six Months by Region and Locality................................................................................................................................ 16

Table 3.9: Access to Public Services........................................................................................ 17

Table 4.1: Relations between Ethnic Groups by Region, Sex, Locality and Age Group, 2015 ...............: ..... 19

Table 4.2: Perception on Relations between Different Religious Groups by Region, Sex and Locality ... 20

Table 4.3: Relations between Ghanaians and Foreigners in your Country by Region and Locality .......... 21

Table 5.1: Ethnic background Affects one's Chances of Getting Government Jobs/contracts ...................... 22

Table 5.2: Ethnic background Affects one's Chances of Getting Public Housing by Region and Locality................................................................................................................................ 23

Table 5.3: Ethnic background Affects one's Chances of Getting Educational Opportunities at the Pre-university Level by Region, Sex and Locality ................................................................... 24

Table 5.4: Ethnic Background Affects one's Chances of Getting Educational Opportunities at the University Level by Region, Sex and Locality................................................................... 25

Table 5.5: Ethnic Background Affects one's Chances of Getting Loans from Government Banks by Region, Sex and Locality ................................................................................................ 26

Table 5.6: Gender Affects one's Chances of Getting Government Jobs/Contracts ................................... 26

Table 5.7: Gender Background Affects one's Chances of Getting Public Housing by Region, Sex and Locality................................................................................................................................ 27

Table 5.8: Gender Background Affects one's Chances of Getting Educational Opportunities at Pre-University Level by Region, Sex and Locality.................................................................. 28

Table 5.9: Gender Background Affects one's Chances of Getting Educational Opportunities at University Level by Region, Sex and Locality.................................................................. 28

Table 5.10: Gender Background Affects one's Chances of Getting Loans From Government Banks by Region, Sex and Locality ................................................................................................ 29

Table 6.1: Felt Unsafe Walking in the Neighbourhood During the Day or Night by Region, Sex and Locality and Age Group ................................................................................................... 31

Table 6.2: Incidence of Theft by Region, Sex and Locality, 2015 ......................................... 32

Table 6.3: Physically Attacked in the Past Year by Region and Locality ................................ 33

Table 6.4: Reporting of Incidence to the Police by Region and Locality................................. 34

Table 6.5: Reasons why Crimes are not Reported to the Police............................................... 35

Table 7.1: Sources of News by Locality................................................................................. 36

Table 7.2: News Media Abuse its Freedoms by Printing or Saying Things that are not True ................. 37

260
EOIR-000253

*Survey Report on Key Socio-Economic and Governance Issues in Ghana.*　　　　　　*The Institute of Economic Affairs, Accra Ghana*

Table 7.3: Citizens' Freedom by Sex and by Locality ................................................................. 38

Table 7.4: Factors which Influenced voters in the 2012 Presidential Election........................... 39

Table 8.1: Treatment of People ................................................................................................... 40

Table 8.2: Trust in Public Institutions ........................................................................................ 41

Table 8.3: The Most Important Problem Confronting the Nation ............................................... 42

Table 8.4: Performance of Current Government in Handling the Following Matters................... 43

Table 8.5: An Elected Metropolitan/Municipal/District Chief Executive will be more Accountable and Responsive.................................................................................................................................. 45

Table 8.6: An Elected Metropolitan/Municipal/District Chief Executive (MMDCE) whose Political Party is Different from that of the Incumbent President will Undermine the President/Government........ 45

Table 8.7: The Government Continues to Appoint Metropolitan/Municipal/District Chief Executive (MMDCE) because of Fear of Losing Partisan Advantage......................................................... 46

Table 8.8: Electing Metropolitan/Municipal/District  Chief  Executives (MMDCEs) can Lower the Chances of Persons from Disadvantaged Groups (Ethnic Minorities, Women, Persons with Disabilities, etc.) Getting Elected.................................................................................................. 47

Table 8.9 Election of Metropolitan/Municipal/District Chief Executives (MMDCEs) will Promote Grassroots participation in Local Elections............................................................................... 47

## List of Figures

Figure  1.1: Ethnic Group Composition of Respondents............................................................ 8

Figure  3.1: Present Living Conditions, by Sex and Locality..................................................... 9

Figure  4.1: Relationship between Ethnic Groups in Ghana....................................................... 18

261
EOIR-000254



## LIST OF ABBREVIATIONS

| | |
|---|---|
| CAADP | Comprehensive Africa Agriculture Development Programme |
| CDD | Centre for Democratic Development |
| CRC | Constitution Review Commission |
| CSPRO | Census Processing Software |
| CV | Coefficient of Variation |
| EA | Enumeration Area |
| FAO | Food and Agriculture Organisation |
| IEA | Institute of Economic Affairs |
| GRA | Ghana Revenue Authority |
| GSS | Ghana Statistical Service |
| MDAs | Ministries, Departments and Agencies |
| MMDAs | Metropolitan, Municipal and District Assemblies |
| MMDCEs | Metropolitan, Municipal and District Chief Executives |
| MPs | Members of Parliament |
| NACAP | National Anti-Corruption Action Plan |
| NAPRM-GC | National African Peer Review Mechanism Governing Council |
| PPS | Probability Proportional to the Size |
| PSUs | Primary Sampling Units |
| SEGS | Socio-economic and Governance Survey |
| SDGs | Sustainable Development Goals |
| SPSS | Statistical Package for the Social Sciences |
| SSUs | Secondary Sampling Units |

**262**
EOIR-000255



## PREFACE

Public opinion on critical national issues remains crucial in the efforts towards effective policy design and implementation. However, in Ghana, there is a dearth of data on critical socio-economic and governance issues such as peace and security, freedom, discrimination, corruption and rights of political participation. In fact, where they exist, such data have limited national coverage. It therefore becomes difficult to come up with effective and efficient measures to address critical socio-economic and governance challenges facing the population.

The IEA Socio-Economic and Governance Surveys, introduced in 2011, is an annual survey that seeks the opinion of the public on socio-economic and governance issues including people's living conditions, government's performance in addressing key socio-economic challenges, peace and security, freedom, discrimination, rights of political participation, trust in public institutions etc. These surveys have enhanced public awareness of socio-economic and governance issues and informed debate on key challenges facing the country. Additionally, the reports produced from the Institute's surveys have provided concrete recommendations for consideration by policy makers.

The IEA 2015 Socio-Economic and Governance Survey (SEGS 3) is the third in a series conducted by the Institute of Economic Affairs (IEA). The SEGS 3 examines the views of 1,500 people across all ten (10) regions of Ghana on public perception and assessment of socio-economic and governance conditions in the country. This edition presents a rather incisive analysis, as it compares the results of the two most recent surveys — SEGS 2 (2014) and SEGS 3 (2015).

It is worth pointing out that the survey was conducted in line with a rigorous methodology and adequate quality control measures. The survey followed strictly the sampling procedure recommended by the United Nations (2005) and also relied on the Ghana Statistical Service (GSS) for the random selection of Enumeration Areas (EAs).

We hope you find this report useful and look forward to receiving your feedback.

Thank you.

Mrs. Jean Mensa
Executive Director
The Institute of Economic Affairs

**263**
EOIR-000256

# EXECUTIVE SUMMARY

The 2015 Socio-economic and Governance Survey (SEGS 3) is the third in the series of surveys conducted by the Institute of Economic Affairs (IEA) on public perception and assessment of socio-economic and governance conditions in the country. The survey was carried out in November/December, 2015 and consisted of a regionally representative sample of 1,500 respondents aged 18 years and above from the 10 regions of Ghana.

The study provides comprehensive information on individuals' perception on the following: (i) economic/living conditions; (ii) safety and security; (iii) media abuse of freedoms; (iv) discrimination and relations between ethnic groups; (v) factors which influence voters in elections; (vi) trust in institutions; (vii) most important problems confronting the country; (viii) performance of current government; and (ix) access to public services in Ghana.

## Key Findings

### a. Economic/Living Conditions

The proportion of respondents who reported that their living conditions was bad increased slightly from 63% in 2014 to 64% in 2015. Those who said that their conditions were good declined from 25% in 2014 down to 23% in 2015. Living conditions worsened in the Greater Accra, Volta, Eastern, Upper East and Upper West regions between 2014 and 2015.

The overall food security situation improved in the country from 52% in 2014 to 61% in 2015. At the regional level, respondents in the Upper East, Northern, Upper West and Western regions reported of going without food many times in the six months under review.

The proportion of persons who had access to clean water declined slightly from about 60% in 2014 down to 59% in 2015. However, access to safe drinking water improved in the Central, Volta, Ashanti and Brong Ahafo regions while access to safe drinking water in the Northern, Upper East and Western regions deteriorated between the same periods.

The medical situation in the country remained virtually the same between 2014 and 2015 with about 50% of respondents declaring that they had no access to medical treatment. A large proportion of the respondents in the Western, Ashanti, Brong Ahafo, Upper East and Upper West regions reported declined access to medical services.

Despite improvement in the proportion of households with difficulties in meeting school expenses, more than half of households could not meet educational expenses in 2015. The percentage which could not meet school expenses dropped from 66% in 2014 to 58% in 2015. Rural households were more likely to default in the payment of educational expenses compared to their urban counterparts. The problem was more serious in the Northern (77.8%),

264
EOIR-000257

O · O

---

*Survey Report on Key Socio-Economic and Governance Issues in Ghana.*      *The Institute of Economic Affairs, Accra Ghana*

---

Western (74.8%), Upper East (71.4%), Upper West (66.7%) and Brong Ahafo (63.2%) regions.

### b. Safety and Security

Generally, a greater proportion of people in Ghana felt safe in their neighborhood. However, the proportion of households who felt safe while walking in their neighborhood at night dropped by 5.4 percentage points from 74.3% in 2014 to 68.9% in 2015.

The proportion of respondents who had experienced theft and had something stolen from them at home during the past year was 27.1%. Respondents in the Eastern (10.2%), Upper West (14.4%), Volta (18.5%) and the Brong Ahafo (21.5%) regions recorded the lowest incidence of theft during the past one year. The proportion of respondents who had not experienced an incidence of theft is slightly higher among rural (78.1%) compared to the urban (67.3%) dwellers. The proportion of respondents who never experienced or suffered any form of physical attack during the past year rose from 3.2% in 2014 to 5.7 in 2015.

With the exception of the Eastern and Brong Ahafo regions, the proportion of respondents who reported that they never suffered from physical attack in the past year compared to 2014 declined implying that physical attacks increased in all the other regions. The Western Region led in physical attacks as 10.4% of persons in the region reported that they were physically attacked at least once during the past year.

Only 24.8% of respondents who experienced theft, physical attack, burglary or had anything stolen from them at home reported the incident to the police. The Central (35.5%) and Upper East (31.7%) regions have the highest proportion of crime reported to the police.

More than seven out of every ten (74.3%) respondents who suffered physical attack or burglary and did not report to the police had various reasons for not doing so. Notable among the reasons are that they did not have enough time to report crimes (13.8%); they thought that it was a waste of time through repeated visits (27.9%) while 12.5% said that there was no police man or police station in the area or the nearest police station too was far.

The demand for money or bribe by the police dropped significantly by 11.4 percentage points from 17.1% in 2014 to 5.7% in 2015. It appears that the vigorous sensitization campaign mounted by the Police Administration helped minimize this perception.

### c. Media and Freedom of Participation

Radio remains the most dominant source of news for all citizens regardless of region, locality, sex or age. Seven out of ten people got their daily news from the radio. This is followed by television with 24%. Interestingly, close to 30% of females got their information from television compared to 18% for males. The Internet has overtaken newspapers as a source of news regardless of sex, locality or age of the individual.

265
EOIR-000258

Media abuse of freedoms remains high. The results of the survey indicate that about 46% of the respondents believed that the news media often or always abused their freedom in 2015 by printing or saying things that they knew were not true. However, the proportion fell by about 10 percentage points from 56% in 2014 to 46% in 2015.

Citizens' freedom of speech, association and choice of candidates remain very high in Ghana. However, the proportion of respondents who felt that one was completely free to say what one thinks fell by seven percentage points from 80% in 2014 to 73% in 2015. The largest percentage fall of 8% occurred among the urban respondents.

### d. Discrimination and Relations between Ethnic Groups

There is a general perception that one's ethnic background or gender affects his/her chances of getting government jobs and contracts. The survey shows that 47.4% of respondents believed that ethnic background did not affect one's chances of getting government jobs compared to 45.3% who reported ethnic background could affect one's chances of securing a government job. In the award of government contracts, the study further indicates that 47.7% of respondents believed that government contracts were awarded based on one's ethnic background. This belief is more prevalent among rural (49.9%), and the over 60 years (51.3%) groups.

The relationship between ethnic groups in Ghana is generally good. Approximately 8 out of 10 of the respondents indicated that the ethnic groups in the country relate well. However, 10% of respondents in the Central and Volta regions felt that the relationship is bad. Again, eight in ten (85.3%) persons reported that the relationship among religious groups in Ghana is good while 5.6% reported that the relationship is bad. Furthermore, a majority of respondents (84.2%) believed that the relationship between Ghanaians and foreigners is cordial.

### e. Factors which Influenced Voters in the Last Presidential Elections

Generally speaking, one would expect that some of the attributes voters would consider during presidential elections are qualifications and competencies of the candidates vying for the positions. The survey results depict that 84% of voters in Ghana in the 2012 presidential election considered the proposed policies of the candidates. The second most important factor is qualification and competencies of candidates (82%) and in third place is their political ideology (78%).

### f. Trust in Institutions

The police are found to be the least trusted institution out of the 10 institutions covered in the survey. About 46% of respondents had no trust at all in the police. The ruling party (39.8%), the judiciary (38%) and the tax department (38%) also had no trust at all from the public.

266
EOIR-000259

In contrast, the army is the most trusted institution. Only 13% of the people said that they did not trust the army at all down from 15% in 2014. The army is followed by the opposition political parties (26.9%).

### g. Most Important Problems Confronting the Country

There are so many issues confronting the country which require urgent attention. Of the 15 areas identified for the survey, about 66% of the respondents stated that the three most important problems which confronted people in Ghana in 2015 were either: (i) unemployment; or (ii) poverty; or (iii) unreliable power supply. The unemployment problem continued to worsen. About 26% of the people reported unemployment as the most important problem in 2015 compared to about 25% in 2014.

### h. Performance of Present Government

Of the 16 areas of concerns identified, it turned out that the government performed badly in checking price increases (87.6%), creating jobs (84.9%), narrowing the gaps between the rich and the poor (83.5%), improving the living standards of the poor (79.7%) and providing a reliable supply of electricity (77.5%) in 2015.

Though not among the first three areas of concern, the three areas which respondents felt the performance had worsened considerably (in terms of percentage increases) between 2014 and 2015 and are worth mentioning are: providing a reliable supply of electricity (the proportion increased by 13.6 percentage points), improving health services (increase of 12%) and ensuring everyone has enough to eat (increase of 9.3%).

### i. Citizens Freedom to Speech, Association and Vote

Genuine and sustainable democracy thrives on political participation through the freedom to: say what one thinks, join any political organization, vote for a candidate and political party of choice without feeling pressured, register as a voter, to vote on policies and above all, engage in protests. Over 70% of people believed that anyone is free to say what he/she thinks, while a further 90% and over are of the view that one is free to join any political organization and choose who to vote for without any hindrance. However, respondents' perception of citizen's freedom of speech, association and choice of candidates in Ghana seems to be falling.

### j. Access to Public Services in Ghana

The ease with which people are able to access public services like obtaining: birth certificate; driver's license; passport, electricity, water, education; national health insurance card, medical treatment, etc., shows how efficient and effective public institutions charged with delivering

267
EOIR-000260

such services are operating. On the other hand, the more difficult it is to access these facilities, the easier it is for corruption to thrive in the society.

It was easier to get electricity, water for household use, sanitation, drivers' license, passport, and medical treatment in 2015 than 2014. The percentage of respondents who reported that obtaining these facilities was very difficult fell from 12% in 2014 to 3.9% in 2015. Similarly, obtaining help from the police in 2015 was much easier (28.8%) than in 2014 (20.5%).

Access to health insurance, on the other hand, is still a major challenge to some Ghanaians. About 29% of households found it difficult to obtain a national health insurance card, an increase of about 18.5% over the reported figure in 2014.

### k. Election of Metropolitan/Municipal/District Chief Executives

Sixty (60) percent to 89% of respondents wanted Metropolitan, Municipal and District Chief Executives (MMDCEs) to be elected. It is their belief that an elected MMDCE would be more accountable and responsive to the needs of the people at the local level.

**268**
EOIR-000261



THE INSTITUTE OF ECONOMIC AFFAIRS
*A Public Policy Institute*

# SURVEY REPORT ON KEY SOCIO-ECONOMIC AND GOVERNANCE ISSUES IN GHANA

EOIR-000262

## PROOF OF SERVICE

On November 6, 2019, I, Melissa A. Malmgren, served a copy of the Respondent's Proposed Witness List and any attached pages by U.S. Postal Service Priority Mail to the Office of Chief Counsel at the following address: ICE/DHS 26 Federal Plaza Room 1130, New York, New York 10278.

Dated: November 6, 2019

MELISSA A. MALMGREN
LAW OFFICE OF SANDY KHINE, PC
299 Broadway, Suite 803
New York, NY 10007
(212) 786-1500

**270**
EOIR-000263

CSE



MELISSA A. MALMGREN, ESQ.
LAW OFFICE OF SANDY KHINE, PC
299 BROADWAY, SUITE 803
NEW YORK, NY 10007

NON-DETAINED

12|6|19

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT
### NEW YORK, NEW YORK

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| **DAVID YAW TOTIMEH,** | ) File No.: **A208 125 369** |
| | ) |
| | ) |
| | ) |
| In Removal Proceedings. | ) |

Immigration Judge: **Sagesse, Cathy**

Next Individual Hearing:
December 6, 2019 at 9:00 A.M.

2019 NOV -6 PM 3:59

## RESPONDENT'S PROPOSED EXHIBITS



EXHIBIT # 5

DEC 06 2019

IMMIGRATION COURT
NYC

EOIR-000264

## TABLE OF CONTENTS

Page

**Exhibit B**   **Statement of the Respondent in Support of Form I-589 Application for Asylum and for Withholding of Removal**......................................................20-21

**Exhibit C**   **Affidavits in support of good moral character**..........................................22-27

Statement of Haliyah Issah with copy of photo identification..............................22

Affidavit of Memouma Ousman with copy of photo identification .....................24

Affidavit of Mohammed Ayub ............................................................................26

**Exhibit D**   **Corroborating Affidavits**............................................................................28-40

Affidavit of Hawawu Mohammed Yaro, sister of the Respondent, with copy of Republic of Ghana Driver License ....................................................28

Affidavit of Yaw Totimeh with copy of Republic of Ghana Driver License ......................................................................................................30

Affidavit of Adiza Mohammed a/k/a Adiza Salihu, mother of the Respondent with copy of ECOWAS Identity Card ...............................................32

Affidavit of Mohammed Bawa with copy of biographical page of passport .............................................................................................................34

Affidavit of Sualiu Mariama with copy of ECOWAS Identity Card....................36

Statement of Suleman Mohammed Yaro, brother of the Respondent, with copy of biographical page of passport ..........................................................39

**Exhibit E**   **Country Condition Reports** .......................................................................41-241

**U.S. Department of State**, *Country Reports on Human Rights Practices for 2018-Ghana,* available at: https://www.state.gov/wp-content/uploads/2019/03/Ghana-2018.pdf [last accessed 4 November 2019] ......41

"Human rights issues included arbitrary or unlawful killings by the government or its agents; harsh and life-threatening prison conditions; corruption in all branches of government..." (page 41)

"While the constitution prohibits such practices, there were credible reports police beat and otherwise abused detained suspects and other citizens." (page 42)

EOIR-000265

**Page**

"Police brutality, corruption, negligence, and impunity were problems. While the constitution prohibits such practices, there were credible reports police beat and otherwise abuses suspects and other citizens. There were delays in prosecuting suspects, reports of police collaboration with criminals, and a widespread public perception of police ineptitude. Police often failed to respond to reports of abuses and, in many instances, did not act unless complainants paid for police transportation and other operating expenses. There were credible reports police extorted money by acting as private debt collectors, setting up illegal checkpoints, and arresting citizens in exchange for bribes from disgruntled business associates of those detained. A study by the Ghana Integrity Initiative, conducted in 2016 and released in February 2017, indicated that 61 percent of respondents had paid a bribe to the police. There were multiple reports police failed to prevent and respond to societal violence, in particular "mob justice." (page 44)

**Amnesty International**, *Ghana 2017/2018*, available at: https://www.amnesty.org/en/countries/africa/ghana/report-ghana/ [last accessed 4 November 2019] ...........................................................................................61

"Access to justice remained limited, especially for people from low income or marginalized backgrounds. The Ghana Legal Aid Scheme suffered from funding shortages; just 23 lawyers offering legal aid were available to the country's population of more than 28 million people." (page 63)

**The Daily Graphic**, *Ghana losing fight against corruption – Emile Short* (November 29, 2017), available at https://www.graphic.com.gh/news/politics/ghana-losing-fight-against-corruption-emile-short.html [last accessed 4 November 2019] ...........................................65

"A former Commissioner of the Commission on Human Rights and Administrative Justice (CHRAJ), Mr Emile Short, says Ghana is losing the fight against corruption.

