

The economics of corruption

# The wages of sin

*In theory, higher pay cuts corruption. In practice, the opposite happens*

📖 Print edition | Finance and economics ›

Jan 28th 2016

WHETHER the miscreants are African policemen, European politicians or American university basketball players, the same remedy for corrupt behaviour is offered: pay people more money. It sounds intuitive. But does legitimate lucre really drive out the filthy kind? New research involving a natural experiment in West Africa suggests that it does not—and that conventional economic theories of corruption are wrong.

In 2010 Ghana began to move public officials to a new salary structure. The earliest and biggest beneficiaries were police officers, whose pay abruptly doubled. It was hoped that they would start behaving better as a result—and especially that they would stop extorting money from drivers at roadblocks. There was certainly much room for improvement: surveys around that time by Transparency International, a watchdog, found that 91% of Ghanaians believed their police were corrupt, an even higher proportion than thought the same of politicians.

ADVERTISING

As it happened, a large survey was already under way of lorry drivers plying the roads of Ghana and its neighbour, Burkina Faso. Drivers with their papers in order were asked to record how many times they were stopped and how much money they paid to police and customs officials along the route.

Two American economists, Jeremy Foltz and Kweku Opoku-Agyemang, have examined the data on 2,100 long-haul journeys. Oddly, they find that Ghana's police became more corrupt after their salaries increased, both absolutely and relative to Burkina Faso's police and Ghanaian customs officers. The cops erected more roadblocks, detained lorries for longer (the average driver was stopped 16 times as he drove through Ghana, for eight minutes each time) and extracted more money.

Economic theory suggests the opposite should have happened, for two reasons. First, corruption is risky. You might lose your job if you do it, and the more you are paid, the bigger that loss would be. Second, officials are thought to have an income target. If they are underpaid, they will behave corruptly in order to make up the difference. The fact that some British MPs cheated on their expenses a decade ago was put down to the fact that they earned less than similarly qualified people. Ghana's president, John Mahama, said last year that there was "no justification" for corruption now that salaries were higher.

Employees in the rich world who suddenly receive more money per hour—when their taxes are cut, for example—tend not to work less, as they might do if they had a fixed income target in mind. They work more. But given that the rewards from corruption had not gone up, this does not explain why Ghanaian police officers engaged in more graft. Mr Foltz and Mr Opoku-Agyemang, whose research was funded by the International Growth Centre at the London School of Economics, suggest that corrupt superiors or greedy relatives might have demanded more money from the officers. Another possibility is that the cops' expectations went up. The pay rise may have boosted their sense of their own worth, leading them to demand more money.

It might be that the risk of being caught in Ghana is so low that normal calculations of risk and reward do not apply. Perhaps a combination of higher pay, political leadership and stiff punishments would have stopped corruption: it did in Singapore, for example. But money alone is not enough. In Ghana, some are astonished that anybody could have believed that higher pay would have made cops less greedy. That is just not human nature. As Ransford Van Gyampo, a political scientist at the University of Ghana, puts it: "In spite of how big the sea is, it still receives rain."



You've seen the news,
now discover the story

Get incisive analysis on the issues that matter. Whether you read each issue cover
to cover, listen to the audio edition or go behind the headlines on your phone, time
with *The Economist* is always well spent.

EOIR-000380

# Ghana losing war against corruption

Critics say bodies such as the police, Economic and Organised Crime Office, Commission on Human Rights and Administrative Justice, parliament's Public Accounts Committee, courts and Auditor General's Office are failing to fight corruption.

It's about time the heads of these institutions are held accountable for their stewardship

Police and the human rights commission have been hit with allegations of scams and siphoning of millions of state funds, forcing the government to probe their top officials.

The institutions have not been able to fight graft and this has retarded the country's development over the years, says a policy think tank, Institute of Economic Affairs (IEA).

"The phenomenon of corruption had become pervasive and continues to weaken the moral fibre of the country," the IEA said at a corruption conference in the capital, Accra.

The anti-graft campaigners at the conference expressed worry over what they termed "the nation's alarming tolerance for corruption."

"It is tragic that several agencies established by law to prevent and fight corruption have not been able to effectively carry out their mandate," said head of IEA, Jean Mensa.

*Daily newsletter:*

*join our 100 000 subscribers!*

EOIR-000384

"If effective measures are not in place to check the menace now, it will completely overwhelm us and we can well wave goodbye to any effective fight against corruption.

"It's about time the heads of these institutions are held accountable for their stewardship, after all it is the tax payer's money that goes to support them and their institutions, therefore they must deliver as expected of them," she added.

But many also think that the agencies mandated to curb corruption were under tooled, lacked appropriate training and were faced with many limitations including lack of legal backing to prosecute corrupt officials.

Former human rights commissioner, Justice Francis Emil Short said the commission could only recommend prosecution of corrupt people to the Attorney General.

"But the latter [Attorney General] may choose not to implement the recommendation especially, if the persons affected are members of the existing administration," he said.

The government's tender process continues to be mired in controversy despite the promulgation of the public procurement law in January 2004.

The law was crafted to improve transparency, accountability and value for money in locally funded contracts. Mažoji bendrija "Saugus Krovinys" – Krovinių pervežimas, Transporto ir perkraustymo paslaugos

Companies have been accused of using bribes to win contracts and businesspersons often cite corruption as an impediment for doing business in the country.

However, civil society groups have criticised the law as inadequate and are demanding a speedy passage of information law to allow greater access to public information.

EOIR-000383

# Press Briefing

# IEA's

# Socio-economic and Governance Survey

25th February, 2015

129

EOIR-000384

2

## Introduction and Background

In line with its goal of promoting good public policies, IEA conducts periodic surveys on public perception and assessment of socio-economic and governance conditions in the country. The purpose of these surveys is to solicit and provide information on Ghanaians' perceptions on a whole range of subjects, including: economic and living conditions, public safety and security, media freedom and abuse, discrimination and relations between ethnic groups, factors which influence elections, trust in institutions, important problems confronting the country, government performance, corruption, bribery, access to public services, etc.

## METHODOLOGY

The survey was conducted in all the 10 regions of Ghana, with persons aged 18 years and above as the target population.

A stratified design that employs sampling with probability proportional to size (PPS) was adopted. Stratification was based on the regions of Ghana, and selected households and individuals for the survey were randomly sampled from pre-selected primary sampling units (PSU's).

A total sample of 1,200 households was selected to allow for up to 20% non-response.



**Regional Distribution of Respondents**

**Demographic background of respondents**

130
EOIR-000385

3

The regional and gender distribution mirrors closely the 2010 population and housing census figures. The region with the highest proportion of respondents is Ashanti (18.8%) and upper west region has the least (3.6%). Females make up 52.3 percent of the respondents as against 47.8 percent males.

## SURVEY RESULTS

### People's Living Conditions

The survey tried to elicit household perceptions and assessment of their living conditions. A good majority of respondents (63.3%) regard their current living conditions to be bad. Only 25.2% indicated that their current living conditions were good. The results generally suggest deep economic hardship.

There were considerable regional variations in the responses. More people in Western, Central, Ashanti and Brong Ahafo regions reported bad living conditions when compared to the Greater Accra, Upper east and Upper West. In general, urban dwellers (63.5%) reported worse living conditions than rural dwellers (60%). This result must be taken against the backdrop of generally higher cost of living conditions in urban areas, although poverty is also lower in those areas.

Females (66.5%) reported worse conditions than males (60.4%). This is not surprising since males tend to be generally better off economically than females given that males have better opportunities in education and jobs and tend to have higher incomes. Most homes have males as the breadwinners.

The majority of respondents (68.5%) indicated that their living conditions remained the same or worsened over the last six months. However, respondents were generally optimistic about improvements in their living conditions in the next six months. 43.4% indicated that their living conditions will improve over the next six months and this optimism cuts across the gender and rural urban divide. Only 22.4% thought their living conditions will worsen. The general optimism seems to emanate from the fact that economic conditions were pretty bad at the time of the survey, including a cedi crisis, high fuel and utility prices and power constraints. The expectation was that things could only get better going forward.

Regarding access to food, about a quarter (25%) of respondents indicated that their households did not have enough food to eat in the last six months. In addition, another 22% had on occasions experienced hunger. Northern region reported the highest level of respondents without food while Greater Accra reported the least. Further, rural areas generally reported lower access to food, possibly reflecting the higher poverty in those areas.

In terms of access to clean water, about 3 in every 5 persons (60%) had access over the past six months. There were regional variations with 66% in Greater Accra having access compared with 47% for the Northern Region. Also, unsurprisingly, urban access (65%) is higher than rural access (55%).

With regards to access to medicine or medical treatment, almost 50% of interviewees responded that they had had no access in the last six months. Not surprisingly, the worst affected areas are Northern Region and Upper East Region, where medical facilities are relatively few.

Regarding school expenses, an overwhelming majority of households reported difficulties in meeting them. Nationally, 66% of households indicated they lacked money for school expenses. Unsurprisingly, the problem was more widespread amongst rural dwellers (69.2%) than urban dwellers (63.2%). The levels in both cases are, however, high and generally point to a high incidence nationwide of difficulty in meeting school expenses. Given the importance of education in national development, policy intervention to address this need is urgent.

The ease with which people are able to access public services like birth certificates; driver's license; passports, electricity, education; medical care, to mention a few, shows how efficient and effective public institutions charged with delivering such services are operating. On the other hand, the more difficult it is to access these facilities, the easier it is for corruption to thrive. Respondents generally expressed difficulty in having access to passports, police assistance, water for household use, and drivers' license. Four services stand out in terms of ease of access. These are: voters' ID, national health insurance card, and a place in a primary school for a child.

132
EOIR-000387

## Most Important Problems Confronting the Country

On the most important problems facing the country, the questionnaire offered a menu of 38 for respondents to choose from. While the answers showed that the problems are many and varied, the answers became quite diffused.

About a fifth (20%) of respondents consider unemployment to be the most critical problem. This is followed by education (12.3%), management of the economy (8.3%), electricity (7.3%) and roads (6.9%). Others are water supply (6.7%), transportation (5%), health (4.6%), wages and salaries (4.2%) and poverty/destitution (4.1%). The least of the worries are: international war, AIDS, land issues, civil war, gender issues/women's rights, discrimination/inequality, political violence and drought. At the local level, unemployment is still the dominant problem though it is more endemic in the urban places (22.7%) than the rural areas (16.0%). Again, education, roads, water supply, transportation, farming/agriculture and health are more of a concern in the rural areas than the urban areas. In contrast, the management of the economy, electricity, rates and taxes, corruption, and access to loans/credit are of much worry to urban dwellers than their rural counterparts.

Broadly speaking, therefore, about 40 percent of Ghanaians think the economy as a whole is the major problem confronting the country. This shows clearly that bread and butter issues are the immediate concern for respondents. Understandably, respondents do not seem to be so much concerned with issues that look too remote to them (such as civil war, political violence, drought) or which they may not have encountered before (like AIDS, gender rights, discrimination). Our leaders need to pay due attention to the bread and butter issues.

## Public Safety

Ghanaians feel reasonably safe within their neighborhoods with levels of feeling safe higher in the more rural areas. Our results indicate that more than 7 out of every 10 persons (74.3%) reported that they felt safe walking in the neighbourhood during the day or during the night. More persons in Upper West Region (88.4%), Brong Ahafo Region (80.4%) and Northern

133
EOIR-000388

Region (80.2%) felt safe walking in the neighbourhood during the day or the night. Not surprisingly, more males (79.6%) than females (71.1%) feel safe walking in the neighbourhood during the day or night. 81.4 percent of the rural persons feel safe walking in the neighbourhood during the day or night as compared to their urban counterparts (69.8%).

Given the level of safety, only 27.2% reported someone had been attacked in their neighbourhood. Similarly, respondents (26%) are not afraid of being burglared. Only 23.8% of respondents had experienced theft once or more.

A relatively higher number of persons in urban localities (28.1%) as compared to their counterparts in rural communities (26.2%) indicated that they did not suffer any physical attack during the past year.

Unfortunately, a large majority (71.4%) who had suffered attacks or bulglaries at home did not report to the police. There were considerable regional variations. Most persons in Western, Upper East, and Upper West Regions who suffered physical attack or burglary at homes did not report to the police. In the more urbanized regions, e.g. the Greater Accra Region, over 50% of such persons who suffered physical attack or burglary did report to the police.

Majority of persons (23.2%) who suffered physical attack or burglary and did not report to the police believe that it would be a waste of time since they would be required to make repeated visits to the police station. This is more pronounced among the 25-59 year group (24%) compared to the 18-24 (23%) and 60 and over year (19.1%) groups. One out of every five also believe that people really do not have enough time to report crimes whilst another 17.1 indicated that the police would have demanded money or a bribe from them if they had reported their case.

Fear of reprisal from attacker/relatives of attacker/community (3.9%) is another reason why those attacked did not report to the police. The year group which feared reprisal from attacker/relatives of attacker/community more are the 25-59 (4.4%) followed by the 60+ group (2.5%). However, only 2.7 percent of the 18-24 year group did not report to the police due to the fear of reprisal from attacker/relatives of attacker/community.

Moreover, about one percent was of the opinion that the police themselves may be involved in the robbery or assault.

134
EOIR-000389

## Relations between Ethnic Groups

There is a general perception that one's ethnic background or gender affects his/her chances of getting government job, contract, public housing, loans from government banks or even admission into the education institutions and other security services.

Generally, about 50% of respondents think that someone's ethnic background influences one's chances of getting government job. The perception is higher among urban dwellers (57.3%) than rural dwellers (37.6%). The regional perception varies from 33.1% in Volta Region to as high as 61% in the Western Region. Generally, the heterogenous nature of urban and peri-urban centers predisposes them to ethnic cosmopolitanism. Rural dwellers generally have the advantage of enjoying ethnic homogeneity. This could explain why more urban dwellers think there is a correlation between one's ethnic background and chances of securing government job, as compared to the situation in the rural areas.

The relations between ethnic groups in Ghana are generally good. Approximately 80 percent of the respondents indicated that the ethnic groups in the country relate peacefully. Only one percent (one in hundred persons) feels that relations are bad. This is good for long-term social cohesion.

On the religious front, about 84 percent of respondents are of the view that relations between the different religious groups are either very good or good. Only 6.5 percent indicated that the relations are bad. The same perception cuts across the regions, locality of residence, educational level and ethnic groups. Indeed, one of the many critical factors that have contributed to Ghana's drive towards democratic maturity and sustenance is religious tolerance. This is good news and we need to build on it.

## Performance of Present Government

Seventeen areas of concern were identified and views of respondents solicited as to how well or badly the current government is addressing them. Government performed poorest in "keeping prices down" (71.5% response rate). This was followed respectively by "creating jobs" (62.0%), "narrowing the gap between rich and poor" (58.2%), and "improving the living standards of the

135
EOIR-000390

people" (57.8%). 56 percent of the respondents believe that the current government is managing the economy very badly as against only 5% who say the government is doing very well.

Among the 17 matters put to respondents, it is only in the areas of "combating HIV/AIDS" and "resolving violent conflict between communities" that more respondents consider Government to be performing very well as against those who think it is performing very badly. In the 15 other areas, more respondents consider the government to be performing very badly than those who consider it to be performing very well. The verdict is clear here and does not need further elaboration.

## Bribery and Corruption

Bribery and corruption affect the moral and economic fabric of the country in diverse ways. Already in Ghana the perception of bribery among the people is very high and the acquisition of basic services like: getting a document or a permit; getting water or sanitation services; electricity connection; getting treatment at a local health clinic or hospital; avoiding a problem with the police, like passing a check point or avoiding a fine or arrest; avoiding a problem with the local tax officer; getting a place in a primary school for a child; getting a place in a government senior high school for a child; and getting a place in a government tertiary institution for a child are deemed to be herculean tasks in many instances.

Respondents allege that one has to pay a bribe, give a gift or do a favour before he/she could obtain any of the aforementioned services.

The survey results indicate that in the past six months, 44 percent to 50 percent of people have not had any experience with getting any of the services mentioned. Of those who have had the experience, between 42% and 50% have never paid bribe, given a gift or done a favor to get the service.

However, the services which people had had to pay bribe etc. from the most likely to the least likely are: i) avoiding a problem with the police, like passing a check point or avoiding a fine or arrest (6.7%); ii) getting electricity connection (6.6%); iii) getting a document or a permit

136
EOIR-000391

9

(6.3%); iv) getting treatment at a local hospital (5.1%) and v) getting a place in a government senior high school for a child (5.1%). The rest are: vi) getting water services (4.3%); vii) avoiding a problem with the local tax officer (3.6%); viii) getting a place in a government tertiary institution for a child (3.5%); and ix) getting a place in a primary school for a child.

Respondents' views on corruption of 10 state institutions namely: the Office of the President; Members of parliament; Government officials; Police; Tax officials; District chief executives; Judges and magistrates; Assemblymen and women; Immigration; and Army were solicited. According to the results of the survey, 23 percent of the people are of the opinion that nearly all police officials are corrupt. Only 4.4 percent said not all of them are corrupt.

The police are followed closely by the Office of the President (19.2%), tax officials (15.4%), and members of parliament (15%) at fourth place. Others are government officials generally (13.9%) district chief executives (13.3%), judges/magistrates (13.1%), assemblymen/women (11.9%), immigration (10.4 (%) and the army (7.0%).

Generally, one of the most pressing governance challenges confronting the country is the high prevalence of bribery and corruption. Transparency International ranked Ghana 63rd out of 177 countries in its 2013 Corruption Perception Index and 61st out of 175 the 2014 rankings. While countries such as Botswana, Cape Verde, Lesotho, Namibia and Rwanda have taken proactive steps in minimizing corruption, Ghana continues to grapple with the problem. And the survey results clearly point to its severity.

**Trust in Public Institutions**

The public seem to have little confidence in some state institutions. The image of the Tax department especially leaves much to be desired. Out of 11 institutions studied, 37.4 percent of the people said they do not at all trust the Tax Department. This is followed closely by the Electoral Commission (35.8%), The Ruling Party (35.6%), the Police (35.1%), the Metropolitan/Municipal/District Assemblies (33.9%), the Office of the President (33.8%) and Parliament (33.1%).

Public confidence in state institutions promotes goodwill and legitimacy of such institutions.

137
EOIR-000392

There can be no meaningful discussion of effective and strong state institutions without dealing with the lack of public confidence and the legitimacy deficit of such institutions. Without public confidence and goodwill towards state institutions, the citizenry would evade their obligations towards them and would find their own ways of taking the laws into their own hands without recourse to due process. Unfortunately, the survey results show that many Ghanaians have a very weak image of several state institutions. This is as a result of their failure to deliver effectively on their respective mandates.

## Participation in the Democratic Process

Genuine and sustainable democracy thrives on political participation through the freedom to: say what one thinks, join any political organization, vote for a candidate and political party of choice without feeling pressured, register as a voter, to vote on policies and above all, engage in protests. Furthermore, political participation is one of the key determinants of the quality and satisfaction of life. In general, most Ghanaians feel they are free to say what they think, associate freely and participate in the democratic processes.

About 80% of the respondents feel they are free to say what they think. Differences in this perception between rural and urban areas, and males and females are statistically insignificant.

There is a very high sense of freedom of association, registration as a voter and also voting. Virtually everyone, 95% of respondents feel they are free to join any political party. An equal number feel they are free to vote.

Approximately 92% of the respondents voted in the 2012 presidential elections. Unsurprisingly, more rural residents (94.3%) voted as against 89.3% in the urban areas. Generally, Ghanaians are politically alive and free.

## Media Freedom in Ghana

All over the world, the media is perceived as the fourth estate of the realm, coming after the executive, legislature and the judiciary. It plays a vital role in the dispensation of modern democracy by promoting peace and security. As an arm of civil society, it educates, inform, entertains and provides a linkage between governments and the governed. Generally, it can be

138
EOIR-000393

11

said that the media landscape of Ghana has changed for the better under the 1992 Constitution of Ghana.

The survey results show that two-thirds of Ghanaians get their daily news from Radio. This is followed by Television (45.7%), Friends/relatives/neighbours/churches/mosques (35.5%) and telephone (20%). However, as expected, the proportion of people who get their daily news from Television in the urban areas (58%) is far greater than the rural people (31.7). Reading newspapers for news seems not to be common with many people as 3 out of every 4 (75%) people never get their news from newspapers.

The results of the survey indicate that approximately 56percent people believe that the news media abuse their freedom by printing or saying things they know are not true. More urban people (64%) have this perception as against 46percent of the rural residents. The dark days of censorship, gagging and other undemocratic tendencies that undermine media freedom seem to have given way to a new dispensation where media freedom is highly exalted.

