ideas, suggestions and recommendations on how the police should function more effectively in the regions and also to monitor the conduct and performance of the police as a corporate body and as individuals."[171]

Each Regional Police Committee is made up of the relevant Minister of State (who is Chair), the two most senior police officers in the region and a representative of the Attorney General, the regional House of Chiefs and a local practising lawyer.[172]

The Regional Police Committees have the potential to be key oversight mechanisms at the local level, passing critical information regarding police conduct to the Police Council. However, there is no information in the public domain regarding the effectiveness of the Committees.

## Commission for Human Rights and Administrative Justice

The Commission for Human Rights and Administrative Justice is a constitutional body mandated with protecting human rights and addressing issues of administrative justice.[173] It is empowered to investigate complaints of breaches of fundamental rights and freedoms, injustice, corruption, abuse of power or unfair treatment of a person by a public official doing his or her job. The Commission can also investigate administrative complaints about the functioning of administrative organs of state (including the police). The Commission has the power to call for a human rights violation or administrative injustice to be remedied through negotiation between the parties, reporting to the offender's senior officer, bringing court proceedings to stop the offending action or bringing a court case to stop a law that illegitimately justifies misconduct (or is beyond its power) from being enforced.[174]

The Commission was established in 1993. Since then it has received, investigated and acted on thousands of cases alleging violations of human rights and administrative justice.[175] The Commission is the major independent body that deals with complaints against the police; between 1995 and 1998 it received 1000 police-related complaints from the public.[176] Most of these complaints relate to unlawful arrest and detention.

The Commission also performs a number of more specific functions. It receives complaints from police officers aggrieved by their treatment at the hands of senior officers. It investigates prison conditions and publishes its findings — it has consistently found that the police breach the constitutional requirements that a detained person must be taken before a court within 48 hours and has also consistently reported that conditions in prisons across Ghana are appalling.[177] It is given the power to investigate the recruitment process to the police, and ensure that it is fair.[178] It is mandated to look into all allegations or suspicions of corruption or misappropriation of public money by officials.[179] It has a rights education role, and has put together human rights education programmes for police officers.[180]

The Commission's powers are generally recommendatory. For example, where the Commission finds that a police officer has engaged in misconduct, it can only make a recommendation to the Inspector General that the officer be dismissed. It must then rely on the Inspector General to consider the recommendation.[181] The Commission can also find that its investigations into allegations of misconduct are hampered by non-cooperative police officers.[182] The Inspector General's office has said that the Commission is one of the less effective oversight mechanisms, while the Inspector General has criticised the Commission on the basis that it is not "firmly on the ground to ensure effective monitoring."[183] In terms of policing oversight, the Commission's impact is limited by the wide variety of other work that it is also tasked to undertake; this is a problem both in terms of resources and in developing police-related expertise within the Commission.

214
EOIR-000469

### Freedom of religion or just too much noise?
*Alhasuna Muslim Faith v Regional Police Commander, Bolgatanga[184]*

In this case, the Bolgatanga branch of a Muslim group, Alhasuna Muslim Faith, claimed that the local police, who had prevented them from using loudspeakers during worship, had violated their fundamental right to freedom of religion and worship. The police had responded that the use of loudspeakers was disturbing other people in the community. The group claimed that the police were being used by a rival Muslim group to sabotage their observances and that other concerts, rallies and dances were often organised in the area. The Commission decided for the police, finding that the group's right to freedom of religion and worship did not give them a right to infringe on other people's right to be free from excessive noise.[185]

### Commission investigation results in release from detention

In a case reported in the Commission's 1998 annual report, a person lodged a complaint with the Commission, asking for his brother-in-law to be released from detention. He claimed that his brother-in-law had been arrested by a group of boys after a woman had complained that he had stolen a bag of rice from her. He said that his brother-in-law had been detained and that, despite several attempts on his part, had not been granted bail. The Commission began to investigate, and the complainant was notified that his brother-in-law had been released on the instructions of the station's Police Commander.[186]

### Guilty of honest conduct

Police officers also use the Commission to seek redress. The Commission's 1993-1994 annual report provides an example, when two senior police officers complained to the Commission that they had both been dismissed, separately, but in similar circumstances. In both cases, the officers had been leading a team of other officers to investigate a claim of drivers being subject to police extortion at different police road barriers. Charges were then drawn up against the officers for failing to account for money – but the petitioners were acquitted during committee of inquiry hearing. The officers were then dismissed (the dismissal was confirmed by the Inspector General of Police). The Commission brought the case to the Inspector General's attention and recommended the officer's reinstatement.[187] No information is available on the final outcome.

## Executive

Two Ministries – the Interior Ministry and the newer Ministry of National Security – have potential police oversight roles, as well as the Attorney General's department.

### Ministry of Interior

The Ministry of Interior is charged with maintaining Ghana's internal security. The government website describes the Ministry's role as "reviewing, formulating, implementing and evaluating policies related·to the protection of life and property... [and] prevention and detection of

215
EOIR-000470

crime..."[188] The Ministry's role overseeing the police has, in practice, been as an agency appointing high-level Committees of Inquiry into deaths resulting from police conduct and the relationship between the police and drug dealers.[189]

For example, in September 2006, the Interior Minister appointed a panel of judges to investigate links between senior police and drug dealers, following the disappearance of more than two tonnes of seized cocaine from police custody.[190] The panel submitted a report on the incident, which led to the suspension of the Director General of Police Operations and charges of extortion being levelled at five junior officers. The panel heard that the Director General had entertained suspected drug dealers at his home, although he responded that his senior officers were aware and that he was working undercover.[191]

The Interior Ministry is one of the few external accountability mechanisms that appears to be doing its job — and succeeding in bringing about positive change within police ranks.

## Ministry of National Security

In May 2006, a new Ministry of National Security was created to coordinate the activities of the bodies that relate to Ghana's national security.[192] The Ministry is more focused on Ghana's intelligence and security agencies than the police, but also has the potential to play an oversight role over police agencies. It has the power to investigate allegations of police misconduct, of its own volition or following a public complaint. The Ministry has been involved in investigating the alleged role of high-ranking police officers in drug offences.[193]

## Attorney General

The Attorney General's department has a key role in police accountability, as it is responsible for deciding whether to pursue a prosecution (based on police information) for a senior offence and provides the police with the power to prosecute minor offences itself.[194] The Attorney General's department ensures that the police are not able to prosecute for inappropriate reasons, and ensures that criminal charges framed against a police officer for misconduct are prosecuted.

# Parliament

International good practice supports an independent role for the parliament in keeping the police under scrutiny. Parliament has the power to question police wrongdoing, to correct systemic faults by passing new laws, to seek accounts of police performance, and to keep policing under constant review. Members of Parliament have many routine opportunities for police oversight through question time and by examining policing issues through the parliamentary committee system.

## Question time

Questions in Parliament on policing issues have focused on resource and funding. In 2006, each of the Minister of the Interior, the Attorney General and the Minister for Justice responded to policing questions (the Minister of the Interior 14 times and the Attorney General and Minister for Justice once, in a joint response). Questions are focused heavily on resourcing. For example, on 25 January 2006, the Minister of Interior was asked when renovation work regarding a particular police station would be completed, allowing the police station to operate. Other questions in a similar vein followed, dealing with when other police buildings would be completed. The focus on resourcing, rather than police operations, means that the potential for question time to act as an accountability mechanism in Ghana is largely untapped.

216
EOIR-000471

**Direct question provokes laughter in Parliament**

Over the whole of 2006, there was only one question asked that directly scrutinised police actions. On 4 July 2006, Mr Hodogbey asked the Minister for Justice and Attorney General the following question. "Mr Speaker my question is, if somebody is arrested on a Friday and he is not granted bail, and there is no court to grant him bail and he stays in the cells till Monday — and mostly the courts sit on a Tuesday — is that not a violation of his human rights and the Constitution?"

The question was greeted with laughter by the Members and the Speaker asked Mr Hodogbey if he had another question.

## Parliamentary Select Committee on Defence and Interior

The Parliamentary Select Committee on Defence and Interior is a group of 18 Members of Parliament mandated to "examine all questions relating to defence and internal affairs."[195] The Committee has the powers given to all parliamentary select committees; this means that it can investigate and inquire into the activities and administration of ministries, departments, public organisations and corporations as Parliament determines. It has the powers of a High Court in terms of requiring witness attendance, compelling the production of documents and the issuing of commissions to examine overseas witnesses.[196]

The Committee claims to exercise oversight responsibilities over the police in a number of ways.[197] Committee members responding to a question probing their understanding of their role said that the Committee calls for investigations into malpractice within the police, summons the Inspector General before the Committee to answer questions regarding malpractice or corruption allegations, brings the Inspector General before the Privileges Committee, reviews the annual report that the police organisation is required to submit to Parliament and promotes public education on police accountability.[198]

In practice, the Committee is ineffective and disengaged from its police accountability role. For example, the Committee reviewed the annual police report for the first time in 2006 – in previous years, the police service had simply failed to submit the report to Parliament, and the Committee had failed to require its submission. The Committee accepted the failure of the police to comply with its constitutional reporting obligations on the basis that democracy had long been absent in Ghana.[199] The Committee's failure to push for the reappointment of the Police Council in 2005 and 2006 also illustrates its lack of engagement with its oversight role.

The Committee has not been playing a complaints investigation role either. The Committee has not received or considered any complaints or reports of police misconduct, despite the high incidence of misconduct in Ghana. The Committee has not made its potential role as complaint investigator public and, despite recognising that it must do more to raise public awareness of rights when dealing with the police, has no plans in place to do this.[200]

Even if the Committee took a more active interest in performing its external oversight role, it would be faced with a number of challenges. Ghana's executive wields considerable influence over its Parliament and so parliamentary oversight is weakened in the face of executive pressure.[201] Second, most information in Ghana is still considered to be a state secret, and as a result would not be available for the Committee to consider. Third, even where information is not classified, the Committee relies on the police organisation to provide it.

EOIR-000472

Where police officers are attempting to cover up misconduct, they are unlikely to provide the evidence of the misconduct to an oversight body that has little capacity for direct investigation.[202]

# Judiciary

The judiciary forms one of the key components of any criminal justice system. Its role, especially in adversarial legal systems like Ghana, is to ensure that everyone brought before it has a fair and public hearing by a competent, impartial and independent tribunal. The judiciary has a police accountability function, hearing cases of police misconduct and settling civilian suits related to the police. The Chief Justice of the Supreme Court is appointed by the President, acting in consultation with the Council of State and the approval of Parliament – other Supreme Court judges are appointed by the President acting on the advice of the Judicial Council (in consultation with the Council of State and with Parliament's approval), while other judges are appointed by the President acting on the advice of the Judicial Council (no with consultation or approval).

Unfortunately, in Ghana the judiciary has been subject to allegations that question its effectiveness and partiality. Of particular concern is bribery and corruption within the ranks of the judiciary, sometimes involving the police. Examples of police-judicial collusion has included falsification of evidence, the refusal to grant bail and indefinite or frequent adjournment of cases.[203]

Critically, the court system also hears appeals from internal police investigations, which adds an important layer of external oversight and accountability to internal decisions. For example, in the case *Republic v IGP*,[204] an officer was reduced in rank after an internal inquiry found that he had engaged in misconduct and referred the imposition of a penalty to the Inspector General of Police. The Inspector General wrote a review of the decision and reduced the officer's rank. The officer applied to the Court to revoke the decision, which the Court did, on the basis that the Inspector General had acted beyond his power and should have either given a minor penalty or, if the penalty was major, conduct a formal hearing.[205]

# Committees of Inquiry

The Constitution empowers the President to appoint a Committee of Inquiry to look at matters of public interest.[206] The Constitution also empowers the Council of State to recommend that a Committee of Inquiry be set up, while Parliament can, by resolution, request that a Committee of Inquiry be put together. A Committee of Inquiry, or Commission, is given the powers of the High Court (or a High Court Judge) and so is able to enforce the attendance of witnesses, examine those witnesses and compel the production of documents. Generally, a Committee is provided with specific terms of reference and a time frame in which to provide a report, which includes recommendations, to the President. After the President receives a report, he or she has six months to prepare a government response to the Committee and publish the report, with the government response. Where the President declines to make a report public, he or she must release a statement setting out the reasons for confidentiality. If a Committee makes a finding against a person, the report is considered to be a judgment of the High Court (this means that the person can appeal to the Court of Appeal).

A variation on Committees of Inquiry are commissions instituted as fact finding bodies to investigate specific events and to make recommendations.[207] These commissions do not have the same powers as a Committee of Inquiry. A recent example of these fact finding bodies is a committee looking into the loss of cocaine in police custody and the role of senior police officers (that recommended the prosecution of a senior officer in its findings) and a 2004 committee looking into police shootings in Accra in 2004.

**THE POLICE, THE PEOPLE, THE POLITICS**

Committees of Inquiry are a valuable oversight tool, but in practice there have been a number of shortcomings. These shortcomings include a delay in the publication of the Committee's report (and the associated government response), the government response to the recommendations (which highlights a lack of political will to engage in reform or change) and a delay in implementation of the recommendations – or no implementation of the reforms at all. The findings of each committee are highlighted in chapter 8.

### The following Committees of Inquiry have looked at issues involving the police:

- The Young Commission (1951)
- The Boye Committee (1971)
- Committee of Inquiry into Recent Disturbances in the Ghana Police Force (1979)
- Commission of Inquiry into Promotions within the Police Force (1986)
- Report of the Chief Constable of Norfolk Constabulary on the Assessment of the Police Service (the Ryan Report, 1992)
- Presidential Commission into the Ghana Police Service (the Archer Commission, 1996)
- Presidential Commission into the Ghana Police Service (1999)
- Presidential Committee of Inquiry into the Accra Stadium Disaster (the Okudzeto Commission, 2001)

# Civil society

Civil society plays a key role in strengthening police accountability by raising community awareness, promoting debate on important issues, monitoring the performance of government institutions, exposing misconduct, demanding public participation, transparency and accountability and championing reforms.

## Civil society organisations

Activities of civil society groups related to the police are broadly of two types. The first is the groups that deal with violations of human rights committed by police officers. The second is those concerned with systemic reforms in the working of the police organisation.

An example of a civil society group working at the level of police violations in Ghana is the Legal Resources Centre, which has run a legal aid clinic for people in need and victims of gross human rights violations. About half of the cases reported to the clinic relate to police misconduct, mostly unlawful arrest and detention.[208] In 2003, the Legal Resources Centre embarked on a prisoner's rights programme, which revealed that police often arrest, charge and detain suspects, and then leave them to "rot in jail."[209]

There are a number of groups within Ghana looking at systemic reform of the police. Key civil society groups include the Commonwealth Human Rights Initiative, Africa Security Dialogue and Research, the Centre for Democratic Development, the Legal Resource Center and the Media Foundation for West Africa.[210] An example of civil society comment on issues in Ghana that included recommendations on police reform are the 2007 reports on the state of governance in Ghana, produced by AFRIMAP as complements to the African Peer Review Mechanism process.

**219**
EOIR-000474

## West African Police Reform Network

An example of a network of regional civil society organisations working on systemic police reforms is the West African Police Reform Network. The Network seeks to:

- Promote information sharing
- Develop expertise in police reform
- Undertake exchange programmes
- Advance best practice
- Undertake research initiatives
- Organise seminars on police reform in various countries
- Collect and make available information on policing in countries in the region
- Establish national structures/working groups to engage governments on reform initiatives

The Network is affiliated to the African Policing Civilian Oversight Forum (APCOF), a continental body of policing oversight practitioners drawn from state civil society and academia promoting police reform and civilian oversight across Africa.

## Civil society watching police suspects

The Center for Public Interest Law is running a project that looks at the needs of suspects waiting for trial, the Remand Prisoners and Suspected Criminals Access to Justice project.[211] The basis of the programme is the Constitutional provisions regarding arrest and detention – the project has found that these requirements are largely ignored. Suspects are often detained for more than 48 hours before they are brought before a court – in some cases, officers intentionally subvert this rule by arresting suspects on Friday night and keeping them in detention over the weekend.[212]

## Neighbourhood Watch

Neighbourhood Watch systems exist in different parts of Ghana, although mainly in urban areas, and are an example of direct community involvement with the police. Neighbourhood Watch programmes have lots of positive benefits in terms of bringing the community and police together and ensuring that the police are community focused, but also come with their own problems.[213] Neighbourhood Watch groups can, if not properly formed and developed, pose a security risk – in 2003 police clashed with a Neighbourhood Watch group in a suburb of Accra, resulting in fatalities.[214]

220
EOIR-000475

## Media

The media can play an important police watchdog role, revealing unlawful activity, getting information into the public domain, making comments and creating public awareness. The media is also a vital part of any police reform effort. Strategic media coverage of police abuses can be a way to put pressure on the Government to reform the police, to create oversight mechanisms, or to prosecute errant officers. The visual drama and human interest stories associated with the police and their activities sell papers and find an abundance of space in print and television.

Ghana's media continues to expand its police watchdog role, as both the quantity of reporting of policing issues and police misconduct, as well as the quality of analysis of the relevant issues, increases. The major daily newspapers often highlight examples of police misconduct and do not shy from hard-hitting reports looking at the flaws within the police and political organisations. Popular radio stations have, in recent times, run public awareness campaigns on police misconduct issues, and actively engaged with the police in an effort to elicit responses for the public.

The media is at risk, however. The right to free expression has been enshrined in the Constitution,[215] but the press are often hindered by fines for defamation, arrest and detention, property damage and censorship.[216] In some cases the police attempt to assist journalists – in one 2005 case, police attempted to protect a journalist from being attacked during a march protesting fuel prices in Accra – but they also have been reported to harass journalists – in another 2005 case, police damaged cameras and tape recorders of journalists attempting to take photographs of a building that had been recently acquired by the President's son and had been a subject of controversy.[217]

## Other

The Inspector General's office also considers foreign diplomatic missions as external oversight mechanisms on the basis that the service is held accountable by human rights reports circulated by other national governments.[218] For example, the US State Department's annual country reports are available online.

221
EOIR-000476



# CHAPTER 8

## Debates on police reform in Ghana

Debate around police reform is nothing new in Ghana. The need for change and reform has been recognised since 1951 and a number of Government sponsored commissions have sat and produced reports on the ways that policing should change in Ghana. Unfortunately, these reports have for the most part gathered dust on the government's shelves.

EOIR-000477

Debate around, police reform is nothing new in Ghana. The need for change and reform has been recognised since 1951 and a number of Government sponsored commissions have sat and produced reports on the ways that policing should change in Ghana. Unfortunately, these reports have for the most part gathered dust on the government's shelves.

# Young Report – 1951

The first committee on policing in Ghana took place in 1951, after the Governor of Ghana appointed a British Police Commissioner, A.Y. Young, to lead a committee to examine the police and make recommendations regarding its organisational structure, training mechanisms and methods for effective policing in Ghana.[219] The committee produced a report, known as the Young Report, which included three crucial recommendations – it defined a police officer, recommended the establishment of a Police Council as an oversight body and pushed for the operational and administrative decentralisation of the police.[220] Each of these key recommendations are discussed in more detail below.

## Definition of police officer

The Young Report recommended that a police officer be defined as "a citizen serving the office of a constable thereby having certain powers and liable to certain responsibilities. He serves the sovereign and is a servant of the state exercising original authority." This definition of a police officer has been seen as an effort to establish a police organisation independent of politics and immunised against illegitimate political interference. Unfortunately, political developments in the then colony rendered this important recommendation redundant.[221]

## Police Council

The report also recommended that a Police Council be put in place, foreshadowing the eventual establishment of the Committee in a permanent form nineteen years later in the 1969 constitution.[222] In 1953, an interim Police Council was put in place.[223]

## Decentralisation

The third key recommendation of the report was the operational and administrative decentralisation of the police. The report set out a unitary decentralised structure that allowed the regions to exercise some measure of responsibility and ensure effective policing. This recommendation was rejected by the Government – although no reasons were given, it is likely that given the developing political consciousness and nationalist movement, the Government prioritised its own security and so retained a heavily centralised police.[224]

# Boye Committee – 1971

In 1971, the Government mandated a committee to "survey the Ghana Police Service and advise on its structure, how effective the organisation was as well as the modernisation of its equipment, particularly for crowd control."[225] The Boye Committee submitted a report in late 1971 that contained a number of recommendations. Key recommendations included overhauling the police organisation structure, equating police and military pay and the reduction in arms training component of police education – this was a significant signal that the police should be civilianised, rather than further militarised. Unfortunately, the Boye Report was never implemented – it became a victim of the political turmoil that engulfed Ghana and the overthrow of the government in early 1972.

223
EOIR-000478

## Commission of Inquiry into Promotions within the Police Force (Tibiru Committee) – 1986

During the late 1970s, corruption and administrative malpractice within the Ghana police became public knowledge and the subject of scandal.[226] The government responded by appointing a committee under a retired Commissioner, J.E. Tibiru, to investigate police practices, known as the Committee of Inquiry into Recent Disturbances in the Ghana Police Force, or the Tibiru Committee.[227] The Committee found that the Inspector General had removed the names of successful candidates in an officer's examination and replaced them with unsuccessful candidates and that there had been extremely suspect practices regarding promotions. The Government accepted a number of the findings, nullifying the promotions of 15 members of staff whose names had been fraudulently inserted into an approved list (and stripping those staff of their ranks) and cancelling the promotion of 14 officers into different ranks.[228]

## Ryan Report – 1992

The Ryan Report emerged from an assessment of the Ghana police by the Chief Constable of the Norfolk Constabulary. The report was revisited by the Archer Commission in 1996.

## Presidential Commission into the Ghana Police Service (Archer Commission) – 1996

The Archer Commission is one of the most far-reaching commissions on policing in Ghana. The Government appointed the Commission in February 1996, under retired Chief Justice Archer, and mandated it to review the structure and operations of the service and determine its response to the law enforcement needs of the nation, while considering the 1992 Ryan Report and making recommendations.[229] The Archer Commission submitted its report in March 1997. It took the Government two years to respond with a white paper – and this is indicative of the delay and lack of enthusiasm that has prevented the Archer Commission's recommendations from becoming part of the policing structure.[230]

**Findings and recommendations of the Archer Commission**

- The police organisations continued to outsource building projects at high cost, despite having the internal skills to complete the projects.
- There were flagrant violations of regulations governing armouries and the issuing of arms and ammunitions.
- Regulations regarding the use and maintenance of police vehicles were regularly disregarded.
- Police salaries should not be anchored to the salaries paid to occupations with fixed-hours.
- Expenditure levels fixed by the Finance Ministry did not meet the needs, programmes and activities designed to achieve the goals of the police.
- Crowd control methods needed to be modernised, with the use of smoke bombs and water cannons instead of truncheons and guns.

224
EOIR-000479

THE POLICE, THE PEOPLE, THE POLITICS

The Ryan report recommendations were generally approved, except for the recommendation that British expatriate officers be provided to Ghana to assist with the reform process.

## Okudzeto Commission – 2001

In May 2001, the Presidential Commission of Inquiry into the Accra Stadium Disaster (also known as the Okudzeto Commission) was formed to investigate the circumstances that led to the deaths and injuries in a crowd of soccer fans.[231]

The Commission was mandated with investigating the causes and circumstances that led to the disaster, inquiring into Ghana's preparedness for such incidents and emergencies and recommending sanctions against public officers where appropriate.[232]

The Commission found that the fact that the police were armed, coupled with the layout of the stadium and the over reaction of police present, led to the tragedy. With respect to the police, the Commission stated that Regional Police Commands must assume full responsibility for control of security arrangements at sports events. It also recommended that a number of police officers be prosecuted for their role in the disaster.[233]

225
EOIR-000480



# CHAPTER 9

## Agenda for change

Ghana's police service is ready for change and Ghana is ready for a new police service.

EOIR-000481

# Agenda for change

The police service has not kept up with Ghana's evolution from a British colonial outpost to a modern, independent African democracy. In 1951, as Ghana moved towards self rule and independence, basic recommendations were made by the Young Committee – as a government sponsored commission on policing – to begin to change and shape a new police service for Ghana. Unfortunately, over the years of political instability, regime change and military rule that followed, police officers found themselves involved in politics, and politicians in matters of policing. Moving to a modern, democratic, transparent and accountable police service was not a possibility in these circumstances.

Ghana's police service is ready for change and Ghana is ready for a new police service. Set out below are the major issues that need to be addressed by any reform process, to ensure that the resulting police service is democratic, transparent and accountable.

**The police must be adequately resourced.** This means that the police service must be provided with the infrastructure and equipment it needs to perform its functions effectively and efficiently.

**Internal accountability must be supported.** This means continuing to support the work of the Police Intelligence and Professional Standards Bureau, ensuring that the Bureau is adequately resourced and free from illegitimate political interference.

**External accountability must be strengthened.**

This means that an independent civilian police complaints authority must be put in place to deal with public complaints against the police.

It also means that the **membership of the Police Council must be reviewed,** to ensure its independence of both politics and the police. The President must comply with the constitutional provisions that require the appointment of the Police Council. **The Regional Police Committees must be established and supported,** to help them perform their work supporting the Police Council.

**Inconsistencies between the Constitution and police legislation must be identified and removed.** The Police Service Act must be revised to include a statement of values for the police organisation and a clear set of guidelines on police use of force.

**Recruitment and training must be revised.** This means aiming to recruit police members with an existing level of basic education. Training systems must be reworked to build a thorough foundation in human rights, accountability concepts and the practical application of these ideas, to new recruits. Training must be structured, constant and ongoing to ensure that all officers are equipped with the appropriate levels of training and skills.

The Government must prove its political will for real change, by leading and supporting reform processes based on existing debates and literature, international good practice and community consultation.

The Government must **legislate the right to information** by enacting the draft Freedom of Information Bill that is currently before Cabinet.

The Government must comply with its reporting obligations under international treaties that impact on human rights and policing. Particularly, outstanding reports under United Nations and African Union agreements must be submitted.

227
EOIR-000482



228
EOIR-000483

# Annex 1: United Nations and other global instruments on policing

### Universal Declaration of Human Rights (UDHR)
The 1948 UDHR is a fundamental source for legislative and judicial practice across the world, and a basis for all other international treaties and conventions discussed below. The UDHR defines the duty of governments to protect people's human rights, and lays down principles or standards for all nations to follow.

### Standard Minimum Rules for the Treatment of Prisoners
Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders in 1955, and approved by the Economic and Social Council in 1957, these rules set out principles and good practice in the treatment of prisoners and the management of institutions. The Rules were among the first international instruments for the protection of the rights of those accused of committing a criminal offence.

### International Convention on the Elimination of All Forms of Racial Discrimination (ICERD)
Adopted in 1965, ICERD reaffirms that all human beings are born free and equal in dignity, and should be entitled to equal protection of the law against any discrimination. Signatory states take responsibility for prohibiting and eliminating racial discrimination in all its forms. The UN Committee on the Elimination of Racial Discrimination was established under this Convention to monitor how the states have fulfilled their undertakings. The Committee also accepts complaints from one state about racial discrimination by another state.

### International Covenant on Civil and Political Rights (ICCPR)
The 1966 ICCPR widened the range of rights established by the UDHR and established the UN Human Rights Committee to monitor implementation.

### Optional Protocol to the International Covenant on Civil and Political Rights
Also adopted in 1966, this optional protocol sets up systems for the Human Rights Committee to receive and consider communications from individuals who claim to be victims of human rights violations by any signatory states.

### Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW)
Adopted in 1979, CEDAW defines discrimination against women and provides the basis for the realisation of equality between women and men. States which ratify CEDAW are legally bound to put its provisions into practice. It establishes the Committee on the Elimination of Discrimination against Women, which can receive and consider communications or complaints about gender discrimination from individuals or groups.