He attributed the surge in corruption to lack of funds to enable anti corruption institutions to operate effectively, modes of appointing public officials as well as people being appointed not based on meritocracy but political affiliation and patronage." (page 65)

"Laying specific emphasis on the police and the judiciary, Mr Short said the trend was 'worrying because they are supposed to lead the fight against corruption.'" (page 66)

**Page**

**International Growth Centre,** *Higher salaries worsened police corruption in Ghana, according to IGC-funded research* (February 9, 2016), available at https://www.theigc.org/news-item/higher-salaries-worsened-police-corruption-in-ghana-according-to-igc-funded-research/ [last accessed 4 November 2019] .......72

"Rather than reducing police corruption, research funded by the International Growth Centre finds that raising police salaries actually increases levels of police bribery on Ghanaian roads." (page 73)

**The Economist,** *The economics of corruption – The wages of sin* (January 28, 2016, available at https://www.economist.com/finance-and-economics/2016/01/28/the-wages-of-sin [last accessed 4 November 2019].......124

"Two American economists, Jeremy Foltz and Kweku Opoku-Agyemang, have examined the data on 2,100 long-haul journeys. Oddly they find that Ghana's police became more corrupt after their salaries increased, both absolutely and relative to Burkina Faso's police and Ghanaian customs officers. The cops erected more roadblocks, detained lorries for longer (the avenger driver was stopped 16 times as he drove through Ghana, for eight minutes each time) and extracted money." (page 125)

"Mr. Foltz and Mr. Opoku-Agyemang, whose research was funded by the International Growth Centre at the London School of Economics, suggest that corrupt superiors or greedy relatives might have demanded more money from the officers. Another possibility is that the cops' expectations went up…It might be that the risk of being caught in Ghana is so low that normal calculations of risk and reward do not apply." (page 125)

**The Africa Report,** *Ghana losing war against corruption* (April 30, 2015), available at https://www.theafricareport.com/3060/ghana-losing-war-against-corruption/ [last accessed 4 November 2019] .................................................126

"Ghana's anti-graft agencies have come under fire for allegedly reneging on their mandate to deal with corruption, which campaigners say has become 'pervasive, institutionalized and refuses to die but rather adapts, transforms and mutates.'" (page 126)

Police and the human rights commission have been hit with allegations of scams and siphoning of millions of state funds, forcing the government to probe their top officials." (page 126)

EOIR-000267

**Page**

**The Institute of Economic Affairs Ghana,** *Press Briefing – IEA's Socioeconomic and Governance Survey* (February 25, 2015), available at http://ieagh.org/wp-content/uploads/2015/02/Socio-Economic-and-Governance-Survey-Overview-Press-Briefing-1.pdf [last accessed 4 November 2019].........129

"Respondents' views on corruption of 10 state institutions namely: the Office of the President; Members of parliament; Government officials; Police; Tax officials; District chief executives; Judges and magistrates; Assemblymen and women; Immigration; and Army were solicited. According to the results of the survey, 23 percent of the people are of the opinion that nearly all police officials are corrupt. Only 4.4 percent said not all of them are corrupt." (page 137)

"Generally, one of the most pressing governance challenges confronting the country is the high prevalence of bribery and corruption. Transparency International ranked Ghana 63rd out of 177 countries in its 2013 Corruption Perception Index and 61st out of 175 the 2014 rankings." (page 137)

"The public seem to have little confidence in some state institutions." (page 137)

**Transparency International,** *Overview of corruption and anti-corruption in Ghana* (September 11, 2018), available at https://knowledgehub.transparency.org/assets/uploads/helpdesk/overview-of-corruption-and-anti-corruption-in-ghana-2018.pdf [last accessed 4 November 2019].................................................................................143

"Corruption exists in all branches of Ghanaian government, and there is often lack of accountability in cases of violence against women and children, including female genital mutilation/cutting, and human trafficking." (page 145)

"Ghana ranks 81 out of 180 countries in Transparency International's 2017 Corruption Perceptions Index (CPI)(Transparency International 2018). " (page 145)

"The sectors that are most corrupt are the police, followed by electricity and water services." (page 149)

"Police brutality, corruption, negligence and impunity continue to be issues. Credible reports of police beating, raping, and abusing suspects and other citizens are common." (page 151) (citations omitted)

**Page**

**Commonwealth Human Rights Initiative,** *The Police, the People, the Politics –
Police Accountability in Ghana (2007),* available at
https://www.humanrightsinitiative.org/publications/police/police_accountability_i
n_ghana.pdf [last accessed 4 November 2019] .................................................... 162

"Years of colonial style policing prior to independence left a legacy of regime
policing in Ghana; violent, heavy handed and politicised policing that was in
place to protect the ruling regime's interests, rather than to serve the Ghanaian
community. Today's police service is a direct descendant of the colonial police
force, and continues to exhibit many of the same traits. Despite a series of
government sponsored commissions and committees that began in 1951 and have
continued to sit since the Boyes Report of 1970, the police have not been pulled
into line with the modern democracy that Ghana is today; at different times
reform has been undermined by political turmoil or discarded because of a lack of
political will for change." (page 168)

"Despite a strong foundation on paper, there is still a lack of capacity to
effectively monitor police activities and accountability within the police in Ghana.
There are two clear reasons for this. The first is that while there are mechanisms
in place (such as the Police Intelligence and Professional Standards Bureau) they
are undermined, under-resourced or underpowered. The second is that a key
component of the accountability web – an independent, empowered civilian
complaints authority – has not been put in place in Ghana." (page 168)

"The police are the first, and often the only, experience that people in the
community have with the criminal justice system. Unfortunately, in Ghana this
experience is marred by widespread corruption, illegal arrest and detention,
excessive use of force and a failure to respond to complaints. These are all
hallmarks of a regime-style police force that is not held accountable for its
actions." (page 188)

"Illegal arrest and detention is the most common police related complaint made to
the Commission of Human Rights and Administrative Justice." (page 190)

**"The police often fail to act on complaints, or refuse to respond to a request.
This is exacerbated by the corrupt element inside the police who request
payment before they do their duty. For example, in mid 2006, the Daily
Graphic newspaper reported that a primary school teacher had alleged that
he was assaulted by a group of youths wielding guns and machetes. The
teacher claimed that when he went to report the assault to the police, they
demanded 200,000 cedis before they would proceed with the matter.119 In
February 2007, the Daily Graphic carried a story of two police officers under
investigation following allegations that they refused to investigate a crime,**

EOIR-000269

**instead arresting and detaining the complainants for 21 hours, and then asking for a bribe before releasing them on bail."** (page 191) (emphasis added)

Proof of Service ................................................................................................242

EOIR-000270

B

EOIR-000271

**Statement of David Yaw Totimeh a/k/a Alhassan Mohammed Yaro**

1. My name is David Yaw Totimeh and I am a native and citizen of Ghana. I was born as Alhassan Mohammed Yaro on August 21, 1979 in Nima, Accra, Ghana. I am submitting this statement in support of my request for asylum, withholding of removal, and protection under the Convention Against Torture. I do not know how to read or write, and this statement was prepared on my behalf by my attorney and with the help of an interpreter, Badaru Abubakar.

2. I am requesting asylum because I have been targeted by members of my family who seek to harm me because I no longer practice Islam and they do not want me to inherit our father's property. My brother, Yussif, seeks to build a mosque on the property and see my opposition to this act as an act against our religion. I fear that if I am forced to return to Ghana, my family members will harm me. The authorities in Ghana are unable and unwilling to provide me with any protection.

3. After my father died in 2000, he left land to me. In 2010, my brothers and sisters began arguing over this inheritance. My older brother, Yussif, sought to sell the land to a group who intended to use the land for the building of a new mosque. In 2014, I tried to speak with my brother about this sale, he attacked me. He, along with members of the local mosque, brutally beat me. Thankfully, I managed to run away.

4. My brother, Yussif, is in a group and is a part of the mosque called Research Islamic School in Nima. Everyone in our community knows him because he works directly under the Imam as a secretary.

5. I tried to report this incident to the police in Nima. The police refused to take a report and told me to take my problems to the Imam. I went to the Imam. My brothers and I had a meeting with the Imam, and the Imam said the land was meant for the mosque. After the meeting, my brother and his friends attacked me. Yussif cut me on the face with a knife. Some booksellers managed to free me from my brother, and I ran away. I tried to go to a clinic, but they refused to help me because I did not have any money.

6. Before I left Ghana, I returned to my home which was located in Nima. I cooked a meal and fed the food to my dog. The dog died. I believe the food was poisoned. I feared for my safety and immediately arranged to leave the country. I went to a friend, Yaw Totimeh. He helped me take on a new name, David Yaw Totimeh. I am not sure how he changed my name, but he provided me with a passport with the name David Yaw Totimeh and Brazilian visa. He also helped arrange for my travel out of the country.

7. I left Ghana on June 14, 2014 and traveled to Brazil. I remained in Brazil for approximately 6.5 months and then traveled to the United States. I traveled through Ecuador, Columbia, Panama, Costa Rica, Nicaragua, Honduras, Guatemala, and Mexico before reaching the U.S./Mexico border.

8. I fear that if I go back to Ghana, I will be attacked by my older siblings and members of the community. They view me as an opponent to their religion, because I refused to allow them to build a mosque on my father's property. Even my younger siblings have been forced into hiding and they risked their lives to prepare affidavits in support of my case. The police in Ghana do not have resources, are corrupt, and are unable to provide me with protection. For these reasons, I am requesting asylum.

This statement was read back to me in the Hausa language, a language that I understand, and everything is true and correct.

_____
David Yaw Totimeh a/k/a Alhassan Mohammed Yaro

---

**Interpreter's Statement:**

I certify that I am fluent in the English and Hausa languages. I further certify that I have read this document in the Hausa language, and the above-named individuals have understood the contents of this document.

*BADARU ABUBAKR*
Print Your Full Name

_____          NOVEMBER, 5, 2019
Signature                                        Date

c

EOIR-000274

Haliyah Issah
1451 Crotona Place #3B
Bronx, New York 10456

October 30th, 2019

Subject: Affidavit Letter of Support for David Yaw Totimeh

To Whom It May Concern:

I am writing to confirm that I have known David for my entire life. We grew up together as children, and he has always proven to be a very hard working and loyal man. His generosity and kindness have been inspirational to my children and myself. He always volunteers to assist us whenever he can, often times without having to be asked.

My family fully supports, in every possible way, David's immigration application. He is a man with great integrity, a passionate loyalty for the United States of America, a strong character, and a warm and friendly disposition. I can't think of a better addition to this great nation. Feel free to contact me at any time at 718-415-8687 or haliyah.issah@gmail.com

Sincerely,

Haliyah Issah

22
EOIR-000275



October 29, 2019

Memouma Ousman
500 East 147 st
Bronx, NY 10455

I am writing this letter to attest that I have known Mr David Yaw Totimeh and his family in
Ghana for so many years. David is from a very good family and David himself is an outstanding,
hardworking, honest, humble, sensitive, generous, and a very helpful young man. In November
of 2015, I met David again in New York, he still exhibits his good characteristics. Willing to do
hard work in order to make an honest living. He comes in our community center to help those
in need, both young and old. He also helps to clean the community center. He is a very
honorable young man. I give him my highest recommendation. Please feel free to call me at
347-255-3113 or by email hucommitteeusa@gmail.com

Very truly yours,

Memouha Ousman

IBRAHIM ABDULAI MASIGAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01AB6351670
Qualified in Bronx County
My Commission Expires 12-12-2020

SWORN BEFORE ME ON OCTOBER 31st, 2019.

24



EOIR-000278

270 East Burnside Avenue

Apartment 6H,

Bronx-NY 10457

November 05, 2019

**To Whom It May Concern:**

**David Yaw Totimeh**

This is to certify that I Mohammed Ayub a citizen of US and a resident of Bronx County, New York have known David Totimeh for quiet some time now. Despite our differences, I have known him to be a nice person, hardworking person and someone who is dedicated to his job.

Mr. David is really an honorable man, very responsible person that I will not hesitate to recommend him to any individual or organization, Please do not hesitate to contact me on (646) 339-6414 or email at sojah05@gmail.com

Thank You for your cooperation in this matter.

Yours Faithfully,

Mohammed A. Ayub (USN rtd.)

State of New York - Bronx County
Sworn and subscribed on Date, November 5th, 2019
_Mohammed A. Ayub_ personally appeared before me and took an oath under penalties of perjury that the foregoing statement is true and correct.
NORMAN HALLIBURTON, Notary Public #01HA4932135
My Commission Expires June 20, 2022







27

EOIR-000280

D

EOIR-000281

IN THE SUPERIOR COURT OF JUDICATURE

IN THE HIGH COURT OF JUSTICE

ACCRA-GHANA, A.D. 2019

------------------------------------------------

AFFIDAVITY BY HAWAWU MOHAMMED YARO TESTIFYING IN
WITNESS TO ALHASSAN MOHAMMED YARO

------------------------------------------------

I, HAWAWU MOHAMMED YARO of house number E277/12, Nima-Accra in the greater Accra region of the Republic of Ghana do hereby solemnly and sincerely make oath as follows :-

1. That I am the Deponent herein and a Ghanaian by birth and nationality.

2. That Alhassan Mohammed Yaro is my biological elder brother and has in-charge of his younger siblings since the death of our father.

3. That he had to flee the country due to some protracted land issue with his older sibblings, who claimed he did the transaction without his consent.

4. That this is suppose a threat to us, his sibblings and we also had to flee the house and now staying at a village for our safety.

5. That this issue is pretty worrisome to us since he had been our breadwinner and now we have nobody to care for us.

6. That we now learnt he is in the United States of America and we pray that he be given asylum, since we are all not safe.

WHEREFORE, I depose to these facts to the best of my knowledge and belief as the truth.

SWORN AT ACCRA THIS 29TH )
DAY OF JULY, 2019 )

..................................
D E P O N E N T

BEFORE ME,

COMMISSIONER FOR OATHS.





VINCENT DE PAUL BAZOR
P. O. BOX MD 1065
MADINA - ACCRA
TEL: 0206358992/0285015759

28

EOIR-000282

# REPUBLIC OF GHANA
### DRIVER LICENCE

**Name**
HAWAWU MOHAMMED YARO

**Date of Birth**
1985-07-19

**Licence #**
HAW-19071985-69967

**Class of Licence**
B

**Date of Issue**
2019-03-21

**Nationality**
Ghanaian

**Expiry Date**
2025-03-19

**Ref #**
19002547H1

| CLASS/TYPE | | DESCRIPTION | CATEGORIES (KGS)/CC |
|---|---|---|---|
| A | | MOTOCYCLES WITH OR WITHOUT SIDECAR | 1 - UP TO 250CC  2 - ABOVE 250CC |
| B | | CARS, CROSS COUNTRY MINI BUSES AND PICK-UP VEHICLES | UP TO 5000Kgs (1-15 PASSENGERS) |
| C | | BUSES AND MEDIUM GOODS CARRYING VEHICLES | NOT EXCEEDING 10000Kgs (1-45 PASSENGERS) |
| D | | BUSES, COACHES AND HEAVY GOODS VEHICLES | NOT EXCEEDING 35000Kgs (1-65 PASSENGERS) |
| E | | AGRICULTURAL, EARTH MOVING AND INDUSTRIAL EQUIPMENT | 1 TRACTORS 2. GRADERS 3. BULLDOZERS 4 LOADERS 5. ROLLERS 6 FORKLIFTS 7 COMBINED HAVESTORS |
| F | | BUSES, COACHES AND HEAVY GOODS CARRYING VEHICLES | ABOVE 35000Kgs 1. RIGID 2 ARTICULATORS |

| FIRST RENEWAL | DRIVING RESTRICTIONS | INTERPRETATION | SECOND RENEWAL |
|---|---|---|---|
| 2021-03-22 | (A)  (OO) | AUTOMATIC VEHICLES ONLY  DRIVES WITH THE A/O OF SPECTACLES | 2023-03-20 |

THIS LICENCE IS THE PROPERTY OF THE GOVERNMENT OF THE REPUBLIC OF GHANA

29/7/2019

CERTIFIED TRUE COPY
VINCENT DE PAUL BAZOR
FOR OATHS

**29**
EOIR-000283

IN THE SUPERIOR COURT OF JUDICATURE

IN THE HIGH COURT OF JUSTICE

ACCRA-GHANA, A.D. 2019

------------------------------------------------

AFFIDAVIT BY YAW TOTIMEH TESTIFYING IN

WITNESS TO ALHASSAN MOHAMMED YARO

------------------------------------------------

I, YAW TOTIMEH of housenumber E33/12, Kotobabi-Accra in the Greater Accra region of the Republic of Ghana do hereby solemnly and sincerely make oath as follows-

1. That I am the Deponent herein and a Ghanaian by birth and nationality.

2. That Alhassan Mohammed Yaro is the son of my closest friend - hisfather.

3. That he had to flee the country due to some protracted land issue with his older sibblings who claimed he did the transaction without his consent.

4. That I had to shelter him in my house and there I gave him the name David. With my help and assistance, he changed his name to David Yaw Totimeh before heleft the country.

5. That the fact is, he came to me with severe beatings and injuries and I hadto treat him privatetly but due to the continous threat of his sibblings and for his safety, I had to help him to leave the country lest he beharmed killed.

WHEREFORE, I depose to these facts to the best of my knowledge and belief as the truth.

DECLARED/SWORN AT 40TH )
                          )
DAY OF JULY, 2019      ).

.................................
          D E P O N E N T

BEFORE ME,

_____

COMMISSIONER FOR OATHS.





P. O. BOX MD 1065
MADINA - ACCRA
TEL: 0206358992/0285015759

**30**
EOIR-000284



| CLASS/TYPE | | DESCRIPTION | CATEGORIES (KGS)/CC |
|---|---|---|---|
| A | | MOTOCYCLES WITH OR WITHOUT SIDECAR | 1. UP TO 250CC 2. ABOVE 250CC |
| B | | CARS, CROSS COUNTRY, MINI BUSES AND PICK-UP VEHICLES | UP TO 3050KGS (1-8 PASSENGERS) |
| C | | BUSES AND MEDIUM GOODS CARRYING VEHICLES | NOT EXCEEDING 1000KGS (1-45 PASSENGERS) |
| D | | BUSES, COACHES AND HEAVY GOODS VEHICLES | NOT EXCEEDING 15000KGS (1-65 PASSENGERS) |
| E | | AGRICULTURAL, EARTH MOVING AND INDUSTRIAL EQUIPMENT | 1. TRACTORS 2. GRADERS 3. BULLDOZERS 4. LOADERS 5. ROLLERS 6. FORKLIFTS 7. COMBINED HAVESTORS |
| F | | BUSES, COACHES AND HEAVY GOODS CARRYING VEHICLES | ABOVE 36400KGS 1. RIGID 2. ARTICULATORS |

| FIRST RENEWAL | DRIVING RESTRICTIONS | INTERPRETATION | SECOND RENEWAL |
|---|---|---|---|
| 2021-03-03 | Ⓐ ◯◯ | AUTOMATIC VEHICLES ONLY DRIVES WITH THE AID OF SPECTACLES | 2023-03-03 |

THIS LICENCE IS THE PROPERTY OF THE GOVERNMENT OF THE REPUBLIC OF GHANA

29/7/2019

CERTIFIED TRUE COPY
VINCENT DE PAUL BAZOR
COMMISSIONER FOR OATHS
P. O. BOX MD 1065, MADINA · ACCRA
TEL: 0206358992/0285015759

**31**

EOIR-000285

IN THE SUPERIOR COURT OF JUDICATURE

IN THE HIGH COURT OF JUSTICE

ACCRA-GHANA, A.D.2019

AFFIDAVIT BY ADIZA MOHAMMED TESTIFYING IN

WITNESS TO ALHASSAN MOHAMMED YARO

I, ADIZA MOHAMMED of house number E277/12, Nima; Accra in the Greater Accra Region of the Republic of Ghana do hereby solemnly and sincerely make oth and say as follows:-

1. That I am the Deponent herein and a Ghanaian by birth and nationality.

2. That Alhas san Mohammed Yaro is my s on.

3. That I am ADIZA MOHAMMED but the name on my ID is ADIZA SALIHU; this is because in the Muslim tradition onestill maintains her father's name after marriage.

4. That my son left home due to some issueshe had with his other sibblings about a land property they sold to our fellow Muslims to build a mosque on s ame without their consent. The issue got protracted be cause it involves Alhas san with his younger siblings on one side a gains t the older sibblings.

5. That the issue was taken to the Police and they rejected it because they be lieve d Muslims a lways solve their problems with their Imams.

6. That he was compelled to leave the country dueto the continouous threats on his life. I did not even no his whereabouts till one of his friends called me on phoneand said my s on was in America.

7. That as a reult of his absence, I was persistently sleepless, depressed and traumatis ed. As a result, on several occasions I have been admited at the hospital.

8. That I pray a ll authorities concerned in whosecustody my sonis, to give him a sylum and God will reward you for that.

WHEREFORE, I deposed to thesefacts to the best of my k nowledge and belief as the truth.

SWORN AT ACCRA THIS 29TH )

)

DAY OF JULY, 2019 )

. . . . . . . . . . . . . . . . . . . . . . . . .
DEPONENT

BEFORE ME,



## ECOWAS IDENTITY CARD
### CARTE D'IDENTITE CEDEAO / BILHETE DE IDENTIDADE CEDEAO
### REPUBLIC OF GHANA



Surname/Nom
**SALIHU**
Firstnames/Prénoms
**ADIZA**
Previous Name(s)/Noms Précédents

Nationality/Nationalité          Sex/Sexe
**GHANAIAN**                        **F**
Date of Birth/Date de Naissance
**01/07/1957**
Personal Id Number          Height/Taille(m)
**GHA-002296770-1       1.71**
Document Number/Numéro du document
**GH3372068**
Place of Issuance/Lieu de délivrance
**ACCRA**
Date of Issuance/Date d'émission
**25/06/2019**
Date of Expiry/Date d'expiration
**24/06/2029**                    **231347**



21124048

THIS CARD IS THE PROPERTY OF THE GOVERNMENT OF THE REPUBLIC OF GHANA
IF FOUND, PLEASE CONTACT THE NEAREST NIA OFFICE OR POLICE STATION /
CETTE CARTE EST LA PROPRIETE DU GOUVERNEMENT DE LA REPUBLIQUE DU
GHANA SI TROUVEE, VEUILLEZ CONTACTER LE BUREAU DE NIA LE PLUS
PROCHE OU LA POLICE

GHA-002296770-1

Signature / Signature          Country Code / Code du pays
                                **GHA**
Authority of Issuance / Autorité de délivrance
**NATIONAL IDENTIFICATION AUTHORITY**
000568593-00 0301E0027 250619



```
I<GHAGH33720686<<<<<<<<<<<<<<<<
5707016F2906243GHA<<<<<<<<<<<6
SALIHU<<ADIZA<<<<<<<<<<<<<<<<<
```

29/7/2019

[signature]

CERTIFIED TRUE COPY
VINCENT DE PAUL BAZOR
COMMISSIONER FOR OATHS
P.O. BOX MD 1065, MADINA - ACCRA
TEL. 0206358992/0285015759

**33**

I Mohammed Bawa of HOUSE NUMBER E 44/12, Nima-Accra in the Greater Accra Region of the Republic of Ghana do hereby solemnly and sincerely make an oath as follows:

1. That I am a deponent herein and a Ghanaian by birth and Nationality.
2. That Alhassan Mohammed Yaro has been a bosom friend of mine.
3. That once upon a time he came to me with a problem concerning an altercation with his elder siblings about a family land that has seen them threatening his life.
4. That I eventually stopped seeing him and the next thing I will here is that he is seeking refuge in America.
5. I pray he is granted asylum because he is not safe here in Ghana

Wherefore, I make this submissions, deposing to same to the best of my knowledge and belief as the truth.

Sworn at Accra this 29th Day of July, 2019.

......................................

Deponent

......................................

Commissioner for oaths







OBSERVATIONS

3

Passport/*Passeport*

**Republic of Ghana**

Type/ *Type* P

Country Code/ *Code de Pays* GHA

Passport No/ *No. de passeport* G0947665

Surname/ *Nom* MOHAMMED

Given Names/ *Prénoms* BAWA

Nationality/ *Nationalité* GHANAIAN

Date of birth/ *Date de naissance* 23 SEP 1987

Sex/ *Sexe* M

Place of birth/ *Lieu de naissance* ACCRA

Date of issue/ *Date de délivrance* 23 APR 2015

Place of issue/ *Lieu d'emission* ACCRA

Date of expiry/ *Date d'expiration* 22 APR 2020

Authority/ *Autorité* PASSPORT OFFICE

Holder's signature/ *Signature du titulaire*

```
P<GHAMOHAMMED<<BAWA<<<<<<<<<<<<<<<<<<<<<<<<<<<<
G0947665<3GHA8709239M2004220<<<<<<<<<<<<<<<<8
```

29/7/2019

CERTIFIED TRUE COPY
VINCENT DE PAUL BAZOR
COMMISSIONER FOR OATHS
P. O. BOX MD 1065, MADINA - ACCRA
TEL: 020-358992/0285015759

35
EOIR-000289

IN THE SUPERIOR COURT OF JUDICATURE

IN THE HIGH COURT OF JUSTICE

ACCRA-GHANA, A.D. 2019

------------------------------------------------

AFFIDAVIT BY SALIU MARIAMA TESTIFYING IN

WITNESS TO ALHASSAN MOHAMMED YARO

------------------------------------------------

I, SUALIU MARIAMA of house number E277/12, Nima-Accra in the Greater Accra Region of the Republicof Ghana do hereby solemnly and sincerely make oth and say as follow:-

1. That I am the Deponent herein and a Ghanaian by birth and nationality.

2. That Alhassan Mohammed Ya ro is the son of my junior sis ter and we both s tay in s ame hous e where he was born in my presence.

3. That my nephew had to flee the country due to someprotected land issue with his sibblings; the transaction was done without their consent which they got furious and threattened his life.

4. That the Police even re fus ed to dealwith the matter since they claimed Muslims issues are only dealt with by their Imams.