It appears some of the media abuse their freedom by sensationalism and falsehood. Excessive partisanship also seems to dictate what the media publish or do not publish. These tendencies if need to be checked. Experiences from Rwanda and Serra Leone for instance suggest that negative reportage could create social and political instability.

## Factors Which Influence Voters in Presidential Elections

Generally, the factors that influence voting can be broadly categorized into four. These are the rational factors, the sociological factors, the dominant ideology factor and the party identification factor. The survey results show quite clearly that gradually, Ghanaians are being rational in their choices and decision as to who to vote for in elections.

When respondents were quizzed about the relevance of political party programme of action and ideology as determinants of their preferences in an election, a whopping 79.1% stressed the importance of these variables in shaping their voting preference. On qualification and competence of presidential candidates, 77% indicated that they would consider them as important determinants of voting. Again, experience and past records of presidential candidates

139
EOIR-000394

also mattered to a good number of respondents (67.2%) whiles almost 60% highlighted the importance of personal qualities of presidential candidates as determinants of their voter preferences. Political party identification seems to also play a major role in determining voting in Ghana as 59.1% of respondents indicated that their voting is shaped by the party of the candidate and not necessarily the core issues the candidates stand for. Finally, it seems sociological factors like gender (28%), ethnicity (25.5%), religion (24.8%) and region (21%) play less significant role in determining voting in Ghana compared to the other factors that influence voting.

## Conclusions and Policy Implications

1. There is a need for policy reforms that will speed up the rate of transmission of growth impulses into improved living conditions so that they can be realized by Ghanaians, especially with respect to employment.

2. Address issues of food insecurity

3. Ghanaians feel safe in their neighbourhoods.

4. There are no significant ethnic and religious discrimination.

5. The policy of social inclusion and tolerance must be encouraged to maintain a stable social environment for development.

6. Unemployment is reported to be the most critical problem facing the country. Together with difficulties in the management of the economy, this suggests policies to make the current growth more inclusive and also increase the efficient management of the economy.

7. Addressing issues of the economy is the one area of concern to Ghanaians from the survey results. It is also the area in which the government performed least according to our survey results. Economic policies and programs need to refocus on the major areas of concern to Ghanaians:

   a) Keeping down prices

   b) Creating jobs

   c) Narrowing the gap between rich and poor

   d) Improving the living standards of the people

140
EOIR-000395

8. There is a general perception of corruption among public institutions. Improving the reputation of institutions will improve public perception and trust in these institutions. This will elicit public cooperation and support in the smooth running of these institutions.

9. There is an emerging tendency for the survey from Ghanaians to vote on the basis of programs, caliber of candidates and less on ethnicity, religion and region of candidates, which is a good development.

10. The media need to improve their image from the perception that they abuse their freedom by publishing sensational and sometimes false information.

141
EOIR-000396

EGIR-000397

 

U4 Helpdesk Answer 2018:21

# Overview of corruption and anti-corruption in Ghana

**Author(s): Kaunain Rahman**
Reviewer(s): Roberto Martinez B. Kukutschka and Samuel Kaninda
Date: 11 September 2018

Ghana is considered to be one of the more stable countries in West Africa, since its transition to multi-party democracy in 1992. Corruption exists in all branches of Ghanaian government, and there is often a lack of accountability. The culprits often enjoy impunity. The judiciary and police are viewed as the most corrupt. However, the creation of the Office of the Special Prosecutor has instilled new hope in Ghana's anti-corruption efforts.

## U4 Anti-Corruption Helpdesk

*A free service for staff from U4 partner agencies*



143

EOIR-000398

# Query

Please provide an overview of corruption and anti-corruption in Ghana. We are interested in how the role, mandate and in particular the potential of the prosecution service, courts and the Ghana Audit Service might have changed.

## Contents

1. Background
2. Overview of corruption in Ghana
3. Legal and institutional anti-corruption framework
4. References

## Background

Considered as one of the more stable countries in West Africa since its transition to multi-party democracy in 1992, the Republic of Ghana became the first sub-Saharan country in colonial Africa to gain its independence in 1957 (BBC News 2018; CIA 2018). Ghana's post-colonial life has witnessed the consolidation of the country's economy, and, in the past two decades, it has taken major strides toward democracy under a multi-party system (Oxford Business Group 2017; World Bank 2018b).

With a population of 29.6 million, Ghana consistently ranks in the top three countries in Africa for freedom of speech and press freedom, with strong broadcast media in particular, and radio as the medium with the greatest reach. Factors such as these provide Ghana with solid social capital (World Bank 2018b). Ghana's economy is estimated to have expanded by 8.5% in 2017 from 3.6% a year ago, primarily driven by the mining and oil sectors, according numbers released in April 2018 by the Ghana Statistical Service (World Bank 2018b). Gold, cocoa and oil form the

## Main points

- Widespread corruption exists in Ghana. Sectors worst affected by corruption include natural resource management, the judiciary and police.

- There is a need for an all-inclusive anti-corruption law.

- Courts are commonly perceived to be vulnerable to corruption.

- Prosecution of crime is often lengthy and people often turn to informal arbitrations.

foundation of Ghana's economy and have helped fuel an economic boom (BBC News 2018).

The inauguration of President Nana Akufo-Addo in January 2017, the candidate of the New Patriotic Party (NPP), marked the third peaceful transfer of presidential power between the country's two main parties: the NPP, and the National Democratic Congress (NDC) (Freedom House 2018). Although the 2016 election and its immediate aftermath were peaceful and generally praised by international and domestic observers, the campaign period was controversial. There were several reports of clashes between NPP and NDC supporters, as well as

144
EOIR-000399

attacks on Election Commission (EC) officials. Moreover, representatives of civil society raised concerns about what they claimed were alarming levels of hate speech used by politicians, as well as the alleged abuse of state resources (Freedom House 2018).

The incumbent president, Akufo-Addo has had some challenges in fulfilling his election pledges, which included setting up a factory in each of the nation's 216 districts, one dam for every village and providing free high school education. The government has started implementing some of its promises, such as setting up facilities for food, jobs and free secondary education. But the authorities need to pay attention to proper implementation and funding in the years ahead (World Bank 2018b).

Discrimination against women and LGBT (lesbian, gay, bisexual and transgender) people continues, and some weaknesses in judicial independence and rule of law persist (Freedom House 2018). Political corruption and bureaucratic ineptitude are some of the significant threats to government functioning (Bertelsmann Stiftung 2018; Freedom House 2018). Also, the seemingly uncontrollable rate of inflation continues to be a major stumbling block, while economic inequality, poverty and environmental degradation have not been adequately addressed (Bertelsmann Stiftung 2018).

# Overview of corruption in Ghana

Corruption exists in all branches of Ghanaian government, and there is often a lack of accountability in cases of violence against women and children, including female genital

mutilation/cutting, and human trafficking (US Department of State 2017). Ghana is also a transhipment point for illegal drugs, particularly cocaine from South America, as well as heroin from Afghanistan and Pakistan (US Department of State 2017). A study by IMANI (a think tank based in the country) found that Ghana loses more than US $3 billion a year to corruption (

## Extent of corruption

Ghana ranks 81 out of 180 countries in Transparency International's 2017 Corruption Perceptions Index (CPI) (Transparency International 2018). The Worldwide Governance Indicators (WGI) by the World Bank (2016) accord the following scores in percentile rank[1] to Ghana:

| Indicator | 2016 percentile rank | 2017 percentile rank |
|---|---|---|
| Control of corruption | 51.9 | 49.0 |
| Government effectiveness | 45.2 | 49.0 |
| Political stability and absence of violence/terrorism | 41.0 | 49.5 |
| Regulatory quality | 45.7 | 49.5 |
| Rule of law | 55.8 | 59.1 |
| Voice and accountability | 67.5 | 67.5 |

---

[1] Percentile rank indicates the country's rank among all countries covered by the aggregate indicator, with 0 corresponding to lowest rank, and 100 to highest rank (World Bank 2016)

145
EOIR-000400

Apart from the data captured in 2016 and 2017, Ghana's percentile rank has witnessed the following trend in terms of the WGI control of corruption indicator:

- 2008 – 55.3
- 2010 – 57.6
- 2012 – 55.0
- 2014 – 52.4

According to the WGI, The 2017 TRACE Bribery Risk Matrix places Ghana in the "moderate" risk category, ranking it 86 out of 200 surveyed countries. Similarly, Ghana's Doing Business rank for 2018 is 120/190 with a Distance to Frontier (DTF)[2] score of 57.24 (The World Bank 2018a).

Ghana's economic freedom score is 56.0, making its economy the 122nd freest out of the 170 surveyed in the 2018 Index of Economic Freedom by the Heritage Foundation. Its overall score has increased by 0.2 points, with lower scores for the property rights and labour freedom indicators outweighing improvements in judicial effectiveness, government spending and fiscal health. Ghana is ranked 19 among 47 countries in sub-Saharan Africa, and its overall score is above the regional average but below the world average.

Bertelsmann Stiftung's Transformation Index (BTI) 2018 ranks the country 32 out of 129 countries. It adds that corruption in the country has evolved into a pressing problem, especially with regard to high-ranking cases, which has diminished public trust in the government and is poised to have long-term, adverse effects on public attitudes toward the democratic system. Freedom House, in its 2018

Freedom in the World report, on the other hand, accords the status of "free" to Ghana with a score of 83/100. Although, the Freedom House 2018 report cautions that existing "political corruption presents challenges to government performance".

The Open Budget Index by the International Budget Partnership (IBO), provides a comparative measure of central government budget transparency. According to IBP's 2017 Open Budget Survey, Ghana provides the public with limited budget information, receiving a score of 50/100 in transparency. Moreover, a score of 22/100 in the category of public participation shows that there are few opportunities for public engagement in the budget process. Finally, the Ghanaian legislature and supreme audit institution were found to provide limited supervision of the budget, as IBP scores the country 43/100 in terms of budget oversight.

According to the 2017 Ibrahim Index of African Governance (IIAG), Ghana ranks in the top 10 highest scoring countries (8 out of 54) with a score of 65.0 (out of 100.0) in overall governance. In the last 10 years, however, it is also the eighth most deteriorated country on the continent in overall governance, having declined by -1.5 points in this period (Mo Ibrahim Foundation 2017).

The Africa Integrity Indicators (AII), a product of the collaboration between Global Integrity and the Mo Ibrahim Foundation found that the overall category score for Ghana did not show any substantial change, increasing by only two points from 58 in 2015 to 60 in 2016 ("somewhat weak" on the Global Integrity scale[3]). On five out of the six

---

[2] The distance to frontier (DTF) measure shows the distance of each economy to the "frontier", which represents the best performance observed on each of the indicators across all economies in the Doing Business sample since 2005. An economy's distance to frontier is reflected on a scale from 0 to 100, where 0 represents the lowest performance and 100 represents the frontier. The ease of doing business ranking ranges from 1 to 190 (World Bank 2018a).

[3] The Global Integrity scale on the Africa Integrity Indicators website is as follows: 81-100 (strong), 61-80 (moderate), 41-60 (somewhat weak), 21-40 (weak), 0-20 (very weak).

---

subcategories, however, Ghana's aggregate scores were higher than those of the West African region and the continent (Global Integrity 2016).

Finally, in response to the corruption levels in the country, according to Afrobarometer 2017, 73% of the surveyed Ghanaians want corrupt officials prosecuted and jailed, and 64% opine that, in addition, corrupt officials should return stolen funds and be publicly named and shamed.

## Forms of corruption

### Political corruption

Political corruption remains a problem, despite legal and institutional frameworks to counter it, plus active media coverage and government anti-corruption initiatives (Freedom House 2018). The previous Mahama-government faced a number of high-ranking and highly publicised cases of corruption in office, which shaped its public image and contributed to its downfall. Aggravated by economic problems during the last years, corruption seems to be increasing and public perception of how cases are dealt with has become increasingly negative. Thus, these corruption scandals have weakened the legitimacy of democratic institutions among the broader population (Bertelsmann Stiftung 2018).

During the campaign, a widely shared video showed Mahama allegedly "buying votes" by handing out money to women at a market (Cheeseman, Lynch and Willis 2016). However, what was troubling were the results of the survey conducted by Washington Post in 2015, as part of a project on the impact of elections in Africa. Forty-three percent of Ghanaians answered that bribing voters was either "not wrong at all" or was "wrong but should not be punished". Similarly, 76% of Ghanaians felt that politicians should not be punished for directing development projects

toward areas that support them (Cheeseman, Lynch and Willis 2016). Vote buying is a common phenomenon with many opining that activists from both parties, in this campaign as in previous years, routinely give gifts (Cheeseman, Lynch and Willis 2016).

When it comes to corruption and politics in Ghana, cases, even at the cabinet level, have been witnessed. Politically motivated dismissals or removals have been evident in the past, especially involving potential contenders for the presidency. Those in power and their loyalists often enjoy widespread impunity (Bertelsmann Stiftung 2018).

A report by the CHRAJ (see later) cleared President Mahama from allegations of bribery after the president received a car from a construction firm from Burkina Faso bidding on a lucrative government contract in Ghana. The firm later secured the road-building contract. The president denied the corruption allegations, claiming that the vehicle was a gift and that it was added to the government car pool. Although the CHRAJ cleared the president of bribery, it found him guilty of breaching government rules (Business Day 2016; GAN Integrity 2018).

Later, in 2017, the Youth Employment Agency announced that an internal audit discovered payroll fraud of approximately GHc 50 million (US$11.1 million). However, by the end of the year, there was no indication of the government holding anyone accountable for the fraud.

Also in 2017, the Election Commission (EC) was entangled in a corruption scandal, as senior members of the commission accused each other of fraud and mismanagement, including the unlawful awarding of contracts, misappropriation of funds and political bias (Freedom House 2018; Koswe 2018). After the launch of a probe by Economic and Organized Crime Office investigating allegations

that senior EC officials had misappropriated funds in 2012 and 2013, Osei, the EC chairperson, and two of her deputies were removed by the president in 2018 for corruption and incompetence (Koswe 2018).

## Corruption in business

Despite corruption levels in Ghana remaining low compared to other African countries, it still poses an obstacle for businesses operating or planning to invest in Ghana (GAN Integrity 2018). Rampant corruption, weak rule of law and an under-regulated property rights system remain significant impediments to business confidence (Freedom House 2018).

Bribes and irregular payments are often exchanged in return for obtaining public utilities (GAN Integrity 2018; Freedom House 2018). Low-level government employees have been known to ask for a "dash" (tip) in return for facilitating licence and permit applications, and companies applying for licences and permits are frequently confronted with demands for facilitation payments (GAN Integrity 2018).

Financial analysts state that the widespread corruption in the public sector that companies have to deal with has taken Ghana to the dark ages, with the country's state being described as a "man drowning and clutching at straws" (Business Ghana 2017).

Companies also contend with high corruption risks when dealing with Ghana's public procurement system. Known as "Sakawa" (online fraud), online business scams are common in Ghana. Many foreign companies often report being contacted by an unknown Ghanaian firm claiming to belong to a governmental procurement entity and are lured into paying a series of fees to register or have their

products qualify for sales in Ghana or the West African region (GAN Integrity 2018).

Procurement processes for businesses to acquire government tenders often remain opaque. While introducing a rapid bus transit system in 2015, the erstwhile government circumvented open bidding and awarded an overinflated contract for the branding of the 116 new buses to Smarttys Management and Productions, a company owned by Selassie Ibrahim, the wife of the former minister for food and agriculture. It is rumoured that Mahama was allegedly rewarding her for supporting his election campaign. The purchased buses were further branded at a cost of about US$828,000, and it was later found that the company overbilled the government, as the branding of the buses should have cost only half that amount (Sagoe-Moses 2017).

Most recently, an investigative documentary, "Number 12", aired in 2018, revealed widespread corruption in the football business in Ghana (Ghana Web 2018a). It was revealed that match referees were receiving bribes to favour certain teams, and, on several occasions, match officials and football administrators were engrossed in match-fixing deals, as well as influencing who played for the national team (Ghana News Agency 2018).

A total of 77 Ghanaian referees and 14 Ghana Football Association (GFA) officials were caught in numerous acts of corruption (Ghana News Agency 2018; Ghana Web 2018b). However, what was most alarming was the sting interview of the former president of the GFA, Kwesi Nyantaky, who claimed to have significant power to influence many sectors of the Ghanaian economy. He added that, for a bribe, he could also facilitate business deals involving the president and vice president of

148
EOIR-000403

Ghana (Ghana News Agency 2018; Ghana Web 2018a; Modern Ghana 2018).

## Petty and bureaucratic corruption

Bureaucracy in Ghana is viewed as being inefficient, inept and riddled with corruption scandals (Bertelsmann Stiftung 2018). Existing reasons as to why Ghanaian bureaucrats engage in corruption focus on the numerous opportunities to be corrupt on account of limited monitoring. Alternatively, bureaucrats are said to be motivated to steal from state resources or the public to get wealthy or meet financial pressures from their family members (Brierley 2017). Despite the fact that salaries have been paid on a regular basis, corruption remains a challenge (Bertelsmann Stiftung 2018) In fact, researchers funded by the International Growth Centre (IGC) found that police officers demanded larger bribes after the salaries were doubled in 2015 (IGC 2016).

A study conducted by Brierley of the IGC (2017) found that bureaucrats also facilitate corrupt practices in response to threats from local politicians of being transferred to less desirable districts in the country.

It is also difficult to find civil servants willing to accept a post in rural areas, a problem which has hindered administrative effectiveness (Bertelsmann Stiftung 2018). The legitimacy and image of state officials are frequently questioned.

A recent survey (funded by the IGC) of 1,400 citizens with respect to "social norms and petty corruption" found that a third of Ghanaian citizens have paid a bribe in 2017. The sectors that are most corrupt are the police, followed by electricity and water services. The most common reasons for paying bribes include: to speed up the delivery of the service, to avoid going to the administrative office multiple times and because citizens do not

feel sure that they will get the service (Star Ghana 2018).

## Sectors affected by corruption

### Natural resource management

Corruption is not uncommon when dealing with the natural resources sector in Ghana (GAN Integrity 2018). Local elite capture coupled with limited transparency and accountability, lead to funding misuse and embezzlement in community-based natural resource management in Ghana, especially with regard to mining community development funds. Although such funds are usually established with good intentions, their ability to uplift mining communities through improved incomes, social services and infrastructure tend to be undermined by local power dynamics (Dupuy 2017).

The country's mining sector performs better than equivalents in many of its African neighbours. In fact, Ghana's oil and gas sector scores a satisfactory 67 of 100 points in the 2017 Resource Governance Index (Natural Resource Governance Institute) making it the best performing extractives sector in sub-Saharan Africa (NRGI 2017).

However, the first decade of Ghana's new petroleum industry was not without challenges. It gained international attention when the new government in 2009 started investigating Kosmos Energy, who in June 2007, announced that commercial quantities of oil and gas had been found in Ghana. To quell corruption accusations, and to amend its relationship with the Ghanaian government, Kosmos removed two original front men of the initial Jubilee oil discovery, Musselman and Owusu, out of the picture (Skaten 2018).

Although there is a lack of regulation covering the management of oil revenue, and the country's

institutions are not strong enough to handle the cash influx in a transparent way, Ghana is still viewed as a "compliant country" of the Extractive Industries Transparency Initiative (EITI) (GAN Integrity 2018).

In fact, EITI reports that the Ghanaian government does not have a policy of contract disclosure, but some petroleum contracts are published by the Ministry of Energy and Petroleum. The Ghana chapter of EITI has come up with recommendations aimed at addressing gaps in the legal and fiscal frameworks governing the extractive sector. These include (EITI 2017):

- Streamlining fiscal policies.
- Ensuring open licensing rounds.
- Establishing an online repository on petroleum blocks.
- Developing an investment guide for the Ghana Petroleum Funds.
- Publishing an investment plan for the Ghana National Petroleum Corporation (GNPC).
- Harmonising the methodology, the revenue authority and GNPC use for revenue computation to ensure that figures match.

By 2017, Ghana was found to have achieved meaningful progress in implementing the EITI Standard (EITI 2017).

Commercial fraud is particularly predominant in gold dealings. Potential purchasers of gold and diamonds are often advised to avoid middlemen and deal directly with the Precious Minerals Marketing Company (PMMC) in Ghana, the sole authority through which gold and diamonds can be legally exported (GAN Integrity 2018).