### UN Code of Conduct for Law Enforcement Officials
Adopted in 1979, this code sets out basic standards for policing agencies across the world. It requires police officials in signatory states to recognise the rights set out in the UDHR and other international conventions.

### Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)
Adopted in 1984, the CAT prohibits the use of torture or any other inhuman or degrading treatment in attempting to obtain information from a suspect. It is one of the most important

229
EOIR-000484

declarations to be observed by police officials in the exercise of their duty. The CAT establishes the Committee against Torture, which can consider individual complaints and complaints about torture from one state about another.

### UN Standard Minimum Rules for the Administration of Juvenile Justice ("The Beijing Rules")

Adopted in 1985, the Rules are intended to be universally applicable across different legal systems, setting minimum standards to be observed in the handling of juvenile offenders. These rules require that law enforcement agencies respect the legal status of juveniles, promote their well-being, and avoid any harm to young suspects or offenders.

### Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power

Adopted in 1985, this Declaration defines victims and their rights, and aims to ensure that police, justice, health, social services and other personnel dealing with victims are able to provide proper and prompt aid.

### Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment

Adopted in 1988, the Body of Principles reaffirms that no one in any sort of detention or imprisonment shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment, or to any form of violence or threats.

### Principles on the Effective Prevention and Investigation of Extra-Legal, Arbitrary and Summary Executions

Recommended by the Economic and Social Council in 1989, this document defines principles concerning the arbitrary deprivation of life, and sets up measures to be taken by governments to prevent, investigate and take legal proceedings in relation to extra-legal, arbitrary and summary executions. The Principles should be taken into account and respected by governments within the framework of their national legislation and practices.

### Convention on the Rights of the Child (CRC)

Adopted in 1989, the CRC recognises the rights of children, including child suspects, and requires that every child alleged to have infringed the penal law should be treated in a manner consistent with the promotion of the child's sense of dignity and worth. A Committee on the Rights of the Child was established, but it does not accept individual cases.

### Basic Principles on the Use of Force and Firearms by Law Enforcement Officials

Adopted in 1990, during the 8th United Nations Congress on the Prevention of Crime and the Treatment of Offenders, these principles set up a series of human rights standards regarding the use of force and firearms by law enforcement officials. They function as the global standards for police agencies worldwide, although they are not enforceable in law.

### UN Standard Minimum Rules for Non-Custodial Measures ("The Tokyo Rules")

Adopted in 1990, the Tokyo Rules are basic principles set up by the United Nations in order to promote the use of non-custodial measures in punishment, as well as minimum safeguards for persons subject to alternatives to imprisonment.

230
EOIR-000485

### UN Rules for the Protection of Juveniles Deprived of their Liberty

Adopted in 1990, these rules are intended to establish minimum standards for the protection of juveniles deprived of their liberty in all forms, consistent with human rights and fundamental freedoms, and with a view to counteract the detrimental effects of all types of detention and to foster integration in society.

### Declaration on the Protection of All Persons from Enforced Disappearance

Adopted in 1992, this body of principles arose from deep concern in the United Nations that in many countries there were persistent reports of enforced disappearance caused by officials of different levels of government, often police officials.

### Declaration on the Elimination of Violence Against Women

Adopted in 1993, this Declaration requires governments to develop policies that will eliminate violence against women and sets standards for governments and law enforcement agencies to combat such violence, particularly sexual violence.

### Principles Relating to the Status and Functioning of National Institutions for Protection and Promotion of Human Rights ("Paris Principles")

These principles are a set of internationally recognised standards created to guide states in the setting up of effective human rights commissions. The Paris Principles were endorsed by the United Nations General Assembly in December 1993.

### Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognised Human Rights and Fundamental Freedoms

Adopted in 1998, this Declaration sets down principles to ensure that states support the efforts of human rights defenders and ensure that they are free to conduct their legitimate activities without fear of reprisals.

### UN Convention against Corruption (CAC)

Adopted in 2003 but not yet in force, the CAC calls for international cooperation to prevent and control corruption, and to promote integrity, accountability and proper management of public affairs and property.

231
EOIR-000486

# Annex 2: United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials

### For POLICE OFFICERS, the UN BASIC PRINCIPLES are:[234]

- To apply non-violent means as far as possible before resorting to the use of force and firearms;
- To only use force and firearms in proportion to the seriousness of the offence and the legitimate objective to be achieved;
- To minimise damage and injury and respect and preserve human life;
- To provide prompt assistance and medical aid to any injured person whenever unavoidable use of force was applied, and to notify this person's relatives or close friends as soon as possible;
- To promptly report to a superior officer any incident involving injury or death caused by the use of force and firearms;
- Not to use firearms except in situations which involve self-defence or defence of others against imminent threat of death or serious injury, to prevent the perpetration of a serious crime involving threat to life, to arrest a person presenting such a danger and resisting the police authority, to prevent that person's escape, and only when less extreme means are insufficient.

### For GOVERNMENTS, the UN BASIC PRINCIPLES are:

- To ensure that arbitrary or abusive use of force and firearms by police officers is punished as a criminal offence, under any circumstance;
- To regularly review the rules and regulations on the use of force and firearms;
- To make sure the rules specify circumstances under which police officers are allowed to carry firearms, prescribe the types of firearms permitted and provide for a system of reporting whenever police officers use firearms;
- To equip police with weapons and ammunition which allow for a differentiate use of force and firearms, such as non-lethal incapacitating weapons;
- To equip police with self-defensive equipment in order to decrease the need to use weapons of any kind;
- To ensure that police officers are properly selected, regularly go through professional training and have appropriate proficiency standards in the use of force;
- To ensure that human rights and police ethics are given special attention in the training of police officers, especially in the investigative process;
- To ensure that effective reporting and review processes are put in place whenever police officers use firearms in the performance of their duties and whenever any injury or death is caused by the use of force and firearms;
- To ensure that independent administrative or prosecutorial authorities exist to exercise jurisdiction on the circumstances in which force is used;
- To ensure that superior officers are held responsible if they know, or should have known, that those under their command are resorting or have resorted to unlawful use of force and firearms, and they did not do anything to prevent, suppress or report such a case;
- To ensure that no criminal or disciplinary sanction is imposed on a police officer who refuses to carry out an order to use force and firearms in compliance with the UN Code of Conduct and the UN Basic Principles.

232
EOIR-000487

**THE POLICE, THE PEOPLE, THE POLITICS**

# Endnotes

[1] Commonwealth Human Rights Initiative (2005) *Police Accountability: Too Important to Neglect, Too Urgent to Delay*, http://www.humanrightsinitiative.org/publications/chogm/chogm_2005/chogm_2005_full_report.pdf as on 25 October 2007

[2] Commonwealth Human Rights Initiative (2005) *Police Accountability: Too Important to Neglect, Too Urgent to Delay*, http://www.humanrightsinitiative.org/publications/chogm/chogm_2005/chogm_2005_full_report.pdf as on 25 October 2007

[3] US State Department (2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[4] Ankama, S.K. (1983) *Police history: Some aspects in England and Ghana*, Silkan Books, United Kingdom p. 22

[5] Ankama, S.K. (1983) *Police history: Some aspects in England and Ghana*, Silkan Books, United Kingdom p. 20-26

[6] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 8

[7] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 5

[8] US State Department (2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[9] US State Department (2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[10] US State Department (2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[11] US State Department (2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[12] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 9 and Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 6

[13] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 6

[14] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 9

[15] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 9

[16] Ghana Police Service (2007) *Police Administration: A Brief History*, www.ghanapolice.org/police_admin/index.htm as on 8 February 2007

[17] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 6

[18] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 6

[19] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 6

[20] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 9

[21] Ghana Governement (2005) Final Report of the National Reconciliation Commission, Ghana, at 1.4.1.3

[22] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 6

[23] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 5

[24] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana pp. 7-8

[25] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 7

[26] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 7

[27] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 7

[28] Afari (2004) *Ghana Police Affairs - Reflections*, NAPASVIL Ventures

[29] US State Department (October 2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[30] US State Department (October 2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[31] US State Department (October 2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[32] US State Department (October 2006) *Background note on Ghana:* www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

233
EOIR-000488

[33] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[34] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 6

[35] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 6

[36] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 7

[37] Nkrumah (1971) *I speak of freedom*, Panaf Books Ltd, London, p. 181

[38] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[39] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[40] Ghana Police Service (2007) *Police Administration: A Brief History*, www.ghanapolice.org/police_admin/index.htm as on 8 February 2007

[41] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[42] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 10

[43] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 10

[44] Library of Congress (2005) *Ghana Country Study*, http://lcweb2.loc.gov/frd/cs/ghtoc.html as on 8 February 2007

[45] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[46] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[47] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 11

[48] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 7

[49] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 11

[50] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 11

[51] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 11

[52] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[53] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[54] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 13

[55] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 29

[56] Ghana Police Service (2007) *Police Administration: A Brief History*, www.ghanapolice.org/police_admin/index.htm as on 8 February 2007

[57] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 14

[58] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[59] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[60] US State Department (October 2006) *Background note on Ghana*: www.state.gov/r/pa/ei/bgn/2860.htm as on 5 February 2007

[61] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 16

[62] Section 200(1), *Constitution of the Republic of Ghana* 1992

[63] 200(3), *Constitution of the Republic of Ghana* 1992

[64] Section 202, *Constitution of the Republic of Ghana* 1992

[65] Section 201, *Constitution of the Republic of Ghana* 1992

234
EOIR-000489

**THE POLICE, THE PEOPLE, THE POLITICS**

[66] Section 83, *Constitution of the Republic of Ghana 1992*

[67] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms*, Ghana, p. 6

[68] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms*, Ghana, p. 6

[69] Fraser and Oye Lithur (2005) *Mobillah and extra-judicial killing in the aftermath of 2004 elections*, Modern Ghana General News, March 1 2005, http://pda.modernghana.com/pda.asp?id=VG5wSk5FNTZXVDA9&which=1 as on 23 October 2007

[70] Bayefsky.com (2007) *Ghana reporting history ICCPR*, http://www.bayefsky.com/html/ghana_t3_ccpr.php as on 20 February 2007

[71] Bayefsky.com (2007) *Ghana reporting history ICESCR*, http://www.bayefsky.com/html/ghana_t3_cescr.php as on 20 February 2007

[72] Bayefsky.com (2007) *Ghana reporting history CEDAW*, http://www.bayefsky.com/html/ghana_t3_cedaw.php as on 20 February 2007

[73] Bayefsky.com (2007) *Ghana reporting history CRC*, http://www.bayefsky.com/html/ghana_t3_crc.php as on 20 February 2007

[74] Bayefsky.com (2007) *Ghana reporting history CAT*, http://www.bayefsky.com/html/ghana_t3_cat.php as on 20 February 2007

[75] United Nations Economic Commission for Africa (2005) *Implementation of the Africa Peer Review Mechanism in Ghana*, Ethiopia

[76] Kioko (2005) "The African Union and the Implementation of the Decisions of the African Court on Human and Peoples' Rights", *Interights Bulletin*, Volume 15, Number 1 pp. 7-8

[77] African Commission on Human and Peoples' Rights (2006) *Status on submission of state periodic reports to the African Commission on Human & Peoples' Rights*, http://www.achpr.org/english/_info/status_submission_en.html as on 20 February 2007

[78] African Commission on Human and Peoples' Rights (2006) *Status on submission of state periodic reports to the African Commission on Human & Peoples' Rights*, http://www.achpr.org/english/_info/status_submission_en.html as on 20 February 2007

[79] Mansour (2006) *The relationship between the ECOWAS Court of Justice and the Future African Court on Human and Peoples' Rights*, www.africancourtcoalition.org/content_files/files/RelationshipbetweenECOWASCourtandAfricanCourt.doc as on 7 March 2007

[80] Mansour (2006) *The relationship between the ECOWAS Court of Justice and the Future African Court on Human and Peoples' Rights*, www.africancourtcoalition.org/content_files/files/RelationshipbetweenECOWASCourtandAfricanCourt.doc as on 7 March 2007

[81] For more detail on the Volunteer Police Reserve, see the Sixth Schedule of the *Police Service (Administrative) Regulations*, 1974 9I.I. 8800.

[82] Vinorkor (2006) *Police confess: Our training is inadequate*, Daily Graphic, 23 May 2006 p. 1

[83] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 49

[84] Library of Congress (2005) *Ghana Country Study*, http://lcweb2.loc.gov/frd/cs/ghtoc.html as on 8 February 2007

[85] Library of Congress (2005) *Ghana Country Study*, http://lcweb2.loc.gov/frd/cs/ghtoc.html as on 8 February 2007

[86] Library of Congress (2005) *Ghana Country Study*, http://lcweb2.loc.gov/frd/cs/ghtoc.html as on 8 February 2007

[87] Ghana Police Service (2007) *Brief History of Ghana Police College*, www.ghanapolice.org/others/college.htm as on 8 February 2007

[88] Ghana Police Service (2007) *Brief History of Ghana Police College*, www.ghanapolice.org/others/college.htm as on 8 February 2007

[89] Library of Congress (2005) *Ghana Country Study*, http://lcweb2.loc.gov/frd/cs/ghtoc.html as on 8 February 2007

[90] Library of Congress (2005) *Ghana Country Study*, http://lcweb2.loc.gov/frd/cs/ghtoc.html as on 8 February 2007

[91] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 49

EOIR-000490

[92] Vinorkor (2006) *Police confess: Our training is inadequate*, Daily Graphic, 23 May 2006 p. 1

[93] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 49

[94] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 21

[95] Commonwealth Secretariat (2007) *Human Rights: Our Work: Increasing Knowledge and Awareness* http://www.thecommonwealth.org/Internal/153657/153663/increasing_knowledge_and_awareness/ as on March 7 2006

[96] Commonwealth Secretariat (2007) *Human Rights: Our Work: Increasing Knowledge and Awareness* http://www.thecommonwealth.org/Internal/153657/153663/increasing_knowledge_and_awareness/ as on March 7 2006

[97] Section 200, *Constitution of the Republic of Ghana 1992*

[98] Wakulat and Ochill (2006) *Use of Force by the Ghana Police: Unbridled or Reasonable?*, CHRI Newsletter, Volume 13, Number 1, Spring 2006

[99] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability*, Ghana p. 6

[100] Ghana Police Service (2007) *Police Administration: Administration of the Service*, www.ghanapolice.org/police_admin/broad_formation.htm, as on 8 February 2007

[101] Akwei (2006) *Is the duty of the police worthy of note?*, The Chronicle, 20 July 2006

[102] Duncan (2006) *Police accountability: A right not a privilege*, The Chronicle, July 11 2007, p 3

[103] Akwei (2006) *Is the duty of the police worthy of note?*, The Chronicle, 20 July 2006

[104] Yeboah (2006) *Commercialisation of Police Service?*, Graphic 6 July 2006

[105] Achama (2006) *Police Inspector Faces Fresh Charges*, Daily Guide, 23 August 2006

[106] Ghana Web (2006) *The police have done it again*, Ghana Web, 31 January 2006, www.ghanaweb.com/GhanaHomePage/NewsArchive/artikel.php?ID=98521 as on 7 February 2007

[107] Yeboah (2006) *Commercialisation of Police Service?*, Graphic 6 July 2006

[108] The Statesman (2006) *Drug baron's secretary: Asibi demanded $300,000 to bribe police*, The Statesman, 9 August 2006 p. 2

[109] Fosu (2006) *I didn't take it: CID boss*, Daily Guide, July 27 2006

[110] Tamakloe (2006) *Carry on Ghana Police: Stuff Missing Again*, The Enquirer, 27-30 July 2006

[111] Agbewode (2006) *Juapong Police score another human rights abuse*, The Chronicle, 23 May 2006 p. 10

[112] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability*, Ghana p. 24

[113] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability*, Ghana p. 24

[114] Foley (2006) *The Police Council in Ghana*, http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007

[115] Frimpong (2005) *Police gun down carpenter*, The Chronicle, May 5 2005

[116] Kewura (2006) *Cops torture man to coma*, The Chronicle, January 19 2006 p. 1

[117] BBC News Online (2001) *Relatives besiege Ghana hospitals*, http://news.bbc.co.uk/1/hi/world/africa/1323356.stm as on 23 February 2007

[118] BBC News Online (2001) *Relatives besiege Ghana hospitals*, http://news.bbc.co.uk/1/hi/world/africa/1323356.stm as on 23 February 2007

[119] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 21, referring to paragraph 5(b) of the Government White Paper on the Okudzeto Report

[120] Yeboah (2006) *Commercialisation of Police Service?*, Graphic 6 July 2006

[121] Sydney (2007) *IGP Interdicts 2 cops*, Daily Graphic, 24 February 2007 p. 1

[122] Independent Commission on Policing for Northern Ireland (1999) *A New Beginning: Policing in Northern Ireland -The Report of the Independent Commission on Policing for Northern Ireland*, Northern Ireland, p. 18

[123] Global Facilitation Network for Security Sector Reform (undated), *Compendium of Good Practices on Security Sector Reform*, http://www.gfn-ssr.org/good_practice.cfm?id=27&p=13 as on 17 May 2006

[124] The Independent Commission on Policing for Northern Ireland (1999) *A New Beginning: Policing in Northern Ireland - Report of the Independent Commission on Policing for Northern Ireland*. http://www.belfast.org.uk/report/chapter04.pdf as on 17 May 2006

[125] Morgan (2006) *Nigeria takes the lead on Freedom of Information Act*, http://www.thestatesmanonline.com/pages/news_detail.php?newsid=810&section=1

236
EOIR-000491

**THE POLICE, THE PEOPLE, THE POLITICS**

[126] Morgan (2006) *Nigeria takes the lead on Freedom of Information Act,* http://www.thestatesmanonline.com/pages/news_detail.php?newsid=810&section=1

[127] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 6

[128] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 6

[129] Section 18 of the *Police Service Act* 1970 (Ghana)

[130] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 11

[131] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 11

[132] Section 4(1) of the *Police Service (Disciplinary Proceedings) Regulations*

[133] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 15

[134] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 15·

[135] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 16

[136] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 21

[137] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 21

[138] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 19

[139] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 19

[140] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 19

[141] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 20

[142] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 20

[143] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 20

[144] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 23

[145] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 23

[146] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 22

[147] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 24

[148] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 25

[149] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 25

[150] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 27

[151] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 28

[152] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, pp. 28-30

[153] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 31

[154] Tsidi, F. (2006) *Ghana Police Service Internal Accountability Mechanisms,* Ghana, p. 31

[155] Section 203(1) of *Constitution of the Republic of Ghana* 1992

[156] Section 203(2) of *Constitution of the Republic of Ghana* 1992

[157] Section 201 of *Constitution of the Republic of Ghana* 1992 as amended by section 7 of the *Constitution of the Republic of Ghana (Amendment) Act* 1996 (Act 527) (Ghana)

[158] Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 pp .6-8

[159] Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 p. 13

[160] Section 10(7) of the *Police Service Act* 1970 (Ghana)

[161] Section 12 of the *Police Service Act* 1970 (Ghana)

[162] Sections 14 and 15 of the *Police Service Act* 1970 (Ghana)

[163] Section 16 of the *Police Service Act* 1970 (Ghana)

[164] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 34

[165] Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 p. 10

[166] Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 p. 10

[167] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 34

[168] Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 p. 10

[169] Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 p. 10

237
EOIR-000492

170 Foley (2006) *The Police Council in Ghana,* http://www.humanrightsinitiative.org/programs/aj/police/ea/ conference_2006/ghana_police_council_edmund_foley.pdf as on 25 October 2007 p. 8

171 GhanaWeb (2006) *Police as an institution is not on trial,* GhanaWeb, 10 August 2006

172 GhanaWeb (2006) *Police as an institution is not on trial,* GhanaWeb, 10 August 2006

173 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 35

174 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 16

175 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 17

176 All case studies and statistics are taken from the Commission's series of annual reports.

177 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 17

178 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 17

179 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 37

180 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 37

181 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 37

182 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 36

183 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 36

184 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 37

185 *Alhasuna Muslim Faith v Regional Police Commander, Bolgatanga* [1994-2000] CHRAJ 191

186 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 17

187 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 18

188 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 18

189 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 35

190 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 15

191 NZ Herald (2006) *Ghana police in court over missing drugs haul,* New Zealand Herald, September 20 2006, as on 8 February 2007

192 NZ Herald (2006) *Ghana police in court over missing drugs haul,* New Zealand Herald, September 20 2006, as on 8 February 2007

193 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 16

194 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 16

195 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 16

196 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 14

197 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 14

198 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 43

199 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 43

200 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 43

201 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 43

202 Institute of Commonwealth Studies (2000) *Parliamentary Oversight of the Security Sector in the Commonwealth,* a report developed from an expert meeting convened by the Commonwealth Policy Studies Unit, London, March 28-29 2007.

203 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 44

204 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 42

205 *Republic v IGP; Ex Parte Apeaning* [1984-86] 1 GLR 299

206 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 20

207 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 39

208 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 19

209 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 24

210 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 24

211 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 24 and Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 46

212 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 24

213 Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability,* Ghana p. 24

214 Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana,* Ghana p. 47

238
EOIR-000493

**THE POLICE, THE PEOPLE, THE POLITICS**

[215] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 47

[216] Article 21(a) and (f) the *Constitution of the Republic of Ghana 1992*

[217] Adler (2007) World Press Freedom Review 2005, International Press Institute, www.freemedia.at as on 8 Feb 2007

[218] Adler (2007) World Press Freedom Review 2005, International Press Institute, www.freemedia.at as on 8 Feb 2007

[219] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 26

[220] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 9

[221] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 9

[222] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 9

[223] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 9

[224] Aning, E.K. (2006) *An overview of the Ghana Police Service*, April 2006, Journal of Security Sector Management p. 14

[225] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 9

[226] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 11

[227] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 14

[228] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 39

[229] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 14

[230] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 15

[231] Quantson, K.B. (2006) *Reform of the Ghana Police Service*, Ghana p. 15

[232] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability*, Ghana p. 19

[233] Appiagyei-Atua (2006) *A Study on Police External Accountability in Ghana*, Ghana p. 40

[234] Atuguba, R. (2006) *Structure of the Ghana Police Service and Its Effect on Accountability*, Ghana p. 19

[235] *United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials*

239
EOIR-000494

# CHRI Programmes

CHRI's work is based on the belief that for human rights, genuine democracy and development to become a reality in people's lives, there must be high standards and functional mechanisms for accountability and participation within the Commonwealth and its member countries. Accordingly, in addition to a broad human rights advocacy programme, CHRI advocates access to information and access to justice. It does this through research, publications, workshops, information dissemination and advocacy.

**HUMAN RIGHTS ADVOCACY:** CHRI makes regular submissions to official Commonwealth bodies and member governments. From time to time CHRI conducts fact finding missions and since 1995, has sent missions to Nigeria; Zambia, Fiji Islands and Sierra Leone. CHRI also coordinates the Commonwealth Human Rights Network, which brings together diverse groups to build their collective power to advocate for human rights. CHRI's Media Unit also ensures that human rights issues are in the public consciousness.

## ACCESS TO INFORMATION

CHRI catalyses civil society and governments to take action, acts as a hub of technical expertise in support of strong legislation, and assists partners with implementation of good practice. CHRI works collaboratively with local groups and officials, building government and civil society capacity as well as advocating with policy makers. CHRI is active in South Asia, most recently supporting the successful campaign for a national law in India; provides legal drafting support and inputs in Africa; and in the Pacific, works with regional and national organisations to catalyse interest in access legislation.

## ACCESS TO JUSTICE

**Police Reforms:** In too many countries the police are seen as oppressive instruments of the state rather than as protectors of citizens' rights, leading to widespread rights violations and denial of justice. CHRI promotes systemic reform so that police act as upholders of the rule of law rather than as instruments of the current regime. In India, CHRI's programme aims at mobilising public support for police reform. In East Africa and Ghana, CHRI is examining police accountability issues and political interference.

**Prison Reforms:** The closed nature of prisons makes them prime centres of violations. CHRI aims to open up prisons to public scrutiny by ensuring that the near defunct lay visiting system is revived.

**Judicial Education:** CHRI facilitates judicial exchanges focusing on access to justice for the most vulnerable. Participating judges get a rare opportunity to hear from activists and experts, focus on pressing issues specific to their region and familiarize themselves with recent legal and procedural, as well as social and scientific, developments relevant to their judicial work. The work was begun with INTERIGHTS some years ago. CHRI now works independently to orient lower court judges on human rights in the administration of justice.

240
EOIR-000495



http://www.humanrightsinitiative.org

## PROOF OF SERVICE

On November 6, 2019, I, Melissa A. Malmgren, served a copy of the Respondent's Proposed Exhibits and any attached pages by U.S. Postal Service Priority Mail to the Office of Chief Counsel at the following address:  ICE/DHS 26 Federal Plaza Room 1130, New York, New York 10278.

Dated: November 6, 2019

MELISSA MALMGREN
LAW OFFICE OF SANDY KHINE, PC
299 Broadway, Suite 803
New York, NY 10007
(212) 786-1500

**242**

EOIR-000497

MELISSA A. MALMGREN, ESQ.  NON-DETAINED
LAW OFFICE OF SANDY KHINE PC
299 BROADWAY, SUITE 803
NEW YORK, NY 10007

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
NEW YORK, NEW YORK

**RECEIVED** JUL 18 2017 IMMIGRATION COURT, NYC

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| **DAVID YAW TOTIMEH,** ) | File No.: A 208 125 369 |
| ) | |
| ) | |
| In Removal Proceedings. ) | |

Immigration Judge Terry Bain  Next Hearing: July 18, 2017 at 8:30 A.M.

RESPONDENT'S PROPOSED EXHIBITS



EXHIBIT # 4
DEC 06 2019
IMMIGRATION COURT
NYC

EOIR-000498

Exhibit A   U.S. Department of State, *Country Reports on Human Rights Practices for 2015*, available     1-19
at:
http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2015&dli
d=252687 [last accessed 21 May 2016].

"Authorities failed at times to maintain effective control over the security forces.
Security forces sometimes committed human rights abuses…There were reports that
the government or its agents committed arbitrary or unlawful killings.  Use of
excessive force by security forces in the line of duty resulted in the deaths of several
armed criminal suspects and other persons during the year.…

Police brutality, corruption, negligence, and impunity were problems… There were
credible reports that police extorted money by acting as private debt collectors,
setting up illegal checkpoints, arresting citizens in exchange for bribes from
disgruntled business associates of those detained."

EOIR-000499

**A**

EOIR-000500

# U.S. Department of State
## Diplomacy in Action

Bureau of Democracy, Human Rights and Labor (/j/drl/)
## Country Reports on Human Rights Practices for 2016
Ghana
Translations (http://www.humanrights.gov/dyn/hrr-translations/) | Other Years (/j/drl/rls/hrrpt/index.htm)
| Basic Text (/j/drl/rls/hrrpt/2016/index.htm) | Slideshow (/j/drl/photos/hrr)

HUMANRIGHTS.GOV (http://www.humanrights.gov/)

Learn more (http://www.humanrights.gov/) about the U.S. Government's engagement on human rights abroad

# Ghana
PDF (//www.state.gov/documents/organization/265472.pdf)
Permalink: http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2016&dlid=265260
(http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2016&dlid=265260)

# EXECUTIVE SUMMARY

Ghana is a constitutional democracy with a strong presidency and a unicameral 275-seat parliament. Parties and independent candidates campaigned openly and without undue restrictions in the period preceding the 2016 elections. The campaigns were largely peaceful, although there were reports of isolated instances of violence. Presidential and parliamentary elections conducted on December 7 were peaceful, and domestic and international observers assessed them to be transparent, inclusive, and credible. New Patriotic Party (NPP) candidate Nana Akufo-Addo secured in excess of 53 percent of votes cast, defeating National Democratic Congress (NDC) candidate and incumbent President John Mahama by more than 9 percentage points. President Mahama conceded the election on December 9. NPP candidates won 169 parliamentary seats, with the NDC securing the remaining 106 seats.