5. That this is s ue is a wrorris ome one to the entire family and we even do not know his wherebout until we learnt recently that he is in the United States of America

6. That I pray all a uthorities concerned to grant him asylm since his return to Ghana will be suicidal.

WHEREFORE, I depose to thes e facts to the best of my knowledge and belief as the truth.

SWORN AT ACCRA THIS 29TH )
)
DAY OF JULY, 2019 )

After which I explained contents&
in the Hausa Language which she s eemed)
to understand perfectly)

.........................

D E P O N E N T

BEFORE ME,

_____

COMMISSIONER FOR OATHS.



## ECOWAS IDENTITY CARD
CARTE D'IDENTITE CEDEAO / BILHETE DE IDENTIDADE CEDEAO
REPUBLIC OF GHANA

Surname/Nom
**SUALIU**
Firstnames/Prénoms
**MARIAMA**
Previous Name(s)/Noms Précédents

Nationality/Nationalité    Sex/Sexe
**GHANAIAN**    **F**
Date of Birth/Date de Naissance
**27/04/1955**
Personal ID Number    Height/Taille(m)
**GHA-002295997-1**    **1.67**
Document Number/Numéro du document
**AC4735003**
Place of Issuance/Lieu de délivrance
**ACCRA**
Date of Issuance/Date d'émission
**26/06/2019**
Date of Expiry/Date d'expiration
**24/06/2029**

**783724**



21124459

THIS CARD IS THE PROPERTY OF THE GOVERNMENT OF THE REPUBLIC OF GHANA
IF FOUND PLEASE CONTACT THE NEAREST NIA OFFICE OR POLICE STATION
CETTE CARTE EST LA PROPRIETE DU GOUVERNEMENT DE LA REPUBLIQUE DU
GHANA SI TROUVEE VEUILLEZ CONTACTER LE BUREAU DE NIA LE PLUS
PROCHE OU LA POLICE

GHA-002295997-1

Signature / Signature    Country Code / Code du pays
GHA

Authority of Issuance / Autorite de delivrance
NATIONAL IDENTIFICATION AUTHORITY
000566534-00 0301E0027 250619

```
I<GHAAC47350036<<<<<<<<<<<<<<<<
5504271F2906243GHA<<<<<<<<<<<<4
SUALIU<<MARIAMA<<<<<<<<<<<<<<<<
```

CERTIFIED TRUE COPY
VINCENT DE PAUL BAZOR
COMMISSIONER FOR OATHS
P. O. BOX MD 1065, MADINA - ACCRA
TEL: 0206358992/0285015759

**37**

EOIR-000392

IN THE SUPERIOR COURT OF JUDICATURE

IN THE HIGH COURT OF JUSTICE

ACCRA-GHANA, A.D. 2019

----------------------------------------

AFFIDAVIT BY SULEMAN MOHAMMED YARO TESTIFYING IN

WITNESS TO ALHASSAN MOHAMMED YARO

----------------------------------------

I, SULEMAN MOHAMMED YARO of house number E277/12, Nima-Accra in the Greater Accra Region of the Republic of Ghana do hereby solemnly and sincerely make oath as follows:-

1. That I am the Deponent herein and a Ghanaian by birth and nationality.

2. That Alhassan Mohamme d Yaro is my biological elder brother and I am their last born .

3. That he had to flee the country due to some protracted land issue with his older sibblings , who claimed he did the transaction without his consent.

4. That this issue posed lots of threats to us, his sibblings and we also had to fle e the house and now staying at the village for our safety.

5. That this issue is pretty worrisome to me particularly since he had been m y breadwinner, and now nobody cares for me.

6. That now I learnt he is in the United States of America and I pray that he be given asylum since we all are not safe.

WHEREFORE, I make this submissions, deposing to same to the best of my knowledge and belief as the truth.

SWORN AT ACCRA THIS 29TH )

)

DAY OF JULY, 2019 )

D E P O N E N T

BEFORE ME,

COMMISSIONER FOR OATHS.





**39**

EOIR-000293

## OBSERVATIONS



Passport/*Passeport*

**Republic of Ghana**

| | | |
|---|---|---|
| Type/ *Type* | Country Code/ *Code de Pays* | Passport No/ *No de passeport* |
| P | GHA | G0740938 |

Surname/ *Nom*
MOHAMMED YARO

Given Names/ *Prénoms*
SULEMAN

Nationality/ *Nationalité*
GHANAIAN

Date of birth/ *Date de naissance*
04 AUG 1993

Sex/ *Sexe*  Place of birth/ *Lieu de naissance*
M  ACCRA

Date of issue/ *Date de délivrance*
01 MAY 2014

Place of Issue/ *Lieu d'emission*
ACCRA

Date of expiry/*Date d'expiration*
30 APR 2019

Authority/ *Autorité*
PASSPORT OFFICE

Holder's signature/ *Signature du titulaire*

P<GHAMOHAMMED<YARO<<SULEMAN<<<<<<<<<<<<<<<<<<
G0740938<1GHA9308042M1904301<<<<<<<<<<<<<<<6

29/7/2019

CERTIFIED TRUE COPY
VINCENT DE PAUL BAZOR

40
EOIR-000294

E

EOIR-000295

# U.S. Department of State
## Diplomacy in Action

**Bureau of Democracy, Human Rights and Labor (/j/drl/)**
## Country Reports on Human Rights Practices for 2018
__Ghana__
Translations (//www.state.gov/j/drl/rls/hrrpt/translations/index.htm) | Other Years (/j/drl/rls/hrrpt/index.htm)
| Basic Text (/j/drl/rls/hrrpt/2018/index.htm) | Slideshow (/j/drl/photos/hrr)

## Ghana

PDF (//www.state.gov/documents/organization/289213.pdf)

Permalink: http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2018&dlid=288969

(http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2018&dlid=288969)

# EXECUTIVE SUMMARY

Ghana is a constitutional democracy with a strong presidency and a unicameral 275-seat parliament. Presidential and parliamentary elections conducted in 2016 were peaceful, and domestic and international observers assessed them to be transparent, inclusive, and credible.

Civilian authorities generally maintained effective control over the security forces.

Human rights issues included arbitrary or unlawful killings by the government or its agents; harsh and life-threatening prison conditions; corruption in all branches of government; lack of accountability in cases of violence against women and children, including female genital mutilation/cutting; infanticide of children with disabilities; criminalization of same-sex sexual conduct, although rarely enforced; and exploitative child labor, including forced child labor.

The government took some steps to address corruption and abuse by officials, whether in the security forces or elsewhere in the government. This included the establishment of the Office of the Special Prosecutor (OSP). Impunity remained a problem, however.

# Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were a few reports that the government or its agents committed arbitrary or unlawful killings. In some cases authorities described these killings as having taken place in an "exchange of fire."

In July police killed seven persons near Kumasi in an incident that sparked riots when authorities claimed the victims were suspected robbers. In September the ministerial committee established to investigate the circumstances that led to the deaths submitted its initial report to officials. After studying the report, in a statement issued in November by the minister of

information, the government directed tha⬤l police officers be suspended and mad⬤ubjects of criminal investigations. According to the statement, the government determined there was no evidence the victims were armed robbers. News coverage indicated that police headquarters had not yet received a copy of the committee's investigative report.

As of November authorities had not been able to provide any further updates regarding police service enquiries concerning four officers implicated in the 2016 killing by police of a suspect in Kumasi. The government did not prosecute any officers for the incident, but it dismissed one officer and reprimanded five others.

# b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

# c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

While the constitution and law prohibit such practices, there were credible reports police beat and otherwise abused detained suspects and other citizens. Victims were often reluctant to file formal complaints. Police generally denied allegations or claimed the level of force used was justified. By September the Police Professional Standards Bureau (PPSB) had received 77 cases of police brutality and investigated 14 of those reports.

In December the Commission on Human Rights and Administrative Justice (CHRAJ) completed an investigation into the brutal assault by military personnel against a 16-year-old boy in April 2016 for allegedly stealing a phone. The CHRAJ investigated the case according to the constitution and the UN Convention Against Torture among other related charters and conventions, and ultimately recommended payment to the victim of 30,000 Ghanaian cedis (approximately $6,400) and that the military personnel be tried according to the Armed Forces Act.

In February the United Nations reported that it received a complaint of sexual exploitation and abuse against peacekeepers from Ghana deployed in the UN Mission in South Sudan. The United Nations investigated allegations that members of the unit were having sexual relations with women at one of the protection camps. Forty-six Ghanaian police officers were subsequently repatriated on administrative grounds. Ghanaian authorities continued to investigate.

# Prison and Detention Center Conditions

Prison conditions were generally harsh and sometimes life threatening due to physical abuse, food shortages, overcrowding, inadequate sanitary conditions, and lack of medical care.

Physical Conditions: Ghana Prisons Service statistics available in September indicated that it held 14,985 prisoners (14,827 men and 158 women) in prisons designed to hold 9,875. Although authorities sought to hold juveniles separately from adults, there were reports detainees younger than age 18 were held with adults. Authorities held pretrial detainees in the same facilities as convicts but generally in separate cells, although due to overcrowding in convict blocks, Nsawam Prison began holding some convicts in blocks designated for pretrial detainees. The Prisons Service held women separately from men. No prison staff specifically focused on mental health, and officials did not routinely identify or offer treatment or other support to prisoners with mental disabilities.

42
EOIR-000297

In October foreign diplomatic representatives observed that several prisons suffered from severe overcrowding, inadequate medical care, poor sanitation, and limited rehabilitation programs. Although the government continued to reduce the population of individuals in pretrial detention, prison overcrowding remained a serious problem, with certain prisons holding approximately two to four times more inmates than designed capacity. In July, following two days of hearings, a judge at the Kumasi Central Prison granted bail to 53 of 105 remand prisoners who had applied under the Justice for All program. According to reports, officials were still working to release remand prisoners who received bail in 2017 but who remained in custody because they could not meet the bail terms. Civil society organizations estimated Kumasi Prison alone had more than 400 remand prisoners.

The government reported 30 deaths in custody through September. Causes of death included severe anemia, pulmonary tuberculosis, chronic hepatitis B, infection, heart failure, severe hypertension, liver cirrhosis, and septicemia.

While prisoners had access to potable water, food was inadequate. Meals routinely lacked fruit, vegetables, or meat, forcing prisoners to rely on charitable donations and their families to supplement their diet. The Prisons Service facilitated farming activities for inmates to supplement feeding. The Prisons Service procured five pieces of equipment, including four mechanical planters, to improve agricultural production. Construction of a new camp prison was reportedly making progress as part of efforts to improve food production and decongest the prisons. Officials held much of the prison population in buildings that were originally colonial forts or abandoned public or military buildings, with poor ventilation and sanitation, substandard construction, and inadequate space and light. The Prisons Service periodically fumigated and disinfected prisons, but sanitation remained poor. There were not enough toilets available for the number of prisoners, with as many as 100 prisoners sharing one toilet, and toilets often overflowed with excrement.

Medical assistants, not doctors, provided medical services, and they were overstretched and lacked basic equipment and medicine. At Nsawam a medical officer was recruited to operate the health clinic. All prison infirmaries had a severely limited supply of medicine. All prisons were supplied with malaria test kits. Prisons did not provide dental care. Prison officials referred prisoners to local hospitals to address conditions prison medical personnel could not treat on site, but the prisons often lacked ambulances to properly transport inmates off-site. To facilitate treatment at local facilities, the Prisons Service continued to register inmates in the National Health Insurance Scheme. The Ankaful Disease Camp Prison held at least three prisoners with the most serious contagious diseases.

Religious organizations, charities, private businesses, and citizens often provided services and materials, such as medicine and food, to the prisons.

Although persons with disabilities reported receiving medicine for chronic ailments and having access to recreational facilities and vocational education, a study released in 2016 found that construction of the prisons disadvantaged persons with disabilities, as they faced challenges accessing health care and recreational facilities.

Administration: There was no prison ombudsperson or comparable independent authority to respond to complaints; rather, each prison designated an officer-in-charge to receive and respond to complaints. As of September the Prisons Service reported receipt of 1,381 complaints on various issues, including communication with relatives, health, food rations, sanitation, and court proceedings and appeals. In April a public relations officer from the Ghana Prisons Service wrote an opinion piece for an online newspaper, disputing claims inmates received food only once a day and were subjected to forced labor. The author, however, also called for bolstering resources for inmate meals and recognized overcrowding remained a serious difficulty. Information available in September indicated there was one report of two officers physically abusing a prisoner. They were tried administratively and awaiting a final verdict.

Independent Monitoring: The government permitted independent monitoring of prison conditions. Local nongovernmental organizations (NGOs), which were independent of government influence, worked on behalf of prisoners and detainees to help alleviate overcrowding, monitor juvenile confinement, and improve pretrial detention, bail, and recordkeeping procedures to ensure prisoners did not serve beyond the maximum sentence for the charged offenses and beyond the 48 hours legally authorized for detention without charge. Local news agencies also reported on prison conditions.

# d. Arbitrary Arrest or Detention

The constitution and law provide for protection against arbitrary arrest and detention, but the government frequently disregarded these protections. The law also provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court, but lack of legal representation for detainees inhibited fulfillment of this right.

# Role of the Police and Security Apparatus

The police, under the Ministry of the Interior, are responsible for maintaining law and order, but the military continued to participate in law enforcement activities in a support role, such as by protecting critical infrastructure. A separate entity, the Bureau of National Investigations, handles cases considered critical to state security and answers directly to the Ministry of National Security. Police maintained specialized units in Accra for homicide, forensics, domestic violence, economic crimes, visa fraud, narcotics, and cybercrimes. Such services were unavailable outside the capital due to lack of office space, vehicles, and other equipment. Police maintained specialized antihuman trafficking units in all 11 police administrative regions.

Police brutality, corruption, negligence, and impunity were problems. While the constitution and law prohibit such practices, there were credible reports police beat and otherwise abused suspects and other citizens. There were delays in prosecuting suspects, reports of police collaboration with criminals, and a widespread public perception of police ineptitude. Police often failed to respond to reports of abuses and, in many instances, did not act unless complainants paid for police transportation and other operating expenses. There were credible reports police extorted money by acting as private debt collectors, setting up illegal checkpoints, and arresting citizens in exchange for bribes from disgruntled business associates of those detained. A study by the Ghana Integrity Initiative, conducted in 2016 and released in February 2017, indicated that 61 percent of respondents had paid a bribe to police. There were multiple reports police failed to prevent and respond to societal violence, in particular incidents of "mob justice." In July police killed seven suspected robbers, stirring outcry when the local Zongo (predominantly Muslim enclave) community maintained the young men were innocent. In November the minister of information called for 21 police officers to be suspended and made subjects of criminal investigations.

The Office of the Inspector General of Police and PPSB investigate claims of excessive force by security force members. The PPSB also investigates human rights abuses and police misconduct. Through August the PPSB had recorded 1,144 complaints, of which 210 investigations were completed and 934 remained under investigation. Over this period the PPSB investigated 233 reports of unprofessional handling of cases, 217 of misconduct, 201 of unfair treatment, 160 of undue delay of investigation, 59 of unlawful arrest and detention, 77 of police brutality, 34 of harassment, 14 of fraud, 37 of extortion, and one of rape. As of September the CHRAJ had not received any reports of police beating detainees.

# Arrest Procedures and Treatment of Detainees

The law requires detainees be brought before a court within 48 hours of arrest in the absence of a judicial warrant, but authorities frequently detained individuals without charge or a valid arrest warrant for periods longer than 48 hours. Officials detained some prisoners for indefinite periods by renewing warrants or simply allowing them to lapse while an investigation took place. The constitution grants a detained individual the right to be informed immediately, in a language the person

44
EOIR-000299

understands, of the reasons for detention and of his or her right to a lawyer. Most detainees, however, could not afford a lawyer. While the constitution grants the right to legal aid, the government is not required to provide it, although legal counsel is generally provided to those charged with first-degree felonies. As of September the government employed only 20 full-time legal aid lawyers, who handled criminal and civil cases, and 45 paralegals, who handled civil matters. Defendants in criminal cases who could not afford a lawyer typically represented themselves. The law requires that any detainee not tried within a "reasonable time," as determined by the court, must be released either unconditionally or subject to conditions necessary to ensure the person's appearance at a later court date. Officials rarely observed this provision. The government sought to reduce the population of prisoners in pretrial detention by placing paralegals in some prisons to monitor and advise on the cases of pretrial detainees, and by directing judges to visit prisons to review and take action on pretrial detainee cases.

The law provides for bail, but courts often used their unlimited discretion to set bail prohibitively high. In 2016 the Supreme Court struck down a portion of the law that denied bail to those accused of specific serious crimes, including murder, rape, and violations of the Narcotic Drugs Law.

Arbitrary Arrest: There were reports of arbitrary arrests by police. Unlawful arrests and detentions accounted for 5 percent of all complaint cases PPSB received through August.

Pretrial Detention: Lengthy pretrial detention remained a serious problem. Prisons Service statistics available in September indicated 1,944 prisoners, just under 13 percent of all prisoners, were in pretrial status. The government kept prisoners in extended pretrial detention due to police failing to investigate or follow up on cases, slow trial proceedings marked by frequent adjournments, detainees' inability to meet bail conditions that were often set extremely high even for minor offenses, and inadequate legal representation of criminal defendants. The length of pretrial detention exceeded the maximum sentence for the alleged crime in numerous instances. Inadequate record keeping contributed to prisoners being held in egregiously excessive pretrial detention, some for up to 10 years.

# e. Denial of Fair Public Trial

While the constitution and law provide for an independent judiciary, it was subject to unlawful influence and corruption. Judicial officials reportedly accepted bribes to expedite or postpone cases, "lose" records, or issue favorable rulings for the payer.

Following a 2015 report by an investigative journalist into corruption in the judiciary, the chief justice constituted a five-member committee headed by a Supreme Court judge to investigate the allegations, resulting in the dismissal later that year of 12 high court judges, 22 lower court judges, and 19 judicial service staff. In May the president suspended four additional high court judges who were implicated by the report. In December, the president fired those four judges, three of whom had cases pending before the ECOWAS court.

Despite alternative dispute resolution (ADR) procedures to decongest the courts and improve judicial efficiency, court delays persisted. Professional mediators trained to conduct ADR worked in various district courts throughout the country to resolve disputes and avoid lengthy trials. Nevertheless, even in fast-track courts established to hear cases to conclusion within six months, trials commonly went on for years.

A judicial complaints unit within the Ministry of Justice headed by a retired Supreme Court justice addressed complaints from the public, such as unfair treatment by a court or judge, unlawful arrest or detention, missing trial dockets, delayed trials and rendering of judgments, and bribery of judges.

# Trial Procedures

The constitution and law provide for the right to a fair hearing, and an independent judiciary generally enforced this right. Criminal hearings must be public unless the court orders them closed in the interest of public morality, public safety, public order, defense, welfare of persons under the age of 18, protection of the private lives of persons concerned in the proceedings, and as necessary or expedient where publicity would prejudice the interests of justice.

Defendants are presumed innocent and have the right to be informed promptly and in detail of charges against them, with free assistance of an interpreter as necessary. Defendants have the right to a fair and public trial without undue delay, but trials were often delayed. Defendants have the right to be present at their trials, be represented by an attorney, have adequate time and facilities to prepare their defense, present witnesses and evidence, and confront prosecution or plaintiff witnesses. In his statement following his visit in April, however, UN Special Rapporteur on Extreme Poverty and Human Rights Philip Alston wrote, "Ghana's constitutional right to legal aid is meaningless in the great majority of cases because of a lack of resources and institutional will to introduce the needed far-reaching reforms." Defendants have the right not to be compelled to testify or confess guilt, although generally defendants are expected to testify if the government makes a sufficient case. Defendants have the right to appeal. Authorities generally respected these safeguards, and the law extends these rights to all citizens.

Military personnel are tried separately under the criminal code in a military court. Military courts, which provide the same rights as civilian courts, are not permitted to try civilians. .

Village and other traditional chiefs can mediate local matters and enforce customary tribal laws dealing with such matters as divorce, child custody, and property disputes. Their authority continued to erode, however, because of the growing power of civil institutions, including courts and district assemblies.

# Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

# Civil Judicial Procedures and Remedies

There is an independent and impartial judiciary in civil matters, and citizens had access to a court to bring lawsuits seeking damages for, or cessation of, human rights violations.

Fast-track ADR courts and "automated" commercial courts, whose proceedings were expedited through electronic data management, continued efforts to streamline resolution of disputes, although delays were common. Authorities established additional automated courts across the country, and selecting their judges randomly helped curb judicial corruption.

The constitution states the Supreme Court is the final court of appeal. Defendants, however, may seek remedies for allegations of human rights violations at the Economic Community of West African States Court of Justice.

# f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibits such actions, and there were no reports the government failed to respect these prohibitions.

EOIR-000301

# Section 2. Respect for Civil Liberties, Including:

## a. Freedom of Expression, Including for the Press

The constitution and law provide for freedom of expression, including for the press, and the government generally respected this right.

Violence and Harassment: The Media Foundation for West Africa counted 17 cases of attacks on journalists from January 2017 to March 2018. Earlier in the year, police assaulted a reporter who had visited the Criminal Investigations Department headquarters to report on the arrest of a political party official. The reporter sustained fractures to his skull. Officials reported an investigative report was submitted to administrators in May and provided no further information as of September. In June there were reports that a member of parliament criticized and incited violence against a prominent journalist whose investigative crew produced a film about corruption in Ghana soccer, including involvement by government officials.

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports the government monitored private online communications without appropriate legal authority.

The internet was accessible in Accra and other large cities. There was limited but growing internet access in other areas. According to the International Telecommunication Union, approximately 38 percent of the population used the internet in 2017.

## Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

## b. Freedoms of Peaceful Assembly and Association

The constitution and law provide for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at **www.state.gov/religiousfreedomreport/** **(http://www.state.gov/religiousfreedomreport/)**.

## d. Freedom of Movement

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation and the government generally respected these rights. In an effort to curb human trafficking, however, the government in 2017 imposed a ban on labor recruitment to Gulf countries after increased reports of abuse endured by migrant workers. Media investigations during the year revealed some recruitment agencies continued their operations despite the ban.

Abuse of Migrants, Refugees, and Stateless Persons: Gender-based violence remained a problem. According to the UN High Commissioner for Refugees (UNHCR), as of the end of October, there were 36 incidents of sexual and gender-based violence (SGBV) reported from refugee camps, in addition to 46 cases of verbal assaults and threats. UNHCR worked with

47

Department of Social Welfare personnel ⬤ the Ghana Health Service psychosocial ⬤ unselors to provide medical, psychosocial, security, and legal assistance where necessary in all the cases reported. Obstacles to holding perpetrators of SGBV accountable for acts conducted in the camps included ineffective access to civil and criminal legal counseling for victims; poor coordination among the Department of Social Welfare, the Legal Aid Scheme, and police; and lack of representation for the alleged perpetrator and presumed victims.

# Protection of Refugees

Access to Asylum: The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees. The law allows rejected asylum seekers to appeal and remain in the country until an appeal is adjudicated. A four-member appeals committee, appointed by the minister of the interior, is responsible for adjudicating the appeals, but the process continued to be subject to delays. As of November the government had a backlog of 1,192 asylum seekers whose petitions were pending adjudication, plus another 43 individual asylum seekers who are awaiting a second decision following an initial rejection of their petition.

Employment: Refugees could apply for work permits through the same process as other foreigners; however, work permits were generally issued only for employment in the formal sector, while the majority of refugees worked in the informal sector.