The government regularly publishes records surrounding the total cost and revenue generated from oil production in Ghana in an effort to ensure

transparency in the management of natural resources. Nevertheless, these efforts fall short when it comes to disclosure of financial records associated with gold mining and logging (GAN Integrity 2018)

In Ghana, post-privatisation of water facilities, tariffs have increased by 80%, and around 30% of the population still lack access to clean water (Jenkins 2017). The Ghana Anti-Corruption Coalition (GACC) is leading the way in helping eradicate corruption plaguing the water sector, including the removal of tampered water metres and illegal connections (Yusif 2018).

## Judiciary

Judicial independence in Ghana is constitutionally and legally enshrined; nevertheless, corruption and bribery continue to pose challenges (Freedom House 2018).

Ghana's judiciary was thrown into crisis in 2015 following the release of a documentary that implicated 180 judicial officials, 34 judges, and scores of prosecutors and state attorneys in accepting bribes in exchange for favourable judgments from 2013 to 2014 (Freedom House 2016; US Department of State 2017). Following the exposé by investigative journalist Anas Aremyaw Anas (also responsible for uncovering corruption in the GFA), 22 circuit and magistrate judges were suspended, and 12 high court judges were being investigated (GAN Integrity 2018). However, no criminal prosecutions were pursued against any of the corrupt judicial officials (US Department of State 2017).

While there has been no obvious proof of government meddling in judicial systems, corruption and limited administrative capacity continue to pose the greatest difficulties, illustrated in unduly long legal procedures and sometimes

incomprehensible verdicts (Bertelsmann Stiftung 2018). Moreover, scarce resources and underpaid judges have gone on to hamper the integrity of the body, by indulging in high levels of bribery and extortion within the courts (GAN Integrity 2018).

Large corruption cases are prosecuted in court; however, proceedings are lengthy and convictions are slow in coming (US Department of State 2017; GAN Integrity 2018).

Going to court is often too expensive for the average citizen, and only those with means can afford legal proceedings. Informal procedures of arbitration (e.g. through traditional rulers or elders) are more easily accessible and still play an important role (Bertelsmann Stiftung 2018).

### Police

According to the Afrobarometer results for 2017, the police and the judges were perceived as most corrupt in both government and private-sector leadership (Ghana Web 2017a).

Police in Ghana have a history of using excessive force, making arbitrary arrests, detaining suspects for extended periods and taking bribes (Freedom House 2016). In fact, some of the most significant human rights abuses in Ghana are carried out by the police (US Department of State 2017).

In 2015, high-ranking police officials, including a commissioner, were arrested and charged for their involvement in a scandal in which approximately 200 potential police recruits were given fake acceptance letters and charged around $500 to begin training at the police academy (Freedom House 2016).

Police brutality, corruption, negligence and impunity continue to be issues. Credible reports of police beating, raping, and abusing suspects and other citizens are common (US Department of

State 2017). As of 2017, the Police Intelligence and Professional Standards Unit (PIPS) had investigated 33 reports of police brutality (US Department of State 2017).

There are delays in prosecuting suspects, reports of police collaboration with criminals and a prevalent public perception of police ineptitude. Police often failed to respond to reports of abuses and, in many instances, do not act unless complainants end up paying for police transportation and other operating expenses. Police have also extorted money by acting as private debt collectors, setting up illegal checkpoints and arresting citizens in exchange for bribes from disgruntled business associates of those detained. A study by the Ghana Integrity Initiative, conducted in 2016 and released in February 2018, indicated 61% of respondents had paid a bribe to police (GAN Integrity 2018).

## Legal and institutional anti-corruption framework

### International conventions

Ghana signed the United Nation Convention against Corruption in 2004 and ratified it in 2007 (UNODC 2018). Similarly, the African Union Convention on Preventing and Combating Corruption was signed in October 2003 and ratified by parliament in June 2007.

The country signed the United Nations Framework Convention on Climate Change (UNFCCC or FCCC) in 1992 and ratified it in 1995 (UNFCCC 2018) and ratified the Kyoto protocol in 2003 and brought it into force from 2005 (UNFCCC 2018).

### Domestic legal framework

The country's anti-corruption legal framework is comprehensive and strong, but faces challenges of implementation (Global Integrity 2011; US

**151**
EOIR-000406

Department of State 2017; Bertelsmann Stiftung 2018)

While there is no singular piece of legislation to tackle corruption, the criminal code criminalises corruption in the form of active and passive bribery, extortion, wilful exploitation of public office, use of public office for private gain and bribery of foreign public officials (Global Integrity 2011; Parliament of the Republic of Ghana 2012; Duodo and Goddard 2017). Moreover, corruption is deemed illegal, and both agent and principal are liable – regardless of the nationality of the person who is bribing or being bribed (Global Integrity 2011; Parliament of the Republic of Ghana 2012; GAN Integrity 2018).

Corruption under section 239 of Ghana's criminal code is defined as "corruption of a public officer", and subsequent clauses define various forms of corruption, including bribery and extortion. According to legal experts, this definition needs modernising as it does not include corporate or private bribery offences, and bribery between citizens is not currently outlawed in Ghana. There is also a Code of Conduct for Public Officers and the Civil Service Act which provides guidelines on conflicts of interest for civil servants. However, none of these provisions include safeguards against nepotism, cronyism and patronage. For example, civil servants are not prohibited from entering the private sector after leaving office (Global Integrity 2011; Duodo and Goddard 2017; GAN Integrity 2018).

The Anti-Money Laundering Act 2008 criminalises money laundering (GAN Integrity 2018). The last Mutual Evaluation Report relating to the implementation of anti-money laundering and counter financing of terrorism (AML/CTF) standards in Ghana was undertaken by the Financial Action Task Force (FATF) in 2017.

According to that evaluation, Ghana was deemed "compliant" for 14 and "largely compliant" for 18 of the 40 FATF recommendations (GIABA 2018).

Noting Ghana's significant progress in improving its AML/CFT regime with regard to the strategic deficiencies that the FATF had identified in October 2010, Ghana is no longer on the FATF list of countries that have been identified as having strategic AML deficiencies, and is no longer subject to FATF's monitoring process under its on-going global AML/CFT compliance programme (the country now works with Inter-Governmental Action Group against Money Laundering (GIABA) on its AML issues) (KnowYourCounrty 2017).

While there is no law supporting the beneficial ownership transparency agenda in the country, the Companies Act 2016 lays a firm legal basis for collecting and maintaining a national database on beneficial owners in Ghana. The law mandates the Registrar General's Department to be the institutional body responsible for the collection and maintenance of beneficial ownership register in the country (EITI 2017).

Despite Ghana's comprehensive legal framework and sound institutional structure for investigating and prosecuting money laundering (ML), investigation and prosecution appear to focus more on predicate offences, thus leading to few ML convictions. Ghana also does not actively pursue a policy of tracking confiscation of criminal proceeds. Thus, while Ghana's anti-money laundering laws largely comply with international standards, they are weakly and sporadically enforced (Bureau for International Narcotics and Law Enforcement Affairs 2017).

While there is a Whistle-blowers Act, passed in 2006 to protect witnesses in corruption cases from prosecution once they come forward with pertinent information, it is rarely implemented, as potential

152
EOIR-000407

informants frequently fear losing their well-paid employment (Bertelsmann Stiftung 2018).

The Public Procurement Act, the Financial Administration Act and the Internal Audit Agency Act promote public sector accountability and seek to combat corruption. Companies found guilty of corruption are debarred from participating in future bidding for up to five years. Implementation of this provision, however, is weak (Bertelsmann Stiftung 2018; GAN Integrity 2018).

Ghana is still struggling to pass the Right to Information (RTI) Bill (Graphic Online 2017). The right to information is a fundamental human right guaranteed by the country's 1992 constitution and recognised as a right under international conventions on human rights. The bill, when passed, will give substance to Article 21 (1) (f) of the constitution which states: "All persons shall have the right to information subject to such qualifications and laws as are necessary for a democratic society" (Graphic Online 2017).

A National Anti-Corruption Action Plan (NACAP) was passed in 2014, which aims to improve the prevention, investigation and prosecution of corruption by strengthening a number of state agencies and putting a premium on public awareness of corruption (Government of Ghana 2012; Freedom House 2016; Boateng 2018). However, A UN report, released in February 2015, highlighted the government's inability to implement its anti-corruption policies and effectively prosecute offenders (Freedom House 2016). Moreover, the NACAP story is deemed "not all that rosy", as politicians, after their initial in-front-of-camera pledges, do not seem too committed to the common strategy but rather to some party manifesto pledge; for instance, to create of the Office of the Special Prosecutor (Boateng 2018).

According to anti-corruption activists working on the ground, Ghana's criminal law in relation to corruption needs to be updated, arguing that a new and all-inclusive anti-corruption and bribery act is the need of the hour (Duodo and Goddard 2017).

## Institutional framework

There are several anti-corruption bodies that exist in Ghana; however, like most civil service organisations, they remain understaffed and face funding challenges (Bertelsmann Stiftung 2018).

### Commission of Human Rights and Administrative Justice (CHRAJ)

CHRAJ is one of Ghana's leading anti-corruption bodies. It consolidates the work of an anti-corruption agency, ombudsman, and human rights commission under one umbrella (Kukutschka 2014; ACA 2018). Its anti-corruption powers stem from Articles 218(a) & (e); 284-288 of the 1992 constitution and section 7 (1) (a), (e) & (f) of Act 456. The commission investigates and works to prevent corruption (ACA 2018). However, CHRAJ does not have the power to prosecute, nor does it have budget autonomy (ACA 2018). As the president, on the advice of the Council of State, appoints the commissioners, the organisation is not kept free from the executive's influence (Global Integrity 2011; ACA 2018).

The CHRAJ website regularly updates news and events related to corruption, and offers research and publications on the topic. It also provides a link to submit three types of complaints: normal, whistle-blower and discrimination reporting (CHRAJ 2018). Also, in accordance with a supreme court ruling, the ombudsman cannot initiate its own investigation. Somebody must make a complaint before the ombudsman can begin an investigation (Global Integrity 2011). It should also be noted that, although CHRAJ coordinates and

153
EOIR-000408

monitors the NACAP, it is the presidency that has the lead role as the implementation agency (Boateng 2018).

### Economic and Organised Crime Office (EOCO)

EOCO, inaugurated in 2010, keeps a specialised police agency which concentrates on economic crime prevention, detection, investigation and prosecution, as well as recovering the proceeds of crime (Bertelsmann Stiftung 2018; Office of the Attorney-General and Ministry of Justice 2018).

The functions of the office are to investigate and, on the authority of the attorney-general, prosecute serious offences that involve financial or economic loss to the republic or any state entity or institution in which the state has financial interest. It is also empowered to recover the proceeds of crime. It specifically targets the following areas (EOCO 2018; Office of the Attorney-General and Ministry of Justice 2018):

- money laundering
- human trafficking
- prohibited cyber activity
- tax fraud
- other serious offences

EOCO, like CHRAJ, faces challenges in performing its duties, including interference from the executive. This interference is made possible by the fact that the director and the board are appointed by the executive and report to the attorney-general (Kukutschka 2014).

## Focus areas

### Audit Service of Ghana

The aim of Ghana's audit service is to deliver good governance, transparency, accountability and probity in Ghana's public financial management system by auditing to recognised international standards and reporting their audit results and recommendations to parliament (Ghana Audit Service 2018).

The auditor-general's audit jurisdiction extends to the following (Intosaiitaudit 2018):

- the public accounts of Ghana and of all public offices, including the courts, the central and local government administrations, the universities and public institutions
- the accounts of any public corporation or other body or organisation established by an act of parliament
- the Bank of Ghana
- the accounts of a statutory corporation, a state enterprise or a public commercial institution operating under its own enactment.

The 2017 report by the Audit Service of Ghana stated that the body faced "financial and operational challenges." Nevertheless, the Service still made substantial progress - completing 80% out of the 3,463 planned audits including 2,010 institutions and agencies of Ministries, Departments and Agencies, 210 Metropolitan, Municipal and District Assemblies and 550 Educational Institutions. However, it was unable to present any of its reports to Parliament (Audit Service of Ghana 2017).

The major shortcomings of 2016 audit findings were that institutions often lacked effective internal control measures to minimize instances of financial malfeasance in areas such as cash, procurement, payroll, contract and tax irregularities, as well as non-payment of outstanding loans (Audit Service of Ghana 2017).

Currently, the on-going National Payroll and Personnel Validation Audit Exercise, which started earlier in 2018, has revealed some pertinent issues. There is a worrying trend of the widespread use of

154
EOIR-000409

fake certificates and promotional letters by some public workers to receive salaries (Ghana Web 2018c). This disclosure by the GAA showcases the present-day relevance of the institution in mitigating corruption in the country.

### Office of the Special Prosecutor (OSP)

The government of Ghana has established by an act of parliament in 2017 the Office of the Special Prosecutor to investigate and prosecute certain categories of cases and allegations of corruption and other criminal wrongdoing under the Criminal and Other Offences Act, 1960 (Act 29), including those involving alleged violations of the Public Procurement Act, 2003 (Act 663) and cases implicating public officers and politically exposed persons (Osei-Amoako 2018). A popular term for special prosecutor is the anti-corruption tsar.

The office of the Special Prosecutor carries with it a lot of hope for ordinary Ghanaians, as this is the first time that a position has been created solely to investigate and prosecute graft, particularly at state level, and with a commitment that there will be no interference from the government (Okello 2018).

The office was primarily created to fill an election promise of stamping out corruption made by President Nana Akufo-Addo when he came to power in 2017 (Okello 2018). However, some experts suggest the creation of this office may be undermining several other existing bodies and policies that are currently in place to tackle corruption – including CHRAJ and NACAP. Some have gone said that "NACAP will succeed when political leaders champion and lead the process, just as they championed the establishment of the Office of the Special Prosecutor (OSP)" (Boateng 2018).

Once fully operational, the special prosecutor's office ought to be independent of the executive,

with the office-bearer being protected from presidential sanction or dismissal for carrying out their job. Observers believe this will allow it to adequately deal with corruption-related issues which have plagued past governments (Tenkorang 2018).

The same terms and conditions of service of the Justice of the Court of Appeal apply to the OSP including that special prosecutor cannot be removed at the will of the president once appointed for a fixed non-renewable seven years (Ghana Web 2017b). The special prosecutor has the power to freeze and get the court to assist in seizing property (deemed to be related to graft) of a suspect accused of corruption once charges have been pressed by the OSP. The OSP is also under an obligation of law (Special Prosecutor Act, Act 959) to publish, quarterly, in two major national newspapers and on its website the list of cases and convictions secured (Ghana Web 2017b).

The OSP is authorised to issue plea bargains if the accused shows a "willingness to cooperate in the investigation or prosecution of other persons". However, the accused would still have to plead guilty which cannot be re-appealed or pardoned by the president (Ghana Web 2017b).

Martin Amidu, a former attorney-general and justice minister, was formally sworn in as the special prosecutor earlier in 2018. He is set to investigate and prosecute corruption in the private and public sectors, streamlining what the government said were "institutional bottlenecks" in the fight against graft (Ipotnews 2018). What the OSP achieves is yet to be seen.

### Courts

According to the constitution, the structure and the power of the judiciary are independent of the two other branches of government. The Supreme Court

155
EOIR-000410

of Ghana stands at the apex and has broad powers of judicial review. The constitution authorises the apex body to rule on the constitutionality of any legislation or executive action at the request of any aggrieved citizen. The hierarchy of courts derives largely from British juridical forms. The courts have jurisdiction over all civil and criminal matters. They include[4] the superior courts of judicature, established under the 1992 constitution, and the inferior courts, established by parliament (High Commission 2014).

As mentioned earlier, the judiciary is viewed as one of the most corrupt bodies, especially after the 2015 scandal involving a host of judicial officers (Freedom House 2016; Ghana Web 2017a). The judiciary is also known to use its discretionary powers to punish the poor and favour the rich. While influential people charged with corruption face jail time of two to four years, those that are less fortunate receive 10 year sentences for stealing a basket of tomatoes (Braimah 2016). Experts recommend a clean-up of the Ghanaian justice system to counteract the ill effects of judicial corruption that affects the entire country (Braimah 2016).

## Other stakeholders

### Media

Ghana has an enthusiastic press that plays a key role in political discourse, national identity and popular culture. Economic sustainability, however, is a challenge for Ghana's media (Freedom House 2017; Press Reference 2018). Freedom House, awarded a "partly free" status to Ghana in the 2017 Freedom of the Press report. The report also pointed out that several attacks against journalists were carried out in 2016, including a mob attack against a radio station in Brong Ahafo Region[5], and seizing equipment belonging to three Danish journalists reporting on a private mining corporation (Freedom House 2017).

However, there have also been some legal developments favourable to press freedom. In 2016, the government withdrew the Interception of Postal Packets and Telecommunications Messages Bill, known as the "spy bill", from parliamentary consideration which would have the potential to undermine the right to privacy in private communications (Freedom House 2017). Regulations issued by the National Media Commission (NMC) in 2015 that could have facilitated prepublication censorship were also struck down by the supreme court (Freedom House 2017).

Although the state-run Ghana Broadcasting Corporation (GBC) is protected by the constitution from government interference, political parties often try to influence coverage. Private media also face editorial pressure from their owners, especially those with political connections (Freedom House 2017).

Reporters without Borders ranks Ghana 23 in the 2018 World Press Freedom Index 2018, citing that while media pluralism exists there is not enough independence.

### Civil society

---

[4] The superior courts are, from highest to lowest, the Supreme Court of Ghana, the court of appeal, the high court of justice, and the 10 regional tribunals. The inferior courts, since the Courts Act 2002, include the circuit courts, the magistrate courts, and special courts such as the juvenile courts (High Commission 2014).

[5] Clients of a failed microfinance company controlled by the same person who owned the radio station attacked it. The attackers not only threatened to kill members of the station's staff if their demands for money were not met, one attacker also kidnapped the child of one of the station's journalists (the child was rescued by the police later) (Freedom House 2017).

In Ghana, citizens are at liberty to create civil society organisations and engage in activism of any kind, including anti-corruption activities. The government does not create barriers for anti-corruption civil society organisations (CSOs). However, it is possible that the government monitors their activities and pronouncements, and sometimes reacts to the pronouncements (Global Integrity 2011). Non-governmental organisations (NGOs) and CSOs are generally able to operate freely, and play an important role in ensuring government accountability and transparency (GAN Integrity 2018).

A few noteworthy CSOs are:

The Ghana Anti-Corruption Coalition (GACC) is a cross-sectoral grouping of public, private and civil society organisations with a focus on promoting good governance and fighting corruption in Ghana. Among other work, they routinely publish corruption research, run an anti-corruption hotline and have a section for people to report if they have paid a bribe (I Paid a Bribe) (GACC 2018).

The Ghana Center for Democratic Development (CDD-Ghana) is dedicated to the promotion of society and government based on the rule of law, appropriate checks on the power of the state and integrity in public administration. Its programmes include human rights promotion, natural resource governance, Afrobarometer Surveys and constitutional development (CDD-Ghana 2018).

Ghana Extractive Industry Transparency Initiative (GHEITI), is the Ghana subset of the global initiative (EITI) aimed at following due process and achieving transparency in payments by Extractive Industry companies to governments and government-linked entities. Alongside other efforts to improve transparency in government budget practice, it also seeks to usher processes whereby citizens can hold their governments accountable for

the use of revenues earned from the extractive sector (GHEITI 2018). EITI has provided several aforementioned recommendations to improve transparency in the extractive sector (part of the natural resource management section). GHEITI has followed up with all the involved stakeholders on many of these recommendations, which has resulted in policy changes such as the introduction of capital gains tax, higher ground rent for mining and a fixed royalty rate (EITI 2018).

Ghana Integrity Initiative (GII) is a non-partisan, non-profit civil organisation focused on addressing corruption, and was established in 1999. GII is the Ghana Chapter of Transparency International. A few notable projects include (GII 2018):

- organising sensitisation workshops, seminar etc. on the causes, effects and solution to corruption
- engaging student bodies in schools and identifiable youth groups to talk about the canker and possible remedies of corruption
- advocating for the initiation and/or passage of transparency-enhancing and anti-corruption legislations, such as Freedom of Information Bill, Whistle-blower Law, Assets Declaration Law (Regulation)
- organising nationwide radio programmes to educate the public on the importance of anti-corruption legislation to counter corruption
- holding meetings with key stakeholders in the water sector on transparency and integrity in the water sector under another new GII project called Transparency and Integrity in Service Delivery in Africa (TISDA)
- organising ethics workshops titled "Zero Tolerance Against Corruption Campaign: The Role of Religious Bodies in Ghana" for religious groups throughout the country

---

157
EOIR-000412

- organising workshops for public officials to promote awareness of the guidelines on conflicts of interest developed by CHRAJ
- empowering communities to demand transparency, responsiveness and accountability in the provision of water, under the poverty and corruption in Africa pilot project
- collaborating with Ghana Association of Women Entrepreneurs (GAWE) to implement a project, Gender and Tax Justice in Ghana to research into the impact of taxation on women

158
EOIR-000413

# References

Ablorh, R. 2016. *Corruption: An Everlasting Item on Ghana's Elections Agenda.* My Joy Online.