Civilian authorities maintained effective control over the security forces.

The most serious human rights problems were excessive force by police, including torture that resulted in death and injuries; harsh and life-threatening prison conditions; trafficking in persons; and exploitative child labor, including forced child labor.

Other human rights problems included rape by police; prolonged pretrial detention; assault and harassment of journalists; corruption in all branches of government; violence against women and children, including female genital mutilation/cutting; societal discrimination against women, persons with disabilities, persons with HIV/AIDS, and lesbian, gay, bisexual, transgender, and intersex individuals; politically motivated and vigilante violence.

The government took steps to prosecute and punish officials who committed abuses, whether in the security forces or elsewhere in the government, but impunity remained a problem.

# Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary Deprivation of Life and other Unlawful or Politically Motivated Killings

There were several reports the government or its agents committed arbitrary or unlawful killings. For example, in May police in Kumasi allegedly beat a suspect to death. Although an autopsy report indicated the suspect died of natural causes, eyewitnesses claimed police used Tasers and the butts of their weapons to assault the suspect until he fell unconscious. Authorities arrested three officers but later released them. The Police Intelligence and Professional Standards Unit (PIPS) recommended the officers involved face a service inquiry.

As of August PIPS had investigated 52 reports of police brutality and one shooting incident.

## b. Disappearance

There were no reports of politically motivated disappearances.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

While the constitution and law prohibit such practices, there were credible reports police beat, raped, and otherwise abused suspects and other citizens. Beatings of suspects and other citizens occurred throughout the country but were generally unreported in official channels because victims were reluctant to file formal complaints. Police generally denied allegations or claimed the level of force used was justified. The Commission on Human Rights and Administrative Justice (CHRAJ) received a report alleging military officers tortured a 16-year-old boy in Tamale. As of November the CHRAJ had concluded its investigation, but a final report was pending.

In 2015 UN special rapporteur Juan E. Mendez received reports that torture and other mistreatment occurred with frequency during apprehension, arrest, and interrogation of suspects, and particularly as a means to extract confessions by police. CHRAJ investigations into reports of police beating detainees upon arrest in Ho and Accra were underway as of November.

The United Nations reported that during the year (as of December 20), it received one allegation of sexual exploitation and abuse against Ghana peacekeepers for one alleged incident occurring in 2015. The allegation involved military personnel deployed to the UN Mission in Liberia. According to the United Nations, the allegation was pending investigation by the government of Ghana at year's end.

## Prison and Detention Center Conditions

Prison conditions were generally harsh and sometimes life threatening due to physical abuse, food shortages, overcrowding, and inadequate sanitary conditions and medical care.

Physical Conditions: Ghana Prisons Service statistics available in October indicated that it held 13,685 prisoners (13,496 men and 189 women) in prisons designed to hold 9,875. Authorities held juveniles separately from adults in the Senior Correctional Center in Accra and housed pretrial detainees in the same facilities as convicts but in separate cells. They held women separately from men. No prison staff specifically focused on mental health, and officials did not routinely identify or offer treatment or other support to prisoners with mental disabilities.

EGIR-000502

In his 2013 visit, UN special rapporteur Mendez characterized prison overcrowding as "alarming." Some cellblocks in Nsawam Prison contained 115 convicted prisoners sharing a space of approximately 415 square feet. The pretrial detention sections were often even more congested, with cells so overcrowded (40 in a cell designed for four) prisoners were lying head to toe in a fetal position. Prisoners in Sekondi Prison slept in shifts, sitting up, due to lack of space. Many prisoners slept on the floor without a mattress, mat, or blanket. In his follow-up assessment in 2015, Mendez observed no improvements in these prison conditions. The government made progress in reducing the population at many of the major prisons. Overcrowding remained a serious problem, however, with prisons holding approximately two to four times more prisoners than designed capacity.

The government reported 48 deaths in custody, all from natural causes.

Both guards and other prisoners reportedly physically abused prisoners. Prison guards sometimes allegedly used caning to enforce prison rules, carried out usually by "black coats," a term referring to model prisoners. While the government acknowledged the existence of "black coats," it denied it gave them special powers or allowed them to exercise disciplinary functions. The CHRAJ and Ghana Prisons Service reported receiving no complaints of guards physically abusing prisoners.

While prisoners had access to potable water, food was inadequate. Meals routinely lacked fruit, vegetables, or meat, forcing prisoners to rely on their families to supplement their diet. Officials held much of the prison population in buildings that were originally colonial forts or abandoned public or military buildings, with poor ventilation and sanitation, substandard construction, and inadequate space and light. The Ghana Prisons Service periodically fumigated and disinfected prisons, but sanitation remained poor. There were not enough toilets available for the number of prisoners, with as many as 100 prisoners sharing one toilet, and toilets often overflowed with excrement.

Medical assistants, not doctors, provided medical services, but they were overstretched and lacked basic equipment and medicine. All prison infirmaries had a severely limited supply of medicine. Prisons did not provide dental care. Prison officials referred prisoners to local hospitals to address conditions prison medical personnel could not treat on site. To facilitate treatment at local facilities, the Ghana Prisons Service registered more than half of inmates in the National Health Insurance Scheme. During the year the Ghana Prisons Service acquired additional vehicles and busses to facilitate the transfer of prisoners, including for medical care. The Ankaful Disease Camp Prison held 29 prisoners with the most serious contagious diseases.

Religious organizations, charities, and private businesses and citizens often provided services and materials to the prisons, such as medicine and food. Some organizations reported administrators at the prisons demanded bribes before permitting them to enter.

A study released in August found that as of 2011, 1.6 percent of prisoners in Kumasi, Nsawam, and Sunyani prisons were persons with disabilities, although mental disabilities were likely underreported. Although persons with disabilities reported receiving medicine for chronic ailments and having access to recreational facilities and vocational education, the study found the design of the prisons disadvantaged persons with disabilities, as they had to compete with other prisoners for access to health care and recreational facilities.

Administration: Inadequate recordkeeping contributed to prisoners being held in egregiously excessive pretrial detention, some for up to 10 years. For example, after prisoners destroyed records during a 2015 riot in Kumasi Prison, judicial officials issued new warrants but did not backdate them to the initial date of incarceration. There was no prison ombudsperson or comparable authority to respond to complaints. Authorities investigated few cases of complaints because there was a

EOIR-000503

general reluctance to complain, even when there were allegations of police brutality or use of excessive force. Due to lack of information, few investigations were undertaken of personnel who may be responsible for an offense under Section 25 of the Prisons Service Act, which prohibits the use of torture or harsh treatment.

Independent Monitoring: The government permitted independent monitoring of prison conditions. Local nongovernmental organizations (NGOs), which were independent of government influence, worked on behalf of prisoners and detainees to help alleviate overcrowding, monitor juvenile confinement, and improve pretrial detention, bail, and recordkeeping procedures to ensure prisoners did not serve beyond the maximum sentence for the charged offenses. Local news agencies also reported on prison conditions.

# d. Arbitrary Arrest or Detention

The constitution and law provide for protection against arbitrary arrest and detention, but the government frequently disregarded these protections.

# Role of the Police and Security Apparatus

The police, under the Ministry of the Interior, are responsible for maintaining law and order, but the military continued to participate in law enforcement activities in a support role; for example, in protection of critical infrastructure. A separate entity, the Bureau of National Investigations, handles cases considered critical to state security and answers directly to the Ministry of National Security. Police maintained specialized units in Accra for homicide, forensics, domestic violence, visa fraud, narcotics, and cybercrimes. Police maintained specialized antihuman trafficking units in Accra and some regions. Such services were unavailable outside the capital due to lack of office space, vehicles, and other equipment.

Police brutality, corruption, negligence, and impunity were problems. While the constitution and law prohibit such practices, there were credible reports police beat, raped, and otherwise abused suspects and other citizens. There were delays in prosecuting suspects, reports of police collaboration with criminals, and a widespread public perception of police ineptitude. There were credible reports police extorted money by acting as private debt collectors, setting up illegal checkpoints, and arresting citizens in exchange for bribes from disgruntled business associates of those detained.

The Inspector General of Police, CHRAJ, and PIPS investigate claims security forces used excessive force. PIPS also investigates human rights abuses and police misconduct. As of August PIPS received more than 900 complaints; 25 of these cases were completed and 749 remained under investigation. Over this period PIPS investigated 200 reports of unprofessional handling of cases, 145 reports of undue delay of investigation, 109 reports of unfair treatment, 52 reports of police brutality, 50 reports of unlawful arrest and detention, 22 reports of extortion, and one report each of stealing, a shooting incident, and robbery. As of August, 66 officers had been dismissed as a result of PIPS investigations, but none had been criminally prosecuted.

# Arrest Procedures and Treatment of Detainees

The law requires judicial warrants for arrest and provides for arraignment within 48 hours, but police made frequent arrests without warrants and detained individuals without charge for periods longer than 48 hours. Officials detained some prisoners for indefinite periods by renewing warrants or simply allowing them to lapse while an investigation took place. The constitution grants a detained individual the right to be informed immediately, in a language the person understands, of the reasons for detention and of his or her right to a lawyer. Most detainees, however, could not afford a lawyer, and the government is not required to provide legal counsel. The government employed only 21 full-time legal aid lawyers in the country, and they primarily handled civil matters. Defendants in criminal cases who could not afford a lawyer typically

represented themselves. The law requires that a detainee who has not been tried within a "reasonable time," as determined by the court, be released either unconditionally or subject to conditions necessary to ensure the person's appearance in court at a later date. Officials rarely observed this provision. The government sought to reduce the population of prisoners in pretrial detention by placing paralegals in some prisons to monitor and advise on the cases of pretrial detainees, and by directing judges to visit prisons to review and take action on pretrial detainee cases.

The law provides for bail, but courts often used their unlimited discretion to set bail prohibitively high. In May the Supreme Court struck down a portion of the criminal procedure code that denied bail to those accused of specific serious crimes, including murder, rape, and violations of the Narcotic Drugs Law.

Arbitrary Arrest: There were continued reports of arbitrary arrests by police. Unlawful arrests and detentions accounted for 5.5 percent of all complaint cases PIPS received through August.

Pretrial Detention: Lengthy pretrial detention remained a serious problem. Ghana Prisons Service statistics available in October indicated that 2,295 prisoners, 16.8 percent of all prisoners, were in pretrial status. The length of the pretrial detention exceeded the maximum sentence for the alleged crime in numerous instances.

Detainee's Ability to Challenge Lawfulness of Detention before a Court: Detainees are entitled to challenge in court the legal basis or arbitrary nature of their detention and obtain prompt release and compensation if found to have been unlawfully detained.

# e. Denial of Fair Public Trial

While the constitution and law provide for an independent judiciary, it was subject to unlawful influence and corruption. Judicial officials reportedly accepted bribes to expedite or postpone cases, or to "lose" records.

Following the 2015 report by an investigative journalist into corruption in the judiciary, the chief justice constituted a five-member committee headed by a Supreme Court judge to investigate the allegations. By year's end the judiciary dismissed 12 High Court judges, 22 lower court judges, and 19 judicial service staff from their positions as a result of the investigation. No charges or criminal proceedings were initiated against the judges involved.

Despite alternate dispute resolution (ADR) procedures to decongest the courts and improve judicial inefficiency, court delays persisted. Professional mediators were trained to conduct ADR, and they worked in various district courts throughout the country to resolve disputes and avoid lengthy trials. Nevertheless, even in fast-track courts established to hear cases to conclusion within six months, trials commonly went on for years.

Military personnel are tried separately under the criminal code in a military court. Military courts, which provide the same rights as civilian courts, are not permitted to try civilians.

The Chieftaincy Act gives village and other traditional chiefs the power to mediate local matters and enforce customary tribal laws dealing with such matters as divorce, child custody, and property disputes. The authority of traditional rulers continued to erode, however, because of the growing power of civil institutions, including courts and district assemblies.

A judicial complaints unit within the Ministry of Justice headed by a retired Supreme Court justice addressed public complaints, such as unfair treatment by a court or judge, unlawful arrest or detention, missing trial dockets, delayed trials and rendering of judgments, and bribery of judges.

# Trial Procedures

Defendants are presumed innocent and have the right to be informed promptly and in detail of charges against them, with free interpretation as necessary, from the moment charged through all appeals. Defendants have the right to a fair and public trial without undue delay, but trials were often delayed. Defendants have a right to be present at their trials, be represented by an attorney, have adequate time and facilities to prepare their defense, present witnesses and evidence, and confront prosecution or plaintiff witnesses. Defendants have the right not to be compelled to testify or confess guilt, although generally defendants are expected to testify if the government makes a sufficient case. Defendants do not have the right to access government-held evidence, although there are judicial decisions that indicate the defense is entitled to evidence in the possession of the prosecution. In practice, however, prosecutors customarily resisted providing such access unless defense counsel requested it. Defendants have the right to appeal. Authorities generally respected these safeguards, and the law extends these rights to all citizens.

# Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

# Civil Judicial Procedures and Remedies

There is an independent and impartial judiciary in civil matters, and citizens had access to a court to bring lawsuits seeking damages for, or cessation of, human rights violations.

Fast-track ADR courts and "automated" commercial courts, whose proceedings were expedited through electronic data management, continued efforts to streamline resolution of disputes, although delays were common. Authorities established additional automated courts across the country, and selecting their judges randomly helped curb judicial corruption.

The constitution states the Supreme Court is the final court of appeal. Defendants, however, may seek remedies for allegations of human rights violations at the Economic Community of West African States Court of Justice.

# f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibits such actions, and there were no reports the government failed to respect these prohibitions.

# Section 2. Respect for Civil Liberties, Including:
## a. Freedom of Speech and Press

The constitution and law provide for freedom of speech and press, and the government generally respected these rights.

Violence and Harassment: Government authorities and security officials sometimes assaulted and harassed journalists throughout the country. In one instance the Supreme Court fined and sentenced a radio presenter and two on-air panelists to four months' imprisonment for what the court alleged were threats against judges in a pending case. The court order also fined the radio station and insisted the broadcaster take steps to prevent such comments' being broadcast in the future. A presidential reprieve released the imprisoned radio presenter and panelists after one month.

Local media widely carried allegations police officers in Gomoa Ojobi in Central Region assaulted and detained a reporter from a local television and radio station. In another example, media carried stories alleging a journalist was arrested for taking photographs of a police officer soliciting a bribe from a bus driver.

# Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports the government monitored private online communications without appropriate legal authority. The internet was accessible in Accra and other large cities. There was limited but growing internet access in other areas. According to the International Telecommunication Union, approximately 23 percent of the population used the internet in 2015.

# Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

# b. Freedom of Peaceful Assembly and Association

The constitution and law provide for the freedoms of peaceful assembly and association, and the government generally respected these rights.

# c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/ (http://www.state.gov/religiousfreedomreport/).

# d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights. The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally displaced persons, refugees, returning refugees, asylum seekers, stateless persons, or other persons of concern.

Abuse of Migrants, Refugees, and Stateless Persons: Sexual and gender-based violence remained problems. According to UNHCR, as of December there were 42 incidents of sexual or gender-based violence reported from refugee camps, including attempted rape, defilement (rape of a child), sexual abuse of adults and children, physical assault, and psychological assault. UNHCR worked with personnel of the Department of Social Development and Ghana Health Service psychosocial counselors to provide medical, psychosocial, security, and legal assistance where necessary to all the cases reported. UNHCR reported one of the physical assault cases to police, resulting in the removal of the victim to a shelter and the arrest of a suspect who was later released on bail. At year's end the court had yet to issue a ruling on the case. Challenges to holding perpetrators of sexual or gender-based violence accountable for acts conducted in the camps included ineffective access to civil and criminal legal counseling and representation for the alleged perpetrator and the presumed victims.

# Protection of Refugees

Access to Asylum: The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees. The law allows rejected asylum seekers to appeal and remain in the country until an appeal is adjudicated. A four-member Appeals Committee, appointed by the minister of interior, is responsible for adjudicating the appeals, but the process continued to be subject to delays.

Employment: Refugees could apply for work permits through the same process as other foreigners; however, work permits generally were issued only for employment in the formal sector, while the majority of refugees worked in the informal sector.

Durable Solutions: In 2011 nearly 18,000 residents of Cote d'Ivoire fled to Ghana because of political instability following Cote d'Ivoire's disputed 2010 presidential election. During the year, UNHCR assisted in the voluntary repatriation of 52 Ivoirian refugees. Although Ivoirian refugees were granted prima facie refugee status during the initial stages of the emergency, by the end of 2012 the government had transitioned to individual refugee status determination for all Ivoirians entering thereafter.

In 2012 UNHCR and the International Organization for Migration assisted with the voluntary repatriation of more than 4,700 Liberians from Ghana. Approximately 3,700 Liberians opted for local integration. UNHCR and the Ghana Refugee Board continued to work with the Liberian government to issue them passports enabling them to subsequently be issued a Ghanaian residence and work permit. At year's end fewer than 1,000 individuals were still awaiting Liberian passports. The Ghana Immigration Service also supported the process by issuing reduced-cost residency permits, including work permits for adults, to locally integrating former Liberian refugees.

According to UNHCR's Multipurpose Enhanced Registration Exercise, at year's end, the country hosted 11,865 refugees and 1,371 asylum seekers totaling 13,236 persons of concern. This figure included refugees and asylum seekers from Cote d'Ivoire (6,453 refugees; 504 asylum seekers), Togo (3,299 refugees; 87 asylum seekers), Liberia (1,358 refugees; six asylum seekers), and other countries (755 refugees; 774 asylum seekers).

Approximately 3,500 persons of concern were awaiting verification at year's end. They were primarily Togolese, exempted Liberian refugees, Rwandan refugees, and few exempted Sierra Leonean refugees.

# Section 3. Freedom to Participate in the Political Process

The constitution and law provide citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

# Elections and Political Participation

Recent Elections: Parties and independent candidates campaigned openly and without undue restrictions in the period preceding the 2016 elections. The Electoral Commission took steps to ensure the elections were free and fair, including by conducting a public voter registration verification exercise. The campaigns were largely peaceful, although there were reports of isolated instances of violence. For example, attackers ransacked Electoral Commission offices in Suhum and Asunafo South in September. There were also reports of violence between NPP and NDC supporters and party-affiliated vigilante groups. Presidential and parliamentary elections conducted on December 7 were peaceful. Domestic and international observers, such as the European Union Election Observation Mission and the Coalition of Domestic Election Observers, assessed the election to be transparent, inclusive, and credible. Seven candidates vied for the presidency, including one independent candidate. NPP candidate Nana Akufo-Addo secured more than 53 percent of votes cast, defeating NDC candidate and incumbent President John Mahama by more than 9 percent. President Mahama conceded

EOIR-000508

the election on December 9. NPP candidates won 169 parliamentary seats, with the NDC securing the remaining 106 seats. The Ghana Integrity Initiative, Ghana Center for Democratic Development, Ghana Anti-Corruption Coalition, Citizen's Movement against Corruption, and European Union Election Observation Mission noted concerns over the misuse of incumbency and unequal access granted to state-owned media during the campaign. Reports also noted a regional bias in elections coverage, with Greater Accra and Ashanti regions receiving significantly more attention than other regions.

Participation of Women and Minorities: No laws prevent women or minorities from voting, running for office, serving as electoral monitors, or otherwise participating in political life on the same basis as men or nonminority citizens. Women, however, held fewer leadership positions than men, and some observers believed cultural and traditional factors limited women's participation in political life. Women held 30 seats in the outgoing 275-member parliament. The 2016 elections resulted in 37 women being elected to parliament. Presidential candidates included one woman and one disabled person. Reports indicated female candidates received substantially less media coverage than their male counterparts.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption, but the government did not implement the law effectively, and officials frequently engaged in corrupt practices with impunity. Corruption was present in all branches of government, according to media and NGOs, and various reputable national and international surveys such as the World Bank's Worldwide Governance Indicators and Afrobarometer highlighted the prevalence of corruption in the country. More than 91 percent of respondents to a 2015 survey by the Institute of Economic Affairs said overall corruption was high or very high.

Corruption: As a result of the 2015 investigation into widespread corruption in the judiciary, two High Court judges were dismissed in April and one in June, bringing the total number of judges dismissed to 23. In June an investigative journalist revealed evidence President Mahama had accepted a vehicle in 2012 from an individual who had been awarded two government contracts. The CHRAJ determined in September that, while the president had contravened the gift policy under the code of conduct for public officers, his actions were not in violation of the applicable rules on conflicts of interest and the gift did not constitute a bribe. In September the opposition NPP accused the government of corruption in the issuance of several sole-source contracts, including the renovation of Kumasi airport's runway and a city bus branding project.

Financial Disclosure: The constitution's code of conduct for public officers establishes an income and asset declaration requirement for the head of state, ministers, cabinet members, members of parliament, and civil servants. All elected and some appointed public officials are required to make these declarations every four years and before leaving office. Financial disclosures can also be requested through court order, but only the auditor general is allowed to review documents so obtained. Financial information typically was not disclosed to the public.

Public Access to Information: The constitution provides for public access to government information, but obtaining such access was difficult. Government offices kept poor records, many official records were missing, and requests for information often received no reply. The country is a party to the Open Government Partnership--an international initiative signed in 2011 to enhance transparency, citizen participation, accountability, and technology and innovation within government--but implementation of its commitments under this initiative was uneven.

# Section 5. Governmental Attitude Regarding International

EOIR-000509

# and Nongovernmental Investigation of Alleged Violations of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were often cooperative and responsive to their views.

Government Human Rights Bodies: The CHRAJ, which mediated and settled cases brought by individuals against government agencies or private companies, operated with no overt interference from the government; however, since it is itself a government institution, some critics questioned its ability independently to investigate high-level corruption. Its biggest obstacle was a lack of adequate funding, which resulted in low salaries, poor working conditions, and the loss of many of its staff to other governmental organizations and NGOs. Public confidence in the CHRAJ was high, resulting in an increased workload for its staff.

# Section 6. Discrimination, Societal Abuses, and Trafficking in Persons
## Women

Rape and Domestic Violence: The law criminalizes rape but not spousal rape. Convicted rapists may be punished with prison sentences ranging from five to 25 years. Rape and domestic violence was significantly underreported and remained a serious problem. The Domestic Violence and Victim Support Unit (DOVVSU) of the Police Service worked closely with the Department of Social Welfare, the national chapter of the International Federation of Women Lawyers, the Legal Aid Board, and several other human rights NGOs to address domestic violence. In 2015, the latest year for which data were available, the DOVVSU received 322 reports of rape and reported 127 arrests and three convictions. At the end of 2015, 237 cases remained under investigation.

Although the law prohibits domestic violence, it continued to be a problem. Survey data released in August suggested 27.7 percent of women and 20 percent of men had experienced at least one type of domestic violence in the 12 months prior to the study. In accordance with local law and international definitions, the study analyzed the incidence of social, physical, sexual, psychological, and economic violence. The law stipulates that a person in a domestic relationship who engages in misdemeanor domestic violence is liable on summary conviction to a fine, a term of imprisonment not to exceed two years, or both. The court also may order the offender to pay compensation directly to the victim. Inadequate resources and logistical capacity in the DOVVSU and other agencies, however, hindered the full application of the law. Unless specifically called upon by the DOVVSU, police seldom intervened in cases of domestic violence, in part due to a lack of counseling skills, shelter facilities, and other resources to assist victims. In many cases victims were discouraged from reporting abuse and from cooperating with prosecutors because they were aware of long delays in bringing such cases to trial. Victims frequently did not complete their formal complaints due to fees associated with physicians' documentation for police medical forms. Victims also did not report domestic violence or rape because of fear of retaliation. According to the DOVVSU, of the 264 rape and assault cases the unit sent to court in 2015, only 17 resulted in convictions. The DOVVSU reported receiving reports of 5,520 assault suspects and referred 186 cases to court.

Female Genital Mutilation/Cutting (FGM/C): Several laws include provisions prohibiting FGM/C. It was rarely performed on adult women, but the practice remained a serious problem for girls under 18 years of age. According to the 2011 Multiple Indicator Cluster Survey (MICS), 4.2 percent of women and girls were victims of some form of FGM/C. FGM/C was

ER-000510

most prevalent in the Upper West and Upper East regions, where 41 percent and 28 percent, respectively, of girls and women between the ages of 15 and 49 had undergone the procedure. Type II FGM, defined by the World Health Organization (WHO) as excision of the clitoris with partial or total excision of the labia minora, was most commonly practiced. According to the 2011 MICS, the vast majority of girls face this procedure prior to age five. Intervention programs were partially successful in reducing the prevalence of FGM/C, particularly in the northern regions. Local NGOs continued educational campaigns to encourage abandonment of FGM/C and to train practitioners for alternative employment.

Other Harmful Traditional Practices: The constitution prohibits practices that dehumanize or are injurious to the physical and mental well-being of a person. In the Northern, Upper East, and Upper West regions, where adherence to indigenous religious beliefs remained strong, rural women and men suspected of "witchcraft" were banished by their families or traditional village authorities to "witch camps." At these villages in the north populated by suspected witches, some of those interned were accompanied by their families. Such camps were distinct from "prayer camps," to which persons with mental illness were sometimes sent by their families. Most accused witches were older women, often widows, whom fellow villagers accused of being the cause of difficulties, such as illness, crop failure, or financial misfortune. Some persons suspected of witchcraft were also killed. NGOs provided food, medical care, and other support to residents of the camps. The Ministry of Gender, Children, and Social Protection monitored witch camps. The CHRAJ had an office in the Northern Region that monitored three witch camps and supported efforts to protect the rights of those accused of being witches. According to the CHRAJ, the Kukuo camp had a population of 123, the Tindaan Shayili-Kpatinga camp 34, and the Gnani camp 20.

The law criminalizes harmful mourning rites, but such rites continued, and authorities did not prosecute any perpetrators. In the north, especially in the Upper West Region, widows are required to undergo certain indigenous rites to mourn or show devotion for the deceased spouse. The most prevalent widowhood rites included a one-year period of mourning, tying ropes and padlocks around the widow's waist, forced sitting by the deceased spouse until burial, solitary confinement, forced starvation, shaving the widow's hair, and smearing clay on the widow's body. If a widow engages in work or economic activity after the spouse's death, she may be regarded as adulterous, considered the cause of the spouse's death, or be declared a witch. In these instances the widow may be forced to undergo purification rites or leave her home.

Sexual Harassment: No law specifically prohibits sexual harassment, although authorities prosecuted some sexual harassment cases under provisions of the criminal code. Women's advocacy groups, including the Ark Foundation, reported sexual harassment remained a widespread problem.

Reproductive Rights: Couples and individuals have the right to decide freely the number, spacing, and timing of their children, free from discrimination, coercion, or violence, but often lacked the information to do so. According to the 2014 Demographic and Health Survey (DHS), use of modern contraceptive methods by married and sexually active unmarried women rose from 17 percent in 2008 to 22 percent in 2014. The UN Population Division estimated 25.1 percent of girls and women ages 15-49 used a modern method of contraception.

According to 2015 WHO estimates, there were between 216 and 458 maternal deaths per 100,000 live births. While more than 95 percent of women received some prenatal care, the quality of that care was widely perceived to be inadequate, contributing to the high maternal mortality ratio. The 2014 DHS found 74 percent of deliveries occurred with the assistance of a skilled health-care provider, likely due to free pregnancy, delivery, and postpartum care being included in benefits under the National Health Insurance Scheme. Postpartum care indicators showed that 78 percent of women had a postnatal checkup in the first two days after birth. Health organizations, however, reported nearly 60 percent of all pregnant women were anemic, and both women and their developing fetuses frequently experienced increased susceptibility to malaria. The

2014 DHS found anemia contributed to perinatal and maternal mortality. According to the survey, factors preventing women from seeking medical care included the inability to get money for treatment (42 percent) and the distance to a health facility (25 percent).