Durable Solutions: In 2011 nearly 18,000 residents of Cote d'Ivoire fled to Ghana because of political instability following Cote d'Ivoire's disputed 2010 presidential election. From January to early November, UNHCR assisted in the voluntary repatriation of 258 Ivoirian refugees--a slow but steady increase the agency attributed to better assistance packages and better information provided to Ivoirians about the situation in their home country. Although the government granted Ivoirian refugees prima facie refugee status during the initial stages of the emergency, by the end of 2012, the government had transitioned to individual refugee status determination for all Ivoirians entering thereafter.

In late November a group of Sudanese refugees began camping outside the UNHCR office in Accra, calling for improved assistance related to health, shelter, food, and resettlement. The population is part of a protracted backlog of cases. A decision from the Ministry of Interior regarding possible integration as a durable solution remained pending.

In 2012 UNHCR and the International Organization for Migration assisted with the voluntary repatriation of more than 4,700 Liberians from Ghana. Approximately 3,700 Liberians opted for local integration. UNHCR and the Ghana Refugee Board continued to work with the Liberian government to issue the Liberians passports, enabling them to subsequently receive a Ghanaian residence and work permit. As of May the Liberian government had issued 352 passports to this population. As of November an estimated 200 Liberians were still awaiting passports. The Ghana Immigration Service also supported the process by issuing reduced-cost residency permits, including work permits for adults, to locally integrating former Liberian refugees.

# Section 3. Freedom to Participate in the Political Process

The constitution and law provide citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

# Elections and Political Participation

EOIR-000303

Recent Elections: Parties and independent candidates campaigned openly and without undue restrictions in the period preceding the most recent elections in 2016. The Electoral Commission took steps to ensure the elections were free and fair, including a voter registration verification exercise. The campaigns were largely peaceful, although there were reports of isolated instances of violence. Domestic and international observers, such as the EU Election Observation Mission and the Coalition of Domestic Election Observers, assessed the election to be transparent, inclusive, and credible. The Ghana Integrity Initiative, Ghana Center for Democratic Development, Ghana Anticorruption Coalition, Citizen's Movement against Corruption, and European Union Election Observation Mission noted concerns over the misuse of incumbency and unequal access granted to state-owned media during the campaign, although the incumbent still lost. There were reports of postelection violence, including takeovers of government institutions by vigilante groups associated with the victorious New Patriotic Party.

The June ouster of the electoral commission chairperson and the president's subsequent stacking of the Electoral Commission with persons considered to be biased in favor of the ruling party raised questions about whether the body might be used to stifle voter registration among the opposition's base.

Participation of Women and Minorities: No laws limit participation of women or members of minorities in the political process, and they did participate. Women, however, held fewer leadership positions than men, and female political figures faced sexism, harassment, and threats of violence. Cultural and traditional factors limited women's participation in political life. Research organizations found that fear of insults, questions about physical safety, and the overall negative societal perception of female politicians hindered women from entering politics.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by government officials, but the government did not implement the law effectively, and officials frequently engaged in corrupt practices with impunity. There were numerous reports of government corruption during the year. Corruption was present in all branches of government, according to media and NGOs, and various reputable national and international surveys, such as the World Bank's Worldwide Governance Indicators and Afrobarometer, highlighted the prevalence of corruption in the country. More than 91 percent of respondents to a 2015 survey by the Institute of Economic Affairs said overall corruption was high or very high. As of September the CHRAJ had received 33 cases of corruption to investigate, of which 22 were resolved.

Corruption: In June 2017 the Youth Employment Agency announced that an internal audit discovered payroll fraud of approximately 50 million cedis ($11.1 million). The matter remained pending in the courts.

The deputy commissioner of the CHRAJ stated that 20 percent of the national budget was lost to corruption annually. In November 2017 the government established the OSP to investigate and prosecute corruption-related crimes. The first special prosecutor, Martin Amidu, was sworn in by the president in February. Reports indicated the government was slow to provide the office with necessary staff, other resources, and office space to carry out its mandate. In the 2019 budget presented to parliament in November, the government allocated 180 million cedis (approximately $38.6 million) to the OSP. There were reports that one official sent friends and supporters to pressure the OSP to stop investigations into the official's abuse of office. In an August news report, Special Prosecutor Amidu revealed an unknown source transferred money into his account and that he immediately asked his bank to remedy the situation, using the incident to "urge the public to gather confidence and reject such illegalities in order to fight corruption."

Financial Disclosure: The constitution's ⬤ de of conduct for public officers establis⬤ an income and asset declaration requirement for the head of state, ministers, cabinet members, members of parliament, and civil servants. All elected and some appointed public officials are required to make these declarations every four years and before leaving office. The commissioner for human rights and administrative justice has authority to investigate allegations of noncompliance with the law regarding asset declaration and take "such action as he considers appropriate." Financial disclosures remain confidential unless requested through court order. Observers criticized the financial disclosure scheme, noting that infrequent filing requirements, exclusion of filing requirements for family members of public officials, lack of public transparency, and absence of consequences for noncompliance undermined its effectiveness.

# Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were often cooperative and responsive to their views. The government actively engaged civil society and the United Nations in preparation for the country's third Universal Periodic Review in November 2017. The government also invited civil society organizations to provide input and revisions to the OSP bill in 2017 and the Right to Information bill in 2018.

Government Human Rights Bodies: The CHRAJ, which mediated and settled cases brought by individuals against government agencies or private companies, operated with no overt interference from the government; however, since it is itself a government institution, some critics questioned its ability independently to investigate high-level corruption. Its biggest obstacle was a lack of adequate funding, which resulted in low salaries, poor working conditions, and the loss of many of its staff to other governmental organizations and NGOs. As of November there was ongoing construction to build more office space and reportedly the financial resources to hire additional personnel. Public confidence in the CHRAJ was high, resulting in an increased workload for its staff.

# Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

## Women

Rape and Domestic Violence: The law criminalizes rape of women but not spousal rape. Sexual assault on a male can be charged as indecent assault. Prison sentences for those convicted of rape range from five to 25 years, while indecent assault is a misdemeanor subject to a minimum term of imprisonment of six months.

Rape and domestic violence remained serious problems. Survey data released in 2016 suggested 28 percent of women and 20 percent of men had experienced at least one type of domestic violence in the 12 months prior to the study.

The Domestic Violence and Victim Support Unit (DOVVSU) of the Police Service worked closely with the Department of Social Welfare, the Domestic Violence Secretariat, the CHRAJ, the Legal Aid Board, the Ark Foundation, UNICEF, the UN Population Fund (UNFPA), the national chapter of the International Federation of Women Lawyers, and several other human rights NGOs to address rape and domestic violence. Inadequate resources and logistical capacity in the DOVVSU and other agencies, however, hindered the full application of the Domestic Violence Act. Pervasive cultural beliefs in women's roles, as

well as sociocultural norms and stereotypes, posed additional challenges to combating domestic violence. According to a 2014 study, almost one-third of girls and women ages 15-24 believed wife beating could be justified. The Domestic Violence Secretariat's management board was not established by the new administration until March.

Unless specifically called upon by the DOVVSU, police seldom intervened in cases of domestic violence, in part due to a lack of counseling skills, shelter facilities, and other resources to assist victims. Few of the cases wherein police identified and arrested suspects for rape or domestic abuse reached court or resulted in conviction due to witness unavailability, inadequate resources and training on investigatory techniques, police prosecutor case mismanagement, and, according to the DOVVSU, lack of resources on the part of victims and their families to pursue cases. There was also no shelter to which police could refer victims. In cases deemed less severe, victims were returned to their homes. Otherwise, the DOVVSU contacted NGOs to identify temporary shelters. Authorities reported officers occasionally had no alternative but to shelter victims in their own residences until other arrangements could be made.

The DOVVSU continued to teach a course on domestic violence case management for police officers assigned to the unit. There was also an SGBV workshop provided for police in January.

Due to limited resources, a hotline for victims of domestic violence was suspended, although the DOVVSU tried to reach the public through various social media accounts. The DOVVSU also addressed rape through public education efforts on radio and in communities, participation in efforts to prevent child marriage and SGBV, expansion of its online data management system to select police divisional headquarters, and data management training.

Female Genital Mutilation/Cutting (FGM/C): Several laws include provisions prohibiting FGM/C. Although rarely performed on adult women, the practice remained a serious problem for girls younger than 18 years. Intervention programs were partially successful in reducing the prevalence of FGM/C, particularly in the northern regions. According to the Ministry of Gender, Children, and Social Protection, FGM/C was significantly higher in the Upper East Region with a prevalence rate of 27.8 percent, compared with the national rate of 3.8 percent.

For more information, see Appendix C.

Other Harmful Traditional Practices: The constitution prohibits practices that dehumanize or are injurious to the physical and mental well-being of a person. Media reported several killings and attempted killings for ritual purposes. A man was arrested in December 2017 and confessed to killing an elderly woman to use her body parts to perform a ritual. In the Northern, Upper East, and Upper West Regions, rural women and men suspected of "witchcraft" were banished by their families or traditional village authorities to "witch camps." Such camps were distinct from "prayer camps," to which persons with mental illness were sometimes sent by their families to seek spiritual healing. Some persons suspected of witchcraft were also killed. According to an antiwitchcraft accusation coalition, there were six witch camps throughout the country, holding approximately 2,000-2,500 adult women and 1,000-1,200 children. One camp had seen its numbers go down significantly due to education, support, and reintegration services provided by the Presbyterian Church. The Ministry of Gender, Children, and Social Protection has the mandate to monitor witch camps but did not have the resources to do so effectively.

The law criminalizes harmful mourning rites, but such rites continued, and authorities did not prosecute any perpetrators. In the north, especially in the Upper West and Upper East Regions, widows are required to undergo certain indigenous rites to mourn or show devotion for the deceased spouse. The most prevalent widowhood rites included a one-year period of mourning, tying ropes and padlocks around the widow's waist or neck, forced sitting by the deceased spouse until burial,

51
EG-IR-000306

solitary confinement, forced starvation, s◯ing the widow's head, and smearing clay◯ the widow's body. In the Northern and Volta Regions along the border with Togo, wife inheritance, the practice of forcing a widow to marry a male relative of her deceased husband, continued.

In August, Second Lady Samira Bawumia launched the Coalition of People Against SGBV and Harmful Practices. UNFPA provided support. Its mission is to pursue high-level advocacy for resources to assist SGBV victims and increase prevention efforts in the country.

Sexual Harassment: No law specifically prohibits sexual harassment, although authorities prosecuted some sexual harassment cases under provisions of the criminal code.

Coercion in Population Control: There were no reports of coerced abortion or involuntary sterilization.

Discrimination: The constitution and law provide for the same legal status and rights for women as for men under family, labor, property, nationality, and inheritance laws. While the government generally made efforts to enforce the law, predominantly male tribal leaders and chiefs are empowered to regulate land access and usage within their tribal areas. Within these areas, women were less likely than men to receive access rights to large plots of fertile land. Widows often faced expulsion from their homes by their deceased husband's relatives, and they often lacked the awareness or means to defend property rights in court.

# Children

Birth Registration: Citizenship is derived by birth in the country or outside if either of the child's parents or one grandparent is a citizen. Children unregistered at birth or without identification documents may be excluded from accessing education, health care, and social security. Although having a birth certificate is required to enroll in school, government contacts indicated that children would not be denied access to education on the basis of documentation. The country's 2016 automated birth registration system aims at enhancing the ease and reliability of registration. The Ministry of Gender, Children, and Social Protection and the Ministry of Local Government and Rural Development were in talks about a proposal to issue birth certificates to children through the age of 15 as part of efforts to curb trafficking. There were no further specifics provided by the government, and it remained unclear how authorities would implement the policy.

For additional information, see Appendix C.

Education: The constitution provides for tuition-free, compulsory, and universal basic education for all children from kindergarten through junior high school. In September 2017 the government began phasing in a program to provide tuition-free enrollment in senior high school, beginning with first-year students. Girls in the northern regions and rural areas throughout the country were less likely to continue and complete their education due to the weak quality of educational services, inability to pay expenses related to schooling, prioritization of boys' education over girls', security problems related to distance between home and school, lack of dormitory facilities, and inadequate sanitation and hygiene facilities.

Child Abuse: The law prohibits sex with a child younger than 16 years with or without consent, incest, and sexual abuse of minors. There continued to be reports of male teachers sexually assaulting and harassing both female and male students. In July the Ghana Education Service fired four high school teachers in the Ashanti Region for sexually assaulting some students, although four other teachers in the same region were kept on the payroll but transferred to other schools. The DOVVSU's Central Regional Office reported a 28 percent increase in cases of sexual abuse of girls younger than 16.

EOIR-000307

According to the Ghana Police Service, reports of adults participating in sexual relations with minors rose by almost 26 percent in 2017, with the highest number of cases reported in Greater Accra and Ashanti Regions. Physical abuse and corporal punishment of children were concerns. Local social workers rarely had sufficient resources, such as transportation and equipment, to effectively respond to and monitor cases of child abuse and neglect.

Early and Forced Marriage: The minimum legal age for marriage for both sexes is 18 years. The law makes forcing a child to marry punishable by a fine, one year's imprisonment, or both. Early and forced child marriage, while illegal, remained a problem, with 34 percent of girls living in the three northern regions of the country marrying before the age of 18. Through September the CHRAJ had received 18 cases of early or forced marriage.

The Child Marriage Unit of the Domestic Violence Secretariat of the Ministry of Gender, Children, and Social Protection continued to lead governmental efforts to combat child marriage. The ministry launched the first National Strategic Framework on Ending Child Marriage in Ghana (2017-26). The framework prioritizes interventions focused on strengthening government capacity to address issues of neglect and abuse of children, girls' education, adolescent health, and girls' empowerment through skills development. The National Advisory Committee to End Child Marriage and the National Stakeholders Forum, with participation from key government and civil society stakeholders, provided strategic guidance and supported information sharing and learning on child marriage among partners in the country. The Child Marriage Unit also created a manual with fact sheets and frequently asked questions, distributing 6,000 copies throughout the country, and created social media accounts to try to reach wider audiences. In November the country hosted a two-day summit on ending child marriage. First Lady Rebecca Akufo-Addo delivered opening remarks at the African Union-organized event, which convened gender ministers, civil society organizations, and technical advisors from across the continent.

For additional information, see Appendix C.

Sexual Exploitation of Children: The law prohibits commercial sexual exploitation of children. The minimum age for consensual sex is 16 years, and participating in sexual activities with anyone under this age is punishable by imprisonment for seven to 25 years. The law criminalizes the use of a computer to publish, produce, procure, or possess child pornography, punishable by imprisonment for up to 10 years, a fine of up to 5,000 penalty units (60,000 cedis or $13,300), or both.

Infanticide or Infanticide of Children with Disabilities: The law bans infanticide, but several NGOs reported that communities in the Upper East Region kill "spirit children" born with physical disabilities who are suspected of being possessed by evil spirits. Local and traditional government entities cooperated with NGOs to raise public awareness about causes and treatments for disabilities and to rescue children at risk of ritual killing.

Displaced Children: The migration of children to urban areas continued due to economic hardship in rural areas. Children were often forced to support themselves to survive, contributing to both child prostitution and the school dropout rate. Girls were among the most vulnerable to commercial sexual exploitation while living on the streets.

International Child Abductions: The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Abduction* at **https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html (https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html)**.

EOIR-000308

# Anti-Semitism

⭕ ⭕

The Jewish community has a few hundred members. There were no reports of anti-Semitic acts.

# Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at **www.state.gov/j/tip/rls/tiprpt/ (http://www.state.gov/j/tip/rls/tiprpt/)**.

# Persons with Disabilities

The law explicitly prohibits discrimination against persons with disabilities, but the government did not effectively enforce the law. The law provides that persons with disabilities have access to public spaces with "appropriate facilities that make the place accessible to and available for use by a person with disability," but inaccessibility to schools and public buildings continued to be problems. Some children with disabilities attended specialized schools that focused on their needs, in particular schools for the deaf. The government lifted a hiring freeze and hired 27 persons with disabilities who were trained teachers to work in the mainstream education sector. As of September there were 150 pending applications from persons with disabilities for a government internship program through the Nation Builders Corps, a government initiative to address graduate unemployment. Overall, however, few adults with disabilities had employment opportunities.

Persons with both mental and physical disabilities, including children, were frequently subjected to abuse and intolerance. Children with disabilities who lived at home were sometimes tied to trees or under market stalls and caned regularly; families reportedly killed some of them. The Ghana Education Service, through its Special Education Unit, supported education for children who are deaf or hard of hearing or have vision disabilities through 14 national schools for deaf and blind students, in addition to one private school for them.

Thousands of persons with mental disabilities, including children as young as seven, were sent to spiritual healing centers known as "prayer camps," where mental disability was often considered a "demonic affliction." Some residents were chained for weeks in these environments, denied food for seven consecutive days, and physically assaulted. In his statement about his 2018 visit to the country, UN Special Rapporteur Alston noted, "Persons with disabilities and families with a disabled child face a double burden of poverty." Officials took few steps to implement a 2012 law that provides for monitoring of prayer camps and bars involuntary or forced treatment. International donor funding helped support office space and some operations of the Mental Health Authority. The Ministry of Health discontinued data collection on persons with disabilities in 2011. In July 2017 officials from the Mental Health Authority rescued 16 persons with mental disabilities whom they found chained at a prayer camp in Central Region; the individuals were later taken to the Ankaful psychiatric hospital for treatment. Despite these efforts, Human Rights Watch reported in October that it found more than 140 persons with real or perceived mental health conditions detained in unsanitary, congested conditions at a prayer camp. In December the Mental Health Authority released guidelines for traditional and faith-based healers as part of efforts to ensure that practitioners respect the rights of patients with mental illness.

There was public outcry when Second Deputy Speaker of Parliament Alban Bagbin remarked that the ministerial appointments of persons with disabilities had led to the National Democratic Congress party's defeat. Bagbin tried to retract his remarks, but organizations such as the Ghana Blind Union expressed disappointment he did not apologize. Ivor Greenstreet, a person living with disabilities who ran in the 2016 presidential elections, called the remarks "unsavory and unacceptable" and "un-befitting …the high office of … Speaker."

26IR-000309

# Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity

The law does not prohibit discrimination based on sexual orientation and gender identity. The law criminalizes the act of "unnatural carnal knowledge," which is defined as "sexual intercourse with a person in an unnatural manner or with an animal." The offense covers only persons engaged in same-sex male relationships and those in heterosexual relationships. There were no reports of adults prosecuted or convicted for consensual same-sex sexual conduct.

Lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons faced widespread discrimination in education and employment. In June, following his visit to the country in April, UN Special Rapporteur Alston noted that stigma and discrimination against LGBTI persons made it difficult for them to find work and become productive members of the community. As of September the CHRAJ had received five reports of discrimination based on sexual orientation or gender identity. LGBTI persons also faced police harassment and extortion attempts. There were reports police were reluctant to investigate claims of assault or violence against LGBTI persons, although some activists said that police attitudes were slowly changing. Gay men in prison were vulnerable to sexual and other physical abuse.

While there were no reported cases of police or government violence against LGBTI persons during the year, stigma, intimidation, and the attitude of the police toward LGBTI persons were factors in preventing victims from reporting incidents of abuse.

Media reported in August that 400 members of the LGBTI community had registered with the National Coalition for Proper Human Sexual Rights and Family "to undergo voluntary counselling and reformation." Amnesty International earlier in the year criticized authorities for conducting involuntary medical tests on two young men who were allegedly found having sex. According to one survey, approximately 60 percent of citizens "strongly disagree" or "disagree" that LGBTI persons deserve equal treatment with heterosexuals.

Activists working to promote LGBTI rights noted great difficulty in engaging officials on these issues because of their social and political sensitivity. Speaker of Parliament Mike Oquaye said in May he "would rather resign than subscribe to these delusions," referring to gay rights legislation. He also said it was unacceptable that foreign governments or groups champion homosexuality and bestiality as human rights. Second Deputy Speaker of Parliament Bagbin said in a radio interview in April, "Homosexuality is worse than [an] atomic bomb" and "there is no way we will accept it in (this) country." In November 2017 President Akufo-Addo made remarks in an interview interpreted by many citizens as supporting same-sex marriage. After much criticism the Office of the President issued a statement in April in which a bolded line read, "It will NOT be under his Presidency that same-sex marriage will be legalized in Ghana." President Akufo-Addo later delivered remarks at an evangelical gathering where he assured the audience, "This government has no plans to change the law on same-sex marriage." Media coverage regarding homosexuality and related topics was almost always negative.

# HIV and AIDS Social Stigma

Discrimination against persons with HIV/AIDS remained a problem. Fear of stigma surrounding the disease, as well as a fear that men getting tested would immediately be labeled as gay, continued to discourage persons from getting tested for HIV infection, and those who tested positive from seeking timely care. HIV-positive persons faced discrimination in employment and often were forced to leave their jobs or houses. As of September the CHRAJ received nine cases of discrimination based on HIV status. The government and NGOs subsidized many centers that provided free HIV testing to citizens, although high patient volume and the physical layout of many clinics often made it difficult for the centers to respect confidentiality.

EOIR-000310

A 2016 law penalizes discrimination against a person infected with or affected by HIV/AIDS by a fine of 100 to 500 penalty units (1,200 cedi to 6,000 cedis, or $265-$1,330), imprisonment for 18 months to three years, or both. The law contains provisions that protect and promote the rights and freedoms of persons with HIV/AIDS and those suspected of having HIV/AIDS, including the right to health, education, insurance benefits, employment/work, privacy and confidentiality, nondisclosure of their HIV/AIDS status without consent, and the right to hold a public or political office.

As part of World AIDS Day, the Ghana AIDS Commission organized activities across three regions centered around the theme of antistigma and antidiscrimination. In the culminating event to mark World AIDS Day, the minister for sanitation and water resources read a statement on behalf of President Nana Akufo-Addo encouraging people to get tested.

# Other Societal Violence or Discrimination

Chieftaincy disputes, which frequently resulted from lack of a clear chain of succession, competing claims over land and other natural resources, and internal rivalries and feuds, continued to result in deaths, injuries, and destruction of property. According to the West Africa Center for Counterextremism, chieftaincy disputes and ethnic violence were the largest source of insecurity and instability in the country. Throughout the year disputes continued between Fulani herdsmen and landowners that at times led to violence. In April, for example, one person died and several houses were burned down when clashes between a farmer and Fulani herdsmen escalated. Similar clashes led to the deaths of two persons who were shot by suspected herdsmen, according to January reports.

In May a long-standing land dispute between the communities of Nkonya and Alavanyo in Volta Region led to violence when an assailant shot and killed one woman and injured another. Citing 85 lives lost since 1983, the Volta Regional Peace Council called for an end to reprisal killings. Earlier in the year, a chieftaincy dispute resulted in five injuries and 10 arrests. Early in the year, the National Peace Council began peace-building training with two towns in the Northern Region.

There were frequent reports of killings of suspected criminals in mob violence. Such vigilantism was often seen as justified in light of the difficulties and constraints facing the police and judicial sectors.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The Ghana Labor Act provides for the right of workers--except for members of the armed forces, police, the Ghana Prisons Service, and other security and intelligence agency personnel--to form and join unions of their choice without previous authorization or excessive requirements. The law requires trade unions or employers' organizations to obtain a certificate of registration and be authorized by the chief labor officer, who is an appointed government official. Union leaders reported that fees for the annual renewal of trade union registration and collective bargaining certificates were exorbitant and possibly legally unenforceable.