Anti-Corruption Authorities (ACA). 2018. Commission on Human Rights and Administrative Justice (CHRAJ).

Audit Service of Ghana. (2017). Republic Of Ghana - Medium Term Expenditure Framework (Mtef) For 2017-2019 & Programme Based Budget Estimates For 2017.

BBC News. 2018. *Ghana Country Profile.*

Bertelsmann Stiftung. 2018. *Ghana Country Report.*

Boateng, C. 2018. *Ghana United against Corruption – National Anti-Corruption Action Plan.* Graphic Online.

Braimah, A. 2016. *Are Judges Corrupt? An Empirical analysis of the Ghana Judiciary.* IOSR Journal of Humanities and Social Science (IOSR-JHSS) Volume 21, Issue 8, Ver.6.

Brierley, S. 2017. Local Government Corruption in Ghana: Misplaced Control and Incentives – IGC. International Growth Centre (IGC).

Bureau for International Narcotics and Law Enforcement Affairs. 2017. *International Narcotics Control Strategy Report Volume II.*

Business Day. 2016. *Ghana's Mahama Cleared of Corruption over Car Gift.*

Cheeseman, N., Lynch, G. and Willis, J. 2016. *Ghana shows a troubling willingness to accept political corruption, our recent survey shows.* Washington Post.

CHRAJ. 2018. *About Us.*

CIA. 2018. *Ghana Profile.*

Development, T. 2018. About CDD Ghana. CDD Ghana.

Duodo, K. and Goddard A. 2017. *ALB Time for a New Bribery and Corruption Act for Ghana – Articles.* African Law and Business (ALB).

Dupuy, K. 2017. *Corruption and Elite Capture of Mining Community Development Funds in Ghana and Sierra Leone.* Chr. Michelsen Institute (CMI).

Economic and Organised Crime Office (EOCO). 2018. *About Us.*

Extractive Industries Transparency Initiative (EITI). (2017). *Ghana.*

Freedom House. 2016. *Freedom in the World: Ghana.*

Freedom House. 2017. *Freedom of the Press: Ghana.*

Freedom House. 2018. *Ghana.*

GACC. 2018. *About us Ghana Anti-Corruption Coalition.*

GAN Integrity. 2018. *Ghana Corruption Report.*

Ghana Audit Service. 2018. *Mission Statement.*

Ghana Extractive Industry Transparency Initiative (GHEITI). (2018). *About EITI in Ghana.*

Ghana Integrity Initiative (GII). 2018. *About GII.*

Ghana News Agency. 2018. *"When Greed and Corruption Become the Norm".*

Ghana Web. 2017. *Police, judges Most Corrupt in Ghana.*

Heritage Foundation. 2018. *Index of Economic Freedom.*

International Budget Partnership (IBP). (2017). *Open Budget Survey Results.*

Inter-Governmental Action Group against Money Laundering (GIABA). 2018. *Anti-money Laundering and Counter-Terrorist Financing Measures Ghana: Mutual Evaluation Report.*

International Growth Centre (IGC). 2016. *Higher Salaries Worsened Police Corruption in Ghana, According to IGC-Funded Research - IGC.*

Intosaiitaudit. 2018. *Ghana Audit Service.*

Ipotnews. 2018. *New Ghana Anti-Corruption Tsar Takes Office.*

---

Jenkins, M. 2017. *The Impact of Corruption on Access to Safe Water and Sanitation for People Living in Poverty.* U4 Anti-corruption Centre.

KnowYourCountry. 2017. *Ghana AML Report.*

Koswe. 2018. *Ghana Electoral Commission Corrupt.* The Zambian Observer.

Kukutschka, R. 2014. *Overview of Corruption in Ghana.* Transparency International.

Mo Ibrahim Foundation. 2017. *Ibrahim Index of African Governance.*

Modern Ghana. 2018. *Nyantakyi's $12 Million Deal Exposed at Last.*

Natural Resource Governance Institute (NRGI). 2017. *Ghana's Oil and Gas Sector is Best-Governed in Sub-Saharan Africa, but Challenges Remain.*

Natural Resource Governance Institute (NRGI). 2018. *Ghana's New Petroleum Register Features Full-Text Contracts.*

Office of the Attorney-General and Ministry of Justice. 2018. *Economic and Organised Crime Office.*

Okello, C. 2018. *High Hopes in Ghana after New Anti-Corruption Tsar Named.* RFI.

Osei-Amoako, Y. 2018. *Reflections on Ghana's Office of the Special Prosecutor.* Ghana Web.

Oxford Business Group. 2017. *The Report: Ghana.*

Parliament of the Republic of Ghana. 2012. *Criminal Offences (Amendment) Act, 2012.*

Reporters Without Borders (RSF). 2018. *Ghana: Media Pluralism but Not Enough Independence | Reporters without Borders.*

Sagoe-Moses, L. 2017. *How to Unmask Corruption in Ghana.* The New York Times.

Skaten, M. 2018. *Ghana's Oil Industry: Steady Growth in a Challenging Environment.* The Oxford Institute for Energy Studies, University of Oxford.

Star Ghana. 2018. *Social Norms and Petty Corruption in Ghana.*

Tenkorang, E. 2018. *Amidu Sworn in As Ghana's First Special Prosecutor – citifmonline.com.* Citi FM Online.

The High Commission of Republic of Ghana New Delhi, India (High Commission). 2014. *The Legal System of Ghana.*

TRACE International. 2017. *TRACE Bribery Risk Matrix.*

Transparency International. 2017. *Corruption Perceptions Index.*

UNFCCC. 2018. *Status of Ratification of the Convention.*

United Nations Office on Drugs and Crime (UNODC). 2018. *UNCAC Ratification status.*

US Department of State. 2017. *Ghana Human Rights Report.*

World Bank. 2016. *Worldwide Governance Indicators.*

World Bank. 2018. *Doing Business in Ghana.*

World Bank. 2018. *Ghana Overview.*

Yusif, F. 2018. GACC Urges Gov't to Deal with Corruption in Water Sector. Citi FM Online.

160
EOIR-000415

## Disclaimer

All views in this text are the author(s)' and may differ from the U4 partner agencies' policies.

## Partner agencies

DFAT (Australia), GIZ/BMZ (Germany), Ministry for Foreign Affairs of Finland, Danida (Denmark), Sida (Sweden), SDC (Switzerland), Norad (Norway), UK Aid/DFID.

## About U4

The U4 anti-corruption helpdesk is a free research service exclusively for staff from U4 partner agencies. This service is a collaboration between U4 and Transparency International (TI) in Berlin, Germany. Researchers at TI run the helpdesk.

The U4 Anti-Corruption Resource Centre shares research and evidence to help international development actors get sustainable results. The centre is part of Chr. Michelsen Institute (CMI) in Bergen, Norway — a research institute on global development and human rights.

www.U4.no

U4@cmi.no

## Keywords

Ghana - judiciary - audit

## Open access

We apply a Creative Commons licence to our publications: CC BY-NC-ND 4.0.

⊚ **creative commons**

*U4 Partner staff can use the helpdesk for free.*
*Email us at **helpdesk@u4.no***

16



# THE POLICE, THE PEOPLE, THE POLITICS
## Police accountability in Ghana

2007
Commonwealth Human Rights Initiative

EOIR-000417

# Commonwealth Human Rights Initiative

The Commonwealth Human Rights Initiative (CHRI) is an independent, non-partisan, international non-governmental organisation, mandated to ensure the *practical* realisation of human rights in the countries of the Commonwealth. In 1987, several Commonwealth professional associations founded CHRI. They believed that while the Commonwealth provided member countries a shared set of values and legal principles from which to work and provided a forum within which to promote human rights, there was little focus on the issues of human rights within the Commonwealth.

The objectives of CHRI are to promote awareness of and adherence to the Commonwealth Harare Principles, the Universal Declaration of Human Rights and other internationally recognised human rights instruments, as well as domestic instruments *supporting human rights in Commonwealth member states.*

Through its reports and periodic investigations, CHRI continually draws attention to progress and setbacks to human rights in Commonwealth countries. In advocating for approaches and measures to prevent human rights abuses, CHRI addresses the Commonwealth Secretariat, member governments and civil society associations. Through its public education programmes, policy dialogues, comparative research, advocacy and networking, CHRI's approach throughout is to act as a catalyst around its priority issues.

The nature of CHRI's sponsoring organisations allows for a national presence and an international network.* These professionals can also steer public policy by incorporating human rights norms into their own work and act as a conduit to disseminate human rights information, standards and practices. These groups also bring local knowledge, can access policy makers, highlight issues, and act in concert to promote human rights.

CHRI is based in New Delhi, India, and has offices in London, UK, and Accra, Ghana.

International Advisory Commission: Sam Okudzeto - Chairperson. Members: Eunice Brookman-Amissah, Murray Burt, Jean Corston, Alison Duxbury, Neville Linton, B.G. Verghese, Zohra Yusuf and Maja Daruwala.

Executive Committee (India): B.G. Verghese – Chairperson. Members: Anu Aga, B.K.Chandrashekar, Bhagwan Das, Nitin Desai, K.S. Dhillon, Harivansh, Sanjoy Hazarika, Poonam Muttreja, Ruma Pal, R.V. Pillai, Mool Chand Sharma and Maja Daruwala – Director

Executive Committee (Ghana): Sam Okudzeto – Chairperson. Members: Anna Bossman, B.G. Verghese, Neville Linton and Maja Daruwala - Director

Executive Committee (UK): Neville Linton - Chairperson; Lindsay Ross - Deputy Chairperson. Members: Austin Davis, Meenakshi Dhar, Derek Ingram, Claire Martin, Elizabeth Smith.

\* Commonwealth Journalists Association, Commonwealth Lawyers Association, Commonwealth Legal Education Association, Commonwealth Parliamentary Association, Commonwealth Press Union and Commonwealth Broadcasting Association.

ISBN: 81-88205-50-8
© Commonwealth Human Rights Initiative, 2007.
Material from this report may be used, duly acknowledging the source.

 **Commonwealth Human Rights Initiative**

**CHRI New Delhi Office (Headquarters)**
B-117, Second Floor, Sarvodaya Enclave
New Delhi - 110 017
INDIA
Tel: +91-11-2685-0523, 2652-8152, 2686-4678
Fax: +91-11-2686-4688
E-mail: chriall@nda.vsnl.net.in

**CHRI London Office**
Institute of Commonwealth Studies
28, Russell Square, London WC1B 5DS
UK
Tel: +44-020-7-862-8857
Fax: +44-020-7-862-8820
E-mail: chri@sas.ac.uk

www.humanrightsinitiative.org

**CHRI Africa Office**
House No.9, Samora Machel Street Asylum Down
opposite Beverly Hills Hotel
Near Trust Towers,Accra, Ghana
Tel: +00233-21-271170
Tel/Fax: +00233-21-271170
E-mail: chriafr@africaonline.com.gh

EOIR-000418



# THE POLICE, THE PEOPLE, THE POLITICS
## Police accountability in Ghana
### 2007

EOIR-000419

# Acknowledgements

The Commonwealth Human Rights Initiative produced this report as part of a two year project on police accountability in Ghana. The report is the result of the work of many people, both inside and outside CHRI.

CHRI would like to thank its contributors in Ghana: Mr Kofi Bentum Quantson (Former National Security Co-ordinator and Chief Executive of the Narcotics Control Board), who provided a report on the history of the police in Ghana, Dr Appiagyei-Atua (Lecturer in the Faculty of Law at the University of Ghana), who provided a report on the external accountability systems of the Ghana police, Francis Tsidi (Research Department of the Ghana police) who provided a report on internal accountability systems and Dr Raymond Atugugba (Lecturer in the Faculty of Law at the University of Ghana) who provided a report on the structure of the Ghana police and its effects on accountability.

Daniel Woods, coordinator of CHRI's police reform programme, shaped and edited the report. The report was also edited by Nana Oye Lithur, Regional Coordinator of CHRI's Ghana office, and Maja Daruwala, CHRI's Executive Director. The editing team was assisted by CHRI staff Edmund Foley, Paul Cruise, Chris Hunt, Elizabeth Wright, Jacob Coppell and Sashi Nathan and Paul Avuyi, who provided valuable input and information. CHRI is also grateful to the Inspector General of Police, Patrick Acheampong, and the police administration for reviewing the report and for their comments. This report was designed and laid out by Chenthilkumar Paramasivam of CHRI.

CHRI would particularly like to thank the British Foreign and Commonwealth Office and the British High Commission in Ghana for their financial support.

# CHRI's police accountability project in Ghana

The Commonwealth Human Rights Initiative has been working across the Commonwealth on issues of police reform for around ten years. This report is produced as part of a two year programme on police accountability in Ghana that has been funded by the British Foreign and Commonwealth Office. The programme aims to assist the development of a responsive and accountable police service in Ghana by examining the police system, identifying accountability gaps, facilitating policing, human rights and accountability related advocacy and increasing debate around and demand for police accountability in Ghana. The programme's activities have included the production of research reports, advocacy documents and information pamphlets, a roundtable workshop on police accountability in Africa, public hearings and a series of radio and television spots on policing and human rights.

EOIR-000420



# Contents

**Introduction**

**Chapter 1: A history of police and politics in Ghana**

    Ghana's police: A product of history
    Traditional policing methods
    The British come to town: Colonial policing
    Independence: A new Ghana, same old police

**Chapter 2: The legislative framework**

    Constitution
    Police Service Act
    Regulations
    Police Service Instructions
    Security and Intelligence Act
    International standards
        United Nations standards
        Regional mechanisms
        The African Union
        The African Commission on Human and Peoples' Rights
        The African Court on Human and Peoples' Rights

**Chapter 3: Understanding the police**

    Police service hierarchy
    Other types of police officers
    Governing bodies
    Training
    Resources

**Chapter 4: The public experience of policing**

    Corruption
    Illegal arrest and detention
    Excessive use of force
    Failure to act on complaints

**Chapter 5: A conceptual framework for democratic policing**

    Policing and human rights
    Hallmarks of democratic policing
    Benefits of democratic policing
    Dimensions of police accountability
    Transparency: An essential precursor to accountability

**Chapter 6: Internal accountability mechanisms**

    Standards of conduct
        Police Service Instructions
        Criminal Procedure Code
        Police Service Act

166

EOIR-000421

**THE POLICE, THE PEOPLE, THE POLITICS**

Police service regulations
Disciplinary proceedings
Public complaints
    Suggestion box – from the early 1970s
    Public Complaints Unit – late 1970s to early 1980s
    Special Police Command Unit – early 1980s to early 2000s
    Monitoring and Inspection Unit – 2001 to 2005
    Police Intelligence and Professional Standards Bureau – 2005 to current

**Chapter 7: External accountability mechanisms**

Independent oversight bodies
    Police Council
    Membership
    Budget and resource constraints
    Political will
    Inadequate legal framework
    Regional Police Committees
    Commission for Human Rights and Administrative Justice
Executive
    Ministry of Interior
    Ministry of National Security
    Attorney General
Parliament
    Question time
    Parliamentary Select Committee on Defence and Interior
Judiciary
Committees of Inquiry
Civil society
    Civil society organisations
    Media
Other

**Chapter 8: Debates on police reform in Ghana**

Young Report – 1951
    Definition of police officer
    Police Council
    Decentralisation
Boye Committee – 1971
Commission of Inquiry into Promotions within the Police Force
    (Tibiru Committee) – 1979
Ryan Report – 1992
Presidential Commission into the Ghana Police Service
    (Archer Commission) – 1996
Okudzeto Commission – 2001

**Chapter 9: Agenda for change**

**Annex 1:** United Nations and other global instruments on policing

**Annex 2:** United Nations basic principles on the use of force and firearms by law enforcement officials

**Endnotes**

EOIR-000422

# Introduction

In 2007, Ghana celebrated 50 years of independence. Ghana's journey over those 50 years to modern, stable democracy has not always been smooth, and has included periods of military rule and illegitimate political interference.

Years of colonial style policing prior to independence left a legacy of regime policing in Ghana; violent, heavy handed and politicised policing that was in place to protect the ruling regime's interests, rather than to serve the Ghanaian community. Today's police service is a direct descendant of the colonial police force, and continues to exhibit many of the same traits. Despite a series of government sponsored commissions and committees that began in 1951 and have continued to sit since the Boyes Report of 1970, the police have not been pulled into line with the modern democracy that Ghana is today; at different times reform has been undermined by political turmoil or discarded because of a lack of political will for change.

A fundamental part of a modern, democratic and transparent police service is accountability – accountability to the state, accountability to the community and accountability to the law. Accountability protects the police service from illegitimate political interference and ensures that police officers are community focused and held to agreed standards of conduct. Global good practice shows that accountability is best achieved through an interconnected web of internal and external oversight mechanisms.

Ghana has the foundations of a strong and effective accountability structure. Internally, it has clearly set out standards of conduct and behaviour, and a high profile, accessible internal complaints unit to deal with incidences of misconduct. Externally, there is an independent advisory body, the Police Council, which is charged principally with advising the President on matters of appointment, finance and administration, a series of Regional Police Committees that support the Police Council, and a human rights commission that can deal with complaints against the police. Accountability in terms of the executive is managed by the Ministry of Interior, Ministry of National Security and the Attorney General's Department. Parliament, the court system, government sponsored committees of inquiry and civil society all play roles in external oversight.



Despite a strong foundation on paper, there is still a lack of capacity to effectively monitor police activities and accountability within the police in Ghana. There are two clear reasons for this. The first is that while there are mechanisms in place (such as the Police Intelligence and Professional Standards Bureau) they are undermined, under-resourced or underpowered. The second is that a key component of the accountability web – an independent, empowered civilian complaints authority – has not been put in place in Ghana.

Ghana's police are ready for reform, and Ghana's community is ready for a police service that reflects its role as a model of successful and stable democratic change for other African nations. It is time that the decades of discussion and debate around police reform translates to tangible change, and the final shaking off of a colonial legacy that has persisted for too long.

168
EOIR-000423

"Ghana's police are ready for reform, and Ghana's community is ready for a police service that reflects its role as a model of successful and stable democratic change for other African nations.

It is time that the decades of discussion and debate around police reform translates to tangible change, and the final shaking off of a colonial legacy that has persisted for too long."

# CHAPTER 1

## A history of police and politics in Ghana

The only major step Ghana has taken towards wholesale reform of the police since 1993 was the establishment of a commission to look into policing in 1996, known as the Archer Commission. The Archer Commission came back with a wide-ranging set of suggested reforms, but the Government has been less than keen to implement any of its recommendations.

EOIR-000425

"Common colonial antecedents provide Commonwealth police structures a core resemblance but post-colonial histories have shaped present day policing in each country.... The evolution of policing values has been influenced by individual national histories."[1]

# Ghana's police: A product of history

Ghana's police service is a product of its political history. Although some form of policing has been practiced in the region since the early days of the Akan people, the current police organisation owes its roots to the days of British trade and colonies along the Gold Coast. The British established military style police squads to protect their trading interests and support their colonial governance structures; when the British sailed, the new independence government kept on the military and political policing structures. The police were heavily involved in the first overthrow of the new democratic government – and remained heavily involved with Ghana's politics and governance, with officers making up half the members of the ruling council. A series of coups and attempts at democracy continued to shape the police over the next years; the 1970 policing legislation that was based on a quickly abandoned 1969 constitution is still in place today. Despite attempts over the years to bring about change and reform and to pull the police into line with the modern democracy Ghana is now proud to be, political upheavals and – more recently – a lack of political will, have prevented reform from taking root.

# Traditional policing methods

Policing in Ghana can be traced as far back as the traditional systems of criminal justice practiced by different groups who lived in the region that has formed modern-day Ghana. The traditional Akan system is one example. The Akan is an important linguistic group, which today includes the Fantis along the coast, the Ashantis in the forest region north of the coast and the Guans on the plains of the Volta River. The Ga and Ewe speaking communities reside in the south and south east and the Moshi-Dagomba speaking tribes live in the northern and upper regions.[2] In historic Akan communities, individuals, the extended family, groups of men and the community performed various police functions. Goals of this system included crime prevention and the apprehension and punishment of people who had committed an offence. The Akan people recognised two types of offences – public and private. Public offences were considered a crime against the community, while private offences were minor crimes (such as a misdemeanour or civil wrong). Policing activities dealt with public offences.