Discrimination: The constitution and law provide for the same legal status and rights for women as for men under family, labor, property, nationality, and inheritance laws. Traditional practices and societal norms, however, often denied women their statutory entitlements to inheritance and property, a legally registered marriage with associated legal rights, and the right to adequate resources to maintain and exercise custody of children. Women often did not have property or assets to use as collateral for loans, thus effectively preventing them from gaining access to credit. Rural families often focused on educating male children at the expense of female children since females typically married into other families. Women also continued to experience discrimination in access to employment, pay, and housing.

# Children

Birth Registration: Citizenship is derived by birth in or outside the country if either of the child's parents or one grandparent is a citizen; however, the UN Children's Fund (UNICEF) reported that more than four in 10 children were not registered at birth, citing related vulnerability to exploitation, trafficking, and early and forced marriage. Children unregistered at birth or without identification documents may be excluded from accessing education, health care, and social security. The lack of a birth certificate or other proof of identity and age also constitutes a barrier to ensuring children receive appropriate protection, assistance, and fair treatment, for example when in contact with the justice system as victims, offenders, or witnesses. If children are separated from their families during natural disasters, conflicts, or as a result of exploitation, reuniting them is made more difficult by the lack of official documentation. Some children were reportedly denied education because their births were not registered, although having a birth certificate is not a legal precondition to attend school. The country launched an automated birth registration system during the year, aimed at enhancing the ease and reliability of registration.

Education: The constitution provides tuition-free, compulsory, and universal basic education for all children from kindergarten through junior high school. Approximately half of students completing junior high school and the Basic Education Certificate Examination continued on to senior high school. Parents incurred other costs associated with children attending school, such as uniforms and materials. Girls in rural and the northern regions were less likely to attend school due to negative social perceptions about girls and formal education, prioritization of boys' education over girls' education, distances between home and school, lack of dormitory facilities, and concerns over generally poor educational outcomes. The 2014 DHS showed the greatest disparity in education in the Northern Region, where 66 percent of women and 47 percent of men have no education--compared with 19 percent and 9 percent nationwide, respectively. A 2014 Ministry of Gender, Children, and Social Protection report stated that in the Upper West Region teachers instructed girl students to fetch water, cook, wash their clothes, and sweep their rooms. In the Western Region, sexual abuse of female students reportedly increased during exams, when students travel for the five-day exam period to examination centers in nearby communities.

Child Abuse: The law prohibits defilement (sex with a child younger than 16 years with or without consent), incest, and sexual abuse of minors. In 2015, the latest year for which data was available, the DOVVSU received 1,195 complaints of suspected defilement and 15 cases of attempted defilement; the true number of cases was believed to be much higher. Statistics on defilement are reported separately from other cases of rape. There continued to be reports of male teachers sexually assaulting and harassing both female and male students. Female and male victims often were reluctant to report these incidents to their parents, and social pressure often prevented parents from going to authorities.

EAR-000512

Early and Forced Marriage: The minimum legal age for marriage for both sexes is 18 years. Early and forced child marriage, while illegal, remained a problem. According to the DHS, 21 percent of women ages 20-24 were first married or in a union before the age of 18 in 2014, the latest year for which data was available. This survey indicated child marriage was most prevalent in the Northern (36 percent), Upper West (33 percent), Upper East (29 percent), and Eastern (25 percent) regions. Child marriage disproportionally affected girls, with only 2 percent of men ages 20-24 married before the age of 18, compared with 21 percent of women. Girls from rural areas were twice as likely to become child brides as those from urban areas. The Child Marriage Unit of the Domestic Violence Secretariat of the Ministry of Gender, Children, and Social Protection led governmental efforts to combat child marriage, for example, by setting up an e-mail platform of government and civil society child marriage stakeholders (including the government, civil society, traditional and religious leaders, and youth organizations) in the country and leading public outreach through social media. The National Advisory Committee to End Child Marriage, with participation from key government and civil society stakeholders, provided strategic guidance and supported information sharing on child marriage.

Female Genital Mutilation/Cutting: See information on girls under 18 in Women section above.

Sexual Exploitation of Children: The law prohibits commercial sexual exploitation of children. The minimum age for consensual sex is 16 years, and defilement is punishable by imprisonment for seven to 25 years. There is no legislation specific to child pornography, but it can be prosecuted as an "offense against public morals" and is punishable by imprisonment for a period not to exceed three years and/or a fine ranging from 120 to 600 cedis ($30-$150). UNICEF, with local and international NGOs, such as Rescue Foundation Ghana, Child Rights International, and Challenging Heights, worked with the government to promote children's rights and were somewhat successful in sensitizing communities about protecting the welfare of children.

Displaced Children: The migration of children to urban areas continued due to economic hardship in rural areas. Children were often forced to support themselves to survive, contributing to both child prostitution and the school dropout rate. Girls were among the most vulnerable to commercial sexual exploitation while living on the streets.

International Child Abductions: The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Abduction* at trav-el.state.gov/content/childabduction/en/legal/compliance.html (http://travel.state.gov/content/childabduction/en/legal/compliance.html).

# Anti-Semitism

The Jewish community had a few hundred members. There were no reports of anti-Semitic acts.

# Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/ (http://www.state.gov/j/tip/rls/tiprpt/).

# Persons with Disabilities

The law explicitly prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, air travel and other transportation, access to health care, judicial proceedings, or the provision of other state services, but the government did not effectively enforce the law. The law provides that persons with disabilities

EOIR-000513

have access to public spaces with "appropriate facilities that make the place accessible to and available for use by a person with disability," but inaccessibility to schools and public buildings continued to be a problem. Children with disabilities attended specialized schools that focused on their needs, in particular schools for the deaf, but few adults with disabilities had employment opportunities.

Persons with both mental and physical disabilities, including children, were frequently subjected to abuse and intolerance. Psychiatric hospitals were overcrowded and unsanitary, and the country had a severe shortage of mental health professionals. Children with disabilities who lived at home were sometimes tied to trees or under market stalls and caned regularly; families reportedly killed some of them. The Ghana Education Service, through its Special Education Unit, supported education for children who are deaf or hard of hearing or have vision disabilities through national schools for deaf and blind students. Diagnosis and adaptive instruction for students with disabilities remained a challenge.

Thousands of persons with mental disabilities, including children as young as seven, were sent to spiritual healing centers known as "prayer camps," where mental disability was often considered a "demonic affliction." Residents were typically chained for weeks against their will in these environments with little challenge to their confinement, denied food and water often for seven consecutive days, and physically assaulted. While the country passed a Mental Health Act in 2012, officials took few steps to implement the legislation.

# Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity

The law criminalizes the act of "unnatural carnal knowledge," which is defined as "sexual intercourse with a person in an unnatural manner or with an animal." It is a misdemeanor offense if the individuals involved are 16 years of age or older and a felony offense if one of the individuals is under 16. The offense applies to persons engaged in same-sex male relationships and those in heterosexual relationships, but not to individuals in same-sex female relationships. The law does not prohibit discrimination based on sexual orientation and gender identity.

Lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons faced widespread discrimination in education and employment. They also faced police harassment and extortion attempts. There were reports police were reluctant to investigate claims of assault or violence against LGBTI persons. Gay men in prison were often subjected to sexual and other physical abuse. The trial of an individual charged with assaulting a gay man because of his sexual orientation, which took place in 2015 in Nima, Accra, was underway at year's end.

While there were no reported cases of police or government violence against LGBTI persons during the year, stigma, intimidation, and the attitude of the police toward LGBTI persons were factors in preventing victims from reporting incidents of abuse.

# HIV and AIDS Social Stigma

Discrimination against persons with HIV/AIDS remained a problem. In the 2014 DHS, only 8 percent of women and girls and 14 percent of men and boys ages 15-49 expressed accepting attitudes on four indicators of stigma associated with HIV/AIDS. The 2014 national HIV Stigma Index Study also identified cases of stigma and discrimination towards persons with HIV: One-fifth of respondents reported abuse of their rights as persons with HIV, yet three-quarters of them did not seek redress. The study attributed this mainly to a lack of knowledge on the part of persons with HIV concerning their rights and lack of supportive policies.

EHIR-000514

Fear of being stigmatized continued to discourage persons from being tested for HIV infection and those who tested positive from seeking timely care. HIV-positive persons faced discrimination in employment and often were forced to leave their jobs or houses. The government and NGOs subsidized many centers that provided free HIV testing to citizens, although high patient volume and the physical layout of many clinics often made it difficult for the centers to respect confidentiality.

According to UNAIDS Ghana, continuing mandatory pre-employment HIV screening in security agencies impeded efforts to reduce stigma and discrimination. Security agencies, including the military and police service, used HIV status as a screening criterion in their recruitment processes and peacekeeping assignments.

The CHRAJ managed an online reporting platform to improve the reporting and tracking of cases of stigma and discrimination experienced by persons with HIV/AIDS and key populations, in particular female sex workers and men who have sex with men. As of November there were 75 cases reported using the online platform. Primary complaint categories include disclosure of protected health information (17), blackmail/extortion (15), harassment/threats (14), and violence/physical abuse (11).

# Other Societal Violence or Discrimination

Unlike in prior years, there were no reports of ritual killings. Chieftaincy disputes, which frequently resulted from lack of a clear chain of succession, competing claims over land and other natural resources, and internal rivalries and feuds continued to result in deaths, injuries, and destruction of property.

# Section 7. Worker Rights
# a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of workers--except for members of the armed forces, police, the Ghana Prisons Service, and other security and intelligence agency personnel--to form and join unions of their choice without previous authorization or excessive requirements. The law requires trade unions or employers' organizations to obtain a certificate of registration and be authorized by the chief labor officer, who is an appointed government official.

The law provides for the right to conduct legal strikes but restricts that right for workers who provide "essential services." The minister of employment and labor relations designated a list of essential services, which included many sectors falling outside the International Labor Organization's (ILO) essential services definition. The list included services carried out by utility companies (water, electricity, etc.), ports and harbors, medical centers, and the Bank of Ghana. In these sectors the parties to any labor disputes are required to resolve their differences within 72 hours; the deadline is intended to put pressure on employers and employees to operate efficiently with limited interruptions. The right to strike can also be restricted for workers in private enterprises whose services are deemed essential to the survival of the enterprise by a union and an employer. A union may call a legal strike only if the parties fail to agree to refer the dispute to voluntary arbitration or if the dispute remains unresolved at the end of arbitration proceedings. Additionally, the Emergency Powers Act of 1994 grants authorities the power to suspend any law and prohibit public meetings and processions, but it was unclear if the law applies to labor disputes.

EOIR-000515

The law provides a framework for collective bargaining. Only unions that represent the majority of workers in a given company, however, can obtain a collective bargaining certificate, which is required to engage in collective bargaining. In cases where there are multiple unions in an enterprise, the majority or plurality union generally receives the certificate and conducts the bargaining. The certificate holder generally includes representatives from the smaller unions. The armed forces, police, the Ghana Prisons Service, and other security and intelligence personnel do not have the right to bargain collectively. Workers in decision-making or managerial roles are not provided the right to collective bargaining under the Labor Act, but they may join unions and enter into labor negotiations with their employers.

The National Labor Commission is a government body with the mandate of ensuring employers and unions comply with labor law. It also serves as a forum for arbitration in labor disputes.

The law allows unions to conduct their activities without interference and provides reinstatement for workers dismissed under unfair pretenses. The labor law also prohibits antiunion discrimination by employers and provides for reinstatement for workers fired for union activity. It protects trade union members and their officers against discrimination if they organize within the free zones.

The government generally protected the right to form and join independent unions and to conduct legal strikes and bargain collectively, and workers exercised these rights. Although the Labor Act makes specified parties liable for violations, specific penalties are not set forth. An employer who resorts to an illegal lockout is liable to pay the unpaid wages of the workers. While there were no instances of employers who refused to bargain, bargained with unions not chosen by workers, or hired workers without bargaining rights, some instances of subtle employer interference in union activities occurred. Many unions did not follow approved processes for dealing with disputes, reportedly due to the unfair and one-sided application of the law against the unions. The National Labor Commission faced challenges in enforcing applicable sanctions against both unions and employers, including inadequate resources, limited ability to enforce its mandate, and insufficient oversight.

Trade unions engaged in collective bargaining for wages and benefits with both private and state-owned enterprises without government interference. No union completed the dispute resolution process involving arbitration, and there were numerous unsanctioned strikes during the year.

# b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor. Provisions of various laws prescribe imprisonment and an obligation to perform prison labor as punishment for violations. For employers found guilty of using forced labor, the law provides for fines of no more than 250 penalty units (each unit is assigned a monetary value adjusted for the fluctuating inflation rate).

The government did not effectively enforce the law. Resources were insufficient to enforce legislation prohibiting forced labor. No fines were levied during the year, and no legal cases were brought that resulted in imprisonment. Data on the number of victims removed from forced labor were not available. Information also was not available regarding government efforts to bring labor laws into conformity with the ILO convention on forced labor, as recommended by the ILO in 1994.

There were indications of compulsory labor affecting both children and adults in the fishing sector, as well as child labor in informal mining and agriculture. According to the 2003 Child Labor Survey Report, more than 49,000 children were involved in fishing: 87 percent were boys and 13 percent girls. Twenty five percent were children five to nine years of age, 41 percent 10-14 years of age, and 34 percent 15-17 years of age. The International Justice Mission estimated that up to 60 percent of the 800 children they observed working on Lake Volta during a 2013 investigation might have been victims of trafficking.

EOIR-000516

Boys paddled canoes, pulled fishing nets, drained canoes of water, carried loads, ran errands, and cooked for adult fishers. Girls generally engaged in fish picking, sorting, packing, transporting, smoking, and selling, as well as cooking, farm work, and errands. In July police reportedly rescued five children who had been trafficked and forced into fishing on Lake Volta. Some children, unable to leave their employers, continued working without pay.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/ (http://www.state.-gov/j/tip/rls/tiprpt/).

# c. Prohibition of Child Labor and Minimum Age for Employment

The law sets the minimum employment age at 15 years, or 13 years for light work unlikely to be harmful to a child or to affect the child's attendance at school. The law prohibits night work and certain types of hazardous labor for those under age 18 and provides for fines and imprisonment for violators. The law allows for children age 15 and above to have an apprenticeship under which craftsmen and employers have the obligation to provide a safe and healthy work environment along with training and tools.

Inspectors from the Ministry of Employment and Labor Relations were responsible for enforcing child labor regulations, and district labor officers and the social services subcommittees of district assemblies were responsible for assuring the relevant provisions of the law were observed through annual workplace visits and spot checks in response to allegations of violations. Those convicted of violating the child labor regulations of the Children's Act could be subjected to a fine of up to 500 cedis ($125), a term of imprisonment not exceeding one year, or to both. Inspectors were required to provide employers with information about child labor violations and effective means to comply with provisions of the law. The government, however, did not provide sufficient resources to law enforcement and judicial authorities to carry out these efforts.

The ILO, government representatives, Trade Union Congress, media, international organizations, and NGOs continued efforts to increase institutional capacity to combat child labor.

The government continued to work closely with NGOs, labor unions, and the cocoa industry to eliminate the worst forms of child labor in the industry. Through these partnerships the government created several community projects, which promoted sensitization, monitoring, and livelihood improvement.

Authorities did not enforce child labor laws effectively or consistently, and law enforcement officials, including judges, police, and labor officials, were sometimes unfamiliar with the provisions of the law that protected children.

Children as young as seven were subjected to forced labor in agriculture and mining, including informal gold mines, and as domestic laborers, porters, hawkers, and quarry workers. In the fishing industry in the Lake Volta Region, child laborers engaged in hazardous work, such as diving into deep waters to untangle fishing nets caught on submerged tree roots. In April, Human Rights Watch indicated child labor continued to be prevalent in artisanal mining. Children also engaged in fetching firewood, bricklaying, food service and cooking, and collecting fares. A report released in May by Understanding Children's Work found 1.9 million children ages five-17, approximately 22 percent of this age group, were involved in child labor. A report released by Tulane University in July that assessed data collected during the 2013-14 harvest season estimated the cocoa sector employed approximately 918,500 child laborers, of which 95.7 percent were engaged in hazardous work in cocoa production. Children also engaged in fetching firewood, bricklaying, food service and cooking, begging, livestock herding, and collecting fares.

EOIR-000517

Children were also forced to work, sometimes after being sold, leased, or given away by their parents to work in fishing villages, shops, or homes. It was difficult to determine the extent of forced and bonded labor of children. Children in small-scale mining reportedly crushed rocks, dug in deep pits, carried heavy loads, operated heavy machinery, sieved stones, and amalgamated gold with mercury.

Child laborers were often poorly paid, physically abused, and received little or no health care.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/ (http://www.dol.gov/ilab/reports/child-labor/findings/).

# d. Discrimination with Respect to Employment and Occupation

The law prohibits discrimination in employment or occupation on grounds of gender, race, color, ethnic origin, religion, political opinion, social or economic status, or disability. The law does not prohibit discrimination on the grounds of age, language, sexual orientation and/or gender identity, HIV-positive status, or having other communicable diseases.

The government did not effectively enforce prohibitions on discrimination. The law provided for penalties for violations, including compensation for lost earnings and reinstatement of terminated workers; however, penalties were not adequate to deter violations. Discrimination in employment and occupation occurred with respect to women, persons with disabilities, HIV-positive persons, and LGBTI persons (see section 6). For example, reports indicated few companies could accommodate the special needs of persons with disabilities in the workplace. Many companies ignored or turned down such individuals who applied for jobs. Women in urban centers and those with skills and training encountered little overt bias, but resistance persisted to women entering nontraditional fields.

# e. Acceptable Conditions of Work

A National Tripartite Committee composed of representatives of the government, labor, and employers set a daily minimum wage, which was seven cedis ($1.75). The Ghana Statistical Service determined the lower poverty line for an equivalent adult in January 2013 based on prices of Greater Accra Region was 792.05 cedis ($198) per year, or 2.17 cedis ($0.54) per day. The study considered those earning less than this amount to be in extreme poverty. The maximum workweek is 40 hours, with a break of at least 48 consecutive hours every seven days. Workers are entitled to at least 15 working days of leave with full pay in a calendar year of continuous service or after having worked at least 200 days in a particular year. Such provisions, however, did not apply to task workers or domestic workers in private homes, or elsewhere in the informal sector. The law does not prescribe overtime rates and does not prohibit excessive compulsory overtime.

The government sets occupational safety and health regulations. By law workers can remove themselves from situations that endangered health or safety without jeopardy to their employment. This legislation only covered workers in the formal sector, which employed less than 20 percent of the labor force.

The Factories Department within the Ministry of Employment and Labor Relations is responsible for imposing sanctions on violators of the standards. Employers who fail to comply are liable to a fine not exceeding 1,000 penalty units, imprisonment for a term not exceeding three years, or both. The law requires that employers report occupational accidents and diseases no later than seven days from the date of occurrence.

EOIR-000518

The Ministry of Employment and Labor Relations was unable to enforce the wage law effectively. The government also did not effectively enforce health and safety regulations. The law reportedly provided inadequate coverage to workers due to its fragmentation and limited scope. In October nurses at Accra psychiatric hospital went on strike over dangerous working conditions. There was widespread violation of the minimum wage law in the formal economy across all sectors. The minimum wage law was not enforced in the informal sector. Legislation governing working hours was largely followed in the formal sector but widely flouted and not enforced in the informal sector.

The Ministry of Employment and Labor Relations employed 97 safety inspectors. Inspectors were poorly trained and lacked the resources to respond to violations effectively. Inspectors did not impose sanctions or otherwise respond to violations during the year. There were no reports of specific government action taken during the year to prevent violations or improve wages and working conditions.

The law provides for compulsory participation in the Social Security and National Insurance Trust Pension Scheme as well as the National Health Insurance Scheme; however, the government did not always enforce compliance, particularly in the informal sector. The law provides for work injury insurance and maternity insurance. The law does not provide for unemployment insurance.

According to the 2014 Ghana Living Standards Survey, approximately 88 percent of the working population was employed in the informal sector, including small to medium-scale businesses such as producers, wholesale and retail traders, and service providers made up of contributing family workers, casual wageworkers, home-based workers, and street vendors. Most of these workers were self-employed persons. In December a gas station in Accra exploded, killing at least 12. Media reported that the National Petroleum Authority indicated the accident was a result of "irresponsible human error." The Chamber of Petroleum Consumers Ghana accused the National Petroleum Authority and the Environmental Protection Agency of ineffectively enforcing safety standards. Later in December after the explosion, the Ghana National Fire Service shut down two filling stations in Accra citing safety and licensing concerns.

According to media reports, in January a mineworker in Talensi district, Upper East region, reportedly died from being buried alive under a stockpile of gold ore.

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.
External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

Department of Homeland Security
U.S. Citizenship and Immigration Services

U.S. Department of Justice
Executive Office for Immigration Review

OMB No. 1615-0067; Expires 11/30/2014

# I-589, Application for Asylum and for Withholding of Removal

**START HERE - Type or print in black ink. See the instructions for information about eligibilty and how to complete and file this application. There is NO filing fee for this application.**

NOTE: Check this box if you also want to apply for withholding of removal under the Convention Against Torture. ☒

## Part A.I. Information About You

| | |
|---|---|
| **1.** Alien Registration Number(s) (A-Number) *(if any)* <br> 208 125 369 | **2.** U.S. Social Security Number *(if any)* |

| **3.** Complete Last Name <br> YAW TOTIMEH | **4.** First Name <br> David | **5.** Middle Name |
|---|---|---|

**6.** What other names have you used *(include maiden name and aliases)*
Mohammed Adiza ALHASSAN, David TOTIMEH, David YAWTOTIMEH, David YAW TOTIWEH

RECEIVED
JUL 18 2017
IMMIGRATION COURT, NYC

EXHIBIT #3

DEC 06 2019
IMMIGRATION COURT NYC

**7.** Residence in the U.S. *(where you physically reside)*

| Street Number and Name <br> 1694 Davidson Avenue | | Apt. Number <br> 4A |
|---|---|---|
| City <br> Bronx | State <br> New York | Zip Code <br> 10453 | Telephone Number <br> ( 917 ) 399-2759 |

**8.** Mailing Address in the U.S. *(if different than the address in Item Number 7)*

| In Care Of *(if applicable):* | Telephone Number <br> ( ) |
|---|---|
| Street Number and Name | Apt. Number |
| City | State | Zip Code |

| **9.** Gender: ☒ Male ☐ Female | **10.** Marital Status: ☒ Single ☐ Married ☐ Divorced ☐ Widowed |
|---|---|

| **11.** Date of Birth *(mm/dd/yyyy)* <br> 01/28/1982 | **12.** City and Country of Birth <br> Accra, Ghana |
|---|---|

| **13.** Present Nationality *(Citizenship)* <br> Ghanaian | **14.** Nationality at Birth <br> Ghanaian | **15.** Race, Ethnic, or Tribal Group <br> Hausa | **16.** Religion <br> None |
|---|---|---|---|

**17.** *Check the box, a through c, that applies:* **a.** ☐ I have never been in Immigration Court proceedings.

**b.** ☒ I am now in Immigration Court proceedings. **c.** ☐ I am **not** now in Immigration Court proceedings, but I have been in the past.

**18.** *Complete 18 a through c.*

a. When did you last leave your country? *(mmm/dd/yyyy)* 06/14/2014 b. What is your current I-94 Number, if any? 41874000933

c. List each entry into the U.S. beginning with your most recent entry. *List date (mm/dd/yyyy), place, and your status for each entry.* (Attach additional sheets as needed.)

| Date 04/07/2015 | Place San Ysidro, CA | Status Asylum Seeker | Date Status Expires DS |
|---|---|---|---|
| Date | Place | Status | |
| Date | Place | Status | |

| **19.** What country issued your last passport or travel document? <br> Ghana | **20.** Passport Number LOST <br> Travel Document Number | **21.** Expiration Date *(mm/dd/yyyy)* <br> Unknonw |
|---|---|---|

| **22.** What is your native language *(include dialect, if applicable)?* <br> Hausa | **23.** Are you fluent in English? <br> ☐ Yes ☒ No | **24.** What other languages do you speak fluently? <br> None |
|---|---|---|

| **For EOIR use only.** | **For USCIS use only.** | Action: <br> Interview Date: _____ <br> Asylum Officer ID#: _____ | Decision: <br> Approval Date: _____ <br> Denial Date: _____ <br> Referral Date: _____ |
|---|---|---|---|

Form I-589 (Rev. 11/01/12) Y

EOIR-000520

## Part A.II. Information About Your Spouse and Children

**Your spouse**  [X]  I am not married. (Skip to **Your Children** below.)

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Date of Birth *(mm/dd/yyyy)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Maiden Name |

| 9. Date of Marriage *(mm/dd/yyyy)* | 10. Place of Marriage | 11. City and Country of Birth |
|---|---|---|

| 12. Nationality *(Citizenship)* | 13. Race, Ethnic, or Tribal Group | 14. Gender  ☐ Male  ☐ Female |
|---|---|---|

**15. Is this person in the U.S.?**
☐ Yes *(Complete Blocks 16 to 24.)*   ☐ No *(Specify location):*

| 16. Place of last entry into the U.S. | 17. Date of last entry into the U.S. *(mm/dd/yyyy)* | 18. I-94 Number *(if any)* | 19. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | 22. Is your spouse in Immigration Court proceedings?  ☐ Yes  ☐ No | 23. If previously in the U.S., date of previous arrival *(mm/dd/yyyy)* |

**24.** If in the U.S., is your spouse to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*

☐ No

**Your Children.** List **all** of your children, regardless of age, location, or marital status.

[X] I do not have any children. *(Skip to Part A.III., **Information about your background.**)*

☐ I have children.    Total number of children: _____.

(**NOTE:** *Use Form I-589 Supplement A or attach additional sheets of paper and documentation if you have more than four children.*)

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender  ☐ Male  ☐ Female |

**13. Is this child in the U.S.?** ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location):*

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings?  ☐ Yes  ☐ No | |

**21.** If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*

☐ No

EOIR-000521

## Part A.II. Information About Your Spouse and Children (Continued)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

**13. Is this child in the U.S. ?** ☐ Yes (Complete Blocks 14 to 21.) ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)

☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

**13. Is this child in the U.S. ?** ☐ Yes (Complete Blocks 14 to 21.) ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)

☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

**13. Is this child in the U.S. ?** ☐ Yes (Complete Blocks 14 to 21.) ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)

☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

☐ No

Form I-589 (Rev. 11/01/12) Y Page 3

EOIR-000522

## Part A.III. Information About Your Background

1. List your last address where you lived before coming to the United States. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State and Country.)*
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| Nima | Nima | Accra | Ghana | /1982 | 06/2014 |
|  |  |  |  |  |  |

2. Provide the following information about your residences during the past 5 years. List your present address first.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 1694 Davidson Avenue 4A | Bronx | New York | USA | 02/2017 | Present |
| 2042 Morris Avenue 2B | Bronx | New York | USA | 08/2015 | 01/2017 |
| ICE Detention | Santa Ana | California | USA | 06/2015 | 08/2015 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

3. Provide the following information about your education, beginning with the most recent.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name of School | Type of School | Location *(Address)* | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| Kanda High School | Basic Education | Accra, Ghana | **/1990** | /1996 |
| Burma Camp Primary School | Primary School | Burma Camp, Accra, Ghana | /1987 | /1990 |
|  |  |  |  |  |
|  |  |  |  |  |

4. Provide the following information about your employment during the past 5 years. List your present employment first.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| Self Employed, Accra, Ghana | Used Clothing Sales | 12/2009 | /2014 |
|  |  |  |  |
|  |  |  |  |

5. Provide the following information about your parents and siblings (brothers and sisters). Check the box if the person is deceased.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Full Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* Adiza Mohammed | Ghana | ☐ Deceased Ghana |
| *Father* Mohammed Yaro | Ghana | ☒ Deceased |
| *Sibling* Yussif Yaro | Nima, Accra, Ghana | ☐ Deceased Nima, Accra, Ghana |
| *Sibling* Fusseini Yaro | Nima, Accra, Ghana | ☐ Deceased Nima, Accra, Ghana |
| *Sibling* Sule Yaro | Nima, Accra, Ghana | ☐ Deceased Nima, Accra, Ghana |
| *Sibling* Abiba Yaro | Nima, Accra, Ghana | ☐ Deceased Nima, Accra, Ghana |

EOIR-000523

## Part B. Information About Your Application

(**NOTE:** *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the INA or withholding of removal under the Convention Against Torture), you must provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You must attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, explain why in your responses to the following questions.

Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, "Completing the Form," Part B, and Section VII, "Additional Evidence That You Should Submit," for more information on completing this section of the form.

1. Why are you applying for asylum or withholding of removal under section 241(b)(3) of the INA, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below.

    I am seeking asylum or withholding of removal based on:

    ☐ Race                ☐ Political opinion

    ☒ Religion           ☒ Membership in a particular social group

    ☐ Nationality        ☒ Torture Convention

**A.** Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

☐ No             ☒ Yes

If "Yes," explain in detail:
1. What happened;
2. When the harm or mistreatment or threats occurred;
3. Who caused the harm or mistreatment or threats; and
4. Why you believe the harm or mistreatment or threats occurred.

```
I fear that if forced to return to Ghana I will be attacked, tortured and possibly killed by my
brothers and their friends. These men seek to harm me because I refused to allow them to build
a mosque on our property.  When my father died in 2000 he left his property to me and my
brothers. For years, we lived in peace. But in 2013, my brother, Yussif, started to become more
and more obsessed with Islam and decided to build a mosque on our property. I had stopped
practicing Islam and told my brother that I was opposed to his plan. This enraged my brother. I
was accused of being an apostate. Twice, in 2013 and 2014, my brother and his supporters
attacked me. (Detailed statement to be submitted).
```

**B.** Do you fear harm or mistreatment if you return to your home country?

☐ No             ☒ Yes

If "Yes," explain in detail:
1. What harm or mistreatment you fear;
2. Who you believe would harm or mistreat you; and
3. Why you believe you would or could be harmed or mistreated.

```
If I am forced to return to Ghana, I fear that I will be attacked by my brothers and members of
the community, because they have told everyone that I no longer practice Islam, that I am an
infidel, and that I have refused to allow a mosque to be built. Over the years, my brother,
Yussif, and his friends have become more and more fanatical and I fear that they will harm me
if I am forced to return to Ghana.
```

EOIR-000524

## Part B. Information About Your Application (Continued)

2. Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No ☒ Yes

If "Yes," explain the circumstances and reasons for the action.

In 2002, while working in Libya, I was detained by Libyan immigration authorities and deported to Ghana.

3.A. Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☒ No ☐ Yes

If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

3.B. Do you or your family members continue to participate in any way in these organizations or groups?

☒ No ☐ Yes

If "Yes," describe for each person your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

4. Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No ☒ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

Torture is routinely used by the Ghanian police and they act with impunity. I fear that if I am forced to return to Ghana, my brother will torture me or even bribe the police and have me arrested.

EOIR-000525

## Part C. Additional Information About Your Application

(NOTE: *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.*)

**1.** Have you, your spouse, your child(ren), your parents or your siblings ever applied to the U.S. Government for refugee status, asylum, or withholding of removal?

☒ No ☐ Yes

If "Yes," explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Indicate whether or not you were included in a parent or spouse's application. If so, include your parent or spouse's A-number in your response. If you have been denied asylum by an immigration judge or the Board of Immigration Appeals, describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

**2.A.** After leaving the country from which you are claiming asylum, did you or your spouse or child(ren) who are now in the United States travel through or reside in any other country before entering the United States?

☐ No ☒ Yes

**2.B.** Have you, your spouse, your child(ren), or other family members, such as your parents or siblings, ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?

☒ No ☐ Yes

If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay, the person's status while there, the reasons for leaving, whether or not the person is entitled to return for lawful residence purposes, and whether the person applied for refugee status or for asylum while there, and if not, why he or she did not do so.

```
After I fled Ghana, I traveled by plan to Brazil. In Brazil, I was a transit passenger. I then
flew to Ecuador. I traveled by foot and bus through Central America before I reached the U.S./
Mexico border where I requested asylum.
```

**3.** Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

☒ No ☐ Yes

If "Yes," describe in detail each such incident and your own, your spouse's, or your child(ren)'s involvement.

EOIR-000526

**Part C. Additional Information About Your Application (Continued)**

4. After you left the country where you were harmed or fear harm, did you return to that country?

   ☐ No    ☒ Yes

   If "Yes," describe in detail the circumstances of your visit(s) (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s).)

5. Are you filing this application more than 1 year after your last arrival in the United States?

   ☐ No    ☒ Yes

   If "Yes," explain why you did not file within the first year after you arrived. You must be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V. "Completing the Form," Part C.

   ```
   This application is an amended application. I filed my first asylum application pro se with the
   Immigration Court while I was detained.
   ```

6. Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted, or sentenced for any crimes in the United States?

   ☒ No    ☐ Yes

   If "Yes," for each instance, specify in your response: what occurred and the circumstances, dates, length of sentence received, location, the duration of the detention or imprisonment, reason(s) for the detention or conviction, any formal charges that were lodged against you or your relatives included in your application, and the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

EOIR-000527

## Part D. Your Signature



I certify, under penalty of perjury under the laws of the United States of America, that this application and evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546(a), provides in Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title United States Code, knowingly subscribes as true, any false statement with respect to a material fact in application, affidavit, or other document required by the immigration laws or regulations prescribed thereunde knowingly presents any such application, affidavit, or other document containing any such false statemer which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this titl imprisoned for up to 25 years. I authorize the release of any information from my immigration record that Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefit I am seeking.

*WARNING:* **Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an immigration judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application. If filing with USCIS, unexcused failure to appear for an appointment to provide biometrics (such as fingerprints) and your biographical information within the time allowed may result in an asylum officer dismissing your asylum application or referring it to an immigration judge. Failure without good cause to provide DHS with biometrics or other biographical information while in removal proceedings may result in your application being found abandoned by the immigration judge. See sections 208(d)(5)(A) and 208(d)(6) of the INA and 8 CFR sections 208.10, 1208.10, 208.20, 1003.47(d) and 1208.20.**

| Print your complete name. | Write your name in your native alphabet. |
|---|---|
| David Yaw Totimeh | |

Did your spouse, parent, or child(ren) assist you in completing this application? ☒ No ☐ Yes *(If "Yes," list the name and relationship.)*

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| *(Name)* | *(Relationship)* | *(Name)* | *(Relationship)* |

Did someone other than your spouse, parent, or child(ren) prepare this application? ☐ No ☒ Yes *(If "Yes,"complete Part E.)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim? ☒ No ☐ Yes

Signature of Applicant *(The person in Part A.I.)*

[ ~~signature~~ ]

Sign your name so it all appears within the brackets

3-27-2017

Date *(mm/dd/yyyy)*

## Part E. Declaration of Person Preparing Form, if Other Than Applicant, Spouse, Parent, or Child

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

| Signature of Preparer | | Print Complete Name of Preparer |
|---|---|---|
| | | Sandy Khine, Esq. |
| Daytime Telephone Number ( 212 ) 786-1500 | Address of Preparer: Street Number and Name 299 Broadway | |
| Apt. Number Suite 803 | City New York | State NY | Zip Code 10007 |

EOIR-000528

## Part F. To Be Completed at Asylum Interview, if Applicable

**NOTE:** *You will be asked to complete this part when you appear for examination before an asylum officer of the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered ____ to ____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Asylum Officer

## Part G. To Be Completed at Removal Hearing, if Applicable

**NOTE:** *You will be asked to complete this Part when you appear before an immigration judge of the U.S. Department of Justice, Executive Office for Immigration Review (EOIR), for a hearing.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered ____ to ____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Immigration Judge

EOIR-000529

# GHANA 2014 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Ghana is a constitutional democracy with a strong presidency and a unicameral, 275-seat parliament.  In late 2008 the National Democratic Congress (NDC) won both the presidency and a small majority in parliament in an election that domestic and international observers deemed generally free and fair.  NDC candidate John Evans Atta Mills became president in early 2009 for a four-year term.  When President Mills died in July 2012, Vice President John Dramani Mahama assumed the office of president.  President Mahama won re-election in December 2012. The New Patriotic Party (NPP) alleged massive voting irregularities and filed a legal suit in the Supreme Court contesting the outcome of the election.  In August 2013 the Supreme Court dismissed the case and upheld the results of the election. Authorities failed at times to maintain effective control over the security forces.

The most important human rights problems included trafficking in persons; exploitative child labor, including forced child labor; and harsh and life-threatening prison conditions.

Other human rights problems included use of excessive force by police that resulted in deaths and injuries; rape by police; prolonged pretrial detention; arbitrary arrest of journalists; corruption in all branches of government; violence against women and children, including female genital mutilation/cutting (FGM/C); societal discrimination against women, persons with disabilities, and persons with HIV/AIDS; societal discrimination against lesbian, gay, bisexual, and transgender (LGBT) individuals; ethnic discrimination and politically motivated violence; and ethnic killings and vigilante violence.

The government took steps to prosecute and punish officials who committed violations, whether in the security forces or elsewhere in the government, but police impunity remained a problem.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

### a. Arbitrary or Unlawful Deprivation of Life

There were reports that the government or its agents committed arbitrary or unlawful killings.

EOIR-000530

For example, in July a military officer in Xikpo, South Tongu District, Volta Region, allegedly shot and killed three participants in a demonstration to protest unsafe road conditions. The incident was under investigation.

Use of excessive force by security forces in the line of duty resulted in the deaths of several armed criminal suspects and other persons during the year.

**b. Disappearance**

There were no reports of politically motivated disappearances.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

While the constitution and law prohibit such practices, there were credible reports police beat and otherwise abused suspects, prisoners, and other citizens. According to the Commission on Human Rights and Administrative Justice (CHRAJ), beatings of suspects and other citizens occurred throughout the country but were generally unreported in official channels because victims were reluctant to file formal complaints. Police generally denied allegations or claimed the level of force used was justified. Military officials also reportedly mistreated persons. Several nongovernmental organizations (NGOs), lawyers, and civil society organizations criticized police use of excessive force.

On March 5, Juan E. Mendez, UN special rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment, released a report of his findings from a November 2013 visit to a number of police and prison detention facilities. While the special rapporteur did not find a widespread pattern or systemic practice of torture or mistreatment by police, he found such abuses occurred in "some individual cases during arrest and transfer to police stations and interrogation" (see section 1.c., Prison and Detention Center Conditions).

Police raped women. In August three police officers--Donald Appiah, Joseph Kwakoh, and George Tanoe--were charged with defiling (having sex with a child younger than 16 years with or without consent) a 14-year-old girl. The officers had been called by the victim's father to her home to investigate a defilement complaint against a man who lived in a nearby town. Several days after the father filed the complaint, the officers returned to the home, abducted the victim, and raped her at the police station. Appiah was sentenced to nine years in prison; Kwakoh and Tanoe were awaiting sentencing at year's end.

EOIR-000531

GHANA                                                                3

## Prison and Detention Center Conditions

According to media and expert reports, prison conditions generally were harsh and sometimes life threatening due to physical abuse, food shortages, overcrowding, and inadequate sanitary conditions and medical care.

Physical Conditions: Prisons Service statistics available in August indicated 13,479 prisoners (13,235 men and 244 women) were held in prisons designed to hold approximately one-third that number. Of this total, 3,027 were remand prisoners. Authorities neither housed juvenile detainees separately from adults nor pretrial detainees separately from convicted prisoners, but women were held separately. No staff specifically focused on mental health, and inmates with mental disabilities were not routinely identified, separated, or transferred to general or psychiatric hospitals.

With few exceptions, prison overcrowding was "alarming," according to the UN special rapporteur. At the time of his 2013 visit, the male section of Nsawam Prison, designed to hold 717 inmates, held 3,773. Kumasi Prison, with a capacity of 800, held 1,981 inmates. Cellblocks there contained 115 convicted prisoners sharing a space of approximately 415 square feet. The remand sections were often worse, with cells so overcrowded (40 in a cell designed for four) that inmates were lying head to toe in a fetal position. Inmates in Sekondi Prison slept in shifts, sitting up, due to lack of space. Many prisoners slept on the floor without a mattress, mat, or blanket.

In 2012, the most recent year for which statistics were available, the government reported 94 deaths in custody, all from natural causes such as malaria, tuberculosis, or HIV.

Both guards and other prisoners physically abused prisoners. During his November 2013 visit, the special rapporteur examined several detainees in Kumasi and Sekondi prisons and found three cases with clear physical evidence of recent and severe caning. Detainees' testimony indicated that prison guards sometimes used caning as punishment but that it was most often carried out by "black coats," a term referring to model prisoners, under the authority of prison staff. While the government acknowledged the existence of black coats, it denied they were given special powers or allowed to exercise disciplinary functions.

EOIR-000532

During his visit the special rapporteur also clinically documented traumatic physical injuries on seven juvenile inmates, resulting from a severe caning incident that had taken place within 48 hours prior to his visit. According to the boys' testimonies, the seven had been caned by an officer of the Senior Correctional Center (Ghana Borstal Institution). The Prisons Administration immediately convened a committee of inquiry to investigate the allegations. Three officers were found culpable, and the main perpetrator, the chief officer, was dismissed. Proceedings against the other two officers continued at year's end.

Prison food, according to the special rapporteur, was inadequate. There was an almost total absence of fruit, vegetables, or meat, and inmates relied on their families to supplement their diet. Officials held much of the prison population in buildings that were originally colonial forts or abandoned public or military buildings, with poor ventilation and sanitation, substandard construction, and limited space and light. Prisoners had access to potable water, however. The Prisons Service periodically fumigated and disinfected prisons, but sanitation remained poor. According to the special rapporteur, in one prison more than 100 prisoners shared one toilet, and toilets often overflowed with excrement.

Medical care was characterized as "wholly inadequate." Medical services were not provided by doctors but by medical assistants who were overstretched and lacked basic equipment and medicine. Hospitalization and treatment were routinely denied to prisoners requiring urgent care. All prison infirmaries had a severely limited supply of medicine. Prisons did not provide dental care. While there is a prison for inmates with contagious diseases in Ankaful, it could hold only 60 of the numerous prisoners with serious contagious illnesses.

Administration: There were reports that inadequate recordkeeping resulted in some pretrial detainees spending excessive time in jail awaiting trial. There were no reports of inadequate recordkeeping on sentenced prisoners. Nonviolent offenders were permitted to pay fines or use alternative dispute resolution as an alternative to incarceration. Prisoners and detainees had reasonable access to visitors and religious observance. There were no prison ombudsmen to respond to complaints. Authorities permitted prisoners and detainees to submit complaints to judicial authorities without censorship and to request investigation of credible allegations of inhuman conditions and treatment, but prisoners seldom did so. According to the special rapporteur, even when there were allegations of police brutality or use of excessive force, there was a general reluctance to complain, and as a result few cases were investigated. He also noted a lack of information concerning personnel who may be responsible for an offense under section 25 of

EOIR-000533

the Prisons Service Act, which prohibits the use of torture or harsh treatment. He added that few investigations were conducted and that officials were seldom prosecuted.

Independent Monitoring: The government permitted independent monitoring of prison conditions. Local NGOs, which were independent of government influence, worked on behalf of prisoners and detainees to help alleviate overcrowding, monitor juvenile confinement, and improve pretrial detention, bail, and recordkeeping procedures to ensure prisoners did not serve beyond the maximum sentence for the charged offenses.

The CHRAJ and the Welfare Unit of the Prisons Service monitored prison conditions and investigated credible allegations of inhuman conditions. In 2013 the CHRAJ visited 34 prisons.

## d. Arbitrary Arrest or Detention

The constitution and law provide for protection against arbitrary arrest and detention, but the government frequently disregarded these protections.

## Role of the Police and Security Apparatus

The police, under the Ministry of Interior, are responsible for maintaining law and order, but the military continued to participate in law enforcement activities. A separate entity, the Bureau of National Investigations (BNI), handles cases considered critical to state security and answers directly to the Ministry of National Security. Police maintained specialized units in Accra for homicide, forensics, domestic violence, trafficking in persons, visa fraud, narcotics, and cybercrimes. Such services were unavailable nationwide due to the lack of office space, vehicles, and other equipment outside the capital.

Police brutality, corruption, negligence, and impunity were problems. There were delays in prosecuting suspects, rumors of police collaboration with criminals, and a widespread public perception of police ineptitude. There were credible reports that police extorted money by acting as private debt collectors, setting up illegal checkpoints, and arresting citizens in exchange for bribes from disgruntled business associates of those detained.

In April 2013 the Western Regional Police Command arrested five police officers for extortion. Dressed in uniform and armed with AK-47 rifles, the officers

EOIR-000534

allegedly forced their way into the home of a foreign businessperson, threatened to arrest him, and demanded a payment of 10,000 cedis ($3,100) in exchange for not taking him to jail. The officers, whose actions were captured on a closed-circuit security camera, were arrested several days later.

The Inspector General of Police, CHRAJ, and the Police Intelligence and Professional Standards Unit (PIPS) investigate claims that security forces used excessive force. PIPS also investigates human rights abuses and police misconduct. In 2013, the most recent year for which statistics were available, PIPS received 788 new complaints, of which 320 were closed and 468 remained under investigation at year's end. Of the 788 new cases, most involved unprofessional handling of a case or misconduct by police.

**Arrest Procedures and Treatment of Detainees**

The law requires judicial warrants for arrest and provides for arraignment within 48 hours, but police made frequent arrests without warrants and detained individuals without charge for periods longer than 48 hours. Officials detained some prisoners for indefinite periods by renewing warrants or simply allowing them to lapse while an investigation occurred. The constitution grants a detained individual the right to be informed immediately, in a language the person understands, of the reasons for detention and of his or her right to a lawyer at state expense if unemployed or indigent. The government did not consistently protect these rights, and legal aid for indigent detainees was limited or nonexistent, which sometimes resulted in years of pretrial detention, according to Amnesty International. The law requires that a detainee who has not been tried within a "reasonable time," as determined by the court, be released either unconditionally or subject to conditions necessary to ensure the person's appearance in court at a later date. This provision was rarely observed.

The law provides for bail, but courts at their unlimited discretion often set bail prohibitively high. The court may refuse to release prisoners on bail and instead may detain them without charge for an indefinite period, subject to weekly review by judicial authorities. On occasion police also demanded money from suspects as a precondition for their release on bail.

Arbitrary Arrest: At least one journalist was arbitrarily arrested during the year.

Pretrial Detention: Lengthy pretrial detention remained a serious problem. According to the Prisons Service's 2012 annual report, 22 percent of the prison

EOIR-000535

## GHANA

population was in pretrial status. Detainees sometimes served more time in detention awaiting trial than the maximum sentence prescribed for the crime with which they were charged.

### e. Denial of Fair Public Trial

While the constitution and law provide for an independent judiciary, the judiciary was subject to influence and corruption. Judicial officials reportedly accepted bribes to expedite or postpone cases or to "lose" records.

Despite alternate dispute resolution (ADR) procedures to decongest the courts and improve judicial inefficiency, court delays persisted. Professional mediators were trained to conduct ADR, and they worked in various district courts throughout the country to resolve disputes and avoid lengthy trials. Nevertheless, even in fast-track courts established to hear cases to conclusion within six months, trials could go on for years.

Members of the military are tried separately under the criminal code in a military court. Military courts, which provide the same rights as civilian courts, were not permitted to try civilians.

The Chieftaincy Act gives village and other traditional chiefs the power to mediate local matters and enforce customary tribal laws dealing with such matters as divorce, child custody, and property disputes. The authority of traditional rulers continued to erode, however, because of the growing power of civil institutions, including courts and district assemblies.

A judicial complaints unit headed by a retired Supreme Court justice addressed public complaints, such as unfair treatment by a court or judge, unlawful arrest or detention, missing trial dockets, delayed trials and rendering of judgments, and bribery of judges. From January through June, the complaints unit received 243 complaints and disposed of 223 cases; 20 cases remained pending.

### Trial Procedures

Defendants are presumed innocent and have the right to be informed promptly and in detail of charges against them, with free interpretation as necessary. Defendants have the right to a fair and public trial without undue delay, but trials were often delayed. Juries are used in murder trials. Defendants have a right to be present at their trials, to be represented by an attorney (at public expense if necessary), to

EOIR-000536

cross-examine witnesses, to have adequate time and facilities to prepare their defense, to have access to government-held evidence relevant to their cases, to present witnesses and evidence, and to confront prosecution or plaintiff witnesses. Defendants have the right not to be compelled to testify or confess guilt. Defendants have the right to appeal. Authorities generally respected these safeguards, and the law extends these rights to all citizens.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

There is an independent and impartial judiciary in civil matters, and citizens had access to a court to bring lawsuits seeking damages for, or cessation of, human rights violations.

Fast-track ADR courts and "automated" commercial courts, whose proceedings were expedited through electronic data management, continued efforts to streamline resolution of disputes, although delays were common. Additional automated courts were established across the country, and their randomly selected judges helped curb judicial corruption.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The constitution prohibits such actions, and there were no reports the government failed to respect these prohibitions.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

Although the constitution and law provide for freedom of speech and press, the government sometimes restricted those rights. During the year security force members assaulted, arrested, detained, and harassed journalists.

Press Freedoms: There were more than 150 newspapers and magazines, approximately 250 FM radio stations, and 28 television stations registered with the National Media Commission. The most popular publications were state owned, while the majority of television and radio stations were private. The independent

EOIR-000537

media were active and expressed a wide variety of views; nevertheless, the courts imposed steep fines on newspapers as a result of libel suits.

<u>Violence and Harassment</u>:  Security officials assaulted, arrested, and harassed journalists throughout the country, even when the government had invited media to cover events.

For example, in March a military officer assaulted a photographer from *The Ghanaian Times* newspaper in Tamale, the capital of the Northern Region.  The assault occurred while the photographer was attempting to take pictures of a confrontation between military personnel and local youth.  The officer destroyed the photographer's camera and confiscated his tablet computer.  No disciplinary action was taken against the officer.

In September the mayor of Accra ordered police to arrest *Joy News* reporters while they were filming and interviewing residents of Mensah Guinea, a suburb of Accra.  The news team was reporting on residents' reaction to the government's demolition of makeshift housing structures, which authorities claimed were unsanitary and a breeding ground for cholera.  The reporters were able to escape, but their driver was arrested.

<u>Libel Laws/National Security</u>:  Academicians cited the punitive use of libel as a threat to press freedom.  During the year the courts imposed steep fines as a result of libel suits.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports the government monitored private online communications without appropriate judicial authority.  The internet was accessible in Accra and other large cities.  There was limited but growing internet access in other parts of the country.  According to the International Telecommunication Union, more than 12 percent of the population used the internet in 2013, the latest year for which data is available.

**Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events.

**b. Freedom of Peaceful Assembly and Association**

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

EOIR-000538

The constitution and law provide for the freedoms of peaceful assembly and association, and the government generally respected these freedoms in practice.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The constitution provides for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected these rights in practice. The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally displaced persons, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

## Protection of Refugees

Access to Asylum: The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.

The law allows rejected asylum seekers to appeal and remain in the country until an appeal is adjudicated. A four-member Appeals Committee, appointed by the minister of interior, is responsible for adjudicating the appeals, but these were often subject to delays. According to the Ghana Refugee Board, there were 15 asylum cases pending review by the interior minister; some of the cases were carried over from the previous year.

Refugee Abuse: Sexual and gender-based violence remained problems. According to the UNHCR, during the year two minors were raped by other refugees; the court sentenced one perpetrator to 10 years' imprisonment, and an investigation was being conducted into the other case. There also were two reports of refugees being assaulted by other refugees.

There were seven reports that citizens sexually harassed refugees at the Egyeikrom host community school. The cases were referred to the police Domestic Violence and Victim Support Unit (DOVVSU) for prosecution. Sexual and gender-based

EOIR-000539

violence (SGBV) committees were located in each refugee camp to educate and sensitize the population on the subject. Regional SGBV task forces met quarterly to discuss the problem, and the UNHCR also provided legal, medical, and psychosocial assistance to SGBV survivors. Some SGBV survivors and women at risk received skills training and income-generating opportunities. SGBV victims who sought legal redress, however, had limited community support.

Employment: Refugees could apply for work permits through the same process as other foreigners. Work permits, however, generally were issued only for employment in the formal sector, while the majority of refugees worked in the informal sector.

Durable Solutions: In 2011 nearly 18,000 residents of Cote d'Ivoire fled to Ghana because of political instability following Cote d'Ivoire's disputed 2010 presidential election. As of July, 10,803 Ivoirian refugees remained in the country, an increase from the 8,857 that remained in October 2013; 11 were repatriated between January and July. The increase resulted from family reunification and continued concerns over political instability in Cote d'Ivoire. Although Ivoirian refugees were granted prima facie refugee status during the initial stages of the emergency, by the end of 2012 the government had transitioned to individual refugee status determination for all Ivoirians entering thereafter.

In 2012 the UNHCR and the International Organization for Migration assisted with the voluntary repatriation of more than 4,700 Liberians from Ghana. For the approximately 4,000 Liberians who opted for local integration, the UNHCR and the Ghana Refugee Board were working with the Liberian government to ensure the timely issuance of passports for the regularization of their immigration status in Ghana. The Ghana Immigration Service also supported the process by issuing reduced-cost residency permits, including work permits for adults, to locally integrating former Liberian refugees.

The UNHCR estimated that as of July, 20,970 refugees and asylum seekers remained in Ghana. This figure included refugees and asylum seekers from Cote d'Ivoire (10,708), Liberia (5,252), Togo (3,700), and Sudan (452), as well as other countries.

**Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government**

EOIR-000540

The constitution and law provide citizens the ability to change their government through free and fair elections, which citizens generally exercised through elections based on universal suffrage.

**Elections and Political Participation**

Recent Elections: Domestic and international election observers deemed the December 2012 presidential and parliamentary elections to be generally free and fair, despite logistical and other problems. The elections were the first in which voters presented biometric identification cards to vote, an initiative intended to eliminate multiple voting. Due to biometric voter verification machine failures and late openings of polling stations, particularly in Accra, authorities extended voting an extra day. The independent Electoral Commission declared President Mahama the winner of the presidential election. The opposition NPP candidate, Nana Akufo-Addo, and that party's leadership alleged voting irregularities, however, and filed suit before the Supreme Court in December 2012. In August 2013 the Supreme Court dismissed the NPP's case and declared Mahama had been legitimately elected president in the 2012 election.

Participation of Women and Minorities: There are no laws preventing women from voting or participating in political life on the same basis as men, but women traditionally and culturally have held fewer leadership positions than men. Women held 29 of 275 seats in parliament, eight of 28 ministers were women, and four of 13 Supreme Court justices were women, including the chief justice.

**Section 4. Corruption and Lack of Transparency in Government**

The law provides criminal penalties for official corruption, but the government did not implement the law effectively, and officials frequently engaged in corrupt practices. Corruption was present in all branches of government, according to media and NGOs, and the World Bank's most recent Worldwide Governance Indicators reflected corruption was a problem.