The law provides for the right to conduct legal strikes but restricts that right for workers who provide "essential services." Workers in export processing zones are not subject to these restrictions. The minister of employment and labor relations designated a list of essential services, which included many sectors falling outside the International Labor Organization's (ILO) essential services definition. The list included services carried out by utility companies (water, electricity, etc.), ports and harbors, medical centers, and the Bank of Ghana. These workers have the right to bargain. In these sectors parties to any labor disputes are required to resolve their differences within 72 hours. The right to strike can also be restricted for

workers in private enterprises whose services are deemed essential to the survival of the enterprise by a union and an employer. A union may call a legal strike only if the parties fail to agree to refer the dispute to voluntary arbitration or if the dispute remains unresolved at the end of arbitration proceedings. Additionally, the Emergency Powers Act of 1994 grants authorities the power to suspend any law and prohibit public meetings and processions, but the act does not apply to labor disputes.

The Ghana Labor Act provides a framework for collective bargaining. A union must obtain a collective bargaining certificate from the chief labor officer in order to engage in collective bargaining on behalf of a class of workers. In cases where there are multiple unions in an enterprise, the majority or plurality union will receive the certificate but must consult with or, where appropriate, invite other unions to participate in negotiations. The certificate holder generally includes representatives from the smaller unions. Workers in decision-making or managerial roles are not provided the right to collective bargaining under the Labor Act, but they may join unions and enter into labor negotiations with their employers.

The National Labor Commission is a government body with the mandate of ensuring employers and unions comply with labor law. It also serves as a forum for arbitration in labor disputes.

The law allows unions to conduct their activities without interference and provides reinstatement for workers dismissed under unfair pretenses. It protects trade union members and their officers against discrimination if they organize.

The government generally protected the right to form and join independent unions and to conduct legal strikes and bargain collectively, and workers exercised these rights. Although the Labor Act makes specified parties liable for violations, specific penalties are not set forth. An employer who resorts to an illegal lockout is required to pay the workers' wages. Some instances of subtle employer interference in union activities occurred. Many unions did not follow approved processes for dealing with disputes, reportedly due to the perceived unfair and one-sided application of the law against the unions. The process is often long and cumbersome, with employers generally taking action when unions threaten to withdraw their services or declare a strike. The National Labor Commission faced obstacles in enforcing applicable sanctions against both unions and employers, including inadequate resources, limited ability to enforce its mandate, and insufficient oversight.

Trade unions engaged in collective bargaining for wages and benefits with both private and state-owned enterprises without government interference. No union completed the dispute resolution process involving arbitration, and there were numerous unsanctioned strikes during the year.

# b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor. Provisions of various laws prescribe fines, imprisonment, and an obligation to perform prison labor as punishment for violations.

The government did not effectively enforce the law. Resources and penalties were insufficient to enforce legislation prohibiting forced labor. In January the government sentenced two individuals who pleaded guilty to child trafficking each to five years' imprisonment. Two additional individuals were sentenced to one year's imprisonment for child trafficking. One individual was convicted in May of using child labor and fined 504 cedis ($112). In 2017 the government investigated 92 suspected labor trafficking cases, prosecuted 46 defendants for alleged forced labor, and convicted six individuals under the antitrafficking act; their sentences ranged from one year to five years' imprisonment. The government also released 730,000 cedis ($162,000) for implementation of its national plan of action for the elimination of human trafficking (2017-21). As of October there were 17 convictions during the year--14 under the child labor law and three under the human trafficking law.

EOIR-000312

There were indications of forced labor affecting both children and adults in the fishing sector, as well as forced child labor in informal mining, agriculture, domestic labor, porterage, begging, herding, quarrying, and hawking (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at **www.state.gov/j/tip/rls/tiprpt/ (http://www.state.gov/j/tip/rls/tiprpt/)**.

# c. Prohibition of Child Labor and Minimum Age for Employment

The law sets the minimum employment age at 15 years, or 13 years for light work unlikely to be harmful to a child or to affect the child's attendance at school. The law prohibits night work and certain types of hazardous labor for those under age 18 and provides for fines and imprisonment for violators. The law allows for children age 15 and above to have an apprenticeship under which craftsmen and employers have the obligation to provide a safe and healthy work environment along with training and tools.

Inspectors from the Ministry of Employment and Labor Relations were responsible for enforcing child labor regulations. The government, however, did not provide sufficient resources to law enforcement and judicial authorities to carry out these efforts, and penalties were not sufficient to deter violations.

The ILO, government representatives, the Trades Union Congress, media, international organizations, and NGOs continued efforts to increase institutional capacity to combat child labor.

The government continued to work closely with NGOs, labor unions, and the cocoa industry to eliminate the worst forms of child labor in the industry. Through these partnerships the government created several community projects, which promoted sensitization, monitoring, and livelihood improvement.

Authorities did not enforce child labor laws effectively or consistently, and law enforcement officials, including judges, police, and labor officials, were sometimes unfamiliar with the provisions of the law that protected children.

Children as young as four years old were subjected to forced labor in the agriculture, fishing, and mining industries, including informal gold mines, and as domestic laborers, porters, hawkers, and quarry workers. One child protection and welfare NGO estimated that 100,000 children were trapped in forced child labor, almost one-half of whom worked in the Volta Region where, in the fishing industry, they engaged in hazardous work, such as diving into deep waters to untangle fishing nets caught on submerged tree roots. The government does not legally recognize working underwater as a form of hazardous work. In October the Ministry of Fishing and Aquaculture Development launched a strategy to combat child labor and trafficking in the fisheries sector that addresses rescue, rehabilitation, and reintegration of child laborers, as well as prevention of child labor.

Child labor continued to be prevalent in artisanal mining (particularly illegal small-scale mining), fetching firewood, bricklaying, food service and cooking, and collecting fares. Children in small-scale mining reportedly crushed rocks, dug in deep pits, carried heavy loads, operated heavy machinery, sieved stones, and amalgamated gold with mercury.

Child labor was present in cocoa harvesting. Children engaged in cocoa harvesting often used sharp tools to clear land and collect cocoa pods, carried heavy loads, and were exposed to agrochemicals, including toxic pesticides. The government did not legally recognize this type of work in agriculture, including in cocoa, as hazardous work for children.

Child laborers were often poorly paid and physically abused, and they received little or no health care.

58

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* www.dol.gov/ilab/reports/child-labor/findings/ (http://www.dol.gov/ilab/reports/child-labor/findings/).

# d. Discrimination with Respect to Employment and Occupation

The government did not effectively enforce prohibitions on discrimination. The law stipulates that an employer cannot discriminate against a person on the basis of several categories, including gender, race, ethnic origin, religion, social or economic status, or disability, whether that person is already employed or seeking employment. Discrimination in employment and occupation occurred with respect to women, persons with disabilities, HIV-positive persons, and LGBTI persons (see section 6). For example, reports indicated few companies could accommodate the special needs of persons with disabilities in the workplace. Many companies ignored or turned down such individuals who applied for jobs. Women in urban centers and those with skills and training encountered little overt bias, but resistance persisted to women entering nontraditional fields and accessing education.

In June the government announced it would award 30 percent of government contracts for local companies to persons with disabilities and women, but the means of implementing and enforcing this provision remained uncertain.

# e. Acceptable Conditions of Work

A national tripartite committee composed of representatives of the government, labor, and employers set a minimum wage. In July 2018 the committee raised the minimum daily wage by 10 percent to 10.65 cedis (approximately $2.29), effective January 1. There were several cases of companies not complying with the new standard. According to an August report from the Ghana Statistical Service, 8.2 percent of Ghanaians lived in extreme poverty in 2016/2017. The extreme poverty line for an adult in 2017, based on a rebased poverty line and new consumption basket, was 982.20 cedis (approximately $211) per year, or 2.69 cedis per day (approximately $0.58). The maximum workweek is 40 hours, with a break of at least 48 consecutive hours every seven days. Workers are entitled to at least 15 working days of leave with full pay in a calendar year of continuous service or after having worked at least 200 days in a particular year. Such provisions, however, did not apply to task workers or domestic workers in private homes, or elsewhere in the informal sector. The law does not prescribe overtime rates and does not prohibit excessive compulsory overtime.

The government sets industry-appropriate occupational safety and health regulations. By law workers can remove themselves from situations that endanger their health or safety without jeopardy to their employment. This legislation covers only workers in the formal sector, which employed less than 20 percent of the labor force.

The Ministry of Employment and Labor Relations was unable to enforce the wage law effectively. The government also did not effectively enforce health and safety regulations, which are set by a range of agencies in the various industries, including but not limited to the Food and Drugs Authority, Ghana Roads Safety Commission, and Inspectorate Division of the Minerals Commission. The law reportedly provided inadequate coverage to workers due to its fragmentation and limited scope. There was widespread violation of the minimum wage law in the formal economy across all sectors. The minimum wage law was not enforced in the informal sector. Legislation governing working hours applies to both formal and informal sectors. It was largely followed in the formal sector but widely flouted and not enforced in the informal sector.

The small number of labor inspectors was insufficient to enforce compliance. Inspectors were poorly trained and lacked the resources to respond to violations effectively. Inspectors did not impose sanctions and were unable to provide data as to how many violations they responded to during the year. In most cases inspectors gave advisory warnings to employers,

EOIR-000314

ith deadlines for taking corrective action ○er regulations, workers are able to remo○ hemselves from hazardous ituations without jeopardy to employment, but in practice, few such cases come forward. Penalties were insufficient to nforce compliance.

approximately 90 percent of the working population was employed in the informal sector, according to the Ghana Statistical iervice's *2015 Labor Force Report*, including small to medium-scale businesses such as producers, wholesale and retail raders, and service providers made up of contributing family workers, casual wageworkers, home-based workers, and itreet vendors. Most of these workers were self-employed persons.

iix construction workers were killed in April when a tunnel roof collapsed at a gold mine in the central region.

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the J.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

60
EOIR-000315



# GHANA 2017/2018

 **ANNUAL REPORT**    GHANA

← Back to Ghana

# GHANA 2017/2018

Concerns were raised around unfair trials and poor prison conditions for people on death row, as well as the shackling of people with psychosocial disabilities. LGBTI people continued to face discrimination, violence and police harassment.

## Background

Nana Addo Dankwa Akufo-Addo of the New Patriotic Party was inaugurated as President in January, following presidential and parliamentary elections in December 2016.

## Legal, constitutional or institutional developments

In July, Ghana signed the AU Convention on Cyber Security and Personal Data Protection, and the Protocol to the African Charter on Human and Peoples' Rights on the Rights of Older Persons in Africa.

EOIR-000316

# Workers' rights

On 23 March, Ghana ratified the UN Minamata Convention on Mercury, which aims to protect workers from toxic liquid metal by reducing mercury use in artisanal and small-scale gold mining and protecting children from exposure. About 1 million people were working in Ghana's gold mines, and nearby communities were often directly exposed to mercury. In April, the government began a campaign to end illegal small-scale gold mining (known as "galamsey"), the negative impacts of which include increased crime, lost revenues and environmental damage as well as encouraging hazardous child labour. The government launched a five-year project to provide illegal miners with alternative livelihoods in the legal mining sector. More than 300 people were arrested on suspicion of illegal gold mining; one person was shot dead by police during the arrests. No official report concerning the death had been released by the end of the year.

# Children's rights

In May the Minister for Gender, Children and Social Protection launched a strategy for 2017-2026 to address the issue of child marriage. Some regions were disproportionately affected by child marriage; 34% of girls in northern Ghana were married before the age of 18. The strategy included accelerating access to quality education and sexual and reproductive health information and services, as well as enforcing the existing legal and policy frameworks in relation to child marriage.

# Death penalty

Scores of people on death row, including six officially considered to have mental and intellectual disabilities, faced poor prison conditions. Inmates experienced overcrowding and lack of access to health care and educational and recreational facilities.

Many death row inmates reported that they had not received adequate legal representation at their trials. Fewer than one in four death row inmates interviewed by Amnesty International had been able to appeal against their conviction or sentence. Few inmates interviewed were aware of how to appeal or access legal aid, while most were unable to pay for private lawyers. The Ghana Prison Service reported that only 12 death row inmates had filed appeals since 2006 – half of which were successful.[1] Proposals made by the Constitutional Review Implementation Committee to abolish the death penalty continued to be stalled as a result of delays in the constitutional review process.

# Justice system

Access to justice remained limited, especially for people from low income or marginalized backgrounds. The

62
EOIR-000317

Ghana Legal Aid Scheme suffered from funding shortages; just 23 lawyers offering legal aid were available to the country's population of more than 28 million people.

# Right to health

Shackling of people with psychosocial disabilities remained common, particularly in private "prayer camps" across the country. The practice involved restraining a person using chains or ropes and locking them in a confined space such as a room, shed or cage. In June the Mental Health Authority of Ghana released 16 people, including two girls, held in shackles at Nyakumasi Prayer Camp, a "spiritual healing centre" in the Central Region. Those freed, some of whom had mental health conditions, were taken to nearby Ankaful Psychiatric Hospital. A coalition of civil society organizations called on the government to adopt and enforce a ban on shackling and to invest in appropriate community-based services to support people with mental health conditions. They also called on the government to fully implement the Mental Health Act 2012, which, among other things, required the establishment of regional mental health committees responsible for monitoring mental health facilities across the country. Funding for mental health services remained lacking.

# Rights of lesbian, gay, bisexual, transgender and intersex people

Consensual same-sex sexual relations between men remained a criminal offence. LGBTI people continued to face discrimination, violence and police harassment as well as extortion attempts by members of the public. In February the Speaker of Parliament stated in the media that the Constitution should be amended to make homosexuality completely illegal and punishable by law. In July he also stated in the media that Ghana would not decriminalize homosexuality as this could lead to bestiality and incest becoming legalized.

1. Locked up and forgotten: The need to abolish the death penalty in Ghana (ACT 50/6268/2017)

## GET THE AMNESTY INTERNATIONAL REPORT 2017/18

Choose language ⌄

DOWNLOAD PDF

EOIR-000318



SURVEYS (/SEARCH?TOPIC=14) • 21 FEBRUARY 2018

# CORRUPTION PERCEPTIONS INDEX 2017

(htt    (mai        (/fe

Jump to: **Results table** | **Research analysis** | **Regional analysis** | **Resources & previous results**

This year's Corruption Perceptions Index highlights that the majority of countries are making little or no progress in ending corruption, while further analysis shows journalists and activists in corrupt countries risking their lives every day in an effort to speak out.

The index, which ranks 180 countries and territories by their perceived levels of public sector corruption according to experts and businesspeople, uses a scale of 0 to 100, where 0 is highly corrupt and 100 is very clean. This year, the index found that more than two-thirds of countries score below 50, with an average score of 43. Unfortunately, compared to recent years, this poor performance is nothing new.

64
EOIR-000319

# Ghana losing fight against corruption — Emile Short

Date: Nov 29 , 2017 , 06:14



A former Commissioner of the Commission on Human Rights and Administrative Justice (CHRAJ), Mr Emile Short, says Ghana is losing the fight against corruption.

He attributed the surge in corruption to lack of funds to enable anti corruption institutions to operate effectively, modes of appointing public officials as well as people being appointed not based on meritocracy but political affiliation and patronage.

Speaking at the presentation of the Afrobarometer Round Seven Findings by the Centre For Democratic Development (CDD) in Accra yesterday, Mr Short agreed with Prof.

Lumumba's call for corruption to be viewed as a crime against humanity and

65

EOIR-000320

further noted that advocacy should be on cost and impact of corruption on society.

He said it was unfortunate how those who flaunt their ill-gotten wealth are admired by society and called for mechanisms to make corruption unattractive.

**Police and judiciary**

# Ghana News Headlines

For latest news in Ghana, visit Graphic Online news headlines page <u>Ghana news page</u>

Laying specific emphasis on the police and the judiciary, Mr Short said the trend was "worrying because they are supposed to lead the fight against corruption."

He was of the view that enough was not being done to fight corruption.

He further attributed the rise in corruption to the kind of multi party democratic system being practiced in Ghana.

That, he noted, was because, political parties were being funded by some corrupt people, and when they won, those corrupt companies and individuals used all means to recoup their cash.

"For the past 24 to 36 months, what action has been taken against corruption? I think very small," he noted and urged the government to allocate more resources to fight corruption.

"The increase in public sector corruption calls for radical action from government," adding that the present government was voted to fight corruption.

66

EOIR-000321

He said the "only" positive move by the government to fight corruption was the passage of the Special Prosecutor bill into law.

Mr Short then queried "what about the Right to Information Bill and the need to review the Assets Declaration law? That law needs to be looked at because assets declared are not made public."

## Vigilantism

Touching on the increase in political vigilantism in the country, Mr Short said those acts should be blamed on politicians who had raised the hopes of the youth beyond reality.

He said the hopes and aspirations were so high people had resorted to all forms of illegal activities.

He said the increased spate in political vigilantism was an indictment on the police because of serious evidence of lack of adherence to rule of law.

Just like in fighting corruption we seem not to hold people accountable

Mr Short noted that the police found it difficult to deal with people indulging in offensive political acts because they (police) were afraid of political repercussions.

The former CHRAJ Commissioner said this problem could be blamed on the process for the appointments to the position of Inspector General of Police, which was currently done by the President.

"The process of appointing the iGP prevents the IGP and those below him to take action. We end up having very weak institutions because the President appoints the heads to strategic public institutions," he noted.

## Ken Ashigbey

The Chief Executive Officer of the Ghana Telecoms Chamber, Mr Kenneth

67

EOIR-000322

Ashigbey, noted that the fight against galamsey had received massive support from the public and the media.

He said one of the critical issues that led to the success of the campaign was the government calling the bluff of illegal miners.

Mr Ashigbey said there was the need to train illegal miners to acquire skills to live on.

**Ghana is losing the fight against corruption – Justice Emile Short.**

## Resource the police

A Security Analyst, Mr Emmanuel Sowatey, bemoaned the use of the military instead of the police to fight the activities of illegal miners.

"We are too quick in using military for work meant for police," he noted and said a special unit can be established under the Ghana Police Service for such special projects.

68
EOIR-000323

He said the constant use of the military to do the work of the police had the potential to demoralise the police.

Mr Sowatey further noted that the galamsey kinpins were not being picked up in galamsey activities.

EOIR-000324



ternational
rowth Centre

o higher salaries lower petty corruption?
policy experiment on West Africa's
lghways

# Higher salaries worsened police corruption in Ghana, according to IGC-funded research

**Rather than reducing police corruption, research funded by the International Growth Centre finds that raising police salaries actually increases levels of police bribery on Ghanaian roads.**

As part of an ambitious policy reform experiment in 2010, Ghana doubled police salaries, in part, to reduce petty corruption on its highways.

However, after analysing the amount of bribes paid during more than 2100 long-haul truck trips on a road between Ghana and Burkina Faso between 2006 and 2014, IGC-funded researchers find that police officers actually demanded larger bribes after the salary increase, despite allowing more trucks to pass without taking bribes.

The value of bribes paid at each police checkpoint increased by over 25%. Overall, the amounts of bribes paid on the road increased by 23% due to the salary increase.

Researchers Jeremy D. Foltz and Kweku A. Opoku-Agyemang suggest that police officers may have had a higher sense of their own worth after the salary increase, and thus asked for more expensive bribes. Another possibility is that supervisors or families asked for more money from the officers after learning of the salary increase.

Foltz and Opoku-Agyemang did find, however, that police officers allowed more trucks to pass their checkpoints without taking bribes – from one-tenth (10%) to almost one-fifth (19%) of trucks. This finding may suggest that police officers are concerned about losing their jobs if they ask for more bribes.

66 Jeremy Foltz, a professor based at the University of Wisconsin-Madison, said: "These findings suggest that the fight against corruption in Ghana cannot be won by salary increases alone. We need to take a closer look at

EOIR-000325

Ghana's anti-corruption laws an' ¹ eir enforcement."

"

A 2015 survey by Ghana's Institute of Economic Affairs (IEA) ranked the police service as the most corrupt state institution in the country.[1]

**Notes:**

A full academic paper on this research is available here: https://www.theigc.org/project/can-raising-police-salaries-reduce-petty-corruption-in-ghana/

1: For the full IEA press briefing on their *Socio-economic and Governance Survey*, please see this page.

**Working paper**

**IGC**

**International Growth Centre**

# Do higher salaries lower petty corruption?

## A policy experiment on West Africa's highways

Jeremy D. Foltz
Kweku A. Opoku-Agyemang
June 2015

DIRECTED BY

FUNDED BY

72
EOIR-000327

# DO HIGHER SALARIES LOWER PETTY CORRUPTION?

# A POLICY EXPERIMENT ON WEST AFRICA'S HIGHWAYS[1]

Jeremy D. Foltz
University of Wisconsin-Madison
Department of Agricultural and Applied Economics
427 Lorch St., Madison, WI 53706
jdfoltz@wisc.edu

Kweku A. Opoku-Agyemang
University of California, Berkeley
Blum Center for Developing Economies
100 Blum Hall, Berkeley, CA 94720
kweku@berkeley.edu

Draft: June 25, 2015

## Abstract

In one of the most ambitious public sector reform experiments in Africa, the Ghana government doubled its police officer salaries in 2010 in part to mitigate petty corruption on its roads, while leaving salaries for other officials unchanged. Neighboring countries in the West African region left their police salaries unchanged. Using unique data on bribes paid from over 2,100 truck trips in West Africa and representing over 45,000 bribe opportunities, we evaluate impacts of higher police salaries on petty corruption using a difference-in-difference method that exploits the exogenous policy experiment. By following bribes paid by the same trucks in different countries as well as to different civil servants in Ghana we identify whether salaries affect the effort to seek bribes, their value and the total amount paid by truckers. Rather than decrease petty corruption, the salary policy significantly increased the police efforts to collect bribes, the value of bribes and the amounts given by truck drivers to policemen in total. Robustness checks show the higher bribe efforts and amounts are stable across alternative specifications. *(JEL K42, R40)*

---

[1] We are very grateful to the West African Trade Hub and USAID for providing access to the data. Funding was graciously provided by an International Growth Center grant. We also thank without implicating Daniel Bromley, Kim Yi Dionne, Marcel Fafchamps, Rachel Glennerster, Ted Miguel, Daniel Posner and participants at University of Wisconsin, Oxford University, University of California, Berkeley, the Working Group in African Political Economy, Watson Institute for International Studies, Brown University, and the World Bank's Annual Bank Conference on Africa for comments and Srini Vasudevan for data cleaning. The usual disclaimer applies.

EOIR-000328

## Introduction

How can we lower the incidence of petty corruption? Given the weaknesses of institutions in developing countries, reducing corruption has long been a concern to economists and policymakers, and understanding this question is important for improving economic efficiency and outcomes. A recent survey of the emerging literature on corruption and economic incentives (Olken and Pande, 2012) succinctly presents the need for research to tackle the fundamental question confronting policy makers: how to promulgate policies to reduce corruption. Indeed the authors of that review note that in providing policy guidance for an anti-corruption agency they "had more questions to pose than concrete answers." (Olken and Pande (2012: 481)).

A burgeoning literature suggests that raising the salaries of government officials could reduce their propensity to solicit and accept bribes. At the aggregate country level Van Rijckeghem and Weder (2001) show that countries with higher civil service wages have lower levels of corruption. Recent work on political corruption by Gagliarducci and Nannicini (2013) and Ferraz and Finan (2009) suggests that higher salaries for politicians reduce their levels of corruption. A growing number of laboratory and field experiments have also shown that raising wages or payments to subjects reduces corrupt behavior (e.g., Armantier and Boly (2011) and Van Veldhuizen (2013)). While the political corruption literature is often well identified, the literature on petty corruption of officials suffers from a lack of identification and questions about external validity outside the laboratory setting.