"Traditional Ghanaian societies had notions of policing which were put in practice to protect and promote the cultural values and democratic ethos of the state. This social control mechanism, however, was disrupted at the advent of colonialism and replaced by the "Colonial Police Model" which was built with the goal of advancing and protecting colonial interests at the expense of the rights of colonised people."[6]

Main policing tasks were performed by groups of men. Duties were similar to modern police tasks and included laying ambush to apprehend a thief who was on the run,[3] using community intelligence to prevent a crime taking place, using an oral warrant issued by the Chief to arrest suspects[4] and conducting village patrols.[5] The communities did not have a prison system – offenders were ostracised from the community for a set period of time.

171
EOIR-000426

# The British come to town: Colonial policing

European contact with modern-day Ghana first took place in 1470, when a party of Portuguese traders landed on its coast. The first permanent trading colony was established by the Portuguese in 1482, at Elmina Castle, at Cape Coast. The first recorded English visit to the area took place in 1553. Over the next three centuries, the English, Danes, Dutch, Germans and Portuguese controlled various parts of the coast.[7]

The British government took control of British trading forts on the Gold Coast in 1821, and signed an agreement with local Chiefs in 1844 that provided legal legitimacy for the British presence.[8] Meanwhile, they were involved in a series of conflicts with the Ashantis, whose kingdom was based inland. These conflicts ended with the British establishing control in 1902, and making the northern areas a British Protectorate.[9] A former German colony was administered from Accra by the British from 1922 as a League of Nations mandate. The British administered each of these areas separately until 1946, when they were consolidated and ruled as a single unit.[10]

Colonial-style policing was introduced to the Gold Coast by Captain George MacLean around 1831 – he had been appointed Governor of the area in 1830.[11] It was firmly aimed at ensuring trade security and protection of the colonising forces – the initial officers were ex-militia that had been in the traders' employ and were selected on the basis of their physical strength.[12] Tasks included patrolling the trade routes that linked Ashanti and the coastal states and protecting the colonial merchants and officials around the old Portuguese trading colony at Elmina Castle.[13] It has also been suggested that the police were additionally charged with maintaining and enforcing the provisions of the agreement signed between the British and the Fanti people.[14] By 1871, the force was made up of 90 members.[15]

The process of formalising the police began in 1873. This was a period of British aggression against the Ashanti communities, and the Governor sought assistance from the British military stationed in Nigeria.[16] 700 men were brought in from the Hausa people in northern Nigeria to assist with establishing and maintaining control, and after the end of conflict, the men stayed on to complete civilian policing duties.[17] An ordinance was passed that "sought to provide for better regulation and discipline of the Armed Gold Coast Police."[18] The Hausa police – as they became known – were synonymous with heavy handed, brutal policing, particularly when putting down civil disorder against the colonial regime.[19] They were also known as "buga-buga", literally "beat-beat" in Hausa.[20]

The police organisation continued to develop during this period, but never moved away from its role as a protector of colonial trade and promoter of colonial governance. In 1876, the Gold Coast Police Force was renamed the Gold Coast Constabulary.[21] Internal specialisations developed and divisions were created, including Railways and Mines Detachments and Escort Police, Marine Police and a Criminal Investigations Department.[22] These specialisations mark the policing priorities; the Escort Police were given guard and escort duties in the important (for British trading interests) mining areas; the Marine Police particularly focused on smuggling and looting and the Criminal Investigations Department (and later a Special Branch) was used to gather intelligence.[23]

In 1894, another Ordinance was passed, giving the authority to form a civil police in the Gold Coast. 400 members of the previous Constabulary were recruited to form the basis of the new Gold Coast Police Force.[24] This led to the establishment of police stations and the standardisation of policing in the British controlled areas of the Gold Coast.[25] The majority of recruits were illiterate; strength and brawn counted for more than education or skills. Training was extremely heavily focused on military aspects of policing. The police officers produced had "attitudes that generated intimidation and bullying with an almost robotic obedience to repressive colonial laws that were regime-centred."[26]

172
EOIR-000427

> "...the pioneers of the Ghana Police were drawn from military sources without proper civil police training. They were held in such dread that children were frightened by the mere mention of the word 'police.' Any member of the public found in the company of a policeman, was considered to have been involved in some trouble! The police was tolerated in the society through fear. In the minds of many, it was the symbol of the imperial powers."[27]

## Independence: A new Ghana, same old police

During the late 1940s, there was an expansion of political consciousness and the nationalist movement in Ghana. This foreshadowed the Governor appointing a British Police Commissioner to lead a committee to look at policing in Ghana in 1951 – this committee produced a set of recommendations that reflected the importance of establishing an independent and politically partisan police service.

Ghana's road to independence began in earnest in 1951, with self rule, and continued in 1954 when a Constitution was put in place that established a cabinet of African ministers drawn from an all-African legislature chosen by popular vote.[28] Elections were held and the Convention People's Party, led by Kwame Nkrumah, won a majority of seats in the new Legislative Assembly.

In 1956, Prime Minister Nkrumah issued a government paper setting out proposals for independence of the Gold Coast.[29] The British government responded positively, and said that it would agree to a firm date for independence if a reasonable majority of the Legislative Assembly voted for independence, following a general election.[30] An election was held later the same year that returned the Convention People's Party and Nkrumah to power, with 71 of 104 seats.[31] Ghana became an independent state on 6 March 1957.[32]

A key policy of the Nkrumah government was an Africanisation of the police force, where Ghanaians were promoted to fill positions within the police organisation that had previously been held by the British.[33] In 1958, Mr Madjitey, the first Ghanaian police head, was appointed.[34] This was an important step towards ensuring that the police organisation was focused on the needs of the Ghanaian community – in 1952, there were 74 European and 18 African senior officers, with no European junior officers and 3,388 African officers.[35]

> "There are colonial police forces, which exist to enforce authority of a foreign power on a colonial people. In such forces, this will be demonstrated by the fact that the police will be peremptory and even brutal in their dealings with the inhabitants of the colony while they will be ingratiating and subservient to those in authority. In a free and independent country, the conduct of the police must be the exact reverse of this. They must demonstrate to the people at large that the country is free and independent by behaving towards the ordinary man in the street with exactly the same politeness as they would behave towards those in superior positions."[36]
> - *Prime Minister Nkrumah addressing the first graduating class of Ghana's first Police College, established in 1959*

Over the next few years, the Convention People's Party began to take a stronger hold over politics in Ghana. Nkrumah extended and made use of preventive detention legislation.[37]

173
EOIR-000428

In 1960, a new constitution was adopted, moving Ghana away from a parliamentary system with a Prime Minister to a republican form of government with a powerful President.[38] The Ghana Police Force became the Ghana Police Service once again.[39] Then, in 1964, a constitutional referendum brought one party rule to Ghana.[40]

On 2 January 1964, a police officer made an unsuccessful assassination attempt on President Nkrumah.[41] In the wake of the attempted shooting, the Police Commissioner and a number of other senior officers (as well as prominent politicians and personalities) were arrested and detained.[42] The President made it clear that he did not trust the police and reduced the size of the organisation from 13,247 in 1964 to 10,709 in 1965.[43]

Just over two years later, on 24 February 1966, the military and the police joined together to oust Nkrumah and the Convention People Party from rule.[44] The Government was dismissed, the Convention People Party and legislature dissolved and the Constitution suspended, while a replacement governance structure, the National Liberation Council, was put in place.[45] The police were heavily involved in both the coup and the subsequent government – senior officers publicly admitted involvement in the coup planning and execution, while the National Liberation Council was made up of four police officers and four military officers.[46] This regime brought into force a Police Service Act that had been drafted in 1965. The Act had a wide ambit and provided for "the organisation of the police service, the appointment, promotion and retirement of police officers and the conditions of service, disciplinary proceedings and other matters relating to the police service."[47]

The National Liberation Council handed over power to an elected civilian government in 1969, under a new constitution. The 1969 Constitution established the Police Council, and brought the police service into the folds of the public service.[48] Comprehensive police legislation – which is still in place today – was then passed, based on the 1969 Constitution. The Police Service Act covered police functions; structures and conditions of service, misconduct and unsatisfactory service and complaints and offences.[49] The Government continued to work towards police reform, putting together a committee to review the police, particularly focusing on structure, effectiveness and state of equipment.[50]

The fledgling Government was faced with mounting economic strife and in late 1971 devalued the currency in an attempt to reign in the country's finances. This led to massive inflation and then civil unrest. The military seized power in early 1972 and put the National Redemption Council in place.[51] The Council was made up of military officers, the head of the police and a civilian.[52] While the police had less direct involvement in governance under the National



174
EOIR-000429

THE POLICE, THE PEOPLE, THE POLITICS

Redemption Council than it had under the National Liberation Council, the coup leader and Government head, General Acheampong, was unsure of his position within the military and equipped a unit within the police with sophisticated weapons, in an attempt to create a counter-force to the military.[53] This dragged the police further into muddy political waters. Another backward step was the renaming of the Police Service Act as the Police Force Act, and renaming the Ghana Police Service the Ghana Police Force.[54]

One positive development during this period was the removal of the police from the wings of the public service, which allowed more autonomy and demanded more self-accountability for the police.[55]

General Acheampong's regime is synonymous with high levels of corruption and mismanagement. Civil unrest against his attempts to bring in a non-party state resulted in his replacement by his Chief of Staff, Lieutenant General Akuffo. Akuffo was unable to reign in corruption – much of which took place within military ranks – and was deposed in a violent military coup in 1979, led by Flight Lieutenant Jerry John Rawlings and his Armed Forces Revolutionary Council. Junior police were involved in the coup, and a combination of the constant political upheaval and police involvement in politics reduced the police organisation to a state of paralysis.[56]

In September 1979, Rawlings' interim Government handed over power to a democratically elected President and Parliament, underpinned by a modern constitution based on examples from western democracies.[57] However, this government was short lived and was overthrown by a second coup led by Rawlings in 1981.

> "None of the civilian and military regimes during the mandate period [1957-1992], made any serious attempt to provide mechanisms that would enable the service to exercise its functions in the society efficiently and honestly, while respecting individual dignity, rights and liberties."
> - Paragraph 1.13.2 of the NRC Report

Rawlings held on to power, with his Provisional National Defence Council as a governing authority, until 1992, when a new Constitution was accepted by national referendum and presidential and parliamentary elections were held. Rawlings won the presidency and his political party, the National Democratic Congress, won the majority of seats in the Parliament.[58] The Constitution entered into force in early 1993, and has remained Ghana's Constitution over the subsequent years – it includes provisions relating to the creation of the police service and sets out the basis for the Police Council. Free and fair elections held in 2000 heralded the first democratic change of government Ghana had ever seen; another series of elections were successfully held in 2004.[59]

> "The governing councils of the institutions [including the police service] are made up of such officials as to make them a part of the government. The number of political office-holders represented on those councils ceased to exist and the institutions suffered from the discontinuation of leadership."
> - Paragraph 1.10.3 of the NRC Report

The only major step Ghana has taken towards wholesale reform of the police since 1993 was the establishment of a commission to look into policing in 1996, known as the Archer Commission. The Archer Commission came back with a wide ranging set of suggested reforms, but the Government has been less than keen to implement any of its recommendations.[60]

175
EOIR-000430

# CHAPTER 2

## The legislative framework

The Ghana Police Service is created by the Constitution, and requires that the "police service shall be equipped and maintained to perform its traditional role of maintaining law and order."

EOIR-000431

## Constitution

The Ghana Police Service is created by the Constitution,[61] and requires that the "police service shall be equipped and maintained to perform its traditional role of maintaining law and order."[62]

The Constitution also sets out the procedure for appointing the Inspector General of Police[63] and creates the Police Council and the Regional Police Committees, which have key presidential advisory roles on policing, and the potential to operate as oversight mechanisms.[64]

As well as providing a broad framework for the police, the Constitution enshrines the protection and promotion of human rights into Ghana's legal fabric. Article 13(1) enshrines the right to life, liberty and security of the person, while article 15(1) protects the Ghanaian people from torture and cruel, inhuman or degrading treatment or punishment. Article 14(1) prohibits arbitrary arrest, detention and exile. Other rights that are included in the Constitution include the right to a fair trial, the right to peaceful assembly, the right to property, the right to privacy, the right to equal treatment before the law and freedom of movement.

The Constitution also creates a National Security Council.[65] The Council is empowered to safeguard Ghana's internal and external security, collect security information and integrate domestic, foreign and security policies to assist security and government agencies to cooperate, assess Ghana's military power and consider policies on matters of common interest to government departments.

### Membership of the National Security Council

The Council is made up of the President, Vice-President, the Ministers for Foreign Affairs, Defence, Interior and Finance (and others determined by the President), the Chief of Defence Staff (and two other members of the Armed Forces), the Inspector General of Police (and two other members of the police, including the Commissioner responsible for the Criminal Investigations Department), the Director-General of the Prisons Service, the Directors of External Intelligence, Internal Intelligence, Military Intelligence, the Commissioner of Customs, Excise and Preventive Service and three Presidential appointees.

## Police Service Act

Ghana's police are defined and empowered by the Police Service Act 1970 (Act 350). Section 1 of the Act sets out the function of the police organisation:

"It shall be the duty of the police service to prevent and detect crime, to apprehend offenders, and to maintain public order and the safety of persons and property."

Part II of the Act deals with the structure and conditions of the service – importantly, section 4 vests the responsibility for day-to-day supervision over the operation and administration of the service in the Inspector General, subject to any directions by the Minister. Part III details the Police Council created under the Constitution and sets out a list of possible misconduct, appropriate penalties, and outlines disciplinary procedures (see Part III, Regulation 21 for more information). The Constitution also sets out a process for public complaints to be taken (in Chapter V) and creates a Volunteer Police Reserve (Chapter VI).

The Act is missing a key component that international good practice considers essential for modern police legislation – it fails to set out clear and positive guidelines in terms of police

177
EOIR-000432

conduct. Modern police legislation includes a statement of police values to guide officers and set a benchmark for police behaviour. The importance of a statement of values is particularly apparent in Ghana, where police misconduct is a serious issue.

**Statement of values – New South Wales Police**
Section 7, Police Act 1990 (New South Wales, Australia)
Each member of NSW Police is to act in a manner which:
(a) places integrity above all,
(b) upholds the rule of law,
(c) preserves the rights and freedoms of individuals,
(d) seeks to improve the quality of life by community involvement in policing,
(e) strives for citizen and police personal satisfaction,
(f) capitalises on the wealth of human resources,
(g) makes efficient and economical use of public resources, and
(h) ensures that authority is exercised responsibly.

**Statement of values – Ontario police**
Section 1, Police Act 1990 (Ontario, Canada)
1. Police services shall be provided throughout Ontario in accordance with the following principles:
   1. The need to ensure the safety and security of all persons and property in Ontario.
   2. The importance of safeguarding the fundamental rights guaranteed by the Canadian Charter of Rights and Freedoms and the Human Rights Code.
   3. The need for co-operation between the providers of police services and the communities they serve.
   4. The importance of respect for victims of crime and understanding of their needs.
   5. The need for sensitivity to the pluralistic, multiracial and multicultural character of Ontario society.
   6. The need to ensure that police forces are representative of the communities they serve.

The Act was drafted to operate under Ghana's 1960 Constitution. As a result, there are some inconsistencies between the Act and the current Constitution (see chapter 7 and a discussion of the Police Council for an example of these inconsistencies).

# Regulations

Police officers are regulated by the Police Service (Administration) Regulations 1974 (LI 880) and the Police Force (Disciplinary Proceedings) Regulations 1974 (LI 993). Importantly, the Police Service (Administration) Regulations define standards of conduct, while the Police Force (Disciplinary Proceedings) Regulations set out the process for disciplining members of the police organisation. The regulations are discussed in more detail in chapter 6.

# Police Service Instructions

The Police Service Instructions are a set of conduct guidelines published by the Inspector General. The Inspector General is empowered to set these guidelines by both the Constitution and the Police Service Act.[66] Acts – or failures to act – that are a breach of discipline are set

178
EOIR-000433

out in the Police Service Instructions, which sit beside the regulations dealing with standards of conduct.[67] A further discussion of the Police Service Instructions is at chapter 7.

# Security and Intelligence Act

The Security and Intelligence Act 1996 sets up regional and district security councils, which are committees of the National Security Council (the Constitutional security body referred to in chapter 7). The regional and district security councils are empowered to deal with threats or likely threats to security within their jurisdiction. Each District Security Council reports to the relevant Regional Security Council, which in turn reports to the National Security Council.

> ## Membership of Regional Security Councils
>
> Each Regional Security Council (REGSEC) is made up of the Regional Minister and Deputy Regional Minister, the Chief Executive of the Metropolitan Assembly, an officer of the Armed Forces, the Regional Police Commander, the Crime Officer, and the Regional Officers of the Internal Intelligence Agency, Customs Excise and Preventive Service, Prisons, Immigration and the Fire Service.
>
> ## Membership of District Security Councils
>
> Each District Security Council (DISEC) is made up of the District Chief Executive, the District Police Commander, the Crime Officer and the district representatives of the Internal Intelligence Agency, Customs, Excise and Preventive Service, Immigration and the Fire Service.

In practice, there have been instances of regional and district councils operating well outside the scope of their legislative power. In 2004, following reports of gunfire in Tamale the day after presidential and parliamentary elections, the relevant Regional Security Council ordered police to hand detainees arrested for lawlessness to the military and for security agents to return "fire for fire". This was well outside the Regional Security Council's mandate and led to the police transferring a detained electoral candidate, Alhaji Issah Mobillah, to military custody. Alhaji Issah Mobillah died while in military custody; the post-mortem report found multiple abrasions on the body, five fractured ribs and the collapse of the left lung with haemothorax and identified these injuries as the cause of death.[68]

# International standards

Ghana is part of the international community of nations through its membership of the United Nations, the Commonwealth and the African Union. International agreements that govern policing should be reflected in Ghanaian law and practice so that they can become a stronger part of the police accountability framework.

## United Nations standards

Key United Nations documents related to policing are set out in Annex 1.

Ghana is a signatory to a number of important United Nations treaties. It has ratified the International Covenant on Civil and Political Rights (ICCPR) (and the first optional protocol to the ICCPR, although not the second optional protocol that prohibits the death penalty),

the International Covenant on Economic, Social and Cultural Rights (ICESCR) and the Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW). It has also signed the Convention on the Rights of the Child (CRC) and has ratified, with a reservation, the Convention Against Torture (CAT). The reservation deals with the consent of parties to arbitration or jurisdiction of the International Court of Justice regarding interpretation of the CAT.

The Government has fallen behind on its reporting obligations under these treaties. It failed to submit any reports under the ICCPR (an initial report was due in February 2001, and a second report was due in February 2006)[69] or the ICESCR (an initial report was due in June 2003).[70] Reports due under the CEDAW have, for the most part, been submitted after their due date – an initial report was due in 1987, but was submitted with the second report in 1991, and the third, fourth and fifth reports, due in 1995, 1999 and 2003 respectively, were submitted as one report in 2005.[71] It is the same for the CRC; an initial report due in 1992 was submitted in 1995, while the second report, due in 1997, was submitted in 2004.[72] Reports were due under the CAT in October 2001 and October 2005 – neither of these reporting deadlines have been met.[73]

## Regional mechanisms

A number of regional mechanisms that exist to promote and protect human rights impact on policing. These include the African Union (AU), the African Commission on Human and Peoples' Rights and the African Court on Human and Peoples' Rights.

### The African Union

The Organisation of African Unity (OAU) was established in 1963 as a forum for the promotion of independent democratic ideals of African countries in the process of emerging from colonial rule. The OAU became the African Union, or AU, in 2002. The African Charter on Human and Peoples' Rights (referred to as the 'Banjul Charter') was adopted by OAU members in 1981 and came into force in 1986. The Charter grants the same civil and political rights protections, directly relevant to policing, as other international instruments such as the Universal Declaration of Human Rights and the ICCPR. For example, the Charter prohibits torture or degrading treatment, detention without trial and arbitrary arrest, while also recognising the right to a fair trial, to an impartial judiciary and to have effective recourse to justice.

Although Ghana was a founding member of the African Union – Kwame Nkrumah was instrumental in the founding of one of the African Union's predecessor organisations in the 1960s – it has not been made accountable for abuses in contravention of international and regional human rights treaties. Unfortunately, the promotion and protection of human rights within AU member states has not been a major priority for the organisation, as it has focused on political and economic independence, non-discrimination and the eradication of colonialism at the expense of individual rights.