Corruption: In July the BNI uncovered a major corruption scandal at the National Service Scheme (NSS), which is responsible for assigning students to one year of mandatory national service, for which they are compensated. BNI investigations revealed more than 200,000 false payroll accounts in the names of the students who were unable to participate in service projects in more than 100 districts across the country. Approximately eight million Ghana cedis ($2.46 million) were paid out to these false accounts. Authorities arrested 23 NSS officials in connection

EOIR-000541

with the scandal. In September, BNI officials revealed NSS officials offered them 200,000 cedis ($61,500), laptops, traditional smocks, yams, and goats in bribes to stop the investigation, which continued at year's end.

During the year the government suspended the Ghana Youth Employment and Entrepreneurial Development Agency (GYEEDA) to facilitate a comprehensive restructuring of the agency. In 2013 the agency was cited for incompetent leadership, mismanagement of procurement and contracts, and inadequate oversight of program finances. The trials of two officials linked with operations of GYEEDA, which received more than 949 million cedis ($292 million) in government support between 2009 and 2012, continued at year's end.

In July parliament unanimously adopted the CHRAJ's National Anti-Corruption Action Plan 2012-20, which calls for resources to combat corruption and enforce applicable laws in the public, private, and nonprofit sectors. In December 2013 a fire destroyed offices of the CHRAJ's Anti-Corruption Department.

The CHRAJ investigates human rights abuses, public corruption, and abuse of power, and is empowered to recommend punishments for violators. The attorney general, the Economic and Organized Crime Office (EOCO), and the Public Prosecutor's Office--all of which are under the Ministry of Justice--are responsible for prosecution. The attorney general is the lead prosecuting agency. The EOCO investigates financial crimes, such as money laundering and cybercrime, and is the lead agency to prosecute these crimes; however, it has prosecuted no cases since its establishment in 2010. The Public Prosecutor's Office acts as the lead enforcer of criminal laws and the protector of the state's legal interests.

The Parliamentary Public Accounts Committee is responsible for auditing government spending, and the Auditor General's Department reviews public sector accounts.

Financial Disclosure: There is no law requiring elected or appointed officials to disclose information about their income or assets. Such information can be obtained only through court order, and only the auditor general is allowed to review documents so obtained. Financial information typically was not disclosed to the public.

Public Access to Information: The constitution provides for public access to government information, but obtaining such access was difficult. Government

EOIR-000542

offices kept poor records, many official records were missing, and requests for information often received no reply.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A variety of domestic and international human rights groups, including the CHRAJ, the Human Rights Advocacy Center (HRAC), and the Ark Foundation, generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials generally were cooperative and responsive to their views.

Government Human Rights Bodies: The CHRAJ, which mediated and settled cases brought by individuals against government agencies or private companies, operated with no overt interference from the government; however, some critics questioned its ability independently to investigate high-level corruption. Its biggest obstacle was a lack of adequate funding, which resulted in low salaries, poor working conditions, and the loss of many of its staff to other governmental organizations and NGOs. Public confidence in the CHRAJ was high, resulting in an increased workload for its staff. In December 2013 a fire demolished the premises of the CHRAJ's Anti-Corruption Department, as well as several other offices. The fire destroyed documents, records, and equipment, reducing the commission's productivity.

The Committee on the Constitution, Legal Issues, and Parliamentary Affairs, a standing parliamentary committee, was effective. It addressed human rights issues in parliament, including the 2013 Property Rights of Spouses Bill.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

The constitution prohibits discrimination on the basis of race, gender, disability, language, or social status; however, enforcement was generally inadequate. Limited financial resources and a generally permissive societal attitude toward such discrimination contributed to its perpetuation. Courts were empowered to order specific enforcement of these prohibitions.

**Women**

Rape and Domestic Violence: The law criminalizes rape but not spousal rape. Convicted rapists may be punished with prison sentences ranging from five to 25

EOIR-000543

**GHANA** 15

years. Rape was significantly underreported and remained a serious problem. The DOVVSU worked closely with the Department of Social Welfare, the national chapter of the International Federation of Women Lawyers, the Legal Aid Board, and several other human rights NGOs to combat domestic violence. In 2013, the latest year for which data was available, the DOVVSU received 312 reports of rape and reported 106 arrests and 78 prosecutions, resulting in six convictions; 231 cases remained under investigation at year's end.

Although the law prohibits domestic violence, it continued to be a problem. The law stipulates that a person in a domestic relationship who engages in misdemeanor domestic violence is liable on summary conviction to a fine, a term of imprisonment of not more than two years, or both. The court also may order the offender to pay compensation directly to the victim. Inadequate resources and logistical capacity in the DOVVSU and other agencies, however, hindered the full application of the law. Unless specifically called upon by the DOVVSU, police seldom intervened in cases of domestic violence, in part due to a lack of counseling skills, shelter facilities, and other resources to assist victims. In many cases victims were discouraged from reporting abuse and from cooperating with prosecutors because they were aware of long delays in bringing such cases to trial. Victims frequently did not complete their formal complaints because they could not afford the fees doctors charged to document the abuse on police medical forms. Victims also did not report domestic violence (or rape) because of fear of retaliation. According to the DOVVSU, of the 255 rape and domestic assault cases sent to court in 2013, only 16 resulted in convictions.

Female Genital Mutilation/Cutting (FGM/C): The law prohibits FGM/C, and although it remained a serious problem for children, it rarely was performed on adult women.

Other Harmful Traditional Practices: In the Northern, Upper East, and Upper West regions, where adherence to indigenous religious beliefs remained strong, rural women and men suspected of witchcraft were banished by their families or traditional village authorities to "witch camps." At these villages in the north populated by suspected witches, some of those interned were accompanied by their families. Such camps were distinct from "prayer camps," to which persons with mental illness were sometimes sent by their families. Most accused witches were older women, often widows, whom fellow villagers accused of being the cause of difficulties, such as illness, crop failure, or financial misfortune. Some persons suspected of witchcraft were also killed. NGOs provided food, medical care, and other support to residents of the camps. The CHRAJ claimed the number of

EOIR-000544

women in witch camps in the Northern Region decreased slightly in recent years. According to a June survey by the Anti-Witchcraft Campaign Coalition, however, the camps contained 785 female residents and 490 children; in 2010 the CHRAJ reported 175 female and eight male residents.

The Ministry of Gender, Children, and Social Protection monitors witch camps. The CHRAJ has an office in Tamale in the Northern Region, which supports efforts to protect the rights of those accused of being witches and monitors four of the seven camps that exist.

In 2013 the minister of gender, children, and social protection, accompanied by HRAC staff, visited the Gambaga Witch Camp in the Northern Region. Following the visit the HRAC issued a statement claiming that the conditions of the camp violated article 25 of the Universal Declaration of Human Rights, which calls for an adequate standard of living for health and well-being.

The law criminalizes harmful mourning rites, but such rites continued, and no perpetrators were prosecuted. In the north, especially in the Upper West Region, widows are required to undergo certain indigenous rites to mourn or show devotion to the deceased spouse. A 2013 study by the CHRAJ found the most prevalent widowhood rites included a one-year period of mourning, tying ropes and padlocks around the widow's waist, forced sitting by the deceased spouse until burial, solitary confinement, forced starvation, shaving the widow's hair, and smearing clay on the widow's body. If a widow engages in work or economic activity after the spouse's death, she may be regarded as adulterous, considered the cause of the spouse's death, or declared a witch. In these instances the widow may be forced to undergo purification rites or leave her home.

Sexual Harassment: No laws specifically prohibit sexual harassment, although some sexual harassment cases were prosecuted under provisions of the criminal code. Women's advocacy groups, including the HRAC, reported sexual harassment remained a widespread problem.

Reproductive Rights: Couples and individuals have the right to decide freely the number, spacing, and timing of pregnancies. According to the government's Multiple Indicator Cluster Survey (MICS), use of a modern contraceptive method by women (married or in a relationship) rose from 17 percent in 2008 to 23 percent in 2011.

EOIR-000545

GHANA                                                                17

According to 2013 UN statistics, there were 380 maternal deaths per 100,000 live births.  While more than 95 percent of women received some prenatal care, the quality of that care was widely perceived to be inadequate.  The 2011 MICS found 67 percent of deliveries occurred with the assistance of a skilled health-care provider, likely due to free pregnancy, delivery, and postpartum care being included in benefits under the National Health Insurance Scheme.  Postpartum care for mothers lagged, however, as at least 26 percent of women who delivered in a health facility left within the first 12 hours after the birth.  In addition health organizations reported nearly 60 percent of all pregnant women were anemic, and both women and their developing fetuses frequently experienced increased susceptibility to malaria.

An estimated 10 percent of the population knew their HIV status.  Approximately 30 percent of HIV-positive pregnant mothers received antiretroviral medications to prevent mother-to-child transmission.

Discrimination:  The constitution provides for equal treatment of all persons under the law, but traditional practices and societal norms often denied women their statutory entitlements to inheritance and property, a legally registered marriage with associated legal rights, and the right to adequate resources to maintain and exercise custody of children.  Women also continued to experience discrimination in access to employment, credit, and education (see section 7.d.).  Women typically did not have property or assets to use as collateral for loans, thus effectively preventing them from gaining access to credit.  Rural families often focused on educating male children at the expense of female children.  Since females typically married into other families, their educational needs were often overlooked.

Women's rights groups, including the Ark Foundation, were active in educational campaigns and in programs to provide vocational training, legal aid, and other support to women.  The government was involved in educational programs targeting women, and many officials were advocates of women's rights.  The Ministry of Chieftaincy and Traditional Affairs conducted research during the year on how to eliminate harmful traditional practices that targeted women, including FGM/C, forced marriages, and witch camps.

**Children**

Birth Registration:  Citizenship is derived by birth in or outside the country if either of the child's parents or one grandparent is a citizen of Ghana; however, not all births were registered with the government.  Some children were reportedly

Country Reports on Human Rights Practices for 2014
United States Department of State • Bureau of Democracy, Human Rights and Labor

EOIR-000546

denied education because their births were not registered, although a birth certificate is not a legal precondition to attend school.

Education: The constitution provides for "free, compulsory, and universal basic education" for all children from kindergarten through junior high school; however, parents were required to purchase uniforms and writing materials. During the year the government provided school uniforms to approximately 10,000 children in "deprived" areas. The government also operated a school feeding program for more than 1.6 million children, which covered incidental costs as well as meals, and a nationwide capitation grant program that covered other school fees for all children attending public schools.

According to the Ministry of Education, girls attending public primary school during the 2012-13 school year constituted 48.7 percent of all students; at the junior high school level, the proportion was 47.1 percent. In 2013 the Ghana Education Service campaigned to expand education for girls by providing 15,700 scholarships at the junior high school level and by offering home rations to 90,000 girls in the three northern regions. The education service placed girls' education officers at regional and district levels, and there were community participation coordinators in every district office to mobilize communities to increase enrollment of girls.

Child Abuse: The law prohibits defilement (having sex with a child younger than 16 years with or without consent), incest, and sexual abuse of minors. In 2013 the DOVVSU received 1,228 complaints of suspected child defilement and eight cases of attempted defilement; the true number of cases was believed to be much higher. There were frequent press reports that male teachers sexually assaulted and harassed female students. Girls often were reluctant to report these incidents to their parents, and social pressure often prevented parents from going to authorities. There were press reports during the year of teachers, coaches, and headmasters/headmistresses arrested for sexual harassment of female students or dismissed for ignoring reported problems. There were also a few reports of male teachers arrested for sexually assaulting male students.

Early and Forced Marriage: According to the law, the minimum legal age for marriage is 18 years. Nevertheless, forced child marriage, which is illegal, remained a problem, and no improvements were noted during the year, according to the CHRAJ and NGOs.

EOIR-000547

## GHANA

Female Genital Mutilation/Cutting (FGM/C): The law prohibits female genital mutilation/cutting (FGM/C), but it was a problem. According to the 2011 MICS, 4.2 percent of women and girls were victims of some form of FGM/C. In the Upper West and East regions, where FGM/C was most prevalent, 41 percent of women and 28 percent of girls had undergone the procedure. Type II FGM, defined by the World Health Organization as the excision of the clitoris with partial or total excision of the labia minora, was most commonly perpetrated. A girl was typically excised between four and 14 years of age.

Intervention programs were somewhat successful in reducing the prevalence of FGM/C, particularly in the northern regions. Officials at all levels, including traditional chiefs, continued to speak out against the practice, and local NGOs continued educational campaigns to encourage abandonment of FGM/C and to train practitioners for alternative employment.

Sexual Exploitation of Children: The minimum age for consensual sex is 16 years, and defilement is punishable by imprisonment for seven to 25 years. There is no legislation specific to child pornography, but it can be prosecuted as an "offense against public morals" and is punishable by imprisonment for a period not to exceed three years and/or a fine ranging from 120 to 600 cedis ($37 to $185). The government generally enforced the law, but sexual exploitation occurred. The migration of children to urban areas continued due to economic hardship in rural areas. Children were often forced to support themselves to survive, contributing to both the incidence of child prostitution and the school dropout rate. Girls under 18 years of age were among the most vulnerable child laborers, as many also engaged in prostitution or were sexually exploited in exchange for protection while living on the streets.

Local and international NGOs, including Rescue Foundation Ghana, Child Rights International, and Challenging Heights, worked with the government to promote children's rights and were somewhat successful in sensitizing communities about protecting the welfare of children.

Displaced Children: The country had a large refugee population, and children living in poor rural areas often migrated to urban areas to survive.

International Child Abductions: The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. For information see the Department of State's report at travel.state.gov/content/childabduction/english/country/ghana.html.

EOIR-000548

## Anti-Semitism

The Jewish community had a few hundred members. There were no reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

## Persons with Disabilities

The law explicitly prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, health care, air travel and other transportation, and other domains. The government did not effectively enforce the law. Children with disabilities attended specialized schools that focused on their needs, but few adults with disabilities had employment opportunities (see section 7.d.).

According to a 2012 Human Rights Watch (HRW) report, more than five million persons--one-fifth of the population--had disabilities, including 2.8 million persons with mental disabilities. The World Health Organization estimated that only 2 percent of Ghanaians with mental disorders received treatment.

The law provides that persons with disabilities have access to public spaces with "appropriate facilities that make the place accessible to and available for use by a person with disability." The inaccessibility of public buildings continued to be a problem, however, and 53 percent of school buildings were not easily accessible to persons with disabilities, according to a 2013 CHRAJ report.

Thousands of persons with mental disabilities were sent to spiritual healing centers known as "prayer camps," where mental illness was often considered a "demonic affliction." Frequently located in the Greater Accra, Eastern, Central, Western, Ashanti, and Brong Ahafo regions, prayer camp residents were chained for weeks, physically assaulted, and denied food or water--often for seven consecutive days-- to cleanse them of evil spirits. Few could challenge their confinement, according to HRW.

EOIR-000549

## GHANA                                                                21

On March 10, Juan E. Mendez, UN special rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment, released a report of his findings from a November 2013 visit to the country's mental health facilities, as well as to some of its police and prison detention facilities. While commending the country for its passage of the 2012 Mental Health Act, he expressed concern that few steps had been taken to carry out the requirements of the legislation, a complaint also made by Voice Ghana, a disability advocacy organization. Characterizing as "inhumane" the conditions in psychiatric hospitals and at "prayer camps," the report documented cases of shackling and denial of food and water to persons with mental disabilities, including children as young as seven. Echoing HRW recommendations from 2012, Mendez called for an absolute ban on the use of electroshock therapy without consent and a prohibition on chaining and other forms of prolonged restraint. Noting the country had only one psychiatrist for every two million persons, he also highlighted the need for additional mental health professionals.

In its 2012 report, HRW urged the government to monitor closely all mental health facilities to end the widespread mistreatment of persons with mental disabilities. It noted psychiatric hospitals were overcrowded and unsanitary. In the eight prayer camps HRW visited in 2012, nearly all residents were chained by their ankles to trees in open compounds or in prison-like cells, where they slept, urinated, defecated, and bathed. The report noted some families caring for mentally ill members had limited financial resources and viewed prayer camps as an accessible treatment option. Although HRW and other NGOs urged regulation of prayer camps, no regulations were implemented by year's end. The Mental Health Authority, however, continued a pilot program that places psychiatric nurses in prayer camps to give medication to patients while they pray.

Persons with both mental and physical disabilities, including children, were frequently subjected to abuse and intolerance. Children with disabilities who lived at home were sometimes tied to trees or under market stalls and caned regularly; some reportedly were killed by their families. The Ghana Education Service, through its Special Education Unit, provided assistive technology devices such as braille readers to blind and visually impaired students.

Several government agencies and NGOs were involved in addressing discrimination against persons with disabilities, including the National Council on Persons with Disability; Ministry of Health; Department of Social Welfare in the Ministry of Gender, Children, and Social Protection; Ministry of Education; and Center for Democratic Development.

EOIR-000550

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

According to the criminal code, "unnatural carnal knowledge" is defined as "sexual intercourse with a person in an unnatural manner or with an animal." It states that individuals who have unnatural carnal knowledge "of any person of 16 years or over with his consent" is guilty of a misdemeanor. There was considerable public debate over whether this legislation could be used to prosecute consenting adults for same-sex sexual activity, but there were no reports it had been used.

LGBT persons faced widespread discrimination in employment and education, as well as police harassment and extortion attempts (see section 7.d.). There were reports police were reluctant to investigate claims of assault or violence against LGBT persons. According to the HRAC, gay men in prison were often subjected to sexual and other physical abuse. The government took no known action to investigate or punish those complicit in the abuses. An LGBT refugee was ostracized by other members of a refugee camp during the year.

In August police in Walewale, a small farming town and capital of the West Mamprusi District, Northern Region, arrested a 21-year-old man on suspicion of being homosexual and "recruiting" other youth to be homosexual. Police stated the arrest was for the suspect's own safety, since residents of the town had vowed to kill the man and his entire family if he was not removed from the community.

While there were no reported cases of police or government violence against LGBT persons during the year, stigma, intimidation, and the attitude of the police toward LGBT persons were likely factors in preventing victims from reporting incidents of abuse.

**HIV and AIDS Social Stigma**

In the most recent Demographic and Health Survey for Ghana (2008), 68 percent of women and 57 percent of men reported holding discriminatory attitudes towards persons with HIV.

According to the West Africa AIDS Foundation, discrimination against persons with HIV/AIDS was a problem. Fear of being stigmatized continued to discourage persons from being tested for HIV infection and those who tested positive from

EOIR-000551

## GHANA

seeking timely care. HIV-positive persons faced discrimination in employment and often were forced to leave their jobs or houses. The government and NGOs subsidized many centers that provided free HIV testing to citizens, although high patient volume and the physical layout of many clinics made it difficult for the centers to respect confidentiality at all times.

According to UNAIDS Ghana, continuing mandatory pre-employment HIV screening in security agencies impeded efforts to reduce stigma and discrimination. Security agencies, including the military and police service, used HIV status as a screening criterion in their recruitment processes and peacekeeping assignments.

**Other Societal Violence or Discrimination**

Ritual killings continued to occur. For example, in August police in Bolgatanga Municipality, Upper East Region, found a decapitated head, severed genitals, a chain padlock, the wing of a bird, and a pair of slippers buried in a building under construction. Police suspected the killing was committed for ritual purposes and arrested the owner of the building, but no charges had been pressed by year's end.

Chieftaincy disputes, which frequently resulted from lack of a clear chain of succession, competing claims over land and other natural resources, and internal rivalries and feuds, continued to result in deaths, injuries, and destruction of property.

In June 2013 one person was killed and three others were injured in Teshie, Accra, when feuding factions clashed over naming a successor to a chief who died in 1984. Police arrested four suspects in connection with the violence and were investigating the incident.

**Section 7. Worker Rights**

**a. Freedom of Association and the Right to Collective Bargaining**

The law allows workers--except for members of the armed forces, police, Prisons Service, and other security and intelligence agency personnel--to form and join unions of their choice without previous authorization or excessive requirements. The law requires that trade unions or employers' organizations must register; be authorized by the chief labor officer, an appointed government official; and obtain a certificate of registration.

EOIR-000552

The law recognizes the right to strike but restricts that right for workers who provide "essential services." The minister of employment and labor relations designated a list of essential services, which included many sectors falling outside the International Labor Organization's (ILO) essential services definition. The list included services carried out by utility companies (water, electricity, etc.), ports and harbors, medical centers, and the Bank of Ghana. In these sectors the parties to any labor disputes are required to resolve their differences within 72 hours; the deadline is intended to put pressure on employers and employees to operate efficiently with limited interruptions. The right to strike can also be restricted for workers in private enterprises whose services are deemed essential to the survival of the enterprise by a union and an employer. A union may call a legal strike only if the parties fail to agree to refer the dispute to voluntary arbitration or if the dispute remains unresolved at the end of arbitration proceedings. Additionally the Emergency Powers Act of 1994 grants authorities the power to suspend any law and prohibit public meetings and processions, but it was unclear if the law applies to labor disputes.

The law provides a framework for collective bargaining. Only unions that represent the majority of workers in a given company, however, can obtain a collective bargaining certificate, which is required to engage in collective bargaining. In cases where there are multiple unions in an enterprise, the majority union generally receives the certificate and conducts the bargaining. The certificate holder generally includes representatives from the smaller unions. The armed forces, police, Prisons Service, security and intelligence personnel, and workers with policy-making and managerial functions do not have the right to bargain collectively.

The National Labor Commission is a government body with the mandate of ensuring employers and unions comply with labor law. It also serves as a forum for arbitration in labor disputes.

The law allows unions to conduct their activities without interference and provides reinstatement for workers dismissed under unfair pretenses. The labor law also prohibits antiunion discrimination by employers and provides for reinstatement for workers fired for union activity. It protects trade union members and their officers against discrimination if they organize within the free zones. The law, however, also provides for an employer's right to terminate workers' employment without giving cause.

EOIR-000553

**GHANA** 25

The government generally protected the right to form and join independent unions and to conduct legal strikes and bargain collectively, and workers exercised these rights. Worker organizations were independent of the government and political parties, and there were no instances of government interference in union activities during the year. There were no reports of violence, threats, or other abuses targeting union leaders and members by government or employers. While there were no instances of employers who refused to bargain, bargained with unions not chosen by workers, or hired workers without bargaining rights, some instances of subtle employer interference in union activities occurred. Since many unions also did not fully understand the labor laws, they normally did not follow approved processes for dealing with disputes. Due to lack of awareness about its role, the National Labor Commission faced challenges in enforcing applicable sanctions against both unions and employers.

Trade unions engaged in collective bargaining for wages and benefits with both private and state-owned enterprises without government interference. No union had ever completed the dispute resolution process involving arbitration, and there were numerous unsanctioned strikes during the year. Some employers continued to fire employees for union activity.

NGOs not designated as labor organizations occasionally worked on labor-related freedom-of-association issues as well as broader human rights concerns.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits all forms of forced or compulsory labor. Provisions of various laws prescribe imprisonment and an obligation to perform prison labor as punishment for violations. For employers found guilty of using forced labor, the law provides for fines of no more than 250 penalty units (each unit is assigned a monetary value adjusted for the fluctuating inflation rate).

There were indications of compulsory labor affecting both children and adults in the fishing sector, illegal mining, and agriculture. During the year children were forced to work (see section 7.c.). Some victims were forced to work on boats as children and were sometimes unable to leave their employers and continued to work without pay as adults. In the illegal mining industry (consisting of independent, artisanal miners known as "galamseys," whose operations sometimes conflicted with larger, concessionary miners), NGOs cited debt bondage as a problem. There were newspaper reports of children sold into involuntary servitude for either sexual exploitation or labor, such as 10- to 12-year-old boys working for

EOIR-000554

fishermen in exchange for a yearly remittance to their families. The practice often involved parental consent. The media regularly published stories about children used in involuntary servitude, particularly as street hawkers and porters.

The government did not commit sufficient resources to enforce legislation prohibiting forced labor. No fines were levied during the year, and no legal cases were brought that resulted in imprisonment. Data on the number of victims removed from forced labor were not available. Information also was not available regarding government efforts to bring its labor laws into conformity with the ILO Convention on forced labor as recommended by the ILO in 1994.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law sets the minimum employment age at 15 years, or 13 years for light work unlikely to be harmful to a child or to affect the child's attendance at or capacity to benefit from school. The law prohibits night work and certain types of hazardous labor for those under age 18 and provides for fines and imprisonment for violators. The law allows for children age 15 and above to have an apprenticeship under which craftsmen and employers have the obligation to provide a safe and healthy work environment along with training and tools.

Child labor laws were not enforced effectively or consistently, and law enforcement officials, including judges, police, and labor officials, were sometimes unfamiliar with the provisions of the law that protected children.

Inspectors from the Ministry of Employment and Labor Relations were responsible for enforcement of child labor regulations, and district labor officers and the social services subcommittees of district assemblies were charged with assuring that the relevant provisions of the law were observed by annually visiting workplaces and making spot checks whenever they received allegations of violations. Inspectors were required to provide employers with information about child labor violations and effective means to comply with provisions of the law. The government, however, did not provide sufficient resources to law enforcement and judicial authorities to carry out these efforts.

EOIR-000555

## GHANA

The ILO, government representatives, the Trade Union Congress, the media, international organizations, and NGOs continued efforts to increase institutional capacity to combat child labor.

The government continued to work closely with NGOs, labor unions, and the cocoa industry to eliminate the worst forms of child labor in the industry. Through these partnerships the government created several community projects, which promoted sensitization, monitoring, and livelihood improvement. During the year the government completed the Child Labor Monitoring System pilot program in the cocoa industry and planned to apply a similar monitoring system to other industries throughout the country.

According to government labor officials and the Ghana Employers Association, child labor problems were infrequent in the formal labor sector. During the year several ministries conducted seminars on child labor to educate the media, police, civil servants, and the general public. Local custom and poverty, however, encouraged children to work to help support their families and eroded societal observance of child labor laws, particularly in the informal sector, where child labor remained a serious problem.

Children as young as age seven worked in agriculture and artisanal gold mining as well as domestic laborers, porters, hawkers, miners, quarry workers, beggars, and fare collectors. Children also engaged in herding livestock, fetching firewood, and bricklaying. Children in the region also engaged in work as domestic servants, cooks, servers, and porters. In the fishing industry in the Lake Volta region, child laborers engaged in potentially hazardous work, such as diving into deep waters to untangle fishing nets caught on submerged tree roots. In August the Anti-Human Trafficking Unit of the police service intercepted seven city buses carrying 33 children who were being trafficked to Lake Volta to work in the fishing industry.

Children were also forced to work, sometimes after being sold, leased, or given away by their parents to work in fishing villages, shops, or homes. It was difficult to determine the extent of forced and bonded labor by children.

Child laborers were often poorly paid and physically abused; they received little or no health care and generally did not attend school.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

EOIR-000556

**d. Discrimination with Respect to Employment or Occupation**

The law prohibits discrimination in employment or occupation on grounds of gender, race, color, ethnic origin, religion, creed, social or economic status, disability, or politics.

Discrimination in employment and occupation occurred with respect to women, the disabled, HIV-positive persons, and LGBT persons (see section 6). Women in urban centers and those with skills and training encountered little overt bias, but resistance persisted to women entering nontraditional fields. Women, especially in rural areas, remained subject to burdensome labor conditions, including the performance of physically difficult manual labor such as farming, transporting goods, and manual household chores, while often carrying a child on their backs.