This work exploits one of the most ambitious civil service policy reforms in Africa to ask whether raising salaries for corrupt officials improves or worsens petty corruption outcomes

74
EOIR-000329

in developing countries. This experiment is important from a policy perspective because officials' salaries in poor countries are low, creating an identification problem on the origins of petty corruption. On the one hand, petty corruption outcomes such as bribery may be only manifestations of low incomes and corruption would reduce significantly if incomes were raised substantially. On the other, corrupt outcomes might occur independently of income levels and be worsened by a higher "appetite" that higher incomes would bring. Classic economic models show that individuals care about both their absolute and relative incomes. These effects are further complicated by the reality that corrupt officials' incomes persist in broader environments, so that other agents (e.g. those who must pay bribes to officials) may be aware that certain officials have higher salaries and potentially alter their strategies to reflect changes.

In this work, we use detailed survey data and experimental evidence to study this question in one particular context: bribery and corruption on highways in West Africa. In July 2010, the Ghana Government implemented a "single-spine" salary structure for all police officials (unilaterally doubling their incomes) in an effort to improve officials' living standards and curb highway bribery by said officials. On the other hand, neighboring countries in the West African region left their police salaries unchanged throughout the period, as did other officials within Ghana. Between 2006 and 2012 the United States Agency for International Development (USAID) West African Trade Hub has collected unique data from over 2,100 long-haul truck trips in the sub-region, representing over 45,000 bribe opportunities on the road between Tema, Ghana and Ouagadougou, Burkina Faso. By following bribes paid by the same trucks in different countries as well as aggregate trends in Ghanaian bribe taking using a difference-in-difference methodology, we can identify whether salaries affect both demand for bribes and the amount

2

given by truckers. Figure 1, produced by the West African Trade Hub, shows some of the bribe data collected in a map of the Tema, Ghana to Ouagadougou, Burkina Faso corridor.

**Figure 1**

**Map of the Route From Tema, Ghana to Ouagadougou, Burkina Faso**



Source: West Africa Trade Hub. Red and blue bars represent customs and police stops respectively, in their customary or most frequent locations.

The question of incentive-compatible anti-corruption policy is a growing concern for political and development economists as shown by an increasing number of studies focusing on countries such as Indonesia (e.g. Olken (2007); Olken and Barron, (2009)), India (Bertrand, Djankov, Hanna and Mullanaithan (2007)), and Uganda (e.g. Fisman and Svensson (2007). One study based in Italy highlights the need to disentangle inefficiency from corruption (Bandiera,

3

Prat and Valletti (2009). Such approaches are nested in the need to improve state capacity as outlined in Rose-Ackerman (2010).

As shown in a map of the roads used by the trucks in our study in figure 1, this research investigates a cross-border aspect of corruption, which has seen relatively little study in the literature. An exception is Zitzewitz, (2012) in which the International Skating Union found that an anti-corruption transparency reform led to more nationalistic bias from within-country judges. No study (to the best of our knowledge) has been able to evaluate polices aimed at lowering petty corruption on highways on an international scale. This gap in the literature persists although Freund and Rocha (2009) show that delays in the time it takes to get goods in and out of ports represents a major deterrent to the level of trade within and among African countries, but especially so for those that are landlocked. This paper also addresses a need to study and evaluate evidence on corruption that occurs across national boundaries. Although high levels of corruption on the truck routes of West Africa are most certainly detrimental to the viability of both exports and imports, international highways are becoming more dominant across the countries of Latin America, Asia and the Middle East. Policy on petty corruption at the international level in these areas may similarly benefit from understanding how petty corruption might transpire even in the context of international trade.

We find that the salary reform worsened petty corruption outcomes rather than improving them, empirically diverging from most of the theoretical models of corruption extant in the literature. The results show that raised salaries for Ghanaian police officers caused the police to increase the effort they put forth to get bribes by 19 percent, the value of bribes taken at each individual stop by between 25-28 percent (~$0.25), and increases the total amount taken on the road, even while they reduce the number of times they receive a bribe. In other words, the higher

4

salary translates into petty corruption effort becoming more intense. This outcome is mostly explained by complementary behavioral model environments in which the choices of corrupt officials does not only depend on the material outcome choices, but also on points of orientation to which such outcomes may be compared (e.g. Kőszegi and Rabin 2006). This observation of reference dependence driven corruption choices has implications not only for the discourse on the economic origins of petty corruption, but anti-corruption policy reform. As developing countries attempt to gain from integration within their respective sub-regions, political barriers to trade such as petty corruption may benefit from such behavioral perspectives.

The remainder of the article proceeds as follows. The second section discusses the single spine salary policy experiment implemented in Ghana. The third section presents some descriptive statistics of the data. The fourth section provides a conceptual framework and develops testable hypotheses. Section five discusses the empirical strategy and results and the sixth section concludes.

## 2. The Single Spine Salary Structure (SSSS) in Ghana

Civil service salary reform in Ghana, though desired by many, has had a long and tortuous history of fits and starts with little actual reform taking place until recently. Following independence in 1957, corruption in the Ghanaian public service led to both economic and political instability in the 1960s and 1970s and a series of coups into the early 1980s. During that period public pay review interim commissions mandated with harmonizing salary standards in the Ghana Universal Salary Structure (GUSS) post-independence public pay system had difficulties implementing reforms in the context of on going political unrest and instability.

5

78
EOIR-000333

After returning to democracy in 1992, the Gyampoh Commission met during the rule of President Jerry Rawlings to plan and implement the public sector reforms previously envisioned decades earlier, but the commission disbanded only a year later. Next, in 2000, President Kufour's Ministry of Public Sector Reforms constructed a pay policy to correct existing disparities within the public sector, renamed the Single Spine Salary Structure (SSSS) and announced in 2007. The term "single spine" was inspired by a biological analogy: as all nerves and organs of the human body are connected to a single spinal cord, so would all public workers, irrespective of sector and specialization be connected to a common salary system (Seniwoliba (2014)). Although President Kufuor's Government had intended to implement these public sector pay reforms, his party, the New Patriotic Party (NPP) lost the general elections to the rival National Democratic Congress (NDC) in 2008, again calling into question whether these reforms would ever take place.

The NDC Government issued an announcement in November 2009, pledging to mitigate pay disparities in the public service; implement numerous pay negotiations; and improve productivity through payment channels (Daily Graphic, 2009). To facilitate SSSS implementation, public sector workers were categorized by job similarities with factors influencing categorization including education, skills, training, and career roles. Parliament passed the Fair Wages and Salaries Commission (FWSC) to administer the SSSS in 25 levels. Following negotiations with public sector unions in 2009, the SSSS started implementation in July 2010 with the police service as the first type of civil servant to receive this structure.

## 2.2 Ghana Police Salary Increases

Everyone is hoping to see the end of corruption, inefficiency and bribery by the police, now that their salaries have gone up.

--Stephen Owusu (2011) *Can Single-Spine Salary For Police Stop Bribery and Corruption?*

The FWSC migrated the Ghana Police Service to the single spine structure on July 1, 2010, leading to a doubling of police salaries. Such a doubling of salaries for the police was unique and not repeated across other civil servant types. Although having other public sectors on the same structure helped harmonize pay standards across sub-sectors, this might have influenced the impression that the SSSS was meant to add more funds to all salaries. When the Ghana Prison Services, Ghana National Association of Teachers, National Association of Graduate Teachers, Civil and Local Government Staff Association Ghana, Ghana Medical Association and others received their pay without the significant pay increases received by police, they either picketed, demonstrated, threatened strike action or actually took such actions.

Two reasons seem to account for Ghana giving a disproportionate rise in salaries exclusively to the police. Historically, the police service has been the least well-paid of all public sector workers in Ghana. Second, it was thought that this measure could curb corruption, as noted in the above media report. Thus, from a public policy perspective one might consider it both fair and the investment with the highest expected return in terms of lowered corruption to give disproportionate raises to the police. However, the SSSS has not been targeted exclusively to the Ghanaian police, although the administrative and efficiency characteristics of the reform meant that staff working in other sectors often had little to gain financially on eventual migration to the SSSS, which may partially explain the strong opposition to police salary increases (Aliu and Fuseini (2014). Other researchers argue that the labor unrest may have occurred because there was little to no educational outreach on the role of the program to harmonize pay scales of

7

80
EOIR-000335

various public officials as well as significant delays in SSSS implementation for other types of civil servants in the subsequent stages (Seniwoliba 2014).

By 2014, the SSSS had already become a main source of government expenditure pressure. Ghana's wage bill grew by 47% between 2011 and 2012, representing the highest wage bill growth rate on the African continent, which is a development that has been attributed to the SSSS (McTernan 2013). In the same year, the government wage bill totaled about $2 billion, with economists in Ghana calling for a delay in further SSSS implementation to reduce the 11% deficit (Daily Graphic, 2014). At the same time however, corruption remained a concern with the Ghanaian public as acknowledged by President John Mahama in his State of the Union address, where he observed that there was no longer any reason for petty corruption since salary concerns had been addressed (Gadugah 2015).

## 3. Data

This investigation draws on unique data collected by the USAID-West Africa Trade Hub (WATH) project since 2006 from over 2,400 trucks plying the roads in West Africa.[2] Since 2006 they given surveys to long-haul trucks plying the major truck routes of West Africa. The dataset for this work includes trucks traveling back and forth from Ouagadougou, the capital of Burkina Faso, to the port town of Tema, Ghana, see figure 1 for a map of the route. Drivers of trucks on these routes wrote down the delay, amount paid and the official type each time they paid an average of 27 bribes per trip to seven different types of officials spread out along the nearly 1,000 km of road on this corridor.[3]

---

[2] The WATH corruption data used in this work is available on the WATH website at http://www.borderlesswa.com/resources/publications
[3] Due to the poor quality of secondary roads, there are few alternative routes or ways for truckers to drive around checkpoints and barriers.

81
EOIR-000336

In the dataset, each checkpoint stop for an individual driver represents a data point, which produces some 40,000 useable stops for more than 2,400 drivers on trips in Ghana and Burkina Faso, with 34,869 stops occurring in Ghana. There are seven different types of stops recorded: Customs, Forestry, Gendarmerie, Health, Other, Police, and Unions on the road from Tema in Ghana to Ouagadougou in Burkina Faso. The data also include information on driver and truck characteristics including country of origin of the driver & truck; truck type (tanker, container, general purpose); and truck value. Since over 90% of the stops in Ghana are either customs or police, we use only the data on customs and police stops in Ghana with the addition of the gendarmes (a police force) in Burkina Faso. The results reported are robust to inclusion of the other authority types.

The surveys were given to truck drivers at the beginning of their trips. When the drivers are approached with a survey, an expert in trucking checks their papers and assesses if the papers for the truck and cargo are in order. If they are in correct condition and the truck driver agrees to take the survey, the driver is given a survey to fill out which is then collected at the end of the trip. Only trucks scheduled to drive the whole trip are given surveys to fill out. It is estimated by those that hand out the survey that the trucks with their papers in order represent about one-third of the long-haul trucks on the road. The data therefore represent a selected sample that represents the minimum levels of bribes paid, since the trucks without appropriate papers will be likely to pay higher bribes. Collecting data from trucks whose documentation are confirmed to be in order also minimizes the possibility that a bribe payment can be warranted.

Our data suggest that the total cost of bribes is between $0.03 and $0.17 per kilometer, implying that bribes are a non-negligible 1-5% of total costs, and between 2% and 10% of variable costs of a long-haul trip. In addition the data show delays due to petty corruption that

9

ECFR-000337

can add up to an extra day in transit. The average bribe paid in Ghana is just under $1 on average, with the most frequent bribe amount being paid at 1 Ghanaian Cedi (roughly equivalent to $0.25).

## 4. Conceptual Framework: Theories of Bribe Taking

We present simple theoretical models that capture multiple potential outcomes from increasing police salaries, including the three major theories from the literature about how raising salaries might change corruption. The first of those theories is the "crime and punishment" or shirking model from Becker and Stigler (1974), in which government officials choose corruption based on a cost benefit analysis that equates corruption returns to their lost potential forgone future income if they get caught. This set up is broadly related to the social norms literature on corruption such as Acemoglu and Jackson (2014) and expresses similar concerns to models of "career concerns", albeit with different mechanisms (e.g., Dewatripont, Jewitt and Tirole, 1999). The second theory, first formalized by Akerlof and Yellen (1990) is the "fair wage" hypothesis in which officials engage in corruption up to the point that their wage rises to what is considered the fair wage. We add a third possibility to our modeling, developed from the reference dependent utility and target income literatures. In this reference dependent utility model, the salary change affects policemen's reference income level relative to other civil servants leading to higher levels of corruption. These diverse models therefore yield substitutive predictions to provide a comprehensive understanding on the economic origins of petty corruption. We proceed with a basic framework.[4]

---

[4] A fourth possibility is the monopolist model of corruption, in which corrupt officials maximize profits by setting a bribe price to pass on the road (see Schliefer and Vishny (1993) for a model and Olken and Barron (2009) for an application to similar truck data as this study. The appendix A2 explores this possibility and finds no empirical evidence to support such a model in the West African context.

83
EOIR-000338

Let there be an official who receives a salary, $B$, and can choose to engage in corrupt practices by putting in effort, $e$, which gets him benefit $g(e)$ but induces a cost to him of $c(e,\bar{B})$ where $\bar{B}$ is the official's permanent income received from salary level $B$. The function $g(.)$ is quasi-concave and $c(.)$ is convex in effort, $e$, and $c(.)$ is multiplicative in $e$ and $\bar{B}$ as well as strictly increasing in permanent income[5]. While one can think of the benefit $g(.)$ as a monetary benefit, the cost $c(.)$ will come in the form of social stigma and potential penalties including losing one's future income stream. The official will choose the effort[6] to allocate to corruption to maximize the following utility function[7]:

$$\max_e \ U = B + g(e) - c(e,\bar{B}) \tag{1}$$

First, if the cost of corruption is independent of salary levels, as would be the case if there is zero probability of getting caught and losing one's job, i.e., $c(e,\bar{B}) = c(e)$, then the optimal level of effort will be determined by the relative marginal costs and benefits of corruption effort[8]. It is easy to see that the optimal effort to maximize utility will be governed by $\partial g / \partial e = -\partial c / \partial e$ and independent of salary levels, $B$. This establishes our null hypothesis against which we test the other propositions.

---

[5] The Becker and Stigler (1974) results are driven by backward induction in a multi-period model. In what follows we use the simplification of using an official's permanent income, which includes the person's discounted future income.

[6] In his work on corruption in Zaire, Gould (1980) makes the point that corrupt practices require a specific effort of the officials. He finds that poorly paid officials will choose between corrupt practices or moonlighting in a different job, depending on the relative value of corruption in the area to which they are posted.

[7] We use a linear utility function to match the principle agent literature as well as ease of exposition. The results and propositions would be the same with some common functional forms such as Cobb-Douglas or exponential utility.

[8] Petty corruption may not always lead to punishment costs, partly because drivers that pay bribes are often themselves at some legal fault. For example, drivers in developing countries often may not have their papers in order. On the other hand, there have been anecdotal cases of properly-credentialed drivers getting bribe-extorting police officers fired in Ghana. The drivers in our study all had their papers in order.

84
EOIR-000339

*Null Hypothesis: Levels of effort and amounts of bribes are independent of changes in salary levels.*

In order to demonstrate the crime and punishment model, we solve (1) for the optimal level of effort assuming that the costs of effort are increasing in one's permanent income $\partial c/\partial e\partial\overline{B} > 0$, as would be the case if one could lose one's job from corruption effort. The first order conditions for the optimal choice of corruption effort will be:

$$e = \begin{cases} 0 & if \quad g(e) < c(e,\overline{B}) \\ e^* & where \ e^* \ solves \quad \partial g/\partial e = \partial c/\partial e \end{cases} \qquad (0.1)$$

This leads to the first of the literature's testable conjectures:

*Conjecture 1: (Crime and Punishment) A rise in an official's salary will reduce the effort officials put into soliciting bribes and the overall value of bribes.*

Proof: First, since permanent income is rising with current income and $c(e,\overline{B})$ rising with $\overline{B}$, the outcome $e = 0$ will be more likely. Second, since $\partial c/\partial e\partial\overline{B} > 0$ then $\partial e^*/\partial B > 0$.

Next we turn to the fair wage hypothesis, which can be illustrated by adding the following constraint to equation (1):

$$s.t. \quad B + g(e) \geq B^{fw} \qquad (0.2)$$

where $B^{fw}$ is the fair wage at which an official believes he is receiving adequate remuneration. The first order conditions will now be:

12

EOIR-000340

$$e = \begin{cases} 0 & if \quad g(e) < c(e, \overline{B}) \\ 0 & if \quad B \geq B^{fw} \\ e^* & where \ e^* \ solves \quad \partial g/\partial e = \partial c/\partial e \end{cases} \tag{0.3}$$

This leads to the following testable conjecture.

*Conjecture 2: (Fair Wages) If the salary increase is large enough to move from an unfair wage to a level above the fair wage, the level of corruption effort and amount of bribes collected will go down.*

The reference dependent utility (Kőszegi and Rabin, 2006) and income targeting (Camerer et al., 1997) literatures provide a third potential explanation for how civil servants might change their corruption seeking effort due to salary level changes. In a reference dependent utility framework, civil servants have a kink in their utility function at their income target. If civil servants received an income level that was less than their reference income level then this would impose a utility cost on them that is higher than levels above the reference income. Since the object of interest is total income, salary plus corruption earnings, this distinguishes the reference dependent utility explanation from a fair wages explanation. In addition as set out in Koszegi and Rabin (2006), the reference points may change over time and space.

We modify equation (1) to account for the reference dependence as follows. Let realized income be: $y = we + B$, where $we$ is the monetary returns to corruption (bribe value times effort) and $B$ is salary and for simplicity let the cost of corruption effort be $c(e, \overline{B}) = c(e)$. Civil servant utility will be:

13

86
EOIR-000341

$$Max_{e} \; V = \begin{cases} \lambda[u(y)-y^r]-c(e), & y \leq y^r \\ [u(y)-y^r]-c(e), & y > y^r \end{cases} \qquad (1.5)$$

where $y^r$ is the target income level and $\lambda > 1$ captures worker aversion to being below their reference utility. First order conditions for this problem produce the following marginal

substitution rates: $\begin{cases} \dfrac{c'(e)}{u'(y)} = \lambda w, & y \leq y^r \quad (a) \\ \dfrac{c'(e)}{u'(y)} = w, & y > y^r \quad (b) \end{cases}$

Reference dependent civil servants receive utility benefits of $\lambda w$ for each unit of effort they

expend below their income target and a lower value $w$ once their income is above the target

level. Solving these equations (a) and (b) in the framework used above gives us three possible

regimes for corruption effort depending on corruption effort's returns relative to costs:

$$e = \begin{cases} 0 & if \quad we + B < c(e) \\ e^* & if \quad y > y^r \\ e^{**} & if \quad y \leq y^r \end{cases} \qquad with \; e^{**} > e^* > 0$$

In the above model if reference income levels $y^r$ are left unchanged by changes in salary, the

effects of salary increase should reduce levels of corruption effort in a manner similar to the fair

wage hypothesis. Reference dependent utility with no change in the reference income level by

civil servants would produce the same result as Conjecture (2) above. We would see that

increases in salary that raised civil servants above their reference dependent utility levels would

decrease bribe-taking effort. If, on the other hand, the salary increase also increases the

14

87
EOIR-000342

reference income level of the civil servants who received the salary increase, then we would expect to see an increase in corruption effort by civil servants who received a raise.[9]

*Conjecture 3: If there are two civil servants and one has a higher reference income level than the other, the one with the higher reference income level will allocate more time to corruption effort.*

It is worth noting two features of the above models that are consistent throughout. First, there is in all models scope for the zero bribe effort outcome in which the utility costs of collecting bribes is strictly more than the utility benefit of collecting bribes. We thus should expect to see some situations in which no bribe is collected, irrespective of which model is correct. Second, across all models, the optimal effort to collect a bribe is increasing in the monetary returns to bribe effort, $w$ in our third model. This means that lower returns to bribe efforts by civil servants will reduce their bribe collection effort. This leads to the following conjecture:

*Conjecture 4: If a salary increase reduces the monetary returns for an individual civil servant's corruption effort, then we should expect to see the salary increase decrease corruption effort.*

A first possibility on how this might happen is that drivers might bargain harder after they heard about the higher civil servant salaries, reducing, $w$ relative to its previous level. A related possibility that might affect monetary returns to bribe effort is if the civil servant on the road has to pay some percentage of his corruption take to a superior officer. If the higher salaries

---

[9] We thank an Accra, Ghana taxi driver named Kofi who outlined the ideas and intuition behind this reference dependent utility model for us during fieldwork. As Kofi described it, the salary increase made policemen "more important" people and therefore they needed the kind of high incomes that important people received. Policemen therefore asked for higher bribe amounts after the salary increase in order to receive the type of high income they expected as newly important people. In a bargain between a driver and civil servant, higher initial bribe amounts asked for increase bargaining time, but generally lead to higher bribes paid.

88
EOIR-000343

increased this rental rate[10], then we should see a version of Conjecture (4) that is a higher salary might increase rental rates, reduce the monetary returns to corruption effort, and reduce corruption effort.

### 4.2 Policy Experimental Design

The above four conjectures of the effects are neither mutually exclusive, nor are they necessarily separable. If there is a distribution among officials on the road of different utility functions or different values to the benefit and cost functions, $g(.)$ and $c(.)$, then we may observe different versions of the propositions or an average of them. Nonetheless we can test them using the Ghanaian policy experiment of raising police salaries on July 1, 2010 and leaving other worker's salaries unchanged.

In our policy experiment set up we have civil servants (Ghanaian policemen) who have received a treatment (higher salaries) and other civil servants (e.g., Ghanaian customs agents or Burkinabé policemen) who did not receive such a treatment. We observe these treated and control populations in multiple interactions (~45,000 bribe "opportunities") with truck drivers across 6 years: 4 years before the experiment (2006 – June 30, 2010) and two years afterwards (July 2010 – 2012). This unique experimental set up allows us to use a difference-in-difference and triple difference approach making use of the variation across civil service type, country and year (Wooldridge, 2010) to test the effects of raises in police salaries on bribes. We can test the effect of the treatment (salary increase) on the amount and levels of bribe taking at both individual stop and national levels, while controlling for truck, truck driver, road, time, and country characteristics.

---

[10] Note that since the higher salaries in question affect all policemen from top to bottom, it would have to be that the superiors operate with a reference dependent utility for them to raise the rental rate on a road stop on their underlings. Thus this outcome would require superiors to act according to conjecture (3) while underlings acted under conjecture (4).

16

89
EOIR-000344

The key outcome (dependent) variables we will be testing are: effort (the amount of time an official used to ask for a bribe), the amount paid at each stop, the number of stops where no bribe is paid, and the total amounts paid on a road. It is worth noting that effort, bribe values and no-bribe outcomes are all correlated, but not as highly correlated as one might expect. The elasticity of bribe value with respect to effort is between 0.19 and 0.13 depending on specifications. In addition while effort and having no-bribes to pay might logically be negatively correlated, they in fact have a 0.034 statistically significant positive correlation. Specific hypotheses to be tested with this methodology are that the rise in police salaries has: 1) Reduced the effort that policemen put into collecting bribes, 2) Reduced the amount paid in bribes to policemen in Ghana compared to other countries and other civil servant types. 3) Reduced the number of times a truck is stopped and asked to pay a bribe by policemen in Ghana compared to other countries and other civil servant types. 4) That 1) and 2) combined have reduced the overall cost and delays associated with bribery on the roads of Ghana.