> "There has been a general impression from the various discussions that the Ghana Police and other security agencies have continued to violate and infringe on the human rights of citizens. Suspects have been detained or held in custody without trial indefinitely and, in some cases in the past, extra-judicial killings were carried out."
> - Country Review Report of the Republic of Ghana – African Peer Review Mechanism

180
EOIR-000435

A push to strengthen the mechanisms of the African Union is currently underway as part of the New Partnership for Africa's Development (NEPAD) programme. Part of this includes the African Peer Review Mechanism (APRM), where assessments are made in key governance areas. Ghana has acceded to the APRM and was the first country to file its report and be peer reviewed by African heads of government.[74] The APRM report on Ghana contained comments and recommendations on policing.

## The African Commission on Human and Peoples' Rights

The African Commission on Human and Peoples' Rights was born out of the Banjul Charter in 1987. The Commission aims to promote and protect the rights set out in the Charter. The Commission's mandate is to investigate and make recommendations to states to carry out investigations and implement measures to prevent the reoccurrence of abuse. The Commission has the potential to be an accountability mechanism for the enforcement of human rights on behalf of a broad range of victims of police brutality, although many argue that it is inadequately funded to achieve its mandate.[75]

Ghana has failed to comply with its reporting requirements under the Banjul Charter. Its first report, due in January 1991, was submitted in September 1992. The next report was submitted in March 2000, and combined the 1995, 1997 and 1999 overdue reports.[76] The 6th, 7th and 8th reports – due in January 2003, 2005 and 2007 – are all pending and overdue.[77]

## The African Court on Human and Peoples' Rights

The African Court on Human and Peoples' Rights was established under the African Charter on Human and Peoples' Rights but is not yet fully functional. The first judges were appointed in January 2006, but it is now expected that the Court will merge with the African Court of Justice. Under the Charter, the Court can hear cases brought by signatory states, the Commission, and African intergovernmental organisations. Individuals and non-government organisations may, at the discretion of the Court, file a petition with the Court against a state, on condition that they have exhausted all other avenues of relief. However, the Court will only hear the case with the relevant state's consent.



## Economic Community of West African States

The Economic Community of West African States (ECOWAS) was set up following the signing of the Treaty of Lagos on 28 May 1975. ECOWAS aims to promote economic integration within West Africa. There are currently fifteen members, including Ghana.

The major judicial mechanism within ECOWAS is the Community Court of Justice, which stemmed from an ECOWAS protocol adopted in July 1991.[78] The Community Court of Justice does not have a human rights mandate; nor are human rights referred to in the protocol that sets it up. The main function of the Court is to deal with disputes that arise under the Treaty of Lagos. However, some commentators have suggested that there is scope for the Community Court of Justice to deal with human rights violations.[79] The important difference for a potential human rights filing in this Court when compared to the African Court on Human and Peoples' Rights is that parties do not have to exhaust other avenues of relief before approaching the Community Court.

EOIR-000436



# CHAPTER 3

## Understanding the police

The foundation of the police service is its legal framework. However, it is also shaped by the way the organisation is structured and administered, the way it works on a day to day basis, and the way it is trained and resourced.

EOIR-000437

The foundation of the police service is its legal framework. However, it is also shaped by the way the organisation is structured and administered, the way it works on a day to day basis, and the way it is trained and resourced. This chapter looks at the nuts and bolts of the police as an institution.

## Police service hierarchy

The structure of the police is set out in section 3 of the Police Service Act.

> "Service delivery with enhanced integrity"
>
> - Ghana Police Service vision

The Inspector General of Police is the head of the police and is responsible for exercising general day-to-day supervision over the operation and administration of the police. He or she is given the power to delegate any of his or her functions as he or she thinks fit. The Inspector General is appointed by the President in consultation with the Council of State (the President has the power to appoint all officers in the police, but is mandated to delegate this power to the Police Council). The Inspector General performs his or her duties subject to the control and direction of the Police Council – the role of the Police Council is set out below and a discussion of its oversight function is included in chapter 7.

The police hierarchy sits under the Inspector General. First, the Inspector General is assisted by two Deputy Inspectors General and an assistance unit. Below this sit two Deputy Inspectors General responsible for policing operations and general administration. Next are nine Directors General. Each Director General heads a department that fulfils a particular function within the police. The Directors in charge of auditing, operations, legal, the Criminal Investigations Division and services all report to the Deputy Inspector Operations. The Directors that handle human resources, welfare, strategic direction and monitoring and finance all report to the Deputy Inspector Administration.

Director Generals are also Commissioners, Deputy Commissioners or Assistant Commissioners. There are currently eight Commissioners. Commissioners are promoted from the Deputy Commissioner rank. The Commissioners are assisted by Deputy Commissioners, who are responsible for particular units within departments. Below this are eleven Regional Commanders who are responsible for particular geographic areas. Regional Commanders are in turn assisted by Regional Operational Commanders. Each Regional Operational Commander supervises the following units in their area: traffic, crime, courts and prosecution, public relations, arms, pay and audit, training (this is currently only in six regions) and mobile force (currently only eight regions). Each region (with the exception of Tema) is further divided into divisions, which are again further divided. Each district has a District Commander who has direct control and supervisory responsibility for all police stations in the district.

## Other types of police officers

The Inspector General has the power to appoint any person as a Special Constable in an area where it appears that a riot or crime has taken place or is anticipated and the regular police will not be able to maintain order or protect life and property.

A Volunteer Police Reserve is also incorporated into the police framework. The Volunteer Police Reserve includes a Chief Inspector, Inspectors, Sergeant Majors, Sergeants, Corporals, Lance Corporals and Constables. The Inspector General exercises control over the Volunteer Police Reserve.[80]

There is also provision for the enlistment of people to perform "supernumerary" duties. Supernumerary duties include assisting with parade organisation for ceremonies and special

183
EOIR-000438



**Senior officers**

Inspector General of Police
Deputy Inspector General (this rank was reinstated in 2002 following the Archer Commission report – for more information on the Archer Commission, refer to chapter 8)
Commissioner
Deputy Commissioner
Assistant Commissioner

Chief Superintendent
Superintendent
Deputy Superintendent
Assistant Superintendent/Director of Music/Senior Staff Instructor

**Junior officers**

Chief Inspector
Inspector, Grade
Regional Sergeant Major
District Sergeant Major
Sergeant
Corporal
Lance Corporals
Constable, Class I
Constable, Class II
Constable, Class III
Police Recruit/Band Learner

occasions. Although the Inspector General has the power to set out qualifications for the appointment, process of enlistment and conditions for supernumerary police, he has not done so – currently, regular officers complete these tasks.

## Governing bodies

The Police Council is an independent advisory body established by the Constitution. It is mandated to advise the President on internal security policy (this includes the police service's role, budget and administration, as well as promotions of Assistant Commissioners and more senior officers) and to make regulations, with the approval of the President, to allow the police organisation to fulfil its functions and for the effective and efficient administration of the police service. The Police Council is empowered to make regulations for the control and administration of the police service, details of ranks, units and uniforms, conditions of service, authority of power and command and the delegation of disciplinary powers.

Below the Police Council sit a series of Regional Police Committees. Each of Ghana's ten regions have a Regional Police Committee that is charged with advising the Police Council on policing issues within its jurisdiction.

184
EOIR-000439

## Training

> "A group of police officers, drawn from various stations in Ghana has described the prevailing method of police training in the country as inadequate and as so cannot combat sophisticated crime. Speaking on behalf of 63 colleagues at the end of a basic practical skills training course in Accra yesterday, Chief Superintendent Mina Ayim said there was the lack of basic practical police skills training at the recruit, intermediate and in-service levels."[81]

Current training programmes and standards are below par. This starts during the recruitment phase, where recruits generally have a low level of education.[82] Recruitment into the police takes place at the rank-and-file and commissioned-officer levels.[83] Education requirements vary between just a basic level of spoken English at the entry levels, the completion of middle or junior secondary school for general applicants, up to the award of a university degree for officer rank applications.

Training for rank-and-file personnel (entry and general level police members) takes place at a police depot at Winneba; entry level training has also taken place in regional areas[84]. Recruits go through a nine-month course that covers physical training and drill, firearms use, unarmed combat and first aid. Entry level members are also given general education and trained in patrol and escort duties, while general police are trained in criminal law and procedures, methods of investigation, current affairs and social sciences.[85]

Up until Ghana attained independence, senior recruits were sent to the United Kingdom for training. In 1959, a Police College was established in Ghana to provide training to new recruits, with an initial intake of 14 Inspectors and Chief Inspectors.[86] Entry into the College is based on competitive examinations, which are open to police members in the Inspectorate rank (there are also a limited number of direct entry places).[87] In addition, the College runs two to six week refresher courses in general and technical subjects.[88] The Police College is staffed by police officers, and also hosts guest lecturers.[89]

Police training at the College is problematic. Programmes are not taught in appropriate ways; for example, police accountability is taught as theory but its practical application is not discussed.[90] Police complain that instead of being taught skills that reinforce their role as community protectors, too much emphasis is placed on non-critical areas, such as parade and fatigue.[91] There is little ongoing training; in many places, members of the police organisation do not even have access to basic documents, such as the Constitution, the Police Service Act or Police Service Instructions.[92] During discussions with a researcher, the Inspector General's office noted that not all police officers have an in-depth knowledge of conduct rules and standards, but argued that junior officers will acquire this information from senior officers through a trickle down process.[93]

A human rights training manual has been prepared for the Ghana police service with assistance from the Commonwealth Secretariat Human Rights Unit. In a pilot project that commenced in May 2004, the Commonwealth Secretariat's Human Rights Unit worked with police training institutions in five West African countries (including Ghana).[94] Following the workshops, the Commonwealth Secretariat developed and published a Manual of Human Rights Training for Police in Commonwealth West African Countries, which was launched in December 2005.[95]

EOIR-000440

# Resources

The Constitution requires the government to adequately resource the police so that it can perform its functions.[96] There is very little specific information regarding policing budgets and resourcing in the public domain. The Ministry of Interior declined to provide information on policing budgets or resourcing for this report. However, police officers have noted that the organisation is not adequately resourced and external commentators and commissions have also found that resources are lacking.

> "The present conditions of the services are deplorable. It is woefully undermined, ill-trained and ill-equipped. Its motivation is almost nil and its morale low."
>
> - *Report of the Archer Commission (1997)*

> "If you put a hungry and angry person in a classroom, you won't be able to teach them. Newly trained constables are crammed into sleeping areas with no bathroom, kitchen or toilet facilities. The system doesn't respect the dignity of police officers or their rights."
>
> - Superintendent Paul Aviyu, Ghana Police Service[97]

The Ghana Police Service was estimated at 17,806 officers strong in 2005, serving 20.67 millions Ghanaians.[98] This puts the police population ratio at 1:1161; the United Nations approved police population ratio is 1:500. There is a 2:1 male to female ratio.[99]



186
EOIR-000441



"Excessive use of force is a fact of Ghanaian policing – and this is evidenced by blood let on the streets, wounds carried by victims and graveyard plots."

EOIR-000442



# CHAPTER 4

## The public experience of policing

The police are the first, and often the only, experience that people in the community have with the criminal justice system. Unfortunately, in Ghana this experience is marred by widespread corruption, illegal arrest and detention, excessive use of force and a failure to respond to complaints. These are all hallmarks of a regime-style police force that is not held accountable for its actions.

EOIR-000443

The police are the first, and often the only, experience that people in the community have with the criminal justice system. Unfortunately, in Ghana this experience is marred by widespread corruption, illegal arrest and detention, excessive use of force and a failure to respond to complaints. These are all hallmarks of a regime-style police force that is not held accountable for its actions.

# Corruption

"When cases are reported at police stations, it often becomes an opportunity to collect bribes. They create the impression that they cannot help much; sometimes advising victims to go home and let sleeping dogs lie. But immediately some few thousand cedis change hands they come alive with enthusiasm to attend to the work for which they are paid with taxpayers' money."[100]

The Chronicle newspaper, Thursday July 20 2006

Ninety two per cent of Ghanaians have paid a bribe to the police at some point.[101] Every rank of the police service – from junior officers on traffic duty, to mid-ranking officers demanding extra cash from complainants, to senior officers skimming bags of cocaine off drug bust hauls – has been accused of rampant corruption. The case studies in this chapter set out examples of the different types of corruption that the police engage in and show the lack of true accountability across the police service.

In the junior ranks of the police, bribes are used to turn a blind eye or to grease the proper and efficient functioning of the police. Traffic management is a particular problem. In an opinion piece in Ghana's Chronicle newspaper, Augustina Akwei lamented that, "it is regrettable and a pity to see our police personnel who patrol our highways extorting money from drivers in the full glare of the public without shame instead of checking that traffic regulations are effectively observed by motorists".[102] In another example, in 2006, the Graphic newspaper reported that a Kasoa man had complained to his local police station that land he had purchased was being encroached. Four policeman arrived at the land following his complaint, but demanded 200,000 cedis payment before they would complete their work. The complainant resisted, but eventually paid the bribe – and then the police dealt with the encroachment.[103]

Mid-level officers also abuse their position of power to line their own pockets. For example, in mid 2006, an Inspector level officer, Andrew Vortiah, was charged with defrauding people of cash. Complainants reported that he "sold" them cars from the police impound lot under the pretext that he was selling them on behalf of the police. After reaching an agreement on price, he would take them to the bank, and assist them to pay an agreed sum into his personal bank account (which he assured the purchasers was the official police account).[104]

Corruption is not just limited to bribes or cash. In 2006, a Ghana Web news article reported that a police officer had knocked down a trader on a bicycle around the Madina market. The injured trader was not sent to hospital – the officer took him to the police station. At the station, the trader was unable to respond to office questioning due to his injuries, the police recorded his disorientation as drunkenness (rather than serious injury), and he was locked up. Eight hours later, as his condition rapidly deteriorated, a police officer who had not been involved in the incident raised an alarm that a person was about to die in detention and organised for the man to be transferred to hospital.[105]

EOIR-000444

> "Over the years, the image of the Ghana Police Service has been synonymous with bribery and corruption. A recent corruption perception survey conducted by Ghana Integrity Initiative, the local branch of Transparency International, indicates that the Ghana Police Service is unrivalled as far as corruption is concerned."[106]

Senior police involvement in the drugs trade has been splashed across the front pages of Ghana's newspapers. There have been several reports of large amounts of cocaine seized by the police disappeared from police custody. At an inquiry into police links with drug cartels, the secretary of an alleged Venezualan drug dealer accused a police superintendent of demanding a US$200,000 bribe to "kill" a case pending against her boss.[107] At the same inquiry, the female companion of the accused said that the same superintendent had introduced her to the Deputy Director General of the Criminal Investigation Department to secure a US$200,000 payment for her partner's freedom. She also later alleged that he had called her to threaten her life after she made allegations in the press.[108]

More opportunistic corruption also takes place – for example, in July 2006 the Enquirer reported that "a shimmering top-of-the-range Mercedes Benz Coupe under the custody of the Regional Police Commander has also evaporated… The vehicle vanished from the Central Police Station two weeks after it had been seized and parked at the station." The incident was the subject of an internal police inquiry.[109]

# Illegal arrest and detention

Illegal arrest and detention is the most common police related complaint made to the Commission of Human Rights and Administrative Justice. The Constitution requires that a person is not detained for more than 48 hours before being produced before Court; this is routinely contravened. An example of the misconduct that takes place was reported in the Chronicle newspaper in May 2006, where police in the Volta region had arrested a man on suspicion of theft. The suspect was detained for three and a half days, was refused bail and was not given the opportunity to appear before a court within 48 hours.[110]

The Center for Public Interest Law, a Ghana based civil society organisation, has been running a programme that looks at remand prisoners and suspects and their access to justice.[111] The project has revealed that detainees are not routinely brought before a court within 48 hours – and in some instances, police officers deliberately circumvent the rule by making arrests on Friday night, which means that they can keep suspects in prison over the weekend. The same project found that arrest is used as an investigative tool, rather than as a conclusion based on the results of an investigation – when multiple suspects are identified, the police often arrest them all.[112]

# Excessive use of force

Excessive use of force is a fact of Ghanaian policing – and this is evidenced by blood let on the streets, wounds carried by victims and graveyard plots. Excessive use of force has a number of faces – in 2006, there were a series of high profile shootings, where innocent members of the community were killed by police, who later claimed that they had suspected the victim was an armed robber. The stadium riots in Accra in 2001 showed the police organisation's inability to deal with crowd control without resorting to excessive use of force; in the aftermath of the police response 126 people were killed.

Early in the morning of 26 April 2006, in Dansoman, a residential area of Accra, police shot at a taxi killing all four occupants. The women in the taxi had been robbed and were in

190
EOIR-000445

pursuit of the men who robbed them. Shortly after, police flagged the cab and when it did not stop they opened fire. Barely a month after this incident, a police officer shot and killed a 26-year old man in Kotobabi, a suburb of Accra, claiming that they suspected he was an armed robber.[113] The police further claimed that he had died as a result of a gun wound to the leg; his family examined the body and claimed that he also had a bullet wound to the head. When the family demanded a post-mortem be conducted to identify a cause of death, the police demanded a payment of 500,000 cedis to perform the procedure. A *Sergeant working at the police station said that this money was partly to pay the pathologist,* and partly for bribes to get the autopsy approved. Family, friends and witnesses all disputed the police version of events, saying that the victim had not shot at police (they claim a gun found on his body was planted by police) and was an extremely unlikely suspect for armed robbery.[114]

In January 2006, the Chronicle newspaper reported that a suspect held in police detention had been tortured into a comatose state. The paper reported that the police beating started at the suspect's home, where he was taking a bath. The victim claimed that he was beaten in his bathroom by four police officers armed with batons and a machine gun, kicked as he was moved to the police station, and then beaten with batons at the station. He was then left in a cell until concerned inmates raised an alarm that he was seriously injured. The police response was to douse him with water and then, when he failed to regain consciousness, transfer him to a hospital.[115]

In 2001, the police reaction to unruly behaviour at a football match led to the death of 126 spectators.[116] The match, between two of Ghana's leading football teams, was into its last five minutes at the Accra Soccer Stadium when a group of fans of the losing team began to pull chairs off the stadium, throwing them onto the pitch. The police response was to use tear gas in an effort to calm the disturbance; this action created panic, and then a stampede. The exit gates were locked and the deaths were caused by trampling as the terrified crowd attempted to get out of the stadium.[117] According to one commentator, "lacking the requisite training and experience in handling such weapons and their effects when discharged into a crowd, it ought not to have come as a surprise that the officers handling these weapons responded without any reflection to the commands issued by their senior officers and 'fired indiscriminately into the North Stand'."[118]



## Failure to act on complaints

The police often fail to act on complaints, or refuse to respond to a request. This is exacerbated by the corrupt element inside the *police who request payment before they do their duty.* For example, in mid 2006, the Daily Graphic newspaper reported that a primary school teacher had alleged that he was assaulted by a group of youths wielding guns and machetes. The teacher claimed that when he went to report the assault to the police, they demanded 200,000 cedis before they would proceed with the matter.[119] In February 2007, the Daily Graphic carried a story of two police officers under investigation following allegations that they refused to investigate a crime, instead arresting and detaining the complainants for 21 hours, and then asking for a bribe before releasing them on bail.[120]

191
EOIR-000446



# CHAPTER 5

## A conceptual framework for democratic policing

Implementing a more democratic approach to policing provides positive benefits for the community, for police officers, and for the police organisation. One benefit is a stronger sense of safety in the community. Another benefit is that crimes are more likely to be prevented and solved. As the public begins to see the police as allies in keeping the peace rather than instruments of oppression, they are more willing to share information that can help to prevent and solve crime.

EOIR-000447

The British colonial legacy of regime policing lives on in many countries of the Commonwealth. This means that the police are still accountable to the ruling powers alone, above and beyond their responsibility to their community. In Ghana, this legacy has been compounded by its years of political upheaval and military government. Today, membership of the Commonwealth is premised on the basis of democracy – and a democracy needs a democratic, accountable police force. This chapter looks at the conceptual framework that surrounds the ideas of democratic policing.

Colonial or regime policing means the police are protectors of government, rather than citizens. It often exhibits a focus on the maintenance of law and order, without any reference to the protection of human rights. Under colonial policing, the police:

- answer predominantly to the regime in power and not to the people;
- are responsible for controlling populations, not protecting the community;
- tend to secure the interests of one dominant group; and
- are required to stay outside the community.