**e. Acceptable Conditions of Work**

A National Tripartite Committee composed of representatives of the government, labor, and employers set a daily minimum wage, which was six cedis ($1.85). The law sets the maximum workweek at 40 hours, with a break of at least 48 consecutive hours every seven days. Workers were entitled to at least 15 working days of leave with full pay in a calendar year of continuous service or after having worked at least 200 days in a particular year. Such provisions, however, did not apply to task workers or domestic workers in private homes, nor elsewhere in the informal sector. The law does not prescribe overtime rates and does not prohibit excessive compulsory overtime.

The government sets occupational safety and health (OSH) regulations. The Factories Department within the Ministry of Employment and Labor Relations was responsible for imposing sanctions on violators of the OSH standards. Employers who failed to comply were liable to a fine not exceeding 1,000 penalty units, imprisonment for a term not exceeding three years, or both. The law requires that employers report occupational accidents and diseases no later than seven days from the date of occurrence. Only workers in the formal sector, which employed less than 20 percent of the labor force, were covered by this legislation.

The Ministry of Employment and Labor Relations was unable to enforce the wage law effectively. There was widespread violation of the minimum wage law in the formal economy across all sectors. The minimum wage law was not enforced in the informal sector. Legislation governing working hours was largely followed in the formal sector but widely flouted and not enforced in the informal sector.

EOIR-000557

## GHANA

29

Safety inspectors were few and poorly trained, and they lacked the resources to respond to violations effectively. Inspectors did not impose sanctions or otherwise respond to violations during the year. Specific information regarding the number of labor inspectors and adequacy of penalties was not available. There were no reports of specific government action taken during the year to prevent violations or improve wages and working conditions.

As first documented in a 2008 CHRAJ report, abuses by the security services in mining areas, particularly among galamseys, continued to be a concern. In August 2013 residents of Twifo Praso, Central Region, alleged a police raid on an illegal galamsey mining site resulted in officers unlawfully shooting and killing two men. The government ordered an investigation into the incident and claimed the two men died of drowning, not gunshot wounds; however, it added that the police officers involved in the raid had overstepped their operational boundaries.

The law provides for compulsory participation in the Social Security and National Insurance Trust Pension Scheme as well as the National Health Insurance Scheme; however, the government did not always enforce compliance, particularly in the informal sector. The law provides for work injury insurance and maternity insurance. Unemployment insurance is not provided by law.

Workers can remove themselves from situations that endanger their health or safety without jeopardy to their employment, and authorities effectively protected employees in this situation.

EOIR-000558

Department of Homeland Security
U.S. Citizenship and Immigration Services

U.S. Department of Justice
Executive Office for Immigration Review

OMB No. 1615-0067; Expires 04/30/11

# I-589, Application for Asylum
# and for Withholding of Removal

**START HERE - Type or print in black ink. See the instructions for information about eligibilty and how to complete and file this application. There is NO filing fee for this application.**

**NOTE:** Check this box if you also want to apply for withholding of removal under the Convention Against Torture. ☒

## Part A. I. Information About You

| | |
|---|---|
| **1.** Alien Registration Number(s) (A-Number) *(if any)* <br> A208125369 | **2.** U.S. Social Security Number *(if any)* <br> N/A |

| **3.** Complete Last Name <br> DAVID | **4.** First Name <br> YAW | **5.** Middle Name |
|---|---|---|

TOTIM... **RECEIVED**
JUL 3 1 2015
KEVIN W. RILEY
IMMIGRATION JUDGE

**6.** What other names have you used *(include maiden name and aliases)?*
ALHASSAN

**7.** Residence in the U.S. *(where you physically reside)*

Telephone Number
( )

| Street Number and Name <br> J.A.M.F 13502 MUSICK ROAD | Apt. Number <br> ECHO 79 |
|---|---|

| City <br> IRVINE | State <br> CALIFORNIA | Zip Code <br> 92618 |
|---|---|---|

**8.** Mailing Address in the U.S. SAME AS ABOVE
*(if different than the address in No. 7)*

In Care Of *(if applicable):*

EXHIBIT #___
DEC 06 2019
IMMIGRATION COURT
NYC

Telephone Number
( )

| Street Number and Name | Apt. Number |
|---|---|
| City | State | Zip Code |

**9.** Gender: ☒ Male ☐ Female  **10.** Marital Status: ☒ Single ☐ Married ☐ Divorced ☐ Widowed

| **11.** Date of Birth *(mm/dd/yyyy)* <br> 01/28/1982 | **12.** City and Country of Birth <br> ACCRA, GHANA |
|---|---|

| **13.** Present Nationality *(Citizenship)* <br> GHANA | **14.** Nationality at Birth <br> GHANA | **15.** Race, Ethnic, or Tribal Group <br> NORTHERN REGION | **16.** Religion <br> ~~MOSLEM~~ XTIAN |
|---|---|---|---|

**17.** *Check the box, a through c, that applies:*  **a.** ☐ I have never been in Immigration Court proceedings.
**b.** ☒ I am now in Immigration Court proceedings.  **c.** ☐ I am **not** now in Immigration Court proceedings, but I have been in the past.

**18.** *Complete 18 a through c.*
**a.** When did you last leave your country? *(mmm/dd/yyyy)*  06/14/2014  **b.** What is your current I-94 Number, if any? N./A

**c.** List each entry into the U.S. beginning with your most recent entry.
*List date (mm/dd/yyyy), place, and your status for each entry.(Attach additional sheets as needed.)*

| Date | Place | Status | Date Status Expires: |
|---|---|---|---|
| 04-07-15 | SAN YSIDRO | ASSYLUM | N/A |
| Date | Place | Status | |
| Date | Place | Status | |

| **19.** What country issued your last passport or travel document? <br> GHANA | **20.** Passport #  UNKNOWN <br> Travel Document #  UNKNOWN | **21.** Expiration Date *(mm/dd/yyyy)* <br> UNKNOWN |
|---|---|---|

| **22.** What is your native language *(include dialect, if applicable)?* <br> HAUSA | **23.** Are you fluent in English? ☐ Yes ☒ No | **24.** What other languages do you speak fluently? <br> HAUSA |
|---|---|---|

| **For EOIR use only.** | **Action:** <br> Interview Date: <br> Asylum Officer ID#: | **For USCIS use only.** Decision: <br> Approval Date: <br> Denial Date: <br> Referral Date: |
|---|---|---|

Form I-589 (Rev. 04/05/10) Y

EOIR-000559

## Part A. II. Information About Your Spouse and Children

**Your spouse**   [X] I am not married. (Skip to **Your Children** below.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card No. (if any) | 3. Date of Birth (mm/dd/yyyy) | 4. U.S. Social Security No. (if any) |
|---|---|---|---|
| | | | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Maiden Name |
|---|---|---|---|
| | | | |

| 9. Date of Marriage (mm/dd/yyyy) | 10. Place of Marriage | 11. City and Country of Birth |
|---|---|---|
| | | |

| 12. Nationality (Citizenship) | 13. Race, Ethnic, or Tribal Group | 14. Gender  [ ] Male   [ ] Female |
|---|---|---|
| | | |

**15. Is this person in the U.S.?**

[ ] Yes (Complete Blocks 16 to 24.)     [ ] No (Specify location): _____

| 16. Place of last entry into the U.S. | 17. Date of last entry into the U.S. (mm/dd/yyyy) | 18. I-94 No. (if any) | 19. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| | | | |

| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 22. Is your spouse in Immigration Court proceedings?  [ ] Yes   [ ] No | 23. If previously in the U.S., date of previous arrival (mm/dd/yyyy) |
|---|---|---|---|
| | | | |

**24. If in the U.S., is your spouse to be included in this application?** (Check the appropriate box.)

[ ] Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

[ ] No

**Your Children.** List **all** of your children, regardless of age, location, or marital status.

[ ] I do not have any children. (Skip to Part A. III., **Information about your background.**)

[ ] I have children.   Total number of children: _____ .

(**NOTE:** Use Form I-589 Supplement A or attach additional sheets of paper and documentation if you have more than four children.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card No. (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security No. (if any) |
|---|---|---|---|
| | | | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
|---|---|---|---|
| | | | |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender  [ ] Male   [ ] Female |
|---|---|---|---|
| | | | |

**13. Is this child in the U.S. ?**

[ ] Yes (Complete Blocks 14 to 21.)     [ ] No (Specify location.) _____

| 14. Place of last entry in the U.S. | 15. Date of last entry in the U.S. (mm/dd/yyyy) | 16. I-94 No. (if any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| | | | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings?  [ ] Yes   [ ] No |
|---|---|---|
| | | |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)

[ ] Yes (Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

[ ] No

Form I-589 (Rev. 04/05/10) Y Page 2

## Part A. II. Information About Your Spouse and Children (Continued)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card No. (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security No. (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male  ☐ Female |
|---|---|---|---|

**13. Is this child in the U.S. ?**
☐ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location.) _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes  ☐ No | |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)
☐ Yes (Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card No. (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security No. (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male  ☐ Female |
|---|---|---|---|

**13. Is this child in the U.S.?**
☐ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location.) _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes  ☐ No | |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)
☐ Yes (Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card No. (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security No. (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male  ☐ Female |
|---|---|---|---|

**13. Is this child in the U.S. ?** ☐ Yes (Complete Blocks 14 to 21.)  ☐ No (Specify location.) _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 No. (if any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes  ☐ No | |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)
☐ Yes (Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)
☐ No

Form I-589 (Rev. 04/05/10) Y Page 3

EOIR-000561

## Part A. III. Information About Your Background

**1.** List your last address where you lived before coming to the United States. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State and Country.)*
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| NIMA STREET | ACCRA | | GHANA | Since Birth | 06-14 |
| | | | | | |

**2.** Provide the following information about your residences during the past 5 years. List your present address first.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 13502 MUSICK ROAD | IRVINE | CALIFORNIA | U.S.A | 06-15 | Unknown |
| NIMA STREET | ACCRA | | GHANA | Since Birth | 06-14 |
| | | | | | |
| | | | | | |
| | | | | | |

**3.** Provide the following information about your education, beginning with the most recent.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name of School | Type of School | Location *(Address)* | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| KANDA SCHOOL | HIGH SCHOOL | E 277/12, NIMA | UNKNOWN | UNKNOW |
| BEMA CAMP SCHOOL | PRIMARY SCHOOL | 37,STR, ACCRA | UNKNOWN | UNKNOW |
| | | | | |
| | | | | |

**4.** Provide the following information about your employment during the past 5 years. List your present employment first.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| SELF EMPLOYED | TRADER | 12-2009 | /2014 |
| | | | |
| | | | |

**5.** Provide the following information about your parents and siblings (brothers and sisters). Check the box if the person is deceased.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Full Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* ADIZA MOHAMMED | ACCRA,GHANA | ☐ Deceased  GHANA |
| *Father* TOTIMEH, YARO | ACCRA,GHANA | ☒ Deceased |
| *Sibling* FUSENI,YARO | ACCRA,GHANA | ☐ Deceased  GHANA |
| *Sibling* AWAL,YARO | ACCRA,GHANA | ☐ Deceased  GHANA |
| *Sibling* ABIBA,YARO | ACCRA,GHANA | ☐ Deceased  GHANA |
| *Sibling* SULE,YARO | ACCRA,GHANA | ☐ Deceased  GHANA |

Form I-589 (Rev. 04/05/10) Y Page 4

EOIR-000562

## Part B. Information About Your Application

*(NOTE: Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the INA or withholding of removal under the Convention Against Torture), you must provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You must attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, explain why in your responses to the following questions.

Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, "Completing the Form," Part B, and Section VII, "Additional Evidence That You Should Submit," for more information on completing this section of the form.

1. Why are you applying for asylum or withholding of removal under section 241(b)(3) of the INA, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below:

    I am seeking asylum or withholding of removal based on:

    ☐ Race          ☐ Political opinion

    ☒ Religion         ☐ Membership in a particular social group

    ☐ Nationality       ☒ Torture Convention

A. Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

    ☐ No     ☒ Yes

    If "Yes," explain in detail:

    1. What happened;
    2. When the harm or mistreatment or threats occurred;
    3. Who caused the harm or mistreatment or threats; and
    4. Why you believe the harm or mistreatment or threats occurred.

> 1.It happened because of my religion and land's property.
> 2.The harmed occured in 2013 and 2014.
> 3.My elder siblings and Moslem community caused the harm.
> 4.I believed because of my religion and land's property.

B. Do you fear harm or mistreatment if you return to your home country?

    ☐ No       ☒ Yes

    If "Yes," explain in detail:

    1. What harm or mistreatment you fear;
    2. Who you believe would harm or mistreat you; and
    3. Why you believe you would or could be harmed or mistreated.

> 1.I fear to be harmed or killed .
> 2. I believe my elder siblings will harm or mistreat me.
> 3.I believe i would be killed because of my religion and the land property.



EOIR-000563

## Part B. Information About Your Application (Continued)

2. Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No ☒ Yes

If "Yes," explain the circumstances and reasons for the action.

*Border*

I was arrested in Nicaragua, Panama, Honduras,and Mexico, because i entered illegally but the immigration authority of those gave me a Border Permission to enter other countrys.

3.A. Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No ☒ Yes

If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

My elder sibling was a supervisor for Muslim association in Nima community and he was an active supervisor for approximately six years .

B. Do you or your family members continue to participate in any way in these organizations or groups?

☐ No ☒ Yes

If "Yes," describe for each person your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

My elder sibling is and still the active supervisor for Muslim association in Nima community for approximately six years .

4. Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No ☒ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

I am afraid to be killed in my country by my elder sibling and the Muslim community of Nima and I'll not have a freedom of speech and movement, if i return back to Ghana.



Form I-589 (Rev. 04/05/10) Y Page 6

EOIR-000564

## Part C. Additional Information About Your Application

(**NOTE:** *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.*)

1. Have you, your spouse, your child(ren), your parents or your siblings ever applied to the U.S. Government for refugee status, asylum, or withholding of removal?

   ☒ No          ☐ Yes

   If "Yes," explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Indicate whether or not you were included in a parent or spouse's application. If so, include your parent or spouse's A-number in your response. If you have been denied asylum by an immigration judge or the Board of Immigration Appeals, describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

2. **A.** After leaving the country from which you are claiming asylum, did you or your spouse or child(ren) who are now in the United States travel through or reside in any other country before entering the United States?          ☒ No          ☐ Yes

   **B.** Have you, your spouse, your child(ren), or other family members, such as your parents or siblings, ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?

   ☒ No          ☐ Yes

   If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay, the person's status while there, the reasons for leaving, whether or not the person is entitled to return for lawful residence purposes, and whether the person applied for refugee status or for asylum while there, and if not, why he or she did not do so.

3. Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

   ☒ No          ☐ Yes

   If "Yes," describe in detail each such incident and your own, your spouse's, or your child(ren)'s involvement.

EOIR-000565

## Part C. Additional Information About Your Application (Continued)

**4.** After you left the country where you were harmed or fear harm, did you return to that country?

☒ No          ☐ Yes

If "Yes," describe in detail the circumstances of your visit(s) (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s).)

**5.** Are you filing this application more than 1 year after your last arrival in the United States?

☒ No          ☐ Yes

If "Yes," explain why you did not file within the first year after you arrived. You must be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V. "Completing the Form," Part C.

**6.** Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted, or sentenced for any crimes in the United States?

☒ No          ☐ Yes

If "Yes," for each instance, specify in your response: what occurred and the circumstances, dates, length of sentence received, location, the duration of the detention or imprisonment, reason(s) for the detention or conviction, any formal charges that were lodged against you or your relatives included in your application, and the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.



EOIR-000566

## Part D. Your Signature

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546(a), provides in part: Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned for up to 25 years. I authorize the release of any information from my immigration record that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefit I am seeking.

Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person.

**WARNING:** Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an immigration judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application. If filing with USCIS, unexcused failure to appear for an appointment to provide biometrics (such as fingerprints) and your biographical information within the time allowed may result in an asylum officer dismissing your asylum application or referring it to an immigration judge. Failure without good cause to provide DHS with biometrics or other biographical information while in removal proceedings may result in your application being found abandoned by the immigration judge. See sections 208(d)(5)(A) and 208(d)(6) of the INA and 8 CFR sections 208.10, 1208.10, 208.20, 1003.47(d) and 1208.20.

| Print your complete name. | Write your name in your native alphabet. |
|---|---|
| DAVID YAW TOTIMEH | DAVID YAW TOTIMEH |

Did your spouse, parent, or child(ren) assist you in completing this application? ☒ No ☐ Yes *(If "Yes," list the name and relationship.)*

| (Name) | (Relationship) | (Name) | (Relationship) |
|---|---|---|---|

Did someone other than your spouse, parent, or child(ren) prepare this application? ☐ No ☒ Yes *(If "Yes," complete Part E.)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim? ☐ No ☒ Yes

Signature of Applicant *(The person in Part A.I.)*

[ ~~*AMA*~~ ]    July 31, 15.

Sign your name so it all appears within the brackets    Date *(mm/dd/yyyy)*

## Part E. Declaration of Person Preparing Form, if Other Than Applicant, Spouse, Parent, or Child

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

| Signature of Preparer | Print Complete Name of Preparer |
|---|---|
| | OMAR - A'AL |

| Daytime Telephone Number | Address of Preparer: Street Number and Name |
|---|---|
| ( ) N/A | JAMES A. MUSICK FACILITY, 13502 MUSICK ROAD |

| Apt. No. | City | State | Zip Code |
|---|---|---|---|
| ECHO-86 | IRVINE | CALIFORNIA | 92618 |



Form I-589 (Rev. 04/05/10) Y Page 9

EOIR-000567

## Part F. To Be Completed at Asylum Interview, if Applicable

**NOTE:** *You will be asked to complete this part when you appear for examination before an asylum officer of the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Asylum Officer

## Part G. To Be Completed at Removal Hearing, if Applicable

**NOTE:** *You will be asked to complete this Part when you appear before an immigration judge of the U.S. Department of Justice, Executive Office for Immigration Review (EOIR), for a hearing.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Immigration Judge

EOIR-000568

**Supplement A, Form I-589**

| A-Number *(If available)* | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

### List All of Your Children, Regardless of Age or Marital Status
*(NOTE: Use this form and attach additional pages and documentation as needed, if you have more than four children)*

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

13. Is this child in the U.S.? ☐ Yes *(Complete blocks 14 to 21.)* ☐ No *(Specify location.)* _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(if any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*

☐ No

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender ☐ Male ☐ Female |

13. Is this child in the U.S.? ☐ Yes *(Complete blocks 14 to 21.)* ☐ No *(Specify location.)* _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(if any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one photograph of your child in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*

☐ No

Form I-589 Supplement A (Rev 04/05/10) Y

EOIR-000569

**Supplement B, Form I-589**

## Additional Information About Your Claim to Asylum

| A-Number *(if available)* | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

**NOTE:** *Use this as a continuation page for any additional information requested. Copy and complete as needed.*

**Part** _____

**Question** _____

EOIR-000570

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
26 FEDERAL PLZ, 12TH FL RM1237
NEW YORK, NY   10278

RE:  YAW TOTIWEH, DAVID
FILE: A208-125-369

DATE:  7/18/17

TO:  Law Office of Sandy Khine PC
     Malmgren, Melissa Ann
     299 Broadway STE 803
     New York, NY  10007

Please take notice that the above captioned case has been scheduled for a Master/Individual hearing before the Immigration Court on **12-6-19** at **9:00AM** at

26 FEDERAL PLZ, 12th FL.  COURTROOM #32
NEW YORK, NY  10278

You may be represented in these proceedings, at no expense to the Government, by an attorney or other individual who is authorized and qualified to represent persons before an Immigration Court.  Your hearing date has not been scheduled earlier than 10 days from the date of service of the Notice to Appear in order to permit you the opportunity to obtain an attorney or representative.  If you wish to be represented, your attorney or representative must appear with you at the hearing prepared to proceed.  You can request an earlier hearing in writing.

Failure to appear at your hearing except for exceptional circumstances may result in one or more of the following actions:  (1) You may be taken into custody by the Department of Homeland Security and held for further action. OR (2) Your hearing may be held in your absence under section 240(b)(5) of the Immigration and Nationality Act.  An order of removal will be entered against you if the Department of Homeland Security established by clear, unequivocal and convincing evidence that a) you or your attorney has been provided this notice and b) you are removable.

IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION COURT NEW YORK, NY  THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS. EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE ON THE ATTACHED FORM EOIR-33.  ADDITIONAL FORMS EOIR-33 CAN BE OBTAINED FROM THE COURT WHERE YOU ARE SCHEDULED TO APPEAR.  IN THE EVENT YOU ARE UNABLE TO OBTAIN A FORM EOIR-33, YOU MAY PROVIDE THE COURT IN WRITING WITH YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER BUT YOU MUST CLEARLY MARK THE ENVELOPE "CHANGE OF ADDRESS."  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.

A list of free legal service providers has been given to you.  For information regarding the status of your case, call toll free 1-800-898-7180 or 240-314-1500.

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)      PERSONAL SERVICE (P)
TO: [ ] ALIEN   [ ] ALIEN c/o Custodial Officer  [P] ALIEN's ATT/REP  [P] DHS
DATE: _7/18/17_  BY: COURT STAFF  __MA__          N3.
   Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List   [ ] Other

EOIR-000571

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
26 FEDERAL PLZ, 12TH FL RM1237
NEW YORK, NY, 10278

RE: YAW TOTIWEH, DAVID
FILE: A208-125-369                                      DATE: [April 4, 2017]

TO:    Law Office of Sandy Khine PC.
       Malmgren, Melissa Ann
       299 Broadway STE 803
       New York, NY 10007

      Please take notice that the above captioned case has been scheduled for a
MASTER hearing before the Immigration Court on Jul 18, 2017 at 09:30 A.M. at:

              26 FEDERAL PLZ, 12th FL.  COURTROOM #32
              NEW YORK, NY 10278

      You may be represented in these proceedings, at no expense to the
Government, by an attorney or other individual who is authorized and qualified
to represent persons before an Immigration Court.  Your hearing date has not
been scheduled earlier than 10 days from the date of service of the Notice to
Appear in order to permit you the opportunity to obtain an attorney or
representative.  If you wish to be represented, your attorney or representative
must appear with you at the hearing prepared to proceed.  You can request an
earlier hearing in writing.
      Failure to appear at your hearing except for exceptional circumstances
may result in one or more of the following actions:  (1) You may be taken into
custody by the Department of Homeland Security and held for further
action. OR (2) Your hearing may be held in your absence under section 240(b)(5)
of the Immigration and Nationality Act.  An order of removal will be entered
against you if the Department of Homeland Security established by
clear, unequivocal and convincing evidence that a) you or your attorney has
been provided this notice and b) you are removable.
       IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT
CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION
COURT NEW YORK, NY  THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR
TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS.
EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE
COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE
ON THE ATTACHED FORM EOIR-33.  ADDITIONAL FORMS EOIR-33 CAN BE OBTAINED FROM
THE COURT WHERE YOU ARE SCHEDULED TO APPEAR.  IN THE EVENT YOU ARE UNABLE TO
OBTAIN A FORM EOIR-33, YOU MAY PROVIDE THE COURT IN WRITING WITH YOUR NEW
ADDRESS AND/OR TELEPHONE NUMBER BUT YOU MUST CLEARLY MARK THE ENVELOPE "CHANGE
OF ADDRESS."  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE
SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED
SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.
      A list of free legal service providers has been given to you.  For
information regarding the status of your case, call toll free 1-800-898-7180
or 240-314-1500. For information on Immigration Court procedures, please
consult the Immigration Court Practice Manual, available at www.usdoj.gov/eoir.
                         CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)      PERSONAL SERVICE (P)
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN's ATT/REP  [P] DHS
DATE:  __4/4/17__        BY: COURT STAFF  __MA__            V3
      Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

EOIR-000572

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
26 FEDERAL PLZ, 12TH FL RM1237
NEW YORK, NY   10278

RE:  YAW TOTIWEH, DAVID
FILE: A208-125-369

DATE: 11-15-16

TO:   Law Office of Sandy Khine PC
      Malmgren, Melissa Ann
      299 Broadway STE 803
      New York, NY  10007

Please take notice that the above captioned case has been scheduled for a
Master/Individual hearing before the Immigration Court on _____ 4/4/17 _____
at _____ at

9:30AM    26 FEDERAL PLZ, 12th FL.  COURTROOM #32
          NEW YORK, NY  10278

You may be represented in these proceedings, at no expense to the
Government, by an attorney or other individual who is authorized and qualified
to represent persons before an Immigration Court.  Your hearing date has not
been scheduled earlier than 10 days from the date of service of the Notice to
Appear in order to permit you the opportunity to obtain an attorney or
representative.  If you wish to be represented, your attorney or representative
must appear with you at the hearing prepared to proceed.  You can request an
earlier hearing in writing.

Failure to appear at your hearing except for exceptional circumstances
may result in one or more of the following actions:  (1) You may be taken into
custody by the Department of Homeland Security and held for further
action. OR (2) Your hearing may be held in your absence under section 240(b)(5)
of the Immigration and Nationality Act.  An order of removal will be entered
against you if the Department of Homeland Security established by
clear, unequivocal and convincing evidence that a) you or your attorney has
been provided this notice and b) you are removable.

IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT
CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION
COURT NEW YORK, NY  THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR
TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS.
EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE
COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE
ON THE ATTACHED FORM EOIR-33.  ADDITIONAL FORMS EOIR-33 CAN BE OBTAINED FROM
THE COURT WHERE YOU ARE SCHEDULED TO APPEAR.  IN THE EVENT YOU ARE UNABLE TO
OBTAIN A FORM EOIR-33, YOU MAY PROVIDE THE COURT IN WRITING WITH YOUR NEW
ADDRESS AND/OR TELEPHONE NUMBER BUT YOU MUST CLEARLY MARK THE ENVELOPE "CHANGE
OF ADDRESS."  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE
SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED
SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.

A list of free legal service providers has been given to you.  For
information regarding the status of your case, call toll free 1-800-898-7180
or 240-314-1500.