## 4.3 Econometric Model

Our econometric strategy uses a difference-in-difference method to test the effects of the salary policy change for policemen relative to other civil servants. We have three dependent variables of interest, effort expended to collect a bribe (measured in minutes), the value of a bribe collected (measured in CFA francs), and a dummy variable for when no bribes are paid. Focusing on effort, let $Y_{ijt}$ be the effort expended by a civil servant on truck $i$ at checkpoint $j$ at time $t$, and let $X_{ijt}$ be the characteristics of a truck, $i$, stopping at checkpoint $j$ at time $t$. Our basic equation of interest will then be:

$$Y_{ijt} = \alpha + \beta_1 \, Police_{ijt} + \beta_2 \, Salary\_Policy_t + \beta_3 \, Police_{ijt} \, X \, Salary\_Policy_t + \gamma \, X_{ijt} + T + \eta_j + \varepsilon_{ijt} \, ,$$

(6)

90
EOIR-000345

where $\beta_3$ is our difference-in-difference parameter of interest, $T$ is a series of time dummies (month and year), $\eta_j$ are checkpoint specific fixed effects, and $\varepsilon_{ijt}$ is a standard error term which we cluster at the truck level in the estimations.[11] The equation (6) is first estimated with data from Ghana and provides the difference between effort and bribes paid between policemen and customs officers. We also estimate (6) as linear probability and probit models in which the dependent variable is the number of times a truck is stopped at a roadside checkpoint and leaves without paying a bribe. Versions of (6) are also estimated with the bribe amounts aggregated across $j$ so that $Y_{it}$ represents the average effort or bribe a truck pays on the road in total. Similar estimates are done with the number of stops with no bribe and the total number of stops. All of the aggregated estimates have robust standard errors, rather than clustered errors at the truck level as in the baseline equation.

We then expand the dataset to include the bribes that the trucks paid Burkina Faso, which allows us to estimate (6) as a triple difference panel fixed effects model with truck level fixed effects. Our equation will now be:

$$Y_{ijt} = \alpha + \beta_1\, Police_{ijt} + \beta_2\, Salary\_Policy_t + \beta_3\, Police_{ijt} X\, Salary\_Policy_t + T + C + \eta_j + \mu_i + \varepsilon_{ijt}\,, (7)$$

where the *Salary_Policy* dummy variables are Ghana specific, $C$ is a country dummy variable, and $\mu_i$ is a truck specific fixed effect that controls for differences between trucks. Here the results we obtain will be driven by differences of the bribes paid within a single truck trip, although the triple difference-in-difference will be driven by the checkpoint civil servant and policy changes. This fixed effect regression will control for any changes in truck "quality" between before and after the policy change as might happen if the policy change induced

---

[11] We choose to cluster at the truck level because it is likely to be the source of the greatest heteroskedasticity due to unobservable characteristics. Results presented here are robust to other assumptions about the appropriate clustering of the error term.

91
EOIR-000346

truckers to improve the quality or compliance of their trucks with police checkpoints. It also addresses potential biases that might exist in the data collection across time. We also estimate a linear probability and random effects probit version of (7) with the probability of zero bribe paid as a dependent variable.

## 5. Results

Table 1 shows descriptive statistics for the variables used in the main regressions for the Ghana part of the dataset. As shown across all years the average bribe was paid in 8 minutes and the average bribe was the equivalent of 473 CFA, just under $1 at the exchange rates of the period.[12] The average truck had 16 stops in the Ghana portion of the trip, with 6.5 stops in Burkina Faso. About 13% of the stops involved no bribe paid and 53% of the stops are with police while the other ones are with customs officers. More than 90% of the drivers are Ghanaian, with half of the trucks having Ghanaian registry, and 15% are oil tanker or container trucks, which are less likely to be carrying illegal cargo than general-purpose trucks.[13] The data on the Burkina Faso part of the trip shows higher bribe taking effort, higher bribe values and fewer trucks let go without paying a bribe in that country. Police represent a smaller proportion of the stops at only 22% in Burkina Faso compared to nearly half the stops in Ghana. We present parallel trend tests showing the experimental environment in table A1 of the Appendix.

---

[12] We use CFA francs which are pegged to the Euro, 1 Euro = 655.957 CFA, as a way to account for differences in inflation across two different countries with different inflation rates. Results are in fact stronger if the Ghana regressions are done in Ghanaian cedis.

[13] In the appendix we show that the results hold if we restrict the sample to container and oil tanker trucks, which would be less likely to be victims of corruption and therefore potentially less likely to be affected by this salary change.

92
EOTR-000347

The difference-in-difference effort regressions with the number of minutes that an official spent arguing for a bribe as the dependent variable are shown in table 2 with standard errors clustered at the level of the 2,147 trucks. The first column with our baseline specification shows that police increased their effort asking for bribes by 1.6 minutes after the salary change relative to customs agents, which is a 19% increase in bribe solicitation effort. The estimate is unchanged by adding in truck characteristics and a dummy variable for whether the day is a holiday as done in column 2. We thus have evidence for the reference dependent utility Conjecture (3), that the salary change raised police income expectations in excess of the income change.

The baseline difference-in-difference regressions measuring the amount paid of each bribe (including non-payment at a stop) are presented in table 3, with standard errors clustered at the truck level. They show that the interaction of police and salary policy dummy variables produces about a 119 CFA increase in bribes at each stop across the whole time period. We extend the baseline to include variables describing the truck and driver, whether the particular day the bribe is paid was a holiday, and whether the truck was coming from the port, since many of the return trips are mostly empty trucks. The basic results shown in column 1 hold up with these additional controls and our point estimate of the effect goes up to 126 CFA. Among the control variables, only trucks coming from the port has a significant negative effect, lower bribe values likely due to the empty trucks going to the port having higher propensities to carry illicit goods.[14] The higher magnitudes in bribes, 25-27% higher, are consistent with the baseline that

---

[14] Full regressions are available from the authors on request. In both Ghana and Burkina Faso, long-haul trucks such as these are not allowed to pick up goods or people along the way to either bring to another intermediate point or to the end point. Thus even normally legal goods such as charcoal or pineapples might be illicit for these trucks.

93
EOIR-000348

the higher salaries caused higher corruption levels. Thus we find continuing evidence in the bribe value regressions for Conjecture (3) relative to the first two Conjectures.

We then proceed to investigate the number of times that a truck is allowed to pass through a road-stop without paying a bribe using linear probability and probit regression frameworks, which provides some measure of the amount of bribe taking. Recall that the models suggest that the incidence of bribes might go down with a rise in salaries, even while effort might go up. Also it is possible that drivers will negotiate more vociferously with civil servants who they know received a recent raise, increasing the possibility that they are let go without paying a bribe. Table 4 shows significant positive effects of the salary policy on whether a policeman allows a truck to pass without paying a bribe. In contrast to our results on the level of payment, these results show that policemen were more likely to let a truck pass without paying a bribe than before the change. The raw data show that before the salary change policemen allowed 10% of the trucks to pass without taking a bribe and that this level increased to 19% of the trucks after the salary policy change. These results are potentially consistent with all of the conjectures set out above in our modeling.

While the above estimates provide evidence for how bribe taking changes within Ghana, it is possible that there are unmeasured trends that could be confounding our data within Ghana. We therefore turn to a triple difference fixed effects estimate in which we estimate the effects of the policy in Ghana relative to the amounts paid to customs agents, gendarmes[15] and policemen in the neighboring country of Burkina Faso, who were not affected by the change. In addition, with the truck fixed effects, we are able to control for potential confounding effects of truck

---

[15] In Francophone countries the gendarmes are a type of police force with wider more national mandate than the police as well as a military policing role. Thus the role of the police in Ghana is shared in Burkina Faso jointly by the police and the gendarmes. They would be the equivalent of a cross between the state and military police in the US policing system. Gendarmes represent about 16% of the stops in Burkina Faso.

94
EOIR-000349

characteristics unobservable in the data, but readily observable to a policeman (e.g., a broken headlight). This can also account for any endogenous differences in the truck fleet that might have occurred after the salary policy change. If for example truck fleets changed the quality of their trucks due to the salary change, the OLS regressions would not be robust to this effect, but the fixed effects would be.

Table 5 shows the panel fixed effects results for the effort and bribe value regressions. The three models with the full dataset show significant effects of the police salary policy relative to Burkina Faso and non-policemen. For the effort regressions we find a consistent estimate of 1.7 extra minutes of effort, although it is only significant at the 10% level. For the bribe value regressions, the extra bribe costs per stop are 159 CFA, which represents a 34% increase in the level of bribes after controlling for truck and country effects. Overall, the panel data results across the board confirm the support for Conjecture (3) that the salary increases will increase both bribe seeking effort and bribe values.

In order to test the number of stops without a bribe in the panel dataset, we estimate linear probability fixed effects and random effects probit models, which is shown in table 6. In all models we find corroborating evidence that the salary change increased the number of trucks that policemen allow to pass without paying a bribe went up after police salaries went up. Thus the evidence is that for each stop, the probability a truck did not have to pay a bribe went up for Ghanaian policemen after the salary change relative to customs officers or Burkinabé policemen. Again, these results are consistent with all the conjectures from the modeling.

While the previous estimates are done at the level of each individual time a truck is stopped on the road, they do not tell us about how the aggregate price to travel on the road and number of total stops might change with the Ghanaian police salary change. In order to test

22

those effects the regressions in tables 7 and 8 use data aggregated at the level of a truck trip through Ghana. Table 7 shows the effects of the salary policy on the average effort expended at each stop, the average amount paid in bribes at each stop on the road in Ghana and the percent of stops with no bribe. Consistent with our previous findings, we see that the salary policy increased the average effort at each stop by more than a minute and average amount of bribes paid to each policemen by a statistically significant 109 CFA. This represents a 23% increase in the amounts of bribes paid on the road due to the policy change. We also find that the number of stops without a bribe goes up significantly after the salary policy change.

In order to test the most anomalous of the results, that the number of bribes with no bribe paid went up, we test whether this effect is just at the individual stop level or holds true for the full truck trip. Table 8 shows how the salary policy changes the total number of stops on the road and the total number of stops at which a bribe is paid. The first two columns show that the police salary change increased the number of stops on the road by 0.7 stops, which is an 8% increase over the average of 8.5 stops by policemen in Ghana. This suggests that while the salary increase encouraged policemen to be more likely to let trucks go without paying a bribe, the higher salary also increased the number of police stops. Both of these effects could be interpreted as evidence of policemen doing their job better after the salary increase. It is just that doing the job "better" may also mean collecting higher bribes. The last two columns of table 8 show that the total number of bribes paid on the road, which equals the total number of stops minus the number of stops with zero bribes paid, is unchanged by the increase in police salaries. Thus the result seen at the individual stops in which policemen were more willing to let trucks pass without a bribe after police salaries increased, did not mean truckers paid a smaller number of bribes. The 8% increase in the number of police stops completely offset the reduction in the

96
EOIR-000351

number of bribes paid due to policemen letting some trucks pass without paying a bribe. This gives corroborating evidence for conjecture (3): that a salary increase increases bribe effort and bribe values.

The net effect appears to be policemen allocating more effort to collecting bribes and asking for higher bribe values, but also increasing the number of truckers let go without a bribe. To demonstrate that there has been an increase in zero bribes and a reduction of low level (1 cedi) bribes for policemen relative to customs officers in Ghana, figures 2 and 3 show kernel density estimates of the bribe amounts in Ghanaian cedis, with values truncated at 10 to focus the analysis. Figure 2, which shows policemen's bribe taking behavior before and after the policy change, shows an increase in mass at zero and two cedis, with a reduction in one cedi bribes after the policy change. Figure 3 shows that customs officers have a different behavior with bribes reduced after July 2010 and more of them being one cedi rather than two or three. This provides corroborating evidence that the effect of the salary policy change was to increase the effort and value of bribes asked for by policemen, but to slightly increase the number of trucks they let go without paying a bribe.

## 6. Robustness Checks

The appendix provides robustness checks. We first check whether our difference-in-difference set up exhibits parallel trends, using year time trends and their interaction with the police dummy. Results for data from 2008 forward or 2010 forward show no significant difference in effort between police and customs. Bribe values are significantly different from 2008 forward, showing a positive trend, while 2010 shows a strong non-parallel trend in bribe values in the

24

EOIR-000352

opposite direction of our results post January 1, 2010. In table A1b we limit the sample to test parallel trends to one year before the policy change, July 1, 2009 to June 30, 2010, and test monthly rather than yearly trends. Results using monthly trends instead of yearly ones, show non-significant results or results that suggest a bias in the opposite direction of our main findings. In this case effort is significant at a 10% level but in the opposite direction of our findings (negative) and there are non-significant monthly trends for bribe values.

A second robustness check is to limit the data to a period much closer to the actual policy change in order to limit other potential confounding effects either pre or post policy change. Trucks voyaging after July 1, 2009, such as those used in the monthly parallel trends regressions, table A1b, most clearly show parallel trends. It is also potentially the case that our long timeline post policy change is capturing other confounding effects unrelated to our policy change. We therefore run the basic models of effort and bribe values in both OLS and fixed effect panel versions with a restricted time-frame under which the outcomes are least likely to be contaminated by other effects: from July 1, 2009 to December 31, 2011. The results of those regressions are in table A1c and show the same effects as the regressions over a longer period of time.

We take these results as evidence for the validity of our difference-in-difference for the effort regressions. The potentially non-parallel trend in bribe values over the longer time periods suggests some caution is needed in interpreting the bribe value regressions from Ghana. One should note, however, that if the higher bribes shown post-salary policy change merely follow an existing trend of higher police bribe values then it would still be the case that the salary raise did not reduce bribes. Also the triple difference panel regressions with both Burkina Faso

98
EOR-000353

and Ghana data on the same trucks, which are driven by differences in within truck effects rather than time effects, corroborate the fundamental findings.

A third robustness check is to test whether the results could be described by the model used in Olken and Barron (2009) in which the price paid at each stop is determined in part by the total price paid on the road. As detailed in appendix A2 we find no evidence that this model is the correct specification for bribes on the roads of West Africa.

A fourth robustness check presented in appendix A3 is to limit the sample to container and tanker trucks. Container and tanker trucks are in general "cleaner" in terms of being newer trucks and having fewer violations relative to general-purpose trucks. We therefore re-run the key regressions of the paper with just container and tanker trucks. The results suggest our main results are robust to using only the "best" trucks on the road.[16]

In a fifth and final robustness check, we generate a placebo policy enacted one year before the actual policy of interest, on July 1, 2009. The results in appendix A4 show that such a placebo policy using data up until June 30, 2010, the day before the policy's actual enactment, has no significant effect on any of our variables of interest. We thus do not find any evidence that our findings could be driven by a seasonality effect that might be evident each year in the data as would be the case with our placebo effect. This placebo exercise's non-significance also provides corroborating evidence of there being parallel trends in the year before enactment of the policy.

## 7. Discussion of Reference-Dependence Results

---

[16] Another way to identify the "best" trucks on the road would be to limit the sample to those who had at least one instance on the road of not having to pay a bribe at a stop. The results, available from the authors on request, with this "best truck" sample do not change in magnitude or significance from our main findings.

99
EOIR-000354

Since the police extort significantly more bribes following the policy reform relative to other officials, their reference incomes appear to have shifted significantly higher following the increase in wages. While we believe this shift in reference incomes happens at the individual police official level, we provide two potential mechanisms at a broader system or societal level that might also be broadly consistent with our reference-dependence findings. First, it is possible that the higher salaries worsen petty corruption by "professionalizing" the police, which might raise their keenness for corrupt behavior. Such a professionalizing effect might occur because the salary reform package included improved pathways to promotion at the police sector level. The possibility and expectation of higher status may be one indirect driver of reference-dependence, to the extent that better-paid officers feel that they "merit" higher bribes. It might also be the case that promotions within the police are driven by one's ability to collect bribes at which point more chances for promotion could increase bribe-extracting behavior. Anecdotal evidence from the police, however, suggest that the promotion aspect of the SSSS reform has not actually yet seen implementation. We would thus expect this expected promotion effect to be small or at least diminish significantly over time, an effect not seen in our data.

Another potential mechanism driving reference-dependent consistent behavior may be that better-paid police might face increasing redistributive social pressures from extended family members whose demands might indirectly fuel these bribes. Such a reference-dependent behavior on the part of family members rather than police officers would be consistent with the origins of corruption as a social norm rather than an individual choice per se (see Acemoglu and Jackson (2014)). Although we have no way of directly testing this in the data, such family pressure might be most salient in cases where it is relatively straightforward to extort funds, such as when trucks on the road do not have appropriate documentation. Family pressures would have

100
EOIR-000355

to be uncharacteristically strong to drive our results because all of the trucks in this sample had all of their papers in order throughout the research. It therefore appears unlikely that the police behavior that increases bribe-taking behavior is driven exclusively by increased external influences for extorting bribes rather than their own reference dependent behavior.

## 8. Conclusions

This work has used a policy experiment in Ghana to show that increasing salaries of civil servants can increase bribe taking by those civil servants. The work shows that policemen who received the single spine salary increase in Ghana increased the effort they allocated to colleting bribes in time spent asking for bribes, in the number of checkpoints they operated, the value of bribes they took, the total amount that truckers had to pay on the road, all while they increased the number of trucks let go without a bribe. Their decreasing the number of times they succeeded in getting a bribe could be related to career concerns in which the more often one asks for a bribe, the higher the probability of losing one's job. On the other hand the increased effort and value of bribes taken is consistent with the idea that higher civil service salaries induce civil servants to demand higher bribes through a reference dependent behavioral model.

Since the Ghanaian salary increase experiment took place without a commensurate increase in enforcement of anti-corruption laws, the results here suggest that merely raising salaries without changing the context and incentives within which reference dependent civil servants operate may not have the expected or desired effects on corruption. We demonstrate that raising salaries of corrupt officials can have the consequence of worsening petty corruption, in contrast to many theoretical and experimental predictions from the literature. The results also call into question the relevance of cross-country studies and laboratory based studies, which have shown that higher salaries or payments reduce corruption. The empirical results presented here

101
EOIR-000356

suggest that fighting corruption cannot be done by salary policies alone. Further work is warranted to investigate how widespread the effects shown here are or whether they are specific to West Africa. Investigations of corruption may need to consider salary raises with important complementary factors such as increased corruption enforcement as well as more cohesive institutions as part and parcel of the same equation.

102
EGTR-000357

# References

Acemoglu, D. and M. Jackson. 2014. "Social Norms and the Enforcement of Laws" MIT Department of Economics Working Paper Series 14-16.

Akerloff, G. and J. Yellen 1990, "The Fair Wage Hypothesis and Unemployment." *Quarterly Journal of Economics*. 105(2): 255-283.

Aliu, M., and M. Fuseini. 2014. "Appraisal of Implementation of the Single Spine Pay Policy in Ghana: A Case of the University for Development Studies." International Journal of Economics, Commerce and Management, 2(1):1-16.

Armantier, O. and A. Boly 2011 "A Controlled Field Experiment on Corruption." *European Economic Review.* 55: 1072-1082.

Bandiera, O., A. Prat, and T. Valletti. 2009."Active and Passive Waste in Government Spending: Evidence from a Policy Experiment." *American Economic Review,* 99(4):1278-1308.

Bertrand, M., S. Djankov, R. Hanna, and S. Mullainathan 2007."Obtaining a Driver's License in India: An Experimental Approach to Studying Corruption." *Quarterly Journal of Economics,* 122(4): 1639-1676, November.

Camerer, C. L. Babcock, G. Loewenstein, and R. Thaler. 1997. "Labor Supply of New York City Cabdrivers: One Day at a Time." *Quarterly Journal of Economics.* 112(May 1997): 407-441.

Card, D. A. Mas, E. Moretti, and Emmanuel Saez. 2012. "Inequality at Work: The Effect of Peer Salaries on Job Satisfaction." *American Economic Review,* 102(6): 2981-3003.

Daily Graphic. 2009. "Implementation of Single Spine Salary Structure: Labour Worried." http://www.modernghana.com/news/247070/1/implementation-of-single-spine-salary-structure-la.html

Daily Graphic. 2014. "Defer Full Implementation of Single Spine to Save Economy." http://graphic.com.gh/news/general-news/19203-defer-full-implementation-of-single-spine-to-save-economy-akoto-osei.html

Dewatripont, M. I. Jewitt, and J. Tirole, 1999. "The Economics of Career Concerns, Part I: Comparing Information Structures" *Review of Economic Studies* 66 (1): 183-198

Ferraz, C. and F. Finan. 2009. "Motivating Politicians: The Impacts of Monetary Incentives on Quality and Performance" NBER Working Paper 14906.

Fisman, R. and Svensson, J. 2007. Are corruption and taxation really harmful to growth? Firm level evidence. *Journal of Development Economics,* 83(1): 63-75.

**103**
EOIR-000358

Freund, C. and N. Rocha. 2009. "What Constrains Africa's Exports?" World Bank Policy Research Working Paper No. 5184.

Gagliarducci S. and T. Nannicini. 2013. "Do Better Paid Politicians Perform Better? Disentangling Incentives from Selection, " *Journal of the European Economic Association.* 11(2): 369-398.

Gadugah, N. 2015. "With Single Spine There Is No Justification for Bribes in Ghana – Mahama." http://www.myjoyonline.com/politics/2015/February-26th/with-single-spine-there-is-no-justification-for-bribes-in-ghana-mahama.php

Gould, D.J., 1980. *Bureaucratic Corruption and Underdevelopment in the Third World: The Case of Zaire.* New York: Pergamon Press.

Lambsdorf, J. G., 2006. "The Causes and Consequences of Corruption: What do we know from a cross-section of countries?" In Rose-Ackerman, S. (ed.) 2006. *International Handbook on the Economics of Corruption.* Cheltenham UK: Edward Elgar Publishing.

Kőszegi, B. and M. Rabin. 2006. "A Model of Reference Dependent Preferences." *Quarterly Journal of Economics.* 121 (November 2006): 1133-1165.

Kuhn, P., P. Kooreman, A. Soetevent & A. Kapteyn, 2011. "The Effects of Lottery Prizes on Winners and Their Neighbors: Evidence from the Dutch Postcode Lottery," *American Economic Review,* 101(5): 2226-2247.

McTernan, B. A. 2013. "Ballooning Wage Bills from Accra to Cairo." *The Africa Report.* www.theafricareport.com/North-Africa/ballooning-wage-bills-from-accra-to-cairo.html

Olken, B. 2007. "Monitoring Corruption: Evidence from a Field Experiment in Indonesia." *Journal of Political Economy,* 115: 200-249.

Olken, B. and P. Barron. 2009. "The Simple Economics of Extortion: Evidence from Trucking in Aceh." *Journal of Political Economy.* Vol. 117(3): 417-452

Olken, B. and R. Pande, 2012. "Corruption in Developing Countries" *Annual Review of Economics.* 4(1): 479-509

Owusu, S. 2011. "Can Single-Spine Salary For Police Stop Bribery and Corruption?" *Modern Ghana News.* 9 January, 2011.

Rose-Ackerman, S. 2010. "The Law and Economics of Bribery and Extortion," *Annual Review of Law and Social Science* 6: 217-236.

**104**
EOIR-000359

Seniwoliba, J. A. 2014. "The Single Spine Pay Policy: Can Ignorance Derail the Benefits it Has on the Ghanaian Public Service Worker?" European Scientific Journal 10(8): 437-460.

Shleifer, Andrei and Robert W. Vishny. 1993. "Corruption," *The Quarterly Journal of Economics,* 108(3):599-617.

USAID West African Trade Hub, Corruption Database. Last accessed, January, 2014.

Van Rijckeghem, C. & Weder, B. 2001. "Bureaucratic Corruption and The Rate of Temptation: Do Wages in the Civil Service Affect Corruption, and by how Much *Journal of Development Economics* 65(2) :307-331.

Van Veldhuizen, R. 2013. "The Influence of Wages on Public Officials' corruptibility: A laboratory investigation" *Journal of Economic Psychology* 39: 341–356.

Wooldridge, J. 2010. *Econometric Analysis of Cross-Section and Panel Data.* MIT University Press: Cambridge, MA.