Democratic policing is the alternative. It is rooted in the idea of accountability. A democratic police organisation is one that:

- is accountable to the law, and is not a law unto itself;
- is accountable to democratic structures and the community;
- is transparent in its activities;
- gives top operational priority to protecting the safety and rights of individuals and private groups and protects human rights;
- provides professional services; and
- is representative of the community it serves.

# Policing and human rights

"… the police force of a democracy is concerned strictly with the preservation of safe communities and the application of criminal law equally to all people, without fear or favour."
*- United Nations International Police Task Force*

The police are the gatekeepers of the criminal justice system. They are the first, and often only, contact that members of the community will have with the justice system. The police, as a primary agency responsible for protecting civil liberties, are responsible for turning the promise of human rights into reality. Failure to protect the human rights of a community is a failure of the police. Where police are active in committing human rights violations against their community, policing has failed on more than one level.

"The role of the police is to help achieve that social and international order. They must, for example, uphold the laws that safeguard the lives of citizens. There should be no conflict between human rights and policing. Policing means protecting human rights".[121]
*- Independent Commission on Policing for Northern Ireland*

Respect for human rights is central to how the police do their work. Unlike any other branch of government, the police are given wide powers, including the authority to use force against citizens. This power to infringe on citizens' freedoms carries with it a heavy burden of accountability. Good systems of governance require that the police account for the way they carry out their duties, especially for the way they use force. This ensures that the police will carefully consider the methods they use to protect peace and order, and that incidents of police misconduct or abuse of powers will be dealt with harshly.

193
EOIR-000448

# Hallmarks of democratic policing

A democratic police force:

- is accountable to the law, and not a law unto itself. Democratic police institutions demonstrate a strong respect for the law, including constitutional and human rights law. The police, like all government employees, must act within the law of the country and within international laws and standards, including human rights obligations set out in international law. Police officials who break the law must face the consequences, both internally through the disciplinary systems of police organisations, and externally, in the criminal justice system.

- is accountable to democratic government structures. The police are a government agency and as such must account to the government. In a democratic system, the police account to elected representatives of the people – for example, parliaments, legislatures or local councils – for their performance and use of resources. Democratic police institutions also account 'horizontally' to other agencies of government, such as to Treasury or Finance Departments for their financial performance and sometimes to Public Service Commissions or Departments of Administration for their adherence to civil service codes and administrative policy.

- is transparent in its activities. Accountability is facilitated by transparency. In a democratic system, most police activity should be open to scrutiny and regularly reported to outside bodies. This transparency applies to information about the behaviour of individual police officers as well as the operation of the police organisation as a whole.

- gives top operational priority to protecting the safety and rights of individuals and private groups. The police must primarily serve the people. The police should be responsive to the needs of individual members of the community – especially to people who are vulnerable, marginalised or disadvantaged.

- protects human rights, especially those which are required for political activity characteristic of a democracy. Democratic policing implies policing that is supportive and respectful of human rights, and prioritises the protection of life and dignity of the individual. This requires the police to make a special effort to protect the freedoms that are characteristic of a democracy – freedom of speech, freedom of association, assembly and movement, freedom from arbitrary arrest, detention and exile, and impartiality in the administration of law. A democratic approach can place the police in a difficult position, if, for example, they are required to enforce repressive laws, and simultaneously protect human rights. These situations call for the skilful exercise of professional police discretion, which should always lean towards the prioritisation of human rights.

- adheres to high standards of professional conduct. Police are professionals whose behaviour must be governed by a strong professional code of ethics and conduct in which they can take pride, judge themselves and each other and against which they can be held accountable.

- is representative of the communities it serves. Police organisations that reflect the populations they serve are better able to meet the needs of those populations. They are also more likely to enjoy the confidence of the community and to earn the trust of vulnerable, marginalised or disadvantaged groups who most need their protection.

# Benefits of democratic policing

Implementing a more democratic approach to policing provides positive benefits for the community, for police officers, and for the police organisation. One benefit is a stronger sense of safety in the community. Another benefit is that crimes are more likely to be prevented and solved. As the public begins to see the police as allies in keeping the peace rather than instruments of oppression, they are more willing to share information that can help to prevent and solve crime.

194
EOIR-000449

Additionally, showing commitment to democratic policing can be a way of building the case for more resources to fund improved policing – people are more willing to support the use of limited government funds when they believe public money will benefit them. And, finally, improved accountability will generate greater respect for the police and police officers – people's views of the police will change as the police become part of the community rather than sitting outside it. This is vital to the effectiveness, morale and professional pride of police staff.

### Regulating the use of force: A key issue for democratic policing

Police are authorised by law to use force. However, in many dictatorships, one party states, and even in some democracies, police powers are misused as instruments of the ruling regime to maintain control over the population at large. In accountable police systems the use of force is regulated and must be exercised within the context of larger legal frameworks such as international law and state obligations, domestic law relating to policing, individuals' rights and the operation of the criminal justice system. Policing is also constrained by professional regulations, codes of conduct and rules, as well as the law of the land as it applies to every citizen.

Ghana has a long way to go in terms of regulating the use of force (see Chapter 4 for examples of excessive use of force by the police).

# Dimensions of police accountability

There are commonly four types of accountability or control over police organisations:

- State control – The three branches of government – legislative, judicial and executive – provide the basic architecture for police accountability in a democracy. In a thriving and active democracy, the police are likely to be regularly held to account in all three halls of state; by Members of Parliament, the criminal and civil justice system and by government departments such as Auditors-General, service commissions and treasuries.
- Independent external control – The complex nature of policing and the centrality of police organisations to governments require that some additional controls are put in place. At least one such independent civilian body is desirable in any democracy, although many Commonwealth countries enjoy the services of a number. Institutions such as Human Rights Commissions – the Commission for Human Rights and Administrative Justice in Ghana – Ombudsmen and public complaints agencies can play a valuable role in overseeing the police and limiting police abuse of power. International good practice points to the effectiveness of independent, empowered and police-focused civilian complaints authorities.
- Internal control – Within the police organisation, such as disciplinary systems linked to a public complaints systems, training, mentoring, supervision and systems for recording performance or crime data.
- Social accountability – In a democracy, the police are publicly held accountable by the media and community groups (such as victims of crime, business organisations, local neighbourhood groups or civil society). In this way, the role of holding the police accountable is not left to the democratic institutions that represent the people, but ordinary men and women themselves play an active part in the system of accountability.

EOIR-000450

There is no hard and fast rule about the form good police accountability should take. This will depend very much on the circumstances of each country and the nature of the existing relationship between the police and the community. Mechanisms within the police service are essential - "all well functioning accountability systems are grounded, first and foremost, on internal police mechanisms, processes, and procedures".[122]

External scrutiny is also needed and the basics for this are external oversight by:

- democratically elected representatives (in national parliaments if police are structured at the national level, in state legislatures if police are organised at the state level, and in local councils if policing is organised at the local level);

- an independent judiciary;

- the executive, through direct or indirect policy control over the police, financial control, and horizontal oversight by other government agencies such as Auditors-General, Service Commissions and Treasuries; and

- at least one independent statutory institution, such as an Ombudsman or a Human Rights Commission, or, ideally, a dedicated body that deals with public complaints about the police.

## Transparency: An essential precursor to accountability

"The police service should take steps to improve its transparency. The presumption should be that everything should be available for public scrutiny unless it is in the public interest – not the police interest – to hold it back."
- Independent Commission on Policing for Northern Ireland[123]

Accountability requires transparency. The police cannot be held accountable if the community does not have information with which to assess police conduct and to evaluate claims of misconduct or malpractice. Nor can the police properly perform their policing functions, protect themselves and their colleagues from improper influence and discrimination or resist wrongful orders if they do not have access to information.

One of the most effective ways of ensuring transparency is to realise the right to information. Maximum information disclosure supports police accountability. As long as genuinely sensitive law enforcement information is protected, there are few security reasons why the police should not allow the public to access their records. The police should at least make basic information available, such as departmental rules, policies and procedures, data about the occurrence of crime, details of incidents involving the use of force, internal discipline outcomes and the particulars of budgetary allocations and procurements.

A Freedom of Information Bill was drafted for Ghana in 2003, but has languished on government desks since then.[124] In October 2006, the Minister for Information and National Orientation was reported as saying that the Bill was being considered by the Cabinet, and reviewed to bring it into line with existing "complementary" legislation, including a Whistleblowers Act.[125] It is imperative that the government revisit the freedom of information legislation and ensure that it is passed in the near future. The government must also ensure that the law sets out an accessible and transparent process for accessing information.

196
EOIR-000451

**THE POLICE, THE PEOPLE, THE POLITICS**

## Police Complaints Agency

A Police Complaints Agency is an independent civilian oversight body that investigates – or monitors investigations of – complaints against the police. It does not replace the internal police complaints process, but complements existing mechanisms. The advantages of this type of body are:

- the community is reassured that complaints are dealt with thoroughly and fairly;
- complaints processes are complainant focused, transparent and accessible;
- the quality of internal police investigations are improved; and
- police misconduct is discouraged, impunity is reduced and oversight is more effective.

To be successful, a Police Complaints Agency must:

- be independent of the police and government;
- have adequate powers;
- be sufficiently resourced; and
- be granted the authority to follow up on its recommendations.

There are four main types of police complaints bodies, classified around the way they hear or investigate complaints:

- Model 1 – Independent investigations: this kind of body is empowered to independently investigate any aspect of police activity to uncover potential misconduct.
- Model 2 – Review investigations: this version of the complaints body reviews internal police investigations. This involves considering reports and records generated by internal investigations to determine whether the investigation was conducted properly. The body is not given the power to verify the accuracy of the documents through proactive investigation or interviews.
- Model 3 – Appellate authority: this type of body hears appeals of police investigations brought by members of the community. The body hears the complaint, confers with the police and looks over the investigative file and then makes a decision on whether there was misconduct.
- Model 4 – Process audit: this involves an auditor reviewing the process by which a police agency accepts and investigates complaints, commenting on the fairness and thoroughness of the process. It does not investigate or comment on individual complaints.

The most effective model is a hybrid of model 1 and model 2. A distinction is drawn between serious misconduct and other misconduct and the type of investigation is based on the classification of alleged misconduct. For example, a complaint of serious misconduct is actively investigated by staff employed by the body, while a complaint of less serious misconduct leads to a review of the internal police investigation into the complaints.

197
EOIR-000452



# CHAPTER 6

## Internal accountability mechanisms

Internal accountability – or self-regulation – promotes professionalism and responsibility. Internal mechanisms are also cheaper and, if implemented properly, can be a faster way of addressing misconduct or poor performance than external mechanisms.

EOIR-000453

Internal accountability – or self-regulation – promotes professionalism and responsibility. Internal mechanisms are also cheaper and, if implemented properly, can be a faster way of addressing misconduct or poor performance than external mechanisms (although external mechanisms are an integral part of the overall accountability structure). Internal systems can be developed to monitor performance, maintain discipline, investigate public complaints against the police, investigate allegations of abuse of power or outright corrupt and criminal behaviour and manage any resulting disciplinary procedures. They have aspects of both carrot and stick. Incentives within the police involve regular and quicker promotions, recognition and honours, while disincentives can include dismissal, reduction in rank, reprimand, fines and withholding or deferment of extra duty.

# Standards of conduct

The standards of conduct that apply to police officers, and the disciplinary measures that apply if an officer fails to adhere to these standards, are set out in a number of different policies, laws and regulations.

## Police Service Instructions

The Police Service Instructions are a set of conduct guidelines published by the Inspector General. The Inspector General is empowered to set these guidelines by both the Constitution and the Police Service Act.[126] Acts – or failures to act – that are a breach of discipline are set out in the Police Service Instructions.[127] The Police Service Instructions divide misconduct into breaches committed by senior officers (Chief Inspectors and Inspectors) and other officers (officers junior to Inspectors).

The Police Service Instructions are very focused on internal conduct – there is not much scope for members of the public to use them to bolster an allegation against an officer. This means that the instructions are mainly used by more senior officers, to meter our punishment for misconduct to more junior officers. It is important to note that the Police Service Instructions do not apply to officers who are senior to Chief Inspectors – this is a legacy of the colonial roots of the instructions. This must be rectified to ensure that all police officers, regardless of rank, have a set of guiding behaviours to comply with.

### Senior police officers – acts of misconduct under Police Service Instructions

The following acts or omissions are breaches of the conduct guidelines for Chief Inspectors and Inspectors:
1. Disobedience of a lawful order given by a more senior officer, whether verbally, in writing, by authorised signal or parade.
2. Oppressive or tyrannical behaviour towards a more junior officer.
3. Failure to attend to a reasonable request made by a member of the public.
4. Neglect of duty.
5. Lending money to, or borrowing money from, any other officer.
6. Accepting (directly or indirectly) any gratuity, present, subscription or testimonial without the knowledge of a more senior officer.

EOIR-000454

7. Divulging confidential information.
8. Communicating police matters to unauthorised people without permission from a more senior officer.
9. Absence without good cause.
10. Conduct, disorder or neglect in breach of good order and discipline (this general provision applies outside the breaches of conduct listed in the instructions).
11. Failure to comply with – or disobedience of – any policing regulation, service instruction or service order.

## Junior police officers – acts of misconduct under Police Service Instructions

The following acts or omissions are breaches of the conduct guidelines for officers below the rank of Inspector:
1. Insubordination.
2. Disobedience of a lawful order given by a more senior officer, whether verbally, in writing, by authorised signal or parade.
3. Disrespect, in word, act or demeanour to his or her senior officer.
4. Use of abusive or insulting language towards, or quarrelling with, another officer.
5. Oppressive or tyrannical conduct towards more junior officers.
6. Forcing a sentry or sending a Constable to perform sentry illegally.
7. Pawning, selling or losing (wilfully or negligently) or failing to report damage to any of the clothing, arms or other things issued to him or her by the government, or in his charge.
8. Inattention, singing or misbehaviour during parade.
9. Lateness for duty or parade.
10. Being dirty or untidy on parade.
11. Drunkenness.
12. Drinking alcohol while on duty.
13. Entering an alcohol shop while on duty (except in the course of duty).
14. Removing an armlet or duty badge while on duty – or trying to conceal or disguise a police number.
15. Smoking while on duty.
16. Failing to work a beat properly.
17. Idling, gossiping, sitting or lying down without cause or sleeping when on duty.
18. Failing to attend to any reasonable request made by a member of the public.
19. Leaving a beat, or place where he or she has been ordered, without permission or sufficient reason.

200
EOIR-000455

**THE POLICE, THE PEOPLE, THE POLITICS**

20. Leaving arrest or confinement before being allowed to by an authorised authority.
21. Unnecessary violence or mistreating a person in custody.
22. Negligently permitting a prisoner to escape.
23. Neglect of duty.
24. Failing to report the whereabouts of a missing offender (or failing to take action to bring the offender forward).
25. Neglecting to assist any person injured or ill in the streets.
26. Failing to make a necessary entry in an official document, book or paper (or making a false entry).
27. Prevarication before any court or inquiry.
28. Withholding or failing to promptly report a complaint against another officer by a member of the public.
29. Neglecting or refusing to assist in the apprehension of an officer charged with an offence.
30. Protecting a person in a manner not allowed by law.
31. Making, or helping to make, an anonymous complaint.
32. Making a frivolous or vexatious complaint.
33. Lending money to, or borrowing from, another officer.
34. Accepting (directly or indirectly) any gratuity, present, subscription or testimonial without the knowledge and permission of a senior officer.
35. Incurring debt with no reasonable prospect or intention of paying the debt (or making no reasonable effort to pay an incurred debt).
36. Divulging confidential information.
37. Conveying information regarding a warrant or summons to a person who is about to be issued with a warrant or summons.
38. Communicating police matters to unauthorised people without permission from a more senior officer.
39. Absence without good cause.
40. Malingering or feigning sickness without due case (or concealing or failing to report a venereal or contagious disease).
41. Gambling (or permitting or failing to report gambling) in a police station or barracks.
42. Lack of civility to a member of the public.
43. Conduct, disorder or neglect in breach of good order and discipline (this general provision applies outside the breaches of conduct listed in the instructions).
44. Failure to comply with – or disobedience of – any policing regulation, service instruction or service order.

201
EOIR-000456

## Criminal Procedure Code

The Criminal Procedure Code sets out guidelines on the use of force by police – sections 3 to 10 of the Code set out procedures for the use of force when arresting or preventing the escape of a suspect. These guidelines should be incorporated into the conduct provisions of the policing legislation for easy reference and access by members of the police organisation.

## Police Service Act

The Police Service Act is a more democratic document than the Police Service Instructions; it does not discriminate between different ranks and sets out the same standards of conduct for all officers.

The Police Service Act also sets out the types of penalties that can be applied to police officers who engage in misconduct.[128] Penalties include dismissal (which includes forfeiting all retirement benefits), removal (a termination of employment without a reduction in retirement benefits), reduction in rank, deferment or stoppage of increment, imposition of a fine (not exceeding one-eight of one month's salary), severe reprimand, caution or, in the case of Constables, confinement to barracks for two weeks or less.

The misconduct provisions in the Act are not adequate. While they detail individual acts of misconduct, they do not provide the kind of holistic guidance necessary to steer police officers' conduct and behaviour. This can be considered in terms of the use of force – a key issue in Ghana. The Act fails to set out when force may be used, and when use of force will constitute misconduct. A section should be included in the Act that demarcates when force may be used – the section should provide both the police and the public with a very clear and specific set of guidelines relating to the use of force.

### Acts of misconduct – Police Service Act

Section 17 of the Police Service Act sets out the following conduct guidelines:

1. To be absent from duty without leave or reasonable excuse.
2. To be insubordinate.
3. To use, without lawful authority, any property or activities provided for policing work in a way not connected with official duties.
4. To engage in any activity outside official duties likely to lead to political controversy.
5. To engage in work outside the police without the consent of the Inspector General.
6. To join a trade union (or similar organisation) that is not authorised by the Minister.
7. To sleep on duty.
8. To drink alcohol on duty.
9. To permit a prisoner to escape (through negligence or wilfulness).
10. To divulge confidential information to an unauthorised person.
11. To do something (without reasonable excuse) that amounts to a failure to perform a duty properly imposed, which contravenes an Act related to the police service, or which is prejudicial to the efficient conduct of the police or brings the police into disrepute.

202
EOIR-000457

## Police service regulations

The Police Service (Administration) Regulations further define the rules of conduct.[129] The regulations make a distinction between acts or omissions committed by any police officer, acts or omissions committed by senior officers and acts or omissions committed by subordinate officers. Senior officers are defined as "an officer not below the rank of Assistant Superintendent of Police." Junior officers are defined as "a member of the police force other than a senior police officer."[130]

The use of firearms is regulated by Service Instruction 97 of the Police Service Instructions.

# Disciplinary proceedings

Disciplinary proceedings are guided by the Police Service (Disciplinary Proceedings) Regulations. Proceedings are either summary or formal.[131] Summary proceedings are defined in section 4(2) of the Regulations, which describes a simple procedure where the details and a brief record are set out in a Police Disciplinary Report Form. Evidence is not recorded in writing or taken on oath. Section 4(3) of the Regulations sets out the requirements for a formal proceeding – when the disciplinary authority considers that the charge carries a major penalty, where the disciplinary authority is the President or where either the Inspector General, the Central Disciplinary Board or a Regional Disciplinary Board considers that formal proceedings are desirable.

The Regulations set up a series of regional and central disciplinary boards. Particular individuals, including the President and the Inspector General of Police, also have disciplinary powers. The Inspector General is the final resort of appeal if a junior officer appeals against a disciplinary decision. Principally, the disciplinary process revolves around the regional and central boards.

At the top of the hierarchy is the Central Disciplinary Board. The Central Board is made up of three members – the Commissioner of Police (Administration) (or the most senior police officer in charge of administration at Police Headquarters) and two other senior officers at the police national headquarters (this means that they must be Assistant Commissioners or more senior). The board normally operates with a minimum of two members as its quorum. Currently, the Chair of the Central Board is the Deputy Inspector General (Administration).

Sitting below the Central Board are the Regional Disciplinary Boards, which are made up of the senior police officer who is in charge of the region and two other senior police officers appointed by the Inspector General. The Central Board can impose all penalties across all ranks, while Regional Boards can only impose minor penalties on junior officers (up to sergeant). The Regional Board is the junior board. It deals with minor offences, while more serious accusations or accusations against more senior officers are dealt with by the Central Board.

Senior officers are empowered to impose minor penalties (for example, stopping salary increases for one year or less severe penalties).