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)     PERSONAL SERVICE (P)
TO: [ ] ALIEN [ ] ALIEN c/o Custodial Officer [ ] ALIEN's ATT/REP [ ] DHS
DATE: 11-15-16 _____ BY: COURT STAFF _____          N3
    Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
26 FEDERAL PLZ, 12TH FL RM1237
NEW YORK, NY · 10278

RE: YAW TOTIWEH, DAVID
FILE: A208-125-369                                        DATE: Aug 3, 2016

TO:    Law Office of Sandy Khine PC
       Malmgren, Melissa Ann
       299 Broadway STE 803
       New York, NY  10007

       Please take notice that the above captioned case has been scheduled for a
MASTER hearing before the Immigration Court on **Nov 15, 2016 at 08:30 A.M.** at:

              **26 FEDERAL PLZ, 12th FL.  COURTROOM #32**
              NEW YORK, NY  10278

       You may be represented in these proceedings, at no expense to the
Government, by an attorney or other individual who is authorized and qualified
to represent persons before an Immigration Court.  Your hearing date has not
been scheduled earlier than 10 days from the date of service of the Notice to
Appear in order to permit you the opportunity to obtain an attorney or
representative.  If you wish to be represented, your attorney or representative
must appear with you at the hearing prepared to proceed.  You can request an
earlier hearing in writing.
       Failure to appear at your hearing except for exceptional circumstances
may result in one or more of the following actions:  (1) You may be taken into
custody by the Department of Homeland Security and held for further
action. OR (2) Your hearing may be held in your absence under section 240(b)(5)
of the Immigration and Nationality Act.  An order of removal will be entered
against you if the Department of Homeland Security established by
clear, unequivocal and convincing evidence that a) you or your attorney has
been provided this notice and b) you are removable.
       IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT
CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION
COURT NEW YORK, NY  THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR
TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS.
EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE
COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE
ON THE ATTACHED FORM EOIR-33.  ADDITIONAL FORMS EOIR-33 CAN BE OBTAINED FROM
THE COURT WHERE YOU ARE SCHEDULED TO APPEAR.  IN THE EVENT YOU ARE UNABLE TO
OBTAIN A FORM EOIR-33, YOU MAY PROVIDE THE COURT IN WRITING WITH YOUR NEW
ADDRESS AND/OR TELEPHONE NUMBER BUT YOU MUST CLEARLY MARK THE ENVELOPE "CHANGE
OF ADDRESS."  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE
SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED
SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.
       A list of free legal service providers has been given to you.  For
information regarding the status of your case, call toll free 1-800-898-7180
or 240-314-1500. For information on Immigration Court procedures, please
consult the Immigration Court Practice Manual, available at www.usdoj.gov/eoir.
                    CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY: MAIL (XX)     PERSONAL SERVICE (P)
TO: [ ] ALIEN   [ ] ALIEN c/o Custodial Officer   [V] ALIEN's ATT/REP   [XX]  DHS
DATE:  __08/03/2016__  BY: COURT STAFF ___C.GUITY___          V3
       Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
606 SOUTH OLIVE ST.
LOS ANGELES, CA  90014

ON BEHALF OF RESPONDENT:
Law Office of Sandy Khine PC
Malmgren, Melissa Ann
299 Broadway STE 803
New York, NY 10007

DATE: July 20, 2016

IN THE MATTER OF
YAW TOTIWEH, DAVID

FILE NO. A208-125-369
IN REMOVAL PROCEEDINGS

ON BEHALF OF DEPARTMENT OF
HOMELAND SECURITY:

ORDER

Upon due consideration of the Motion for Change of Venue and
_____ non-opposition by the opposing party, or
__X__ opposing party was given notice and had an opportunity to respond

in the above entitled matter, it is HEREBY ORDERED; that venue is changed
to Immigration Court at New York, NY
in order to permit the respondent to defend himself/herself in the area
in which he/she resides.
The Alien's current address is: 2042 MORRIS AVENUE 2B
BRONX, NY 10453

RECEIVED

AUG 03 2016

IMMIGRATION COURT
NYC

_Arlene E. Dorfman_
ARLENE E. DORFMAN
Immigration Judge                         HW

Appeal:
Appeal Due By:

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)      PERSONAL SERVICE (P)
TO: [ ] ALIEN [ ] ALIEN c/o Custodial Officer [M] ALIEN'S ATT/REP [P] DHS
DATE: 07/21/2016      BY:  COURT STAFF  _C. Herrera_
 Attachments:  [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ]OTHER

EOIR-000575



MELISSA A. MALMGREN, ESQ.
LAW OFFICE OF SANDY KHINE PC
299 BROADWAY, SUITE 803
NEW YORK, NY 10007

NON-DETAINED

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## LOS ANGELES, CALIFORNIA

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| **DAVID YAW TOTIMEH,** ) | File No.: A 208 125 369 |
| ) | |
| ) | |
| In Removal Proceedings. ) | |

Immigration Judge Arlene E. Dorfman

Next Hearing: August 19, 2016 at 8:30 A.M.

## RESPONDENT'S MOTION TO CHANGE VENUE AND WRITTEN PLEADINGS



RECEIVED
DEPARTMENT OF JUSTICE

JUL 19 2016

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

EOIR-000576

YAW TOTIMEH, DAVID (A208 125 369)

## TABLE OF CONTENTS

Respondent's Motion to Change Venue…………………………..……….……….…1

Respondent's Written Pleadings……………………….......................................3

Exhibit A      Copy of Parole Card of the Respondent………………………….…5

Exhibit B      EOIR 33 Alien's Change of Address Form….….….........................6

Exhibit C      Copies of Correspondence ………………………..................7

Proposed Order (with two (2) additional copies)……………………………....9

Proof of Service………………………………………………………….12

EOIR-000577

YAW TOTIMEH, DAVID (A208 125 369)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

JUL 19 2016

DEPARTMENT OF JUSTICE
RECEIVED

In the Matter of:                )
                                 )
DAVID YAW TOTIMEH,               )        File No.: A 208 125 369
                                 )
IN REMOVAL PROCEEDINGS.          )        MOTION TO CHANGE VENUE
                                 )
                                 )

## MOTION TO CHANGE VENUE

The Respondent, David Yaw Totimeh, through undersigned counsel, hereby moves this Court to change the venue of his removal proceedings from Los Angeles, California to New York, New York pursuant to 8 CFR § 1003.23. The Respondent requests a change of venue so that he may adequately prepare and present testimony in support of his request for asylum. In support of this motion, the Respondent states the following:

1. The Respondent is a 34-year-old male native and citizen of Ghana. He arrived in the United States on April 7, 2015 at or near San Ysidro, California. The Respondent was detained by Immigration and Customs Enforcement ("ICE") at arrival and was paroled into the United States on August 14, 2015.

2. The Respondent was placed in removal proceedings, after being served with a Notice to Appear. He is currently scheduled for a master hearing at this Immigration Court on August 19, 2016 at 8:30 A.M.

3. The Respondent resides at 2042 Morris Avenue Apt 2B Bronx, New York 10453. He has filed form EOIR-33, Change of Address with ICE and with the Court, and has attached that form as an exhibit to this motion.

4. The Respondent's address is within the jurisdiction of the Immigration Court in New York, New York. This is the residence where he may be reached for further notification.

5. The Respondent is currently represented by Melissa A. Malmgren, Esq., an attorney who maintains her law office at 299 Broadway, Suite 803, New York, NY 10007.

EOIR-000578

YAW TOTIMEH, DAVID (A208 125 369)

6. The Respondent desires to pursue the relief of asylum, withholding of removal, and protection under the U.N. Convention Against Torture.

7. The Respondent requests that venue be changed to the Immigration Court having jurisdiction over his address in New York City.

8. It would be a considerable financial burden for the Respondent to be required to travel to Los Angeles, California to attend all hearings.

9. A change of venue to New York, New York would not be an inconvenience to the Department of Homeland Security. Pursuant to *Baires v. INS,* 856 F.2d 89 (8th Cir. 1988) and *Chlomos v. U.S. Dept. of Justice,* 516 F.2d 310 (3d Cir. 1975), it would be an abuse of discretion to deny a change of venue in which there would be little or no inconvenience to the government.

WHEREFORE, based upon the forgoing reasons, the Respondent respectfully requests that venue in this matter be changed from Los Angeles, California to New York, New York.

Dated: July 12, 2016

Respectfully submitted,

*Melissa A. Malmgren*

Melissa A. Malmgren, Esq.
Attorney for Respondent
Law Office of Sandy Khine
299 Broadway, Suite 803
New York, NY 10007
(212) 786-1500
Facsimile (212) 785-1503

EOIR-000579

YAW TOTIMEH, DAVID (A208 125 369)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

In the Matter of: )
)
**DAVID YAW TOTIMEH,** ) File No.: A 208 125 369
)
IN REMOVAL PROCEEDINGS. ) WRITTEN PLEADINGS
)
)

## WRITTEN PLEADINGS

1. The Respondent, through counsel, waives the presence of an interpreter for master calendar proceedings.

2. The Respondent, through counsel, concedes proper service of the Notice to Appear dated May 14, 2015.

3. Attorney for the Respondent has discussed with the Respondent the rights set forth in 8 CFR § 242.16(b) and the consequences of failing to appear in Court or for a scheduled date of departure, as set forth in the Immigration and Nationality Act, as amended, Section 242B.

4. Attorney for the Respondent has discussed with the Respondent the nature and purpose of these proceedings, discussed specifically the allegations of fact and the charge(s) of removability, and has advised the Respondent of his legal rights in these removal proceedings.

5. The Respondent, through counsel, waives a reading of the allegations of the Notice to Appear.

6. The Respondent, through counsel, admits the truth of the allegations numbered 1 (one) through 4 (four) of the Notice to Appear. The Respondent, through counsel, denies the allegation numbered 5 (five). The Respondent was paroled into the United States on August 14, 2015. The Respondent, through counsel, concedes his removability as charged.

7. In the event of removal, the Respondent declines to designate a country to which removal should be directed.

EOIR-000580

YAW TOTIMEH, DAVID (A08 125 369)

8. The Respondent seeks the following forms of relief: asylum, withholding of removal, and protection under Article 3 of the United Nations Convention Against Torture.

9. Application(s) not previously filed, or updated/amended application(s), shall be filed with the Court at the next hearing, unless otherwise directed by the Court. Copies of such applications shall be served on the Office of the Chief Counsel, Department of Homeland Security. The Respondent, through counsel, acknowledges that if the application(s) are not timely filed, the application(s) shall be deemed waived.

10. Attorney for the Respondent represents to the Court that the Respondent is *prima facie* eligible for the relief stated therein.

11. Pursuant to the Immigration Court Practice manual, all documents shall be filed with the Court no later than fifteen (15) days prior to the individual hearing, unless otherwise directed by the Court. The Respondent, through counsel, acknowledges that if documents are not timely filed, their submission shall be deemed waived.

12. Counsel for the Respondent estimates that two (2) hours shall be required to present the case.

13. It is requested that an interpreter in the Hausa language be provided for the individual hearing.

14. As to each of the above points, counsel for the Respondent asserts that she is satisfied that the Respondent understands fully.

Dated: July 12, 2016

Melissa A. Malmgren, Esq.
Attorney for Respondent
Law Office of Sandy Khine
299 Broadway, Suite 803
New York, NY 10007
(212) 786-1500

EOIR-000581

A

EOIR-000582

**DEPARTMENT OF HOMELAND SECURITY**
U.S. Customs and Border Protection

OMB No. 1651-0111

**PAROLED**

Until **13 Aug 2016**

Purpose: **Under 8CFR 212.5(b)**

**Employment Not Authorized**

**14 Aug 2015 SAA D02297**
(Date)   (Location)   (Officer)

**Departure Record**

Admission Number

**418740009  33**

18. Family Name

**Yaw Totimeh**

19. First (Given) Name

**David**

20. Birth Date (DD/MM/YY)

**28 01 82**

21. Country of Citizenship

**Ghana**

CBP Form I-94 (05/08)

See Other Side                                                          **STAPLE HERE**

**Warning** A nonimmigrant who accepts unauthorized employment is subject to deportation.
**Important** Retain this permit in your possession; *you must surrender it when you leave the U.S.*
Failure to do so may delay your entry into the U.S. in the future.
You are authorized to stay in the U.S. only until the date written on this form. To remain past this date,
without permission from Department of Homeland Security authorities, is a violation of the law.
**Surrender this permit when you leave the U.S.:**
  - By sea or air, to the transportation line;
  - Across the Canadian border, to a Canadian Official;
  - Across the Mexican border, to a U.S. Official
Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-
Departure" on page 2 of Form I-20 prior to surrendering this permit.

**Record of Changes**

**A 208 125 369**

**Departure Record**

Port:

Date:

Carrier:

Flight No./ Ship Name:

EOIR-000583

B

EOIR-000584

**U.S. Department of Justice**
Executive Office for Immigration Review
*Immigration Court*

OMB# 1125-0004

## Alien's Change of Address Form/ Immigration Court

If you move or change your phone number, the law requires you to file this Change of Address Form with the Immigration Court. You must file this form within five (5) working days of a change in your address or phone number. You will only receive notification as to the time, date, and place of hearing or other official correspondence at the address which you provide. Changes in address or telephone numbers communicated through any means except this form, e.g., pleadings, motion papers, correspondence, telephone calls, applications for relief, etc. will not be recognized and the address information and record will remain unchanged.

Failure to appear at any hearing before an Immigration Judge, when notice of that hearing or other official correspondence was served on you or sent to the address you provided, may result in one or more of the following actions:

• If you are not already detained, you may be taken into custody by the Department of Homeland Security (DHS) and held for further action; and

| If you are in *removal* proceedings: | If you are in *deportation* proceedings: | If you are in *exclusion* proceedings: |
|---|---|---|
| Your hearing may be held in your absence under Section 240 of the Immigration and Nationality Act (INA), and an order of removal may be entered against you. Furthermore, you may become ineligible for the following forms of relief from removal for a period of 10 years after the date of the entry of the final order: 1. Voluntary Departure as provided for in Section 240B of the INA; 2. Cancellation of Removal as provided for in Section 240A of the INA; 3. Adjustment of Status or Change of Status as provided for in Section(s) 245, 248, or 249 of the INA. | Your hearing may be held in your absence under Section 242B of the Immigration and Nationality Act (INA) (1995), and an order of deportation may be entered against you. Furthermore, you may become ineligible for the following forms of relief from deportation for a period of 5 years after the date of the entry of the final order: 1. Voluntary Departure as provided for in Section 242(b) of the INA (1995); 2. Suspension of Deportation or Voluntary Departure as provided for in Section 244 of the INA (1995); 3. Adjustment of Status or Change of Status as provided for in Section(s) 245, 248, or 249 of the INA (1995). | Your application for admission to the United States may be considered withdrawn, and your hearing may be held in your absence and an order of exclusion and deportation entered against you. |

**Name:** DAVID YAW TOTIMEH     **Alien Number:** A 208 125 369

| **My OLD address was:** | **My NEW address is:** |
|---|---|
| ("In care of" other person, if any) | ("In care of" other person, if any) |
| 1694 Davidson Avenue Apartment 4A | 2042 Morris Avenue 2B |
| (Number, Street, Apartment) | (Number, Street, Apartment) |
| Bronx, NY 10453 | Bronx, NY 10453 |
| (City, State and ZIP Code) | (City, State and ZIP Code) |
| | |
| (Country, if other than U.S.) | (Country, if other than U.S.) |
| | (917)399-2759 |
| | (New Telephone Number) |

**SIGN HERE →** X _____ 07/01/2016
Signature     Date

## PROOF OF SERVICE (You Must Complete This)

I Melissa A. Malmgren _____ mailed or delivered a copy of this Change of Address Form on
(Name)

07/12/2016 _____ to the Office of the Chief Counsel for the DHS (U.S. Immigration and Customs Enforcement-ICE) at
(Date)

606 South Olive St. 8th Floor, Los Angeles, CA 90014
(Number and Street, City, State, Zip Code)

**SIGN HERE →** X _Melissa A. Malmgren_
Signature

Form EOIR - 33/IC
Revised July 2015



C

EOIR-000586

Department of Homeland Security
U.S. Citizenship and Immigration Service

Form I-797C, Notice of Action

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | NOTICE DATE |
|---|---|
| Receipt | November 04, 2015 |

| CASE TYPE | USCIS ALIEN NUMBER |
|---|---|
| I-765, Application for Employment Authorization | |

| RECEIPT NUMBER | RECEIVED DATE | PAGE |
|---|---|---|
| EAC1690030984 | October 23, 2015 | 1 of 1 |
| | | DATE OF BIRTH |
| | | January 28, 1982 |

DAVID Y. TOTIMEH
2042 MORRIS AVE APT 2B
BRONX, NY 10453

2    00000429

**PAYMENT INFORMATION:**

| | |
|---|---|
| Application/Petition Fee: | $0.00 |
| Biometrics Fee: | $0.00 |
| Total Amount Received: | $0.00 |
| Total Balance Due: | $0.00 |

NAME AND MAILING ADDRESS

The above case has been received by our office and is in process.

Please verify your personal information listed above and immediately notify the USCIS National Customer Service Center at the phone number listed below if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

If you have questions about possible immigration benefits and services, filing information, or USCIS forms, please call the USCIS National Customer Service Center (NCSC) at **1-800-375-5283**. If you are hearing impaired, please call the NCSC TDD at **1-800-767-1833**. Please also refer to the USCIS website: www.uscis.gov.

If you have any questions or comments regarding this notice or the status of your case, please contact our customer service number.

You will be notified separately about any other case you may have filed.

**USCIS Office Address:**

USCIS
Vermont Service Center
75 Lower Welden Street
St. Albans, VT 05479-0001

**USCIS Customer Service Number:**

(800)375-5283



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.    Form I-797C 07/11/14 Y

RESTRICTED Case: 26-882, 07/01/2026, DktEntry: 13.5, Page 120 of 127

FROM . SADA- waraga-

470-Park-ave. apt.R-31

East- orange-N-J- 07017



DV DANIELS NJ 070

29 MAR 2016 PM 10 1

TO- DaviD-Y- totimah

2042 morris- ave apt mt

2b- bronX-N·Y 10453

10453420499

EOIR-0005888

YAW TOTIMEH, DAVID (A208 125 369)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

In the Matter of DAVID YAW TOTIMEH                    A 208 125 369

ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Respondent's Motion to Change Venue to New York, New York, it is HEREBY ORDERED that the motion be _____ GRANTED _____ DENIED because:

_____ DHS does not oppose the motion.

_____ Respondent does not oppose the motion.

_____ A response to the motion has not been filed with the Court.

_____ Good cause has been established for the motion.

_____ The court agrees with the reasons stated in opposition to the motion.

_____ The motion is untimely per _____.

_____ Other: _____.

Deadlines:

_____ The application(s) for relief must be filed by _____.

_____ Respondent must comply with DHS biometrics instructions by _____.

_____        _____
        Date                              Arlene Dorfman
                                          Immigration Judge

------------------------------------------------------------------------------------

CERTIFICATE OF SERVICE

**This document was served by:**        _____ **Mail**        _____ **Personal Service**

**To:** ___ **Alien**  ___**Alien c/o Custodial Officer**  ___**Alien's Atty/Rep.**  ___**DHS**

**Date:** _____                    **By: Court Staff:** _____

EOIR-000589

YAW TOTIMEH, DAVID (A 208 125 369)

## UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### IMMIGRATION COURT
### LOS ANGELES, CALIFORNIA

In the Matter of DAVID YAW TOTIMEH        A 208 125 369

### ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Respondent's Motion to Change Venue to New York, New York, it is HEREBY ORDERED that the motion be _____ GRANTED _____ DENIED because:

_____ DHS does not oppose the motion.

_____ Respondent does not oppose the motion.

_____ A response to the motion has not been filed with the Court.

_____ Good cause has been established for the motion.

_____ The court agrees with the reasons stated in opposition to the motion.

_____ The motion is untimely per _____.

_____ Other: _____.

Deadlines:

_____ The application(s) for relief must be filed by _____.

_____ Respondent must comply with DHS biometrics instructions by _____.

_____      _____
Date                     Arlene Dorfman
                            Immigration Judge

------------------------------------------------------------------------

### CERTIFICATE OF SERVICE

**This document was served by:**     _____ **Mail**     _____ **Personal Service**

**To:** ___ **Alien** ___**Alien c/o Custodial Officer** ___**Alien's Atty/Rep.** ___**DHS**

**Date:** _____           **By: Court Staff:** _____

EOIR-000590

YAW TOTIMEH, DAVID (A208 125 369)

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
LOS ANGELES, CALIFORNIA

In the Matter of DAVID YAW TOTIMEH                    A 208 125 369

### ORDER OF THE IMMIGRATION JUDGE

Upon consideration of the Respondent's Motion to Change Venue to New York, New York, it is HEREBY ORDERED that the motion be _____ GRANTED _____ DENIED because:

_____ DHS does not oppose the motion.

_____ Respondent does not oppose the motion.

_____ A response to the motion has not been filed with the Court.

_____ Good cause has been established for the motion.

_____ The court agrees with the reasons stated in opposition to the motion.

_____ The motion is untimely per _____.

_____ Other: _____.

Deadlines:

_____ The application(s) for relief must be filed by _____.

_____ Respondent must comply with DHS biometrics instructions by _____.

_____                    _____
Date                                        Arlene Dorfman
                                            Immigration Judge

----------------------------------------------------------------------

### CERTIFICATE OF SERVICE

**This document was served by:**       _____ **Mail**       _____ **Personal Service**

**To:** ___ **Alien** ___**Alien c/o Custodial Officer** ___**Alien's Atty/Rep.** ___**DHS**

**Date:** _____                    **By: Court Staff:** _____

EOIR-000591

YAW TOTIMEH, DAVID (A208 125 369)

## PROOF OF SERVICE

On July 12, 2016, I, Melissa A. Malmgren, served a copy of the Respondent's Motion to Change Venue to New York, New York and any attached pages via U.S. Postal Service Priority Mail to the Office of the Chief Counsel, ICE/DHS, at the following address: 606 South Olive Street, 8th Floor, Los Angeles, California 90014.

Dated: July 12, 2016

Melissa A. Malmgren, Esq.
Attorney for Respondent
Law Office of Sandy Khine
299 Broadway, Suite 803
New York, NY 10007
(212) 786-1500

EOIR-000592

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
606 SOUTH OLIVE ST.
LOS ANGELES, CA   90014

RE:  YAW TOTIWEH, DAVID
FILE:  208-125-369

DATE:  Mar 23, 2016

TO:
      YAW TOTIWEH, DAVID
      1694 DAVIDSON AVE APT 4A
      BRONX, NY   10453

Attention: Your Hearing Has been rescheduled. Disregard any notice you may have received before the above date.

      Please take notice that the above captioned case has been scheduled for a
MASTER hearing before the Immigration Court on Aug 19, 2016 at 08:30 A.M. at:
            606 SOUTH OLIVE ST. 5TH FL. COURTROOM 2
            LOS ANGELES, CA, 90014
      You may be represented in these proceedings, at no expense to the
Government, by an attorney or other individual who is authorized and qualified
to represent persons before an Immigration Court.  Your hearing date has not
been scheduled earlier than 10 days from the date of service of the Notice to
Appear in order to permit you the opportunity to obtain an attorney or
representative.  If you wish to be represented, your attorney or representative
must appear with you at the hearing prepared to proceed.  You can request an
earlier hearing in writing.
      Failure to appear at your hearing except for exceptional circumstances
may result in one or more of the following actions:  (1) You may be taken into
custody by the Department of Homeland Security and held for further
action. OR (2) Your hearing may be held in your absence under section 240(b)(5)
of the Immigration and Nationality Act.  An order of removal will be entered
against you if the Department of Homeland Security established by
clear, unequivocal and convincing evidence that a) you or your attorney has
been provided this notice and b) you are removable.
      IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT
CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION
COURT LOS ANGELES, CA THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR
TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS.
EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE
COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE
ON THE ATTACHED FORM EOIR-33.  ADDITIONAL FORMS EOIR-33 CAN BE OBTAINED FROM
THE COURT WHERE YOU ARE SCHEDULED TO APPEAR.  IN THE EVENT YOU ARE UNABLE TO
OBTAIN A FORM EOIR-33, YOU MAY PROVIDE THE COURT IN WRITING WITH YOUR NEW
ADDRESS AND/OR TELEPHONE NUMBER BUT YOU MUST CLEARLY MARK THE ENVELOPE "CHANGE
OF ADDRESS."  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE
SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED
SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.
      A list of free legal service providers has been given to you.  For
information regarding the status of your case, call toll free 1-800-898-7180
or 240-314-1500.

---

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:     MAIL  (M)        PERSONAL SERVICE  (P)
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN/S ATT/REP  [X] DHS
DATE: 3/29/16                    BY:  COURT STAFF _____  Z3
   Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

EOIR-000593

NOTICE OF HEARING IN REMOVAL PROCEEDINGS
IMMIGRATION COURT
606 SOUTH OLIVE ST.
LOS ANGELES, CA   90014

LEAD FILE:  208-125-369
RE: 208-125-369 YAW TOTIWEH, DAVID

DATE:  AUGUST 31, 2015

TO:

YAW TOTIWEH, DAVID
1694 DAVIDSON AVE APT 4A
BRONX, NY   10453

Please take notice that the above captioned case has been scheduled for a MASTER hearing before the Immigration Court on Jun 17, 2016 at 08:30 A.M. at:
606 SOUTH OLIVE ST. 5TH FL. COURTROOM 2
LOS ANGELES, CA   90014
You may be represented in these proceedings, at no expense to the Government, by an attorney or other individual who is authorized and qualified to represent persons before an Immigration Court.  Your hearing date has not been scheduled earlier than 10 days from the date of service of the Notice to Appear in order to permit you the opportunity to obtain an attorney or representative.  If you wish to be represented, your attorney or representative must appear with you at the hearing prepared to proceed.  You can request an earlier hearing in writing.

Failure to appear at your hearing except for exceptional circumstances may result in one or more of the following actions:  (1) You may be taken into custody by the Department of Homeland Security and held for further action. OR (2) Your hearing may be held in your absence under section 240(b)(5) of the Immigration and Nationality Act.  An order of removal will be entered against you if the Department of Homeland Security established by clear, unequivocal and convincing evidence that a) you or your attorney has been provided this notice and b) you are removable.

IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION COURT LOS ANGELES, CA  THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS. EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE ON THE ATTACHED FORM EOIR-33.  ADDITIONAL FORMS EOIR-33 CAN BE OBTAINED FROM THE COURT WHERE YOU ARE SCHEDULED TO APPEAR.  IN THE EVENT YOU ARE UNABLE TO OBTAIN A FORM EOIR-33, YOU MAY PROVIDE THE COURT IN WRITING WITH YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER BUT YOU MUST CLEARLY MARK THE ENVELOPE "CHANGE OF ADDRESS."  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED SUFFICIENT NOTICE TO YOU AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.

A list of free legal service providers has been given to you.  For information regarding the status of your case, call toll free 1-800-898-7180 or 240-314-1500.

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVICED BY:  MAIL (M)      PERSONAL SERVICE   (P)
TO: [M] ALIEN [ ] ALIEN c/o Custodial Officer [ ] ALIEN's ATT/REP  [P] DHS
DATE: _8/31/15_    BY:  COURT STAFF  _Letturgem_

Attachments:  [X] EOIR-33  [ ] EOIR-26  [X] Legal Services List  [ ] Other T3

EOIR-000594

9/4

| U.S. Department of Homeland Security | **Notice to EOIR: Alien Address** |

Date: **August 20, 2015**   File No: 208 125 369

Event No: OTM1504000145

To: Office of the Immigration Judge
Executive Office for Immigration Review
606 SOUTH OLIVE STREET, 15 FLOOR

LOS ANGELES, CA 90014

From: Department of Homeland Security

IMMIGRATION AND CUSTOMS ENFORCEMENT - ERO

13502 MUSICK ROAD, IRVINE, CA 92618

Respondent: DAVID YAW TOTIMEH AKA: TOLIMED, DAVD YAW; YARO, ALHASSAN MOHAMMED

---

This is to notify you that this respondent is:

☐ Currently incarcerated by other than DHS. A charging document has been served on the respondent and an Immigration Detainer- Notice of Action by the DHS (Form I-247) has been filed with the institution shown below. He/She is incarcerated at:

His/Her anticipated release date is: _____

☐ Currently detained by DHS at: _____

RECEIVED
DEPARTMENT OF JUSTICE
EOIR

AUG 2 0 2015

IMMIGRATION ⌐⌐
LOS ANGE⌐ ⌐⌐ ⌐⌐

☐ Currently detained by DHS and transferred this date to a new location: _____

DHS motion for change of venue attached. ☐ Yes ☒ No

☒ Released from DHS custody on the following condition(s):

☐ Personal recognizance

☐ Order of recognizance (Form I-220A)

☐ Bond in the amount of $ _____ ☐ Surety bond ☐ Cash bond

☒ Other   PAROLE

☒ Upon release from DHS custody, the respondent reported his/her address and telephone number will be:
1694 DAVIDSON AVE, Apt 4A

BRONX, NEW YORK, 10453

---

☒ Upon release from DHS custody, the respondent was reminded of the requirements contained in section 239(a)(1)(F)(ii) of the Immigration and Nationality Act and was provided with an EOIR change of address form (EOIR-33).

DO
(Signature of DHS official)   (Title of DHS official)

J 2818 ARAMBULO   Irvne CA . Musik Faility
(Printed name of DHS official)   (Location)

Form I-830 (Rev. 08/01/07)

EOIR-000595