Zitzewitz, E. 2012. "Forensic Economics" *Journal of Economic Literature.* Vol. 50(3): 731-769

105
EOIR-000360

## Table 1: Descriptive Statistics

| Variable | Observations (# of stops) | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|---|
| **Ghana only** | | | | | |
| Effort (Minutes per stop) | 34,869 | 8.343 | 22.92 | 0 | 1440 |
| Bribe value in CFA (500 ~ = $1) | 34,869 | 472.40 | 1307.46 | 0 | 150289 |
| No bribe paid at a stop | 34,869 | 0.1313 | 0.3378 | 0 | 1 |
| Police | 34,869 | 0.5276 | 0.4992 | 0 | 1 |
| Salary Policy | 34,869 | 0.3936 | 0.4886 | 0 | 1 |
| Police X Salary Policy | 34,869 | 0.2114 | 0.4083 | 0 | 1 |
| Container or Tanker Truck | 34,869 | 0.1477 | 0.3547 | 0 | 1 |
| Holiday | 34,869 | 0.1663 | 0.3723 | 0 | 1 |
| Ghanaian Vehicle | 34,869 | 0.5780 | 0.4939 | 0 | 1 |
| Ghanaian driver | 34,869 | 0.9114 | 0.2841 | 0 | 1 |
| Coming from the port | 34,869 | 0.7891 | 0.4080 | 0 | 1 |
| **Burkina Faso only** | | | | | |
| Effort (Minutes per stop) | 12,514 | 14.60 | 83.18 | 0 | 7170 |
| Bribe value in CFA (500 ~ = $1) | 12,514 | 1428.4 | 880.91 | 0 | 20000 |
| No bribe paid at a stop | 12,514 | 0.046 | 0.201 | 0 | 1 |
| Police | 12,514 | 0.227 | 0.419 | 0 | 1 |
| **Total sample** | 47,383 | | | | |
| Number of Trucks | 2,147 | | | | |

Notes: Effort, bribe values, and no bribe paid at a stop provides the mean for both customs and police stops combined, with the Burkina Faso data also including gendarme stops. Note we do not show the Burkina Faso data for "Container or Tanker Truck", "Holiday", vehicle and driver origin, or "Coming from the port" since the means are the same as for the Ghana only portion.

106
EOIR-000361

**Table 2:**

**Baseline Effort Regressions**

| Variables | (1) Effort | (2) Effort |
|---|---|---|
| Police | -1.700*** | -1.606*** |
| | (0.408) | (0.413) |
| Salary Policy | -0.618 | -0.719 |
| | (0.645) | (0.651) |
| Police X Salary | 1.592*** | 1.592*** |
| | (0.325) | (0.330) |
| Constant | 4.758*** | 6.410*** |
| | (1.583) | (1.659) |
| Year & Month effects | Yes | Yes |
| Checkpoint fixed effects | Yes | Yes |
| Truck characteristics | No | Yes |
| Observations | 34,869 | 34,869 |
| R-squared | 0.242 | 0.244 |

Notes: Robust standard errors clustered at the truck level are in parentheses. Truck characteristics are tanker or container dummy, driver and truck home country, and a holiday dummy.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

107
EOIR-000362

### Table 3: Baseline Bribe Value Regressions

Dependent variable is real CFA value of bribe paid at each stop

| Variables | (1) Bribes | (2) Bribes |
|---|---|---|
| Police | -197.5*** | -202.9*** |
|  | (32.47) | (31.90) |
| Salary Policy | -28.57 | -28.57 |
|  | (33.46) | (32.49) |
| Police X Salary | 119.0*** | 125.6*** |
|  | (28.71) | (28.88) |
| Constant | 555.1*** | 679.0*** |
|  | (60.56) | (87.85) |
| Year & Month effects | Yes | Yes |
| Checkpoint fixed effects | Yes | Yes |
| Truck characteristics | No | Yes |
| Observations | 34,869 | 34,869 |
| R-squared | 0.036 | 0.038 |

Notes: Robust standard errors clustered at the truck level are in parentheses. Truck characteristics are tanker or container dummy, driver and truck home country, and a holiday dummy.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

108
EOIR-000363

**Table 4: Probability of paying no bribe (Linear probability & Probit)**
Dependent variable = 1 if no bribe paid

| Variables | (1) Linear Probability | (2) Linear Probability | (3) Probit |
|---|---|---|---|
| Police | 0.0111** | 0.00471 | 0.0600** |
| | (0.00541) | (0.00627) | (0.0295) |
| Salary Policy | -0.0120 | -0.0116 | -0.115 |
| | (0.0172) | (0.0171) | (0.0798) |
| Police X Salary | 0.0494*** | 0.0462*** | 0.181*** |
| | (0.0102) | (0.00998) | (0.0458) |
| Constant | -0.00114 | -0.0632* | -1.251*** |
| | (0.0320) | (0.0368) | (0.134) |
| Year & Month effects | Yes | Yes | Yes |
| Truck characteristics | Yes | Yes | Yes |
| Checkpoint fixed effects | No | Yes | No |
| Observations | 34,862 | 34,862 | 34,866 |
| R-squared | 0.038 | 0.083 | |
| Log Likelihood | | | -12968 |

Notes: Robust standard errors clustered at the truck level are in parentheses. Truck characteristics are tanker or container dummy, driver and truck home country, and a holiday dummy.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

109
EOIR-000364

### Table 5: Panel Fixed Effects using data from Ghana and Burkina Faso

Dependent variables are minutes of effort or real CFA value of bribe paid at each stop

| Variables | (1) Effort | (2) Effort | (3) Bribe value | (4) Bribe value |
|---|---|---|---|---|
| Ghana | -2.639 | -2.637 | 167.9 | 168.2 |
|  | (9.517) | (9.517) | (241.0) | (240.9) |
| Ghana X Police | 1.435 | 1.437 | -327.1*** | -326.8*** |
|  | (1.355) | (1.355) | (34.30) | (34.29) |
| Police | -2.484** | -2.489** | -309.8*** | -310.7*** |
|  | (1.181) | (1.181) | (29.89) | (29.89) |
| Salary Policy | -2.376** | -2.378** | 94.00*** | 93.66*** |
|  | (1.107) | (1.107) | (28.03) | (28.03) |
| Ghana Police X Salary | 1.731* | 1.730* | 152.9*** | 152.8*** |
|  | (1.039) | (1.039) | (26.30) | (26.30) |
| Holiday |  | 0.603 |  | 101.1** |
|  |  | (1.671) |  | (42.30) |
| Constant | 11.03 | 10.16 | 103.0 | -41.84 |
|  | (33.61) | (33.69) | (850.8) | (852.9) |
| Checkpoint fixed effects | Yes | Yes | Yes | Yes |
| Year fixed effects | Yes | Yes | Yes | Yes |
| Observations | 47,383 | 47,383 | 47,383 | 47,383 |
| R-squared | 0.071 | 0.071 | 0.163 | 0.163 |
| Number of truck trips | 2,147 | 2,147 | 2,147 | 2,147 |

Notes: Include police, customs and in Burkina Faso gendarmerie stops with robust standard errors in parentheses.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

EOIR-000365

### Table 6: Panel Data No bribe paid
Dependent variable = 1 if no bribe paid

| Variables | (1) Linear Probability fixed effects | (2) Linear Probability fixed effects | (3) Random effects Probit |
|---|---|---|---|
| Ghana | 0.0547*** | -0.100* | 0.423*** |
|  | (0.00466) | (0.0586) | (0.0352) |
| Ghana Police | 0.0257*** | 0.0178** | 0.327*** |
|  | (0.00733) | (0.00834) | (0.0648) |
| Police | -0.0126** | -0.00559 | -0.237*** |
|  | (0.00613) | (0.00682) | (0.0588) |
| Salary Policy | 0.0408*** | 0.0415*** | 0.360*** |
|  | (0.00711) | (0.00729) | (0.0559) |
| Police X Salary | 0.0504*** | 0.0477*** | 0.191*** |
|  | (0.00638) | (0.00640) | (0.0392) |
| Constant | 0.740** | 0.921*** | -1.896*** |
|  | (0.296) | (0.337) | (0.0915) |
| Year & Month effects | Yes | Yes | Yes |
| Checkpoint effects | No | Yes | No |
| Observations | 47,383 | 47,383 | 47,286 |
| Number of truck trips | 2,147 | 2,147 | 2,147 |
| Log likelihood |  |  | -13,815 |

Notes: Include police, customs and in Burkina Faso gendarmerie stops with robust standard errors in parentheses.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

111
EOIR-000366

**Table 7: Aggregate per trip total bribes and number of stops with no bribe in Ghana**

| Variables | (1) Effort: Duration at each stop | (2) Values: Avg. Bribe costs on road | (3) Number of stops with no bribe |
|---|---|---|---|
| Police | -0.613 | -95.49*** | 0.0853 |
| | (0.448) | (26.68) | (0.0554) |
| Salary Policy | -4.110 | -969.2*** | 0.261 |
| | (4.716) | (170.1) | (0.448) |
| Police X Salary | 1.127** | 109.1*** | 0.600*** |
| | (0.571) | (42.23) | (0.109) |
| Constant | 11.17*** | 515.8*** | 1.321*** |
| | (0.872) | (45.68) | (0.243) |
| Year & Month effects | Yes | Yes | Yes |
| Observations | 4,238 | 4,238 | 4,238 |
| R-squared | 0.101 | 0.075 | 0.156 |

Notes: Robust standard errors in parentheses.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

112
EOIR-000367

**Table 8: Aggregate per trip number of stops and bribes paid in Ghana**

| Variables | (1) Number of stops | (2) Number of bribes paid (Stops – No bribe stops) |
|---|---|---|
| Police | 0.585*** | 0.497*** |
|  | (0.153) | (0.161) |
| Salary Policy | 0.540** | 0.0973 |
|  | (0.221) | (0.223) |
| Police X Salary | 0.709*** | 0.109 |
|  | (0.223) | (0.235) |
| Constant | 8.435*** | 7.549*** |
|  | (0.379) | (0.411) |
| Year effects | Yes | Yes |
| Observations | 4,236 | 4,236 |
| R-squared | 0.055 | 0.038 |

Notes: Robust standard errors in parentheses.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

40

113
EOIR-000368

**Figure 2. Graph of Police GH Cedi bribe amounts before and after the salary change**



114
EOIR-000369

**Figure 3 Graph of Custom GH Cedi bribe amounts before and after the salary change**



115
EOIR-000370

## Appendix

### A1. Parallel Trends Tests

For the validity of the difference-in-difference specification we need there to be parallel trends in the data prior to July 1, 2010 between effort and bribe values in customs and police stops. Unlike most studies with little "burn in" period, we have 3 years of data before the policy change as well as almost 2 years of data after the policy change.

In the results shown in table A1, we test parallel trends using year time trends and their interaction with the police dummy. Results for data from 2008 forward or 2010 forward show no significant difference in effort between police and customs. Bribe values are significantly different from 2008 forward, showing a positive trend, while 2010 shows a strong non-parallel trend in the opposite direction of our results post January 1, 2010.

### Table A1
#### Parallel Trends with yearly trends

| Variables | (1) Effort (2008-policy change) | (2) Effort (2010-policy change) | (3) Bribe value (2008-policy change) | (4) Bribe value (2010-policy change) |
|---|---|---|---|---|
| Police | -1,057 | -1.906 | -99,894*** | -163.7*** |
| | (718.6) | (2.822) | (38,477) | (54.22) |
| Police X Year | 0.525 | | 49.54*** | |
| | (0.358) | | (19.14) | |
| Year | -2.610*** | | -224.3*** | |
| | (0.420) | | (22.35) | |
| Constant | 5,250*** | 3.138*** | 450,984*** | 385.8*** |
| | (843.5) | (0.521) | (44,900) | (63.37) |
| Month effects | Yes | Yes | Yes | Yes |
| Checkpoint effects | Yes | Yes | Yes | Yes |
| Observations | 16,231 | 2,948 | 16,231 | 2,948 |
| R-squared | 0.342 | 0.182 | 0.154 | 0.068 |

Notes: Robust standard errors in parentheses clustered at the truck level.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

43

116
EOIR-000371

In table A1b, we use monthly trends for the period from July 1, 2009 forward to test parallel trends. These results find no effects of the Police X Month interaction term on bribe values and a negative effect, significant at a 10% level, for the effort regressions. Thus we find reasonable evidence of a parallel trend for the year before our policy change.

**Table A1b**
Monthly Parallel trends 7/1/09 - 6/30/10

| VARIABLES | (1) Bribe Effort | (2) Bribe Values |
|---|---|---|
| Police | 77.45* | -5,732 |
| | (45.43) | (4,775) |
| Police X Month Trend | -0.129* | 8.748 |
| | (0.0773) | (7.960) |
| Month Trend | 0.132 | -20.63*** |
| | (0.144) | (7.338) |
| Constant | -76.02 | 12,708*** |
| | (86.16) | (4,387) |
| | | |
| Observations | 6,922 | 6,922 |
| R-squared | 0.135 | 0.201 |

Notes: Robust standard errors in parentheses clustered at the truck level.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

As a robustness check on our basic results we limit the data to a period much closer to the actual policy change in order to limit other potential confounding effects either pre or post policy change. Trucks voyaging after July 1, 2009, such as those used in the monthly parallel trends regressions, table A1b, most clearly show parallel trends. It is also potentially the case that our long timeline post policy change is capturing other confounding effects unrelated to our policy change. We therefore run the basic models of effort and bribe values in both OLS and fixed effect panel versions with a restricted time-frame under which the outcomes are least likely to be contaminated by other effects: from July 1, 2009 to December 31, 2011. The results of those regressions are in table A1c and show the same effects as the regressions over a longer period of time, with the same high levels of significance but slightly smaller magnitudes on all coefficients.

117
EOIR-000372

**Table A1c**
**Regressions with data from July 1, 2009 – Dec. 31, 2011 only**

| VARIABLES | (1) OLS effort | (2) OLS bribe value | (3) Panel effort | (4) Panel bribe value |
|---|---|---|---|---|
| Salary policy | -0.966 | -189.1** | -4.597*** | -211.5*** |
| | (0.846) | (74.11) | (0.628) | (45.56) |
| Police | -0.679 | -195.4*** | 1.656** | 8.980 |
| | (0.440) | (53.12) | (0.708) | (51.31) |
| Police X Salary policy | 0.823** | 118.5*** | 1.575*** | 148.3*** |
| | (0.341) | (43.44) | (0.589) | (42.68) |
| Ghana | | | 2.410 | -572.4 |
| | | | (7.523) | (545.5) |
| Ghana Police | | | -3.063*** | -242.7*** |
| | | | (0.923) | (66.91) |
| Constant | -0.781 | 273.9*** | 5.243 | 940.7* |
| | (0.800) | (77.94) | (7.846) | (568.9) |
| | | | | |
| Year, Month, Checkpoint FE | Yes | Yes | Yes | Yes |
| Observations | 17,628 | 17,628 | 23,984 | 23,984 |
| R-squared | 0.259 | 0.025 | 0.279 | 0.148 |
| Number of truck trips | | | 1,131 | 1,131 |

Notes: Robust standard errors in parentheses clustered at the truck level for the OLS regressions.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

We take these results in appendix A1 as strong evidence for the validity of our difference-in-difference specification for the effort regressions. The potentially non-parallel trend in bribe values suggests some caution might be needed in interpreting the bribe value regressions from Ghana. One should note, however, that if the post-salary raise higher bribes merely follow an existing trend of higher police bribe values then it would still be the case that the salary raise did not reduce bribes.

45

118
EOIR-000373

## A2. Robustness to the Olken and Barron specification

The Olken and Barron specification suggests that log of bribes paid would be a function of the average bribe paid on the road, with an expected coefficient (elasticity) of close to 1 if the pricing of bribes at individual sites responded to the total price to pass on the road (coordinated system). In such a system, unless the salary rise affects the number of trucks on the road we should expect no effect of higher police salaries on the bribes paid.

The corrupt official as monopolist model is a special case of (1) above in which $c(e,\bar{B}) = 0$ and the function $g(e)$ takes a special form, $g(e, Q)$ that is a pricing function quadratic in the number of "customers", $Q$. It is easy to see that the optimal effort to maximize utility will be governed by $g(e, Q)$ and independent of salary levels, $B$[17]. In the Olken and Barron model the log of the price paid in bribes will be a decreasing function of the log of the expected number of stops on the road. If the road stops work as a coordinated monopoly the coefficient on the log of the expected number of stops should be -1, if they are completely uncoordinated then the coefficient would be zero. In addition the results using the aggregate (total) level of bribes on the road would have a zero coefficient on the log of the number of stops if perfectly coordinated or a value of 1 if uncoordinated.

The results in table A2 mimic those in Olken and Barron, with added variables to test the salary policy. We measure the expected number of stops on the road as the number calculated by authority (police or customs), so that an observation at a police stop uses the expected number of stops by police. We then interact this with our key salary policy variable to see if coordination might have changed with the salary change.[18] They show extremely low levels of coordination in "pricing" and a significant effect of the salary policy on bribe values in columns 1, 2 and 3. In column 4 we do not find a significant effect of the salary policy except in its interaction with the number of stops. In columns 1-3 we find an effect of the policy of a between 13% to 29% increase in bribe values, which is consistent with our other results.

Overall, the results in table A2 show that (i) the Olken and Barron model does not fit well with our data and (ii) controlling for the overall expected number of stops on the road does not change our basic result.

---

[17] Olken and Barron (2009) also have a bargaining model of price setting, which would also have bribe effort and value levels independent of the official's salary. A number of other models, such as ones with costs of bribe taking unrelated to future income (e.g., fixed fine rates without loss of employment), would also produce our null hypothesis, that bribe taking is independent of salary levels.

[18] Note that there are some endogeneity concerns with using the number of stops since we do show above that the number changes with the salary change, which would bias us in favor of finding an expected stop effect. Since this is a robustness check of our paper's main result, we do not concern ourselves with this potential endogeneity.

119
EOIR-000374

**Table A2**
Olken & Barron tests

| VARIABLES | (1) Log Bribe costs | (2) Log Bribe costs | (3) Log Total bribe costs | (4) Log Total bribe costs |
|---|---|---|---|---|
| Salary Policy | 0.0176 | 0.0178 | -0.0631** | -0.0626** |
| | (0.0238) | (0.0238) | (0.0278) | (0.0280) |
| Police | -0.176*** | -0.178*** | -0.0699*** | -0.0699*** |
| | (0.0132) | (0.0132) | (0.0138) | (0.0138) |
| Police X Salary | 0.134*** | 0.286*** | 0.160*** | 0.129 |
| | (0.0143) | (0.0821) | (0.0189) | (0.114) |
| Ln(E[Stops per month]) | -0.0205** | -0.0151 | -0.0631*** | -0.0645*** |
| | (0.00832) | (0.00931) | (0.0120) | (0.0148) |
| Ln(E[Stop/mo])X Police X Salary | | -0.0268* | | 0.00555 |
| | | (0.0144) | | (0.0198) |
| Constant | 5.992*** | 5.959*** | 6.496*** | 6.504*** |
| | (0.0762) | (0.0806) | (0.0975) | (0.114) |
| Year, Month Effects | Yes | Yes | Yes | Yes |
| Checkpoint Effects | Yes | Yes | No | No |
| Observations | 30,290 | 30,290 | 4,146 | 4,146 |
| R-squared | 0.250 | 0.250 | 0.190 | 0.190 |

Notes: Ln(E[Stops per month]) is the average number of stops on the road that month for the particular authority (police or customs). Results are similar if done with the expected total number of stops on the road instead. Standard Errors are clustered at the truck level in columns (1) and (2) and White's robust standard errors in columns (3) and (4).
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

47

120
EOIR-000375

## A3. Containers and Tankers

Container and tanker trucks are in general "cleaner" in terms of being newer trucks and having fewer violations relative to general purpose trucks. We therefore re-run the key regressions of the paper with just container and tanker trucks. The results suggest our main results are robust to using only the "best" trucks on the road.

### Table A3

| Variables | (1) Effort | (2) Bribe value | (3) No stop Probit | (4) Panel FE bribe value |
|---|---|---|---|---|
| Police | -1.179*** | -288.5*** | -0.110* | -307.6*** |
| | (0.427) | (106.5) | (0.0665) | (45.59) |
| Salary Policy | 4.649*** | 189.3 | -0.413** | -594.0*** |
| | (1.154) | (131.5) | (0.179) | (164.7) |
| Police X Salary | 1.278* | 155.7*** | 1.081*** | 269.5* |
| | (0.719) | (55.03) | (0.192) | (144.9) |
| Constant | 12.97*** | 188.4 | -1.247*** | 1,318*** |
| | (2.789) | (336.5) | (0.0714) | (454.8) |
| Year, Month, Checkpoint fixed effects | Yes | Yes | No | Yes |
| Observations | 5,149 | 5,149 | 5,148 | 6,856 |
| R-squared | 0.376 | 0.082 | | 0.034 |
| Number of truck trips | | | | 295 |
| Log-likelihood | | | -1662 | |

Notes: Robust standard errors in parentheses clustered at the driver level.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

## A4 Placebo test

We generate a placebo policy enacted one year before the actual policy of interest, on July 1, 2009. The results in table A4 show that such a placebo policy using data up until June 30, 2010, the day before the policy's actual enactment, has no significant effect on any of our variables of interest. We do not find any evidence that our findings could be driven by a seasonality effect that might be evident each year in the data as would be the case with our placebo effect. This placebo exercise also provides corroborating evidence of there being parallel trends in the year before enactment of the policy.

121
EOIR-000376

**Table A4**

Placebo test of a policy July 1, 2009 to June 30, 2010

| VARIABLES | (1) Effort | (2) Bribe value | (3) Panel FE Effort | (4) Panel FE Bribe value |
|---|---|---|---|---|
| Placebo policy | -9.259*** | 71.94 | 2.641 | -243.4*** |
| | (1.162) | (50.45) | (2.053) | (37.41) |
| Police | -2.041*** | -236.5*** | -6.068*** | 189.9*** |
| | (0.527) | (38.04) | (1.693) | (30.86) |
| Police X Placebo | 0.666 | 23.08 | -0.241 | 2.064 |
| | (0.543) | (22.02) | (1.923) | (35.04) |
| Ghana | | | -4.481 | 575.6* |
| | | | (17.54) | (319.8) |
| Ghana Police | | | 5.174** | -464.7*** |
| | | | (2.056) | (37.47) |
| Constant | 2.220 | 750.9*** | 10.48 | -328.8 |
| | (1.645) | (76.04) | (46.13) | (840.8) |
| | | | | |
| Year, Month, Chckpt FE | Yes | Yes | Yes | Yes |
| Observations | 20,856 | 20,856 | 28,656 | 28,656 |
| R-squared | 0.203 | 0.129 | 0.044 | 0.239 |
| Number of truck trips | | | 1,297 | 1,297 |

Notes: Robust standard errors in parentheses clustered at the driver level.
* Significant at 10 percent
**Significant at 5 percent
***Significant at 1 percent

122
EOIR-000377

The International Growth Centre
(IGC) aims to promote sustainable
growth in developing countries
by providing demand-led policy
advice based on frontier research.

Find out more about
our work on our website
www.theigc.org

For media or communications
enquiries, please contact
mail@theigc.org

Subscribe to our newsletter
and topic updates
www.theigc.org/newsletter

Follow us on Twitter
@the_igc

Contact us
International Growth Centre,
London School of Economic
and Political Science,
Houghton Street,
London WC2A 2AE



IGC
International
Growth Centre

DIRECTED BY

 

LSE · UNIVERSITY OF OXFORD

FUNDED BY



ukaid

Designed by soapbox.

123