The discipline process begins with a complaint from either a police officer or from the Police Intelligence and Professional Standards Bureau (which investigates complaints from the public and is discussed later in this chapter).[132] The relevant Board then mandates an officer to conduct an investigation. On the basis of this investigation the Board decides whether or not to charge the accused. If charges are not pressed then the Board must, in writing, explain their decision. If charges are pressed then a written charge is prepared, which includes the time, date, place and description of offence.

There are two kinds of proceedings – summary and formal. In a summary proceeding, the charge is not served on the defendant, but is read out at the hearing, which must take place as soon as possible. In formal proceedings, a copy of the charges must be served on the defendant at least three days ahead of the hearing. At the time of service, the defendant must be informed of his or her right to submit a letter setting out his or her response to the charge within three days. The defendant can request, in writing, an extension of time to submit their response, and the disciplining authority can grant the request if it considers it appropriate.[133]

Officers subject to a disciplinary hearing are given the same rights as a defendant to a charge in the regular criminal courts. Regulation 9 sets out the rights of the defendant, which include a presumption of innocence, time for preparation of defence, appearing during the trial (unless otherwise agreed or if the defendant makes it impossible to run the trial with his or her presence), restrictions on laying charges regarding conduct that has already been the subject of charges (and where the defendant was acquitted of misconduct), the right to give evidence and to call, examine and cross-examine any witnesses.[134]

In formal proceedings, and where the charge may lead to an officer's removal, dismissal or reduction in rank, the defendant can request to be represented by a lawyer or a senior officer (Inspector or above). The defendant can have representation in other formal proceedings if the disciplining authority agrees.

There is also an appeals procedure built into the disciplinary process. All decisions made by the Regional Boards are subject to review and approval by the Central Board. When a penalty is imposed on an officer below the rank of Inspector, the officer can appeal to the Inspector General. When a penalty is imposed on an officer of the rank of Inspector or above, the officer can appeal to the Police Council.

Internal police disciplinary hearings oust the jurisdiction of the courts, although there is a line of appeal to courts – officers subject to a decision they disagree with can apply for judicial review. Judicial review applies to decisions of both the central and regional disciplinary boards and also the Inspector General himself. More detail of this shift from an internal process to external oversight can be found in Chapter 7 of this report.

---

**Easyrider – Misuse of a police motorbike leads to internal inquiry and judicial review**

In this case, a police officer was charged with misconduct by a disciplinary board after he rode a police motorbike without due care, causing to damage to both the motorbike and a private car.[135] The board considered his actions an internal misconduct issue, rather than a road traffic offence. The officer appealed to the Inspector General, who confirmed the decision. The officer later appealed again to the formal court system, which allowed the appeal on the basis that the Inspector General had not been exposed to all the evidence and records available at the original hearing.[136] The court's decision can be found in *The Republic v IGP; Ex Parte Oblie* [1981] GLR 528.

204
EOIR-000459

**THE POLICE, THE PEOPLE, THE POLITICS**

# Public complaints

As well as an internal investigation process, the Ghana police have sought internal accountability through various public complaint mechanisms.[137] These mechanisms led from the requirement in section 23(1) of the Police Service Act that states that "any member of the public shall be entitled... to make a complaint in writing... as to: (a) any instance of bribery, corruption, oppression or intimidation (b) any neglect or non-performance of duty or (c) other misconduct by a police officer.[138] Under the Act, complaints of bribery, corruption, oppression or intimidation were to be addressed to the senior police officer in the relevant district or unit (or the Inspector General of Police). Complaints of neglect, non-performance of duty or other misconduct were to be addressed to any senior police officer. After receiving a complaint, the officer is obliged by section 23(4) of the Act to cause a full and impartial investigation to be made into the complaint, send a report of his or her conclusions to the complainant and take such action as required.[139]

*Each of the different procedures and systems put in place to deal with public complaints are set out below, in chronological order.*

## Suggestion box – from the early 1970s

Suggestion boxes were first placed in police stations around Ghana in the early 1970s.[140] The box was used to collect public complaints and internal grievances, but in practice the box was used more by members of the police than by the public. Members of the police, particularly those in the junior ranks, used the suggestion box to report misgivings about the performance of their supervisors.[141] The public had little access to the boxes and made very little use of them.[142]

## Public Complaints Unit – late 1970s to early 1980s

The Public Complaints Unit replaced the suggestion box system at the police headquarters in Accra in 1978. The Unit was mandated to receive public complaints, conduct investigations and meter out punishment for misconduct.

## Special Police Command Unit – early 1980s to early 2000s

The Special Police Command Unit was inaugurated in the early 1980s as an internal audit unit. It replaced the Public Complaints Unit. An existing Inspection Unit continued alongside the Special Police Command Unit, but was restricted to carrying our inspections of police stations, barracks and offices and ensuring that police procedural rules governing entries into record books, general turnout, police conduct at the barracks and the use of police books and stationary were all complied with. The Unit was an internal watchdog tasked with dealing with police misconduct.

The Special Police Command Unit was an important step towards ensuring internal accountability. It undertook valuable accountability tasks, such as making unannounced visits to police stations or barracks to check levels of professionalism and general standards. However, the Unit was formed during the Provisional National Defence Council era, following a military coup.[143] The Unit was seen as political and officers tended to consider that its main role was to collect intelligence on officers. It was feared internally and seen as a bully. In addition, the Unit was not accessible to the public that it was supposed to serve.[144]

---

**Looking at the paper in practice – personal experience of disciplinary procedures**

Paul Ayuyi is a retired officer who was subject to disciplinary proceedings during his time with the police. Mr Ayuyi stated that in practice, at the regional level disciplinary proceedings are settled by a one man board made up of the senior commander in the region. Mr Ayuyi advises that the senior commander submits his findings to the Regional Board, who endorses the decision and/or sends it on to the Central Board. Turning to appeals, Mr Ayuyi says that a junior officer appeal ends up with the Inspector General, while senior officers' cases are taken up by the Police Council – a process that is slow and ineffective, with hearings typically taking 3-4 hours and cases lasting for years.

---

**205**
EOIR-000460

> ### Functions of the Special Police Command Unit
>
> The Special Police Command Unit's functions included the following: [145]
>
> 1. Investigate any complaint or report of professional impropriety against a member of the police.
> 2. Check instances of police misbehaviour in public, including drunkenness, smoking and untidiness.
> 3. Enquire into any complaint or report of unjustifiable exhibition of verbal violence, oppression or intimidation by a police officer.
> 4. Ensure that the police do not unlawfully detain or mistreat suspects.
> 5. Ascertain the truth of allegations against an officer regarding neglect or non-performance of his or her official duties.
> 6. Discourage any tendencies of bribery or corruption by officers, and investigate any allegations of bribery or corruption made against officers.
> 7. Enquire into any complaint regarding the acceptance of money (or other consideration) by an officer before granting bail.
> 8. Check the tidiness and punctuality of police personnel.
> 9. Ascertain the veracity of any complaint of unauthorised motorcar checks or other road duties by police.
> 10. Investigate any report that an officer is illegitimately involved in land disputes.
> 11. Prevent officers from making or joining anonymous complaints or writing anonymous letters.
> 12. Ensure that no officer engages in gambling, and that gambling does not take place within police stations or barracks.
> 13. Investigate any other acts or omissions that amount to police misconduct in terms of the public-police relationship.
> 14. Undertake any other assignments as may be determined by the Inspector General of Police.

## Monitoring and Inspection Unit – 2001 to 2005

The Monitoring and Inspection Unit was borne out of the recommendations of the Archer Report and the merger of the Special Police Command Unit and the Inspection Unit.[146] In 2003, the Unit recorded 207 complaints against the police. Unprofessional handling of cases attracted the highest number of complaints, at with 60 complaints for the year.[147] Excessive use of force was second, with 30 complaints, followed by extortion, with 25 cases. Other complaints dealt with undue delay of cases, misappropriation of exhibits and negligence.[148]

The Monitoring and Inspection Unit was based in Accra, and was responsible for nationwide oversight. Despite attempts to travel extensively (in 2003 the Unit made 15 visits to police stations in the Accra region and 61 visits to stations outside the region) this limited the impact that it could have. The Unit was further restrained by a serious lack of resources – for example, the Unit was not equipped with computers, which delayed the finalisation of reports. These problems, coupled with low morale within the Unit and resistance to the Unit's work from within the rest of the police service, meant that the Unit was largely ineffective.

206
EOIR-000461

### Functions of the Monitoring and Inspection Unit

The Monitoring and Inspection Unit's functions included the following:

1. Monitor police work, conducting random checks on stations, beats, offices, guards, road barriers and motor check points.
2. Stop conduct prejudicial to the efficient conduct of the service or which brings the service into disrepute.
3. Investigate public complaints.
4. Travel to regional areas to investigate incidents, occurrences, actions or reports referred to it (in the process, the Unit was empowered to inspect available records).
5. Inspect police armouries and ascertain the proper upkeep of arms and ammunition.
6. Inspect police building projects and barracks.
7. Follow up compliance with directions from police headquarters.
8. Liaise between the Neighbourhood Watch and Police Watchdog Committees.

## Police Intelligence and Professional Standards Bureau 2005 - current

In May 2005, the Monitoring and Inspection Unit was replaced by the Police Intelligence and Professional Standards Bureau.[149] The Bureau has proved to be more active and engaged than its predecessor bodies.



Since it was put together, the Bureau has conducted a sensitisation programme to raise its profile within the police service and an education programme to raise its profile as a complaints unit within the community.[150] Between January and November 2005, the Bureau received 356 complaints against the police. Of the 356 complaints received, 80 were dealt with within the unit, 32 were referred out to a region, division, district or unit, 86 cases were reported and forwarded to the Inspector General, and 158 remained under investigation. Delay of investigation was the highest complained about misconduct (79 cases), followed by unprofessional handling of cases (67 cases) and a general complaint of misconduct (64 cases). Other cases included misappropriation of exhibits (20 cases), extortion (9 cases), brutality (33 cases), illegitimate involvement in civil cases (15 cases) and withholding of exhibits (20 cases). The Accra area received by far the highest number of complaints (the Ashanti region was the next highest, with 13 cases, down to 0 cases registered in the Northern and Upper West region).[151]

The Bureau has had to deal with a much higher volume of cases than its predecessors (this is partly to do with its higher profile in the community).[152] However, logistics, human resources and finances have all conspired to limit its impact and effectiveness. The Bureau has also faced resistance from within police ranks, particularly in regional areas, where Bureau staff are considered to be witch hunters.[153]

207
EOIR-000462

## Insider's view – Police Intelligence and Professional Standards Bureau

According to Assistant Superintendent Cephas Arthur of the police Public Affairs Directorate, the Bureau is taken very seriously within the police service. Assistant Superintendent Arthur advises that during the first quarter of 2007, 39 officers were dismissed on the basis of complaints made by the public, with many complaints still pending.

## Functions of the Police Intelligence and Professional Standards Bureau

The Police Intelligence and Professional Standards Bureau's functions include the following:

1. Collate and co-ordinate the gathering of information and intelligence on crimes and criminals and prepare statistical data on prevailing crime trends.
2. Develop, in collaboration with the Criminal Investigation Department, police headquarters and regional and unit commanders a criminal intelligence apparatus for the police service.
3. Coordinate police training programmes in criminal intelligence in collaboration with the Criminal Investigation Department.
4. Monitor compliance with international police professional standards, human rights and the enforcement of democratic policing principles.
5. Conduct regular inspections of police stations, equipment, records, documents and other facilities in accordance with the guidelines provided in the relevant Service Instructions.
6. Investigate public complaints, instances of malfeasance and any other acts or omissions by police officers.
7. Conduct refresher courses for police officers in areas of identified knowledge or skills deficiencies in cooperation with the Schedule Officer for Training.
8. Investigate complaints referred by the Inspector General of Police or members of the Headquarters Management Advisory Board on matters of police corruption, misconduct or other offences (criminal and civil).
9. Act as an internal affairs unit for the service.
10. Undertake other assignments as determined by the Inspector General of Police.

208
EOIR-000463



" The major independent oversight bodies in Ghana are the Police Council, a constitutional body mandated with an advisory role to the President on policing, Regional Police Councils, which support the work of the Police Council and the Commission for Human Rights and Administrative Justice – Ghana's all-rounder human rights institution. "

EOIR-000464



# CHAPTER 7

## External accountability mechanisms

External accountability mechanisms are the systems, processes and means by which the police, as individuals and as an institution, can be made responsible for their actions. The mechanisms operate outside the police and complement internal procedures. External accountability mechanisms must be strong, independent and credible.

EOIR-000465

External accountability mechanisms are the systems, processes and means by which the police, as individuals and as an institution, can be made responsible for their actions. The mechanisms operate outside the police and complement internal procedures. External accountability mechanisms must be strong, independent and credible. For example, a civil society group can gather evidence and information to prove criminal or unethical behaviour, but without an independent and sympathetic media it is unlikely to be able to raise awareness in the general population. Furthermore, prosecution services must be strong and teamed with an independent and honest judiciary. In Ghana, police oversight is the domain of a whole raft of independent oversight bodies, including the Police Council, Regional Police Committees, the Commission for Human Rights and Administrative Justice, the executive (via two Ministries – the Interior Ministry and the Ministry of National Security and the Attorney General's Department), parliament (particularly the Parliamentary Select Committee on Defence and the Interior), the judiciary, committees of inquiry, civil society and the media. Unfortunately, in the Ghanaian context, external oversight has failed to fulfil its promise.

# Independent oversight bodies

The major independent oversight bodies in Ghana are the Police Council, a constitutional body mandated with an advisory role to the President on policing, Regional Police Councils, which support the work of the Police Council and the Commission for Human Rights and Administrative Justice – Ghana's all-rounder human rights institution.

## Police Council

The Police Council has the potential to be a key oversight mechanism for the police in Ghana. The Council is a constitutional body, mandated by section 203 of the Ghanaian Constitution to "advise the President on matters of policy relating to internal security, including the role of the Police Service, budgeting and finance, administration and the promotion of officers above the rank of Assistance Commissioner of Police."[154] It is one of three advisory bodies created by the Constitution to oversee the security sector – another body looks at the prison system and the third watches over the armed forces. Internationally, oversight bodies tend to play one, or a combination of three roles – dealing with complaints, review and input into policy or setting and monitoring organisational priorities. The Police Council's role is primarily focused on policy, with a particular focus on recruitment issues.

The Council's responsibilities are clarified under section 10(6) of the Police Service Act. Under the Act, the Council is to advise on the appointment of officers, hear appeals from internal disciplinary hearings, examine and advise on welfare and discipline, recruitment and training, police/public relations, the use of the Police Welfare Fund (a fund set up under the Act to provide money for gratuities for junior officers, for officer-related payments that cannot be covered by general funds, and for compensation to the families of deceased officers), the prevent and detect of crime, public order matters, the safety of people and property and advise the President on making regulations.

The Constitution also empowers the Council to make regulations on a range of specific issues, including the control and administration of the service, ranks (and the power and authority that comes with each rank), conditions of service and the delegation of power.[155] The Council has never made use of this power. The President can delegate his powers to the Police Council (or an individual member of the Council) under section 202(4) of the Constitution.

The Police Council has a long and rocky history, stretching back to a recommendation in the 1951 Young Report (see chapter 8 for more information on the Young Report and its recommendations). The first iteration of the Police Council was set up in interim form in 1953. It was permanently established by the 1969 Constitution and further mandated by the 1970 Police Service Act. The Council was disbanded during 1972 and 1979, when Ghana

Article 201 of the Constitution sets out the membership of the Police Council. The Council is made up of the following members:[156]

- A Chairman appointed by the President acting in consultation with the Council of State;
- The Minister responsible for internal affairs;
- The Inspector General of Police;
- The Attorney General or his representative;
- A lawyer nominated by the Ghana Bar Association;
- A representative of the Retired Senior Police Officers Association;
- Two members of the Ghana Police Service, appointed by the President acting in consultation with the Council of State one of whom shall be of a junior rank; and
- Two other members appointed by the President.

was under military rule, but was resuscitated by the 1979 Constitution. The Council again went into hiatus during military rule between 1981 and 1992, and was revived by a new Constitution in 1992, largely in its current form.[157] Over the course of its history, the Council has generally been considered ineffective. Of particular concern was a period between the reappointment of Kufuor as President in 2005 and March 2006, when the Police Council was not even constituted. This caused major problems for the police service in terms of pending promotions and authorisation of the movements of senior officers, as well as meaning that there was no police-specific independent agency in place in Ghana.

Members of the current Council were appointed on 10 March 2006, following considerable pressure from the Commonwealth Human Rights Initiative Ghana Office for President Kufuor to comply with the requirements of the Constitution and put the body together. The Chairman of the Council is Justice Scott Glenn Baddoo, a retired Justice of the Supreme Court and a former prosecutor.[158]

The Act sets the quorum for the Police Council at five members.[159] The Act also provides for a Secretary to the Council (who is a public officer, but not a member of the Council).[160] The Police Council currently has its Secretariat at the Ghana Police Headquarters in Accra. The Act grants Council members immunity from legal proceedings when they are exercising their powers under the Act. The Council has powers to subpoena any public officer to appear before it and to provide any documents that the Council requires.[161] If a public officer fails to comply with a request from the Council, they may be held guilty of misconduct.[162] The Council holds monthly meetings. The Council's discussions are considered to be a matter of national security and so are not made available to the public.

The Council's potential as an external oversight mechanism has never been harnessed. The weaknesses that have hampered the Council's work are set out below.

## Membership

The Inspector General of Police's position as member of the Council is problematic as it means that the Council is not independent of the senior police hierarchy – and for an oversight body to be effective, it must be independent of the institution it is watching over. It also means that the Council is extremely unlikely to sanction the Inspector General for misconduct. As well as limiting independence, the Inspector General's inclusion also limits the ability of junior officers on the Council to become an effective voice for their peers.[163]

It is also problematic that the Council's membership is heavily swayed towards presidential appointments. To be effective, the Council needs a truly independent membership.

212
EOTR-000467

A further issue related to the Council's membership is the lack of stability in its leadership. The Chairpersonship of the Council has varied with each new Constitution – in 1969 the Chair was a member of the Public Services Commission, while between 1972 and 1978 it was the Inspector General of Police. From 1979, the Vice President took over the role, and in 1992 the Chairpersonship shifted to presidential appointment (this change occurred by constitutional amendment and came in the wake of bitter differences between the then President, Jerry John Rawlings and the Vice President, the late Kow Nkensen Arkaah).[164]

Between 2000 and 2004, the Police Council did not often meet as the Chair, Mr J. B. Da Rocha, was seriously ill. The President did not make any effort to appoint a Chair who had the capacity to convene and lead the Council and so the Council's work was gravely compromised.[165]

## Budget and resource constraints

The Council is not adequately funded, and lacks the resources necessary to fulfil its functions.[166]

## Political will

A lack of political will has also restricted the Police Council's operation. An obvious example is the length of time that it took to reappoint the Council following the end of the last Presidential term (as discussed above). Another example is the lack of Presidential action when the Council stopped meeting because of the Chair's illness.

Historically, the various iterations of the Police Council have also been rendered ineffective because of the political context in which they existed.[167] Between independence in 1957 and the reinstatement of permanent constitutional democracy in 1993, Ghana experienced four unconstitutional regimes that interfered with the smooth functioning of constitutional bodies, including the Police Council, as the various regimes undermined the constitutional underpinning of Ghana and the Council.[168]

## Inadequate legal framework

The composition and functions of the Police Council are set out in the Police Service Act, which was drafted in 1970, and was based on the 1969 Constitution. This Constitution was very quickly abrogated. The 1970 police legislation has not been updated to reflect constitutional change and so there are a number of inconsistencies between the Act and the Constitution.[169] For example, under the Constitution, the Chair of the Police Council is appointed by the President, in consultation with the Council of State, while the Police Service Act states that a member of the Public Service Commission is the Chair (under the original 1992 Constitution, the Chair was the Vice-President, but this was amended to allow the President to appoint the Chair in 1996).

## Regional Police Committees

The Police Council is, in theory, supported by a network of Regional Police Committees. Each Regional Police Committee is mandated to advise the Police Council on issues of policing importance in its region. In August 2006, the Inspector General of Police and the Chair of the Police Council attended the inauguration of a Regional Police Committee in the Volta region and commented on the roles of the Regional Police Committees. The Police Council Chair said, "the Committee should look into the issue of accommodation, transportation, discipline and police-public relations and advise the Police Council accordingly."[170] The Inspector General followed with the comment that, "the police administration would look up to the Regional Police Committees as channels for the dissemination of policies and programmes of the Police Council; collecting and collating

213
EOIR-